UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 00-CV-6126

JUDGE WILLIAM P. DIMITROULEAS

MAGISTRATE JUDGE JOHNSON

BETTY ORTEGA,

    Plaintiff,

v.

UNISOURCE WORLDWIDE, INC., a
foreign corporation,

    Defendant.

_____/



## NOTICE OF FILING DEPOSITIONS TRANSCRIPTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Unisource Worldwide, Inc., through its undersigned attorneys, hereby gives

notice that it is filing the deposition transcripts of Cecil McClary, William Joseph Ready, Betty

Ortega, and John Glaze taken on September 28, 2000, October 25, 2000, and October 30, 2000.

        HUNTON & WILLIAMS
        Attorney for Unisource Worldwide, Inc.
        One Biscayne Tower, Suite 2500
        2 South Biscayne Boulevard
        Miami, Florida 33131-1802
        Telephone: (305) 810-2500
        Telefax: (305) 810-2460

By: _____
        Juan C. Enjamio
        Florida Bar No. 571910

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed to Karen

C. Amlong, Esq., Jennifer Daley, Esq., Amlong & Amlong, P.A., 500 Northeast Fourth Street,

Second Floor, Fort Lauderdale, Florida 33301-1154 on this __8th__ day of December, 2000.

By: _Juan C. Enjamio_

Juan C. Enjamio

OF COUNSEL:
Robert H. Buckler
Georgia Bar No. 092650
Robert C. Stevens
Georgia Bar No. 680142

TROUTMAN SANDERS, LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Ph: (404) 885-3000
Fax: (404) 885-3900

```
 1              IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2              Case No. 00-6126-Civ-Dimitouleas/Johnson

 3

    BETTY ORTEGA,
 4
                Plaintiff,
 5

 6         vs.                          ORIGINAL

 7

    UNISOURCE WORLDWIDE, INC., a
 8  foreign corporation,

 9              Defendant.
    ----------------------------------
10

11              Deposition of CECIL McCLARY, taken on

12  behalf of the Plaintiff, pursuant to Re-Notice of

13  Telephonic Deposition in the above-entitled action, on

14  Tuesday, October 10, 2000, at 12:26 p.m., at Unisource

15  Worldwide, Inc., 330 Stevens Street, Jacksonville,

16  Florida, before Richetta R. Brown, Court Reporter and

17  Notary Public in and for the State of Florida at Large.

18

19  APPEARANCES:

20       JENNIFER DALEY, Esquire, Attorney for Plaintiff,
              (Via telephone.)
21
         ROBERT C. STEVENS, Esquire, Attorney for
22            Defendant.

23  ALSO PRESENT:
         Amy George.
24

25
```

```
 1                         I N D E X

 2     WITNESS                                      PAGE

 3     CECIL McCLARY

 4     DIRECT EXAMINATION BY MS. DALEY.................    3

 5

 6

 7

 8

 9

10

11

12

13

14

15                  N O    E X H I B I T S

16

17

18

19

20

21

22

23

24

25
```

Hedquist &  Associates Reporters, Inc.

```
 1              S T I P U L A T I O N
 2         It was stipulated and agreed by and between
 3    counsel for the respective parties, and the witness,
 4    that the reading and signing of the deposition by the
 5    witness not be waived.
 6                       - - -
 7                    CECIL McCLARY,
 8    having been produced and first duly sworn as a witness,
 9    testified as follows:
10                  DIRECT EXAMINATION
11    BY MS. DALEY:
12         Q    Please state your full name.
13         A    Cecil Avant McClary.
14         Q    What is your home address?
15         A    12710 Cormorant Cove Lane.
16         Q    Can you spell the street name.
17         A    C-o-r-m-o-r-a-n-t.  It's a bird.
18         Q    In what city?
19         A    Jacksonville.
20         Q    What is your date of birth?
21         A    12/14/42.
22         Q    What is your Social Security number?
23         A    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.
24         Q    What is your present position with Unisource?
25         A    VP Human Resources.
```

Hedquist & Associates Reporters, Inc.

```
 1        Q    And are you VP for a certain region?

 2        A    The U.S.

 3        Q    And what is the title of the person who

 4   supervises you?

 5        A    He's the vice-president of Unisource

 6   Worldwide.

 7        Q    And what is his name?

 8        A    Bob Glisson.

 9        Q    And out of what office does he work?

10        A    Norcross.

11        Q    What are your job duties today?

12        A    I manage the human resources function for

13   the -- for Unisource in the US.

14        Q    Anything else?

15        A    That's what I do.  That's enough.

16        Q    And is -- do you supervise Amy George?

17        A    Indirectly, yes.

18        Q    Who is her supervisor?

19        A    Becky Javurek.

20        Q    What is his title?

21        A    Her title is director HR for the southeast

22   area.

23        Q    And with respect to your job duties, do you

24   set any type of policies for Unisource?  I'm trying to

25   figure out exactly what you do.
```

1    A    Yes.  I assist in the setting of policies and

2    procedures for the human resources area in Unisource.

3    Q    And what type of policies and procedures are

4    you involved with setting?

5    A    Well, human resources policies and procedures,

6    relocation compensation, labor relations, that sort of

7    thing.

8    Q    Do you -- do any of your duties involve

9    dealing with any of the policy -- any of the

10   operational policies at the Miami division?

11   A    What do you mean by operational policies?

12   Q    Day-to-day operation of the business.

13   A    You mean, like, when the trucks go out and

14   that kind of stuff?

15   Q    Yeah.  I mean, basically setting the policies

16   with respect to what the sales representatives do in

17   the human resource -- in the Miami division.  Do you

18   have any duties related to those things?

19   A    I'm not sure what you mean.

20   Q    Okay.  Let me go step by step.  Now, with

21   respect to your function, do you have any

22   decision-making duties with respect to assigning

23   accounts to sales representative in the Miami division?

24   A    No.

25   Q    Have you ever been involved in any decision to

Hedquist &  Associates Reporters, Inc.

| | |
|---|---|
| 1 | assign accounts from one field representative to |
| 2 | another in the Miami division? |
| 3 | A    I may have been involved some time ago, yeah. |
| 4 | Q    What do you mean by some time ago? Tell me |
| 5 | with respect to the time frame, like the last five |
| 6 | years, ten years. |
| 7 | A    Well, I haven't been involved in Miami for |
| 8 | some time because Becky Javurek has that responsibility |
| 9 | through Amy George now, so she will handle all the |
| 10 | day-to-day stuff. But years ago I was more involved |
| 11 | with Miami. |
| 12 | Q    Now, do you know if there was a sales |
| 13 | representative named Tony Gispert working out of the |
| 14 | Miami division? |
| 15 | A    Yeah, I know Tony. |
| 16 | Q    Okay. And do you know when he left the Miami |
| 17 | division? |
| 18 | A    He retired. I'm not sure when, some couple |
| 19 | years ago, perhaps. |
| 20 | Q    And were you involved at all in the decision |
| 21 | with respect to what should happen to his account after |
| 22 | he left? |
| 23 | A    I don't recall. No, I don't recall that. |
| 24 | Q    Now, do you know who Larry Press is? |
| 25 | A    Larry Press? |

1    Q    Yes.

2    A    Yeah, yeah.

3    Q    Okay.  And were you involved in any decision

4    concerning who should get his account after he left?

5    A    I don't recall.  That was a long time ago.

6    Q    How about Mike Altos, do you know who he is?

7    A    I'm sorry?

8    Q    Michael Altos.

9    A    That doesn't ring a bell.

10    Q    Now, have you ever had any conversation with

11    Betty Ortega in which she raised any complaints about

12    anything?

13    A    Yeah.

14    Q    How many such conversations have you had with

15    her?

16    A    I don't recall.  She was constantly

17    complaining.

18    Q    Do you recall if it was more than five times?

19    A    No, I don't.

20    Q    And what -- tell me what she was constantly

21    complaining about.

22    A    Well, she came through an acquisition, Butler

23    Paper and I recall my first visit there she came over

24    and complained about something.  I don't recall what it

25    was, but . . .

1          Q    So the first -- so you're saying after you

2     acquired Butler Paper she came over and complained

3     about something?

4          A    Right.

5          Q    And you don't recall what that something was?

6          A    No, I don't.  That was years ago.

7          Q    Okay.  And what else did she complain to you

8     about?

9          A    I seem to recall she was one of the people

10    that complained about Dennis Laux and maybe Billy

11    Thomas.  We had a problem with a manager there.

12         Q    What else did she complain to you about?

13         A    That's all I can recall right now.

14         Q    And you're saying that she made a complaint to

15    you about Dennis Laux?

16         A    Yeah, yeah.

17         Q    And what did she say about Dennis Laux?

18         A    I don't recall if she was the main complainant

19    or not, but several of the folks in Miami complained

20    about his -- just the way he carried himself and he

21    seemed to be rather threatening.

22         Q    Did anybody say how he was threatening and how

23    he carried himself?

24         A    Well, you had to see him, I guess.  He was a

25    different kind of person.

1        Q    I'm asking you what you were told about with

2    respect to the way he carried himself and what he said.

3    What did people tell you?

4        A    They said that he was threatening in the way

5    he carried himself.

6        Q    Did they explain what they meant by that?

7        A    I guess his -- he had a voice mail at home

8    that was kind of strange and he apparently stared at

9    people in a funny fashion or odd.

10       Q    And did either Ms. Ortega or anybody else tell

11   you anything else about Dennis Laux?

12       A    Not that I recall.

13       Q    And you mentioned something about Billy

14   Thomas.  What complaints did Ms. Ortega make to you

15   about Billy Thomas?

16       A    I think she was -- I got -- this is years ago,

17   but I got a complaint that he was not the best manager

18   in the world.  I think she may have signed a letter.

19       Q    Did she explain to you what she meant by Billy

20   Thomas not being the best manager in the world?

21       A    As I recall at one time during the

22   investigation, talked to a lot of people and made the

23   decision and recommended he be removed from the

24   position, so . . .

25       Q    I am asking you what Ms. Ortega told you about

1    Billy Thomas?

2    A    Yeah, I don't recall that.

3    Q    You don't recall anything of what Ms. Ortega

4    told you about Billy Thomas?

5         MR. STEVENS:  I'm going to object, Jennifer.

6    He just answered that question.

7         MS. DALEY:  Okay.  Thank you.

8         MR. STEVENS:  It's been answered.  I'm not

9    going to let him answer it again.  He answered he

10   doesn't recall.

11        MS. DALEY:  And you're instructing him not to

12   answer the question.

13        MR. STEVENS:  He's not going to answer it

14   again.

15        MS. DALEY:  I'm asking you are you instructing

16   him not to answer it?

17        MS. STEVENS:  Sure, I'll instruct him not to

18   answer it.  He's already answered it.

19        MS. DALEY:  Okay.  Thank you.

20        Ms. Thomas -- I'm sorry, Ms. Brown, can you

21   mark this area of the deposition, please.

22        THE COURT REPORTER:  Okay.

23   BY MS. DALEY:

24   Q    Now, Mr. McClary, what, if anything, did you

25   do after these complaints were brought to your

Hedquist &  Associates Reporters, Inc.

1   attention about Dennis Laux?

2       A    Well, as I recall, again, it's been a long

3   time.  This is ancient history.  But we -- I believe

4   John Glaze was the manager.  We met with Den- -- we met

5   with the employees that made the complaint.  I did that

6   myself, and then met with Dennis and told him what he

7   had to do to stay employed with Unisource.  We made him

8   make a lot of changes and put something in writing as

9   final as I recall.  It's been a while.

10      Q    When you say a while, I need to get some time

11  frame.  Was this before or after 1996?

12      A    Shit, I don't know.

13      Q    So you don't recall at all the time frame?

14      A    I don't recall that specific '96 time frame,

15  no.  I would say it might be before but I don't know.

16  But it's a matter of fact, so . . .

17      Q    I'm sorry?

18      A    It's a matter of fact.  I'm sure we can find

19  that.

20      Q    Okay.  Now, you're saying that somebody met

21  with Dennis Laux.  Who met with Mr. Laux?

22      A    I did and John Glaze did.

23      Q    Separately or together?

24      A    Together.

25      Q    And what was Mr. Laux told about the

Hedquist & Associates Reporters, Inc.

1  complaints that were made about him?

2      A    He was told that he was not coming across real

3  well with the employees, and he was perceived as being

4  threatening and we discussed his -- he had a voice mail

5  on his answering machine that I didn't think was very

6  professional.  We made him change that and just

7  generally told him that he had to treat employees with

8  dignity and respect, and absent that, he wouldn't be

9  around much longer, or words to that affect.

10     Q    Anything else?

11     A    That's -- that's about it.

12     Q    You said something was put in his personnel

13  file.  What was put in his personnel file?

14     A    I think I probably summarized the

15  conversation.  I don't recall.  I don't have his file

16  here.

17     Q    What was the form of the document that was put

18  in, was it a memo?  Was it some other form of doc- --

19  I'm trying to figure out what exactly was put in his

20  personnel file.

21     A    I don't recall.

22     Q    When was the last time you looked at his

23  personnel file?

24     A    God, 19- -- I don't know.  Long time ago.

25  He's been gone for some time.

1      Q    Who in your office would know what was put in

2  his personnel file?

3      A    Just get the file, I guess.

4      Q    I am asking you if there's anyone in your

5  office who would know what was put into Mr. Laux's

6  personnel file?

7      A    I would know if I had his file.

8      Q    And as far as you know does Unisource still

9  have a personnel file for Dennis Laux?

10     A    I would assume so.

11     Q    Was any form of discipline imposed on Mr. Laux

12 as a result of the complaints that you received?

13     A    Just the -- just the warning.

14     Q    Now, with respect to the complaint that was

15 made about Mr. Thomas, what, if anything, was done with

16 respect to that complaint?

17     A    I went down to Miami and spent a couple of

18 days, talked to all the employees, decided Billy was

19 not a good manager and recommended he be removed, and

20 he was.

21     Q    And who did you speak with?

22     A    I spoke to a lot of employees.  Anybody who

23 signed that letter I tried to talk with -- talk to.

24     Q    Tell me, to the best of your recollection, who

25 you spoke with.

```
 1        A    Anybody who signed that letter that I could
 2   find I talked to.
 3        Q    I am asking you for names.
 4        A    I know what you're asking but I don't have the
 5   names.
 6        Q    Let me finish the question because the court
 7   reporter needs to take it down.  Tell me to the best of
 8   your recollection the names of the people who you can
 9   remember talking to.
10        A    Well, I recall Betty, obviously, because she's
11   part of this proceedings but I don't recall the rest of
12   them.
13             MS. DALEY:  Okay.  Ms. Brown, do you have that
14        book of exhibits that we sent to your office?
15             THE COURT REPORTER:  Yes.
16             MS. DALEY:  Can you hand it to Mr. McClary,
17        please.
18             MR. STEVENS:  Okay.  We have it now, Jennifer.
19   BY MS. DALEY:
20        Q    Can you turn to the document on the tab number
21   23, please.
22             MR. STEVENS:  Okay.
23        Q    Tell me if you recognize it.
24        A    Yes.
25        Q    It's a document that's stamped DEF 03626.
```

```
 1    Now, is this the letter that you're talking about?
 2        A    Yeah.
 3        Q    And now look at the second page of the letter
 4    and tell me who you spoke with from the list of the
 5    people on it.
 6        A    You know, this is 1994.  My memory is not that
 7    good.  But I imagine I talked to most of them.
 8        Q    Did you take any written statements from
 9    anybody?
10        A    I don't recall.
11        Q    Did you make any notes when you were talking
12    to these people?
13        A    Probably, I don't know.
14        Q    And if you took any notes, where would they be
15    today?
16        A    Probably in a 1994 file somewhere.
17        Q    Now, in your office when you do investigations
18    do you keep a separate file on every investigation that
19    you do?
20        A    Usually, yes.
21        Q    Okay.  And you kept a separate file with
22    respect to this investigation as well?
23        A    I'm sorry.  That would have gone in the
24    personnel file.
25        Q    Whose personnel file?
```

1          A     Probably Billy Thomas'.

2          Q     So after you conducted this investigation did

3     you issue any findings or any reports?

4          A     I recall we removed him from being a manager

5     and he went back into sales in Miami, that was the end

6     result of that.

7          Q     But did you issue any written findings or

8     reports what your conclusions were from the

9     investigation?

10         A     You mean like a formal kind of thing?  I don't

11    think so.

12         Q     You said that Mr. Thomas was removed from his

13    position?

14         A     Yes, he was.

15         Q     Was he fired or was he given another position?

16         A     He was demoted to a sales rep in Atlanta.

17         Q     Have you done any other investigation

18    concerning any other claims made by Ms. Ortega?

19         A     Actually, I did forget one.  There was -- she

20    filed -- I'm sorry about this.  It slipped my mind.

21    It's so recent.  All this stuff is ancient history.  I

22    got confused.  She filed a harassment charge against a

23    Georgia-Pacific rep.

24         Q     Any other complaints that you recall Ms.

25    Ortega making that you're aware of?

1        A    That's all I can recall.

2        Q    Do you recall if any -- if Ms. Ortega brought

3    to your attention any complaints that she had about the

4    way the warehouse was being operated?

5        A    No, I don't seem to recall that.

6        Q    Do you recall her raising any issues with you

7    concerning Carnival Cruise Lines?

8        A    No, no, I don't, no.

9        Q    Do you recall her raising any issues with you

10   about the company morale in the Miami division?

11       A    She -- like I say, she complained quite a bit

12   about general things, so I guess you might say that

13   would be a morale and she signed a letter that's about

14   morale, so, yeah.

15       Q    When you say general things, do you mean

16   anything other than what you've just testified about?

17       A    No, just that.

18       Q    Now, with respect to this complaint that Ms.

19   Ortega made about the Georgia-Pacific representative,

20   when did she make that?

21       A    We were acquired in 1999, so I would imagine

22   it was around the summer of '99.  I could be off a few

23   months.

24       Q    And what is your understanding as to what she

25   was complaining about?

```
 1        A    She complained that a GP middle rep had
 2    touched her in an unfriendly or sexual way and had
 3    generally harassed her.
 4        Q    What, if anything, did the company do about
 5    the complaint?
 6        A    Actually, Georgia-Pacific assigned an
 7    investigator that came down and pretty much found the
 8    charge to be frivolous.
 9        Q    And who was the rep who came down from
10    Georgia-Pacific?
11        A    I'm trying to think who did that.  It might
12    have been Ann Orr, the manager of the EEO for GP, but
13    don't recall.  But I know they sent an investigator.
14        Q    And how do you know the charges -- the
15    complaint was filed, to be frivolous?
16        A    Well, the issue of the letter saying that they
17    were -- it was unfounded and that, something, just
18    memory again, but something like, they took charges
19    very seriously and they shouldn't be made unless they
20    were, in fact, true, words to that affect.
21        Q    And what, if anything, did Unisource do
22    independently about that?
23        A    Well, nothing.  We're part of Georgia-Pacific.
24    We do what they tell us to do.
25        Q    So you did not do anything independently from
```

1    your office?

2        A    No.   I believe the letter was sent to Betty

3    and one was sent to the rep and that kind of thing.

4        Q    What, if anything, happened to the rep that

5    she complained about?

6        A    Well, nothing happened to the rep because the

7    charges were unfounded.

8        Q    Are you aware of any other complaints made by

9    anyone else other than what you just testified about

10   from the Miami division concerning sex discrimination?

11       A    From what?   From now to 1800 or last year?

12       Q    All that you can remember.

13       A    That's all I can remember.

14       Q    You're not aware of any other complaints made

15   by anyone out of the Miami division concerning sex

16   discrimination?

17       A    I just said that.

18       Q    Okay.   Did anyone ever bring to your attention

19   that Mr. Huempfner had raised a complaint of sex

20   discrimination?

21       A    Mr. Huempfner?

22       Q    Yeah.

23       A    No.   On him?

24       Q    Did anyone ever bring to your attention that

25   Dennis Laux had raised a complaint of sex

1    discrimination?

2         A    No.

3         Q    And what is your understanding as to what a

4    manager needs to do when he or she receives a complaint

5    of any form of discrimination?

6         A    They need to notify HR.

7         Q    And what, if anything, is done to a manager

8    who fails to notify HR of a complaint of

9    discrimination?

10        A    Well, that would depend on the circumstances.

11        Q    Can you explain to me what you meant -- what

12   you mean by that?

13        A    Well, if it's an oversight or a

14   misunderstanding, that would be one thing.  If a

15   manager just hid something intentionally, that would be

16   something different.

17        Q    You just lost me.  You're saying that if a

18   manager --

19        A    Doesn't surprise me.

20        Q    -- fails to report what he or she learned

21   about a complaint of discrimination, if it was due to

22   an oversight, nothing would happen to the manager?

23        A    What I said was that if a manager failed to

24   report a discrimination charge and it was due to an

25   oversight or a misunderstanding or something along

1    those lines, we would treat that one way.

2         Q    How would you treat that?

3         A    Let me finish.  You asked me a question.  Let

4    me answer the question.

5              If the manager intentionally hid something

6    because they were involved or a friend was involved or

7    they were afraid of what we were going to do them, that

8    would be -- we would treat that a different way.

9    That's what I said.

10        Q    Are you finished?

11        A    I'm finished.

12        Q    If it was due to an oversight, what, if

13   anything, would happen to the manager?

14        A    That would depend.  Again, I don't -- you

15   know, you're speculating.  I'm not going to speculate.

16        Q    Depend on what?

17        A    I said I'm not going to speculate.  We would

18   treat each case as it comes up.

19        Q    I'm asking you if we've received testimony in

20   a deposition that Bill Ready received a complaint of

21   discrimination from Dennis Laux and from John Huempfner

22   that he failed to report, what, if anything, would the

23   company do to Bill Ready?

24        A    You're asking me to speculate on what we would

25   do and I've got to see what the report was, what the

```
 1    complaint was, if there was a complaint, and then I
 2    would make a decision.  I'm not going to make a
 3    decision here just willy-nilly, just for your benefit.
 4        Q    Okay.  Do you have any written policies in
 5    place that says what would happen to a manager if a
 6    manager fails to report a complaint of discrimination?
 7        A    I think the policy -- you know, I think the
 8    policy says that they have to -- they should report it.
 9    It doesn't say what's going to happen if you don't.
10        Q    And is there any unwritten policy that
11    addresses what, if anything, happens to a manager who
12    fails to report a complaint of discrimination?
13        A    I don't understand what you're saying.
14        Q    Is there any unwritten policy of Unisource
15    that addresses the issue of what, if anything, happens
16    to a manager who fails to report a complaint of
17    discrimination that's made to him?
18        A    Not that I know of.
19        Q    Do you know who Bill Ready is?
20        A    Bill Ready, yes.
21        Q    Okay.  Now, do you know anything about his
22    movement from a manager position to a sale
23    representative position?
24        A    I believe he replaced Tony, Tony Gispert.
25        Q    Okay.  And do you know if at any time the
```

1   company ever imposed any form of discipline on Mr.

2   Ready?

3      A      No, not that I know of.

4      Q      Do you know if before Mr. Ready replaced Mr.

5   Gispert whether or not there was any -- whether or not

6   the company had intended to terminate Mr. Ready?

7      A      I'm not aware of that.

8      Q      Okay.  Was there -- did the company make any

9   decision before Mr. Ready replaced Mr. Gispert to

10  eliminate Mr. Ready's position?

11     A      Not that I know of, no.

12     Q      Are you aware of whether or not Unisource has

13  a commission structure for Web accounts that is

14  different from a commission structure that is used for

15  the other accounts that the company handle?

16     A      Well, Unisource has a number of commission

17  programs, so that would not surprise me, no.

18     Q      I'm asking you if you're aware of such a

19  different structure for Web accounts as opposed to

20  other type of accounts?

21     A      Yeah, I seem to recall there was one.

22     Q      And have you ever seen a commission made for a

23  sale commission schedule for Web accounts?

24     A      No, I really haven't.

25     Q      Are you aware that Ms. Ortega has been placed

1    on probation?

2         A    I'm sorry.  Say again, please.

3         Q    Are you aware Ms. Ortega is now on probation?

4         A    No, no, I'm not.

5         Q    Do you know of any employee from the Miami

6    division who was ever placed on probation or some type

7    of performance-improvement plan by the company?

8         A    I'm sure there are and have been, yes.

9         Q    Now, have you ever heard of a minimum GTM

10   program that Unisource had?

11        A    Yeah.  Unisource has a minimum GTM dollar

12   requirement for all the commission plans.

13        Q    Okay.  What's the purpose of that program?

14        A    It's to make sure a sales rep doesn't sell a

15   product that's generally not profitable.

16        Q    And onto that program, are any special goals

17   set for the sales representative?

18        A    Well, most commission plans that we have are

19   based on GTM percent and GTM dollars, that's how you

20   determine the payout for commission purposes.

21        Q    And were you involved in any form in

22   implementing this program?

23        A    Yeah, yeah.

24        Q    What was your role?

25        A    I helped design the plan back in the '70s and

1    I've updated it through the years, at least in the

2    southeast.

3    Q   And when was the last time that the program

4    was updated?

5    A   The program was updated, I believe, in the

6    spring of '99.

7    Q   Okay.  Now, with respect to the sales goals

8    that are set for representatives onto the program, if a

9    representative fails to meet the sales goals, what

10    happens?

11    A   Well, you're talking two things here.  One

12    is -- you mean the sales plan for the year, their

13    budget?

14    Q   I'm still going back to this minimum GTM

15    program.  Are any goals set for sales representatives

16    onto that program?

17    A   The commission plans takes care of that

18    without setting goals.  If they don't meet the minimal

19    commissional order, they're not paid for that sale.

20    Q   Now, to your knowledge has any employee ever

21    been terminated for failing to meet sales goals?

22    A   Oh, absolutely.

23    Q   Mr. McClary?

24    A   Yes.

25    Q   Okay.  Are you aware of whether or not any of

1    the sales representatives in the Miami division was

2    ever given a profit goal to make in the range of

3    $358,000?

4        A    358?

5        Q    Something in that range 358, $350,000.

6        A    I do recall -- I do recall last year, from

7    like October until maybe February of this year we

8    established goals that sales reps had to meet by a

9    business and that none of them were 358 but one of them

10   was 350.

11       Q    Now, how about for this year.  Are you aware

12   of whether or not any memorandum came out of your

13   office listing some sale representatives who were not

14   on target to meet any goals that had been set on

15   this -- any profit goal that had been set under the

16   minimum GTM program?

17       A    Yeah, oh, yeah.  I may have sent it myself.  I

18   don't recall but I know we were communicating in the

19   divisions to make sure they address their under

20   performance sales rep, absolutely.

21       Q    So that memorandum wasn't sent out this year?

22       A    I believe it was last year.

23       Q    Do you recall any being sent out in 2000, any

24   such memo?

25       A    Probably follow-ups, yeah, yeah.

Hedquist &  Associates Reporters, Inc.

1        Q    How about in June of 2000, do you remember any

2    memorandum being sent out?

3        A    I don't recall.  I didn't send one out but

4    somebody could have, yeah.

5        Q    Do you remember if Betty Ortega's name was

6    mentioned in any memorandum that was sent out about

7    profit goals?

8        A    No, I don't know that.

9        Q    Can you hold one minute?

10       A    Sure.

11       Q    Mr. McClary --

12       A    Yeah.

13       Q    -- can you look back at the book of exhibits

14   and turn to the document under tab number 24, please.

15       A    Okay.

16       Q    And it's a document stamped DEF 03628.  Tell

17   me if you recognize it.

18       A    Yes, I do.

19       Q    And you recall receiving this letter from Mr.

20   Rominger?

21       A    Yeah, yeah, I recall it.

22       Q    Did you talk to him about the letter?

23       A    I don't believe I talked to him.  One of my

24   managers may have.

25       Q    And did anybody investigate any of the things

1    that he discussed in the letter?

2        A    I believe they did.  I know Mr. Rominger was

3    terminated for performance.  And I take this as he was

4    trying to leverage his severance.

5        Q    What I'm trying to ask you if you are aware of

6    anyone who investigated the things that he mentioned in

7    the letter?

8        A    Yeah, someone may have.  I did not, okay.  I

9    did not.

10        Q    And do you know the name of the person in your

11    department who may have investigated it?

12        A    No, I don't.

13        Q    Now, paragraph 6 of the letter states, I'm

14    reading the second sentence.  Says, Disregard for

15    female employees at Unisource is an issue that

16    certainly needs remedied.  If I have an opportunity to

17    further the action I will.

18            What -- do you know, what, if anything -- what

19    if any findings Unisource made about this allegation in

20    the letter?

21        A    Well, we would -- we would generally take that

22    kind of a statement very seriously; of course, in this

23    context he's trying to get more severance, but I don't

24    know who investigated it and I'm not sure what happened

25    with that.

```
 1        Q    Is there someone in your company who could
 2   tell us whether or not the things that Mr. Rominger
 3   mentioned in this letter was ever investigated?
 4        A    Well, in paragraph 6 he mentions Elly
 5   Jablonski.  I am aware that she was terminated for poor
 6   performance, so I assume, I knew all about that.
 7        Q    What I'm asking you is there a name of someone
 8   in your office who could tell us whether or not these
 9   things that are mentioned in the letter was ever
10   investigated?
11        A    Well, it would be in the file but I don't know
12   who did that.
13        Q    What file?
14        A    It would be in -- probably in Rominger's file,
15   yeah, look in that.
16        Q    Other than it being in Rominger's file, do you
17   have the name of someone who we -- who we could serve a
18   subpoena for a deposition for to ask him about whether
19   or not these claims were investigated?
20        A    Yeah, Becky Javurek.
21        Q    Can you spell her last name?
22        A    J-a-v-u-r-e-k.
23        Q    And what is her title?
24        A    She's the director of HR for the southeast
25   area.
```

1      Q     Out of what office does she work?

2      A     She's in Jacksonville.

3      Q     The same address as yours?

4      A     Yes.

5      Q     Now, before Ms. Jablonski was terminated, was

6    she ever placed on any form of probation or some type

7    of performance improvement plan?

8      A     I'm pretty sure she was, yes.

9      Q     Okay.  And you said that she was terminated

10    for poor performance.  What was the nature of the poor

11    performance that she allegedly had?

12      A     As I recall, it was just generally business,

13    just poor GTM dollars.

14      Q     And for how long was she on probation before

15    she was terminated?

16      A     I don't know.

17      Q     And to your knowledge has Ms. Ortega ever been

18    placed on the type of probation that Ms. Jablonski was

19    placed on before Ms. Jablonski was terminated?

20      A     Not that I'm aware of.

21      Q     With respect to the investigations that you

22    did about the complaints that Ms. Ortega made, did you

23    turn any of those notes over to your attorney?

24      A     I don't think so.  Which investigations?

25      Q     There was one in -- let me see.  Let me go

1   back and look at the investigations that you mentioned

2   today.  First you testified about the investigation

3   concerning Mr. Laux.  To your knowledge was any of the

4   notes or any of the materials from that investigation

5   turned over to your attorney?

6       A    Not that I recall.  Why don't you ask my

7   attorney.

8       Q    Because you're being deposed.  I want to know

9   from you whether or not you turned any of that stuff

10  over to your attorney?

11      A    Not that I recall.

12      Q    How about the investigation that was conducted

13  concerning the complaints about Dennis Laux?

14      A    Same thing.

15      Q    How about the other complaints that Ms. Ortega

16  brought to your attention with respect to any notes

17  that you may have made.  Did you turn any of those over

18  to your attorney?

19      A    Well, I didn't do the investigation on the

20  alleged harassment.

21      Q    Okay.  I'm asking you for any notes that you

22  may have made when Ms. Ortega brought the complaints of

23  the general information to your attention.  Did you

24  turn any of those over to your attorney?

25      A    Not that I recall, no.

1      Q    Do you have any notes in your possession

2 concerning any conversations that you had with Ms.

3 Ortega in which she raised any type of complaints to

4 you?

5      A    My possession, no.

6      Q    Did Mr. Glaze ever bring to your attention

7 that Ms. Ortega had complained to him about what she

8 believed to be discriminatory assignments of accounts?

9      A    I seem to recall that, yeah.

10     Q    And what did he say to you about that?

11     A    Well, I didn't do the investigation but I

12 believe he mentioned that she was concerned about

13 the -- some of the accounts from Tony Gispert being

14 reassigned to someone other than herself.

15     Q    And do you recall him telling you anything

16 else about the conversation he had with Ms. Ortega?

17     A    No, no.

18     Q    And what, if anything, did you say in response

19 to what Mr. Glaze brought to your attention?

20     A    Well, again, I didn't handle -- I don't handle

21 that division anymore directly, so I'm sure I just

22 turned it over to somebody else.

23     Q    But you don't recall saying anything to him in

24 response?

25     A    Could you be more specific.  I don't --

```
 1        Q    What I'm trying to ask you is after Mr. Glaze
 2   brought this issue to your attention, what, if
 3   anything, did you say to him?
 4        A    Yeah, I don't recall.  That's been a long
 5   time.
 6        Q    And to your knowledge has the company ever
 7   investigated whether accounts are assigned to sales
 8   representatives on the basis of race?
 9             MR. STEVENS:  What are you talk- -- I object.
10        What division are you talking about?  Can you
11        rephrase the question, Jennifer.
12        Q    Sure.  Mr. McClary, to your knowledge has the
13   company ever conducted any investigation to determine
14   whether or not accounts are assigned from the Miami
15   division on the basis of race?
16        A    Yeah, I think we have.  I just -- I don't have
17   those off the tip of my tongue but I'm pretty sure we
18   have.
19        Q    When?
20        A    If we have, I don't know when.
21        Q    And who in the company investigated it?
22        A    It would be someone from -- somebody from
23   human resources.
24        Q    And that's from your department?
25        A    Yeah.
```

Hedquist &  Associates Reporters, Inc.

1  Q And who was in your department could tell us

2 whether or not this investigation was ever done?

3  A I guess, again, it would be Becky Javurek.

4  Q And to your knowledge has Unisource ever done

5 any type of investigation to determine whether or not

6 accounts were being assigned with respect to the Miami

7 division on the basis of sex or gender?

8  A Yeah.  Actually, I think we had a charge filed

9 by Ms. Ortega and that was investigated thoroughly and

10 found to be unfounded as well.

11  Q So other than -- so you're saying that there

12 was an investigation done with respect to assignment of

13 accounts out of the Miami division on the basis of

14 gender after Ms. Ortega filed her complaint?

15  A I mean Ms. Ortega's claim, that's what I mean.

16  Q Okay.  Let me see if I can understand what

17 you're saying.  You're saying after Ms. Ortega filed

18 her charge, the company did an investigation to

19 determine whether accounts are assigned from the Miami

20 division on the basis of sex or gender?

21  A I believe that was her charge.  I didn't do it

22 but I believe that was her charge, and, yes, we would

23 have investigated it.

24  Q Okay.  And who did this investigation that

25 you're talking about?

```
 1        A    I think Amy George did.  I'm not sure.
 2        Q    And did Amy George report to you what her
 3   findings were in that investigation?
 4        A    I'm sure I read the report, yeah.
 5        Q    And what were her findings?
 6        A    That it was unfounded.
 7        Q    Now, prior to that investigation of Amy
 8   George, did -- did anybody -- did any -- were any other
 9   investigations done by the company to determine whether
10   accounts were assigned to sales representatives in the
11   Miami division on the basis of sex or gender?
12             MR. STEVENS:  Jennifer, I'm going to butt in
13        here, again.  I apologize.  His testimony was that
14        he didn't know.
15             MS. DALEY:  -- understand what his testimony
16        is --
17             MR. STEVENS:  He didn't know who conducted the
18        investigation.  He thinks it may have been Amy
19        George.
20             MS. DALEY:  And that's not what I'm asking
21        him.
22             MR. STEVENS:  Can you repeat the question?
23             MS. DALEY:  Let me just rephrase my question.
24        I don't want to speak an objection here.
25             MR. STEVENS:  Perfect.
```

```
 1   BY MS. DALEY:
 2       Q    I'm asking you, prior to that investigation
 3   that Amy George did, did the company ever conduct any
 4   type of investigation to determine whether accounts
 5   were being assigned to representatives out of the Miami
 6   division based on sex or gender?
 7            MR. STEVENS:  I'm going to object to the form.
 8            MS. DALEY:  Why are you objecting now?
 9            MR. STEVENS:  Because he doesn't know if Amy
10       George did the investigation.
11       Q    Okay.  Prior to any investigations whether
12   done by Amy George or not, the one that you just
13   testified about, did the company conduct any type of
14   investigation to determine if accounts were being
15   assigned to representatives in the Miami division on
16   the basis of sex or gender?
17       A    You mean from now to when?
18       Q    Anytime.
19       A    1800.
20       Q    If the company was in existence in 1800, yes,
21   I want to know.
22       A    Well, I don't recall that far back.  I'm
23   sorry.
24       Q    But you don't recall any other investigation
25   other than the one that you just mentioned that may
```

1    have been done by Amy George with respect to the issue

2    of sex or gender?

3        A    No, I don't.  I'm sorry.

4        Q    When was the last time that employees in the

5    Miami division were provided any type of training with

6    respect to the issue of equal employment opportunity?

7        A    I don't know that.

8        Q    Who in your company would know?

9        A    Becky Javurek.

10        Q    Just one minute.  Do you know what type of

11    commission structure Bill Ready is under now?

12        A    If it's not the regular program, I don't know.

13    I'm sorry, no.

14        Q    And do you know if he's being guaranteed a

15    minimum amount of commission?

16        A    I don't know that.

17        Q    Who in the company would know?

18        A    Well, John Glaze would know.

19        Q    Anybody else that you're aware of?

20        A    Amy George would know as well, I would think.

21            MS. DALEY:  I have no further questions.

22            MR. STEVENS:  Okay.  You want to take a

23        ten-minute break and then call back and do Amy's.

24            MS. DALEY:  I'm going to need more than 10

25        minutes, maybe 20 minutes or so.

1   MR. STEVENS:  Okay.  You want to call back a

2 little after 1:30?

3   MS. DALEY:  Yeah.

4   MR. STEVENS:  Okay.  Sounds good.

5   MS. DALEY:  Is he going to read or waive?

6   MR. STEVENS:  He's going to read.

7   (Witness excused.)

8   (The deposition was concluded at 1:13 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF DUVAL)

I, Richetta R. Brown, Notary Public, certify
that **GEORGE McCLARY** personally appeared before me and
was duly sworn.

WITNESS my hand and official seal this
31st day of October, 2000.

Richetta R. Brown
Notary Public State of Florida
Commission No.: CC773934
Expires: 09/09/02



Richetta Ratcliff Brown
MY COMMISSION # CC773934 EXPIRES
September 9, 2002
BONDED THRU TROY FAIN INSURANCE, INC.

```
 1                  CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA)

 3    COUNTY OF DUVAL)

 4            I, Richetta R. Brown, Court Reporter, certify

 5    that I was authorized to and did stenographically

 6    report the deposition of GEORGE McCLARY; that a review

 7    of the transcript was requested; and that the

 8    transcript is a true and complete record of my

 9    stenographic notes.

10

11            I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am I

15    financially interested in the action.

16

17        DATED this 31st day of October, 2000.

18

19

20                        Richetta R. Brown
21                        Richetta R. Brown

22

23

24

25
```

Hedquist & Associates Reporters, Inc.

1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2

3    BETTY ORTEGA,

4             Plaintiff,

5        vs.                    CASE NO.
                      00-6126-Civ-Dimitrouleas/Johnson
6

     UNISOURCE WORLDWIDE, INC.,
7    a foreign corporation,                    COPY

8             Defendant.
     _____/
9

10

11                       Fort Lauderdale, Florida

12                       September 29th, 2000

13                       10:00 o'clock A.M.

14   APPEARANCES:

15
     AMLONG & AMLONG, P.A.
16   BY:   JENNIFER DALEY, ESQ.
     appearing on behalf of the Plaintiff.
17
     TROUTMAN, SANDERS, LLP
18   BY: ROBERT C. STEVENS, ESQ.
     appearing on behalf of the Defendant.
19

20                  ------------

21

22                    DEPOSITION

23                       OF

24              WILLIAM JOSEPH READY

25

<u>I N D E X</u>

<u>WITNESS</u>                    DIRECT CROSS  REDIRECT

WILLIAM JOSEPH READY

  BY MS. DALEY                    3


<u>E X H I B I T S</u>

<u>PLAINTIFF'S</u>                    <u>FOR IDENTIFICATION</u>

  (None offered.)

1      Deposition of WILLIAM JOSEPH READY, a witness of

2    lawful age, taken by the Plaintiff for the purpose of

3    discovery and for use as evidence in the above-entitled

4    cause, wherein BETTY ORTEGA is the Plaintiff and

5    UNISOURCE WORLDWIDE, INC., a foreign corporation, is

6    the Defendant, pending in the United States District

7    Court of the Southern District of Florida, in and for

8    Broward, Florida, pursuant to notice heretofore filed,

9    before ANDREA ROBINSON-WEST, Registered Professional

10    Reporter, and Notary Public in and for the State of

11    Florida at Large, at the Offices of Amlong & Amlong,

12    P.A., Fort Lauderdale, Florida, on the 21st day of

13    September, 2000, commencing at 10:00 o'clock A.M.

14             - - - - - - - - - - - -

15    Thereupon:

16                WILLIAM JOSEPH READY,

17     a witness named in the notice heretofore filed,

18     being of lawful age, and being first duly sworn

19     in the above cause, testified on his oath as

20     follows:

21                 DIRECT EXAMINATION

22    BY MS. DALEY:

23       Q.    Please state your full name.

24       A.    William Joseph Ready.

25       Q.    What is your date of birth?

```
 1        A.    11-28-1939.
 2        Q.    What is your home address?
 3        A.    1227 Southwest 87 Terrace, Plantation,
 4   Florida, 33324.
 5        Q.    You're working now as a sales
 6   representative for Unisource?
 7        A.    Yes, ma'am.
 8        Q.    And you were a manager before that?
 9        A.    Yes, ma'am.
10        Q.    And how did it come that you moved from
11   a manager position to a sales representative
12   position?
13        A.    It came quite suddenly when Tony Gispert
14   took an unexpected retirement.  I talked it over
15   with my wife and it didn't happen immediately.  It
16   was a couple weeks there involved, a week or so,
17   and I said back and forth with my wife over the
18   weekend, I said, "Do you mind me going back into
19   sales," and she said, "No, I don't," because I'm
20   in the twilight of my career.  I said, "I think I
21   might do that.  When I go in Monday, I'm going to
22   talk to John," and so that's what I did.  I talked
23   to John when I went in and said, "Would you mind
24   if I took that territory," and he said, "No, not
25   really."  You know, I sort of caught him by
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1   surprise, I caught myself by surprise a little bit
2   too, but that's what I did.
3       Q.   Now just before you got the sales
4   representative position did any of your managers
5   raise any concern about your performance?
6       A.   No, ma'am.
7       Q.   During your entire career with Unisource
8   or any of it's predecessors have any of your
9   managers ever raised any concerns about your work
10  performance?
11      A.   No, ma'am.
12      Q.   And have you ever been disciplined?
13      A.   No, ma'am.
14      Q.   Now before you got the sales
15  representative position did anybody indicate to
16  you that your manager position would be
17  eliminated?
18      A.   No.
19      Q.   So the conversation that you had to
20  obtain the sales position was initiated by you?
21      A.   Yes, ma'am.
22      Q.   And when did you have that conversation
23  with Mr. Glaze?
24      A.   Tony came into my office, it was on
25  February the 17th, and said that the 26th would be

```
 1    his last day.  Then John and I got together and we
 2    were looking for someone for the territory.  John
 3    that weekend, I think it was the latter part of
 4    that week, went immediately over to the Bahamas to
 5    Tony's accounts because it was a surprise and
 6    touched base with the accounts and when he came
 7    back it was after that, so it had to be almost
 8    going like a week and a half in that range when I
 9    sat down with my wife and then I went in -- it was
10    a Monday when I went in there and talked to him.
11         Q.   Okay.  So to the best of your
12    recollection, it was a week and a half after
13    February 17th that you had this conversation with
14    Mr. Glaze?
15         A.   No, it wasn't after the 17th.  It was
16    actually about a week, week and a half after the
17    26th, after Tony left.
18         Q.   And what year are we talking about here?
19         A.   I'm in there about eighteen months so it
20    was eighteen months ago.
21         Q.   So that would be sometime in 1998?
22         A.   1998.
23              MR. STEVENS:  Eighteen months from
24         now.
25              THE WITNESS:  It was eighteen months
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1              ago.  I am in this job eighteen months so
 2              it would have been not this last March.
 3                   MR. STEVENS:  It would have been '99.
 4                   THE WITNESS:  In March of '99, that's
 5              correct.
 6      BY MS. DALEY:
 7         Q.   So all of this happened in 1999?
 8         A.   Yes, ma'am.
 9         Q.   Okay.  So when you told Mr. Glaze that
10      you wanted the position that Mr. Gispert was
11      giving up what did Mr. Glaze say?
12         A.   When I told him he just sat back.  I
13      think I caught him off guard a little bit with it
14      and he said, "Well, let me think about it," you
15      know.
16         Q.   Did he say anything else with respect to
17      the position?
18         A.   I think I sort of caught him off guard
19      with it.  You know, it was just when I walked in
20      his office it was a surprise to him and he said -
21      he indicated to me that he was probably going to
22      have to talk to HR about it and see if there was
23      any problems with me doing that and then he came
24      back later I think it was later in the day and
25      says he was going to definitely consider it and
```

1    whatever.

2        Q.    Okay.  He said after - later in the day

3    he came back to you and told you what?

4        A.    He said he would definitely consider it.

5        Q.    He said he will consider giving you the

6    position?

7        A.    Yes.

8        Q.    And at that point did you have the

9    position?

10       A.    I felt I had a good chance of getting it

11   as far as - I felt I had a good chance of getting

12   it, yes.

13       Q.    When were you informed that you actually

14   had the position?

15       A.    Within a day or so I knew it.

16       Q.    And who told you you had the position?

17       A.    Mr. Glaze.

18       Q.    Now before you were actually told that

19   you had the position did you have any other

20   conversations with Mr. Glaze about who would get

21   the position?

22       A.    We were looking for someone I know and I

23   had recommended two people to Mr. Glaze.  I

24   recommended a young lady named Sue Pullin, this

25   was the week prior I think it was or there abouts

1   and I called her and asked her if she would have

2   an interview with John for this territory.

3          And I also talked to a young lady named

4   Barbara Vega and asked if she would be interested

5   in interviewing for the position and she told

6   me -- I called her back the next day, she said she

7   thought about it -- talking about Barbara -- and

8   said that she really wouldn't be interested at

9   this time.  She was doing very well for herself

10  and would rather not change and Ms. Pullin did

11  come over and interview with John.

12         Q.  Okay.  So you're saying that you had

13  this conversation with Mr. Glaze in which you

14  discussed Sue Pullin as a candidate and Ms. Vega

15  as a candidate?

16         A.  I did.  That was prior to me asking for

17  the job, naturally.

18         Q.  Okay.  So you're saying before you

19  actually told John Glaze you were interested in

20  the position you spoke to him about Ms. Pullin

21  getting the job and Ms. Vega getting the job?

22         A.  That's correct.

23         Q.  And did you speak with Mr. Glaze about

24  anybody else other than those two people getting

25  the job?

```
 1        A.    No.   The only conversation we had there
 2   that I recollect was he was I think interviewing a
 3   gentleman I think that worked at the paper house.
 4   I didn't know the gentleman.  I don't want to
 5   guess who he was.  I think he worked at the paper
 6   house and he was going to talk to him and see if
 7   he would be interested but I don't know who it
 8   was.
 9        Q.    So Mr. Glaze told you that he was
10   speaking to some other gentlemen for the position?
11        A.    Somebody at the paper house, I think it
12   was.
13        Q.    All right.
14        A.    That's the only conversation we had
15   about it.
16        Q.    Did you have any other conversations
17   with Mr. Glaze before you actually got the
18   position, concerning who would fill the position?
19        A.    No.
20        Q.    And were any other candidates -- did you
21   discuss any other candidates with Mr. Glaze with
22   respect to filling the position other than
23   yourself, Ms. Pullin, Ms. Vega and that gentleman
24   from Printin?
25        A.    No.
```

```
 1          Q.   Now, when you were a manager just before
 2   you got this sales position, what type of
 3   compensation did you receive from Unisource?
 4          A.   I was salaried with the possibilities of
 5   a bonus if we made plan.
 6          Q.   Now what was your salary before you got
 7   the sales position?
 8          A.   I don't know exactly.  It would be -- I
 9   don't want to guess but it was a little over seven
10   thousand dollars a month.
11          Q.   And you mentioned the possibility of a
12   bonus.  What was the bonus based on?
13          A.   It was based on if the division made its
14   sales plan, my bonus was based on that sales and
15   profit.
16          Q.   Okay.
17          A.   As a division number.
18          Q.   What was the amount of the last bonus
19   that you received before you got the sales
20   position?
21          A.   I don't actually recall that.
22          Q.   And did you have any other benefits as a
23   manager before you got the sales position?
24          A.   I had expenses if I entertained a
25   customer or gas allowance.
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1          Q.    Anything else?

 2          A.    They paid for my telephone, cellular

 3   telephone.

 4          Q.    Anything else?

 5          A.    Not that I can recollect.

 6          Q.    And with respect to the sales position

 7   that you eventually accepted, what was your

 8   compensation for that position?

 9          A.    I was guaranteed my base salary.  That

10   was it.

11          Q.    And that was the base salary of seven

12   thousand dollars per month?

13          A.    Whatever.  That was seven thousand

14   something.

15          Q.    So you were guaranteed your base salary

16   regardless of what type of sales you generated

17   from the accounts you got from Tony Gispert?

18          A.    Yes.

19          Q.    And did the company honor that guarantee

20   that it gave to you with respect to your salary?

21          A.    Yes.

22          Q.    So you're being paid now a salary or a

23   percentage of the sales that you generate?

24          A.    If I fall short of my guarantee, they

25   would make that up.
```

```
 1          Q.   Did you lose any of the benefits that
 2    you had as a result of taking the sales position?
 3          A.   Yes.  I lost my expense account.
 4          Q.   Anything else?
 5          A.   The telephone, they only allow me twenty
 6    dollars now, and I don't get a bonus anymore.
 7          Q.   And did you know that up front when you
 8    accepted the sales position?
 9          A.   Yes, ma'am, I did.
10          Q.   So in the sales position, you are
11    actually making less than you made as a manager?
12          A.   No.  I'm going to make more because I
13    have a lot of the billing in that area because of
14    the commissions.
15          Q.   From the time -- so are you actually
16    making more now?
17          A.   I'm making a little more now, yes.
18          Q.   Was your movement from a manager to a
19    sales person a demotion?
20          A.   Pardon me?
21          Q.   Were you demoted when you moved from a
22    manager to a sales person?
23          A.   I don't think so.
24          Q.   And why don't you think so?
25          A.   It is a sales organization.  Sales is
```

```
 1    what we're all about, you know, and I don't look
 2    at it as a demotion by any stretch of the
 3    imagination.
 4          Q.    Do you supervise anybody today?
 5          A.    No, ma'am.
 6          Q.    Did you used to supervise people as a
 7    manager?
 8          A.    Yes, ma'am.
 9          Q.    What type of accounts did you get from
10    Tony Gispert?
11          A.    A couple stationers and the balance
12    would be printers, commercial type small printers,
13    a newspaper with a commercial shop, and a hotel
14    down in the Keys.
15          Q.    How many accounts did you get when you
16    became a salesperson that Tony Gispert used to
17    handle?
18          A.    I do not know the exact number.  A good
19    estimate would probably be between fifteen and
20    twenty.
21          Q.    And were they all export accounts?
22          A.    Are you saying of Tony's accounts?
23          Q.    Yes.
24          A.    With the exception of a couple small
25    accounts locally, and like I said, locally I'm
```

1    talking about there's a hotel in the Keys and an

2    outfit in Fort Lauderdale called Pompano --

3    actually, called Sultan and Son that buy

4    shipboards every - once a year, and that's a

5    telemarketing account now.   That was turned over

6    to telemarketing.   That's the only domestic

7    accounts that I got.

8        Q.   So with the exception of those, the rest

9    of them were export accounts?

10       A.   Yes, ma'am.

11       Q.   Before you accepted the position, the

12   sales position, how many years of experience did

13   you have personally handling export accounts?

14       A.   Handling export accounts?   Twelve to

15   fifteen years would be a good number.

16       Q.   And where did you gain those twelve to

17   fifteen years?

18       A.   When I worked for Jim Waldur which was

19   Butler Paper they immediately gave me the Bahamas

20   Paper Company which was a master distributor in

21   Nassau run by Mr. Harry Skates, and I handled that

22   for the duration of the time that I was at that

23   location.

24       Q.   And how many years was that?

25       A.   It was over ten years.

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1      Q.    Okay.  So you got ten years of your

2   experience personally handling export accounts at

3   Butler Paper?

4      A.    It was Jim Walter previous to Butler.

5   Of course, Jim Walter became Butler.

6      Q.    So Jim Walter then Butler you got this

7   over ten years of experience personally handling

8   export accounts?

9      A.    That's correct.  I was the manager and I

10  personally supervised anything that went out of

11  their export, also.  I mean, I was the General

12  Manager of Butler Paper.

13     Q.    Okay.  Now how many years of this twelve

14  to fifteen years did you gain the experience

15  working actually as a salesperson as opposed to a

16  manager?

17     A.    I did that as a manager.  I wore two

18  hats at Butler Paper, which was Jim Walter.  I was

19  the Sales Manager and I was also the General

20  Manager.  I worked two hats.

21     Q.    But at Butler Paper and at Jim Walters,

22  were there sales representatives who also serviced

23  the accounts?

24     A.    No, ma'am.

25     Q.    Okay.  So as a Sales Manager, you

 1   functioned as a sales representative as well --

 2       A.    That's correct.

 3       Q.    -- at Butler and at Jim Walter?

 4       A.    That is correct.

 5       Q.    Now when you came to Unisource or when

 6   the company became Unisource prior to accepting

 7   this sales position, did you ever work as a sales

 8   representative actually servicing export accounts?

 9       A.    When I came there?  When I left Butler

10   and came to Unisource?

11       Q.    Yes.

12       A.    No.  When I left Butler Company,

13   Unisource the jobs were actually dissolved.  They

14   took the managers, I think for the entire state or

15   region and they gave us tests, Chally tests,

16   interviewed us in Orlando, all the managers

17   involved, and then at that point we got a letter

18   saying we were accepted for this job and I got a

19   letter from HR saying that I was accepted as a

20   sales manager if I would accept it.  This is the

21   job at Unisource.  I was accepted as Printing

22   Paper Sales Manager.

23       Q.    So the first time you worked as a sales

24   representative for Unisource was when you got this

25   position that Mr. Gispert vacated?

1    A.    For Unisource, yes.  But prior to being

2  a manager at Jim Walter Paper, I was a sales rep

3  there but I did not handle export accounts.  When

4  I started there, I started there in customer

5  service, became a sales rep and worked my way up.

6  I didn't come in there as a manager.

7    Q.    Can you tell me the names that you can

8  recall of the fifteen to twenty accounts that you

9  got from Tony Gispert.

10    A.    Okay.  Nassau Guardian, Executive

11  Printers, ACME Printers, John Bull.

12    Q.    Spell that last --

13    A.    B-U-L-L, John Bull.

14    Q.    Okay.

15    A.    Freeport Advertising, Freeport News,

16  Island Images, Express Press, the Drafting Shaft.

17  Off the top of my head, that's it.

18    Q.    Now from when you got the sales

19  representative position have you handled any

20  accounts other than the export accounts and the

21  three - the couple of other accounts that you got

22  from Tony Gispert?

23    A.    Yes, ma'am.

24    Q.    Such as Sheet Fed accounts and Web

25  accounts?

```
 1        A.    Yes, ma'am.  I handle accounts called

 2   "Resource Limited."

 3        Q.    What type of account is that one?

 4        A.    He's a supplier for the Florida State

 5   lottery.  TRW Ready, which is now First American,

 6   Westgate Printing.

 7        Q.    Since you became a Sales Representative,

 8   have you handled any web accounts?

 9        A.    No, ma'am.

10        Q.    And do you know what a web account is?

11        A.    Yes, I do.

12        Q.    And what's your understanding as to what

13   a web account is?

14        A.    A web account is basically high-volume

15   low-margin type business mostly direct type

16   tonnage.

17        Q.    And how do they differ from the other

18   type of accounts that Unisource has?

19        A.    There's not a lot of them.  Like I say,

20   they're high-volume, low-margin, could be good,

21   could be bad.

22        Q.    And are the scales with respect to

23   selling on a web account different from the scales

24   that a sales representative needs for selling from

25   any other type of account that Unisource has?
```

```
 1        A.    I do think it takes a little more skill

 2   to sell a web account because of the grades

 3   involved.  Are they heat set accounts?  Are they

 4   cold web, are they half web?  There's a lot more

 5   to a web account.  Mistakes at web accounts are

 6   very costly.

 7        Q.    You mentioned something about a cold -

 8   what is it, a cold --

 9        A.    Cold web.

10        Q.    Cold web.  That's C-O-L-D?

11        A.    Yes, ma'am.

12        Q.    Okay.  And what is that?

13        A.    That's one that doesn't have any type of

14   UV dryer or anything after it's printed to dry the

15   paper where it is just like an ideal situation

16   would be whether it use uncoated papers, and it

17   sort of drys itself versus where UV lights dry it

18   like a magazine type, like you would see maybe

19   Vogue or one of those magazines where that would

20   be a heat set doing it.

21        Q.    Okay.  And how does a cold web account

22   differ from a heat set web account?

23        A.    I don't think the cold web would

24   probably use as much paper and they would use a

25   different type paper.  They would use more
```

1  uncoated offset, like your tablet there you are

2  using, newspaper type things where it drys faster

3  on the surface versus help it dry.

4      Q.    And what different skills does a sales

5  representative need to sell from those type of web

6  accounts versus the other accounts that Unisource

7  handles?

8      A.    I think on the skills end of it they

9  really need to stay up on the papers of what's

10  going on, you know on the technical end of it

11  because that's changing all the time, such as the

12  sheet fed.

13      Q.    So by the different skills that you're

14  referring to, this is basically skills to keep you

15  knowledgable with respect to the area?

16      A.    With the paper, the technology on the

17  paper.

18      Q.    Okay.  And other than the knowledge that

19  the sales representative needs to have in order to

20  keep up on the type of paper that's involved, are

21  there any other types of different skills that are

22  required in order to sell from these accounts as

23  opposed to the other type of accounts that

24  Unisource handles?

25      A.    No, I don't think so.  Just building

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    relationships and it would be the same other than

2    that.

3         Q.    And have you ever seen any written

4    documentation from Unisource outlining the

5    different skills that are required for selling

6    from heat set, web or cold web accounts?

7         A.    I have never seen anything documented on

8    that.

9         Q.    And with respect to the testimony that

10   you just gave as to the knowledge that the sales

11   representative needs, is that something that you

12   came up with yourself or did someone at Unisource

13   tell you that that type of skill is required?

14        A.    It's something I've learned in the field

15   and also that mill reps that come there share it

16   at sales meetings, you know training sessions,

17   working the accounts with the sales rep.

18        Q.    So you're saying you gained that idea

19   that this skill is required from some sales

20   meetings that you attended?

21        A.    You mean personally?

22        Q.    Yes.

23        A.    Eleven years of my career I worked at

24   the mill.   I worked for Georgia Pacific at the

25   mill in the bargaining unit on the machines.

1    That's where I gained it, a lot of it.  That's
2    where I started in 1961.

3        Q.    Let me rephrase the question.  What I'm
4    trying to get at is with respect to the skill that
5    you said is required, this different skill that
6    you said is required for selling the heat set and
7    the cold web accounts, what I'm trying to
8    determine is whether or not Unisource has issued a
9    policy or any type of guidelines stating that a
10   sale representative who sells from this type of
11   account needs to have the type of knowledge that
12   you just testified about.

13       A.    I've seen nothing in writing, no.

14       Q.    Okay.  Has any of the managers or any of
15   the administrators at Unisource ever told you that
16   the knowledge that you just testified about is a
17   requirement for an employee to sell from - to sell
18   from a heat set web or a cold web account?

19       A.    No.

20       Q.    And the next follow up that I was trying
21   to get from you is, for example where did you get
22   this idea from that this particular knowledge is
23   required in order to sell from those types of
24   accounts?

25       A.    Well, when you make the call on a web

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    account they're usually very large accounts.  They

2    use a lot of paper.  And for the most part, these

3    people, you know, they pretty much know exactly

4    what they're after.

5              I mean, they won't sit - for the most

6    part I don't think they'll sit, and just for lack

7    of a better term, shoot the bull with you.  You

8    must know what you're doing when you walk through

9    the door as any other professional.  You must know

10   what you're doing when you sit down with these

11   people because once they get on press it gets very

12   expensive to run those type presses.

13        Q.    So this is just something that you

14   gathered from your years of experience?

15        A.    It's been built a long time but I've

16   seen reps that take it upon themselves to study

17   it.  We don't have a written policy on it.

18   They'll get interested in it.  We've had a few

19   study it, watch it, redo the reading.  We have a

20   web book on supplies, where they're coming from,

21   different type papers.  We do publish that and you

22   know it's something that comes from within,

23   sometimes.

24        Q.    Now with respect to export accounts, to

25   your knowledge, does Unisource have any written

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1   guidelines or policies requiring a sales
2   representative to have any special skills in order
3   to sell from that type of account?
4       A.    I don't know of any particular skill
5   that's required unless it would be in certain
6   countries, a language.
7       Q.    Now, the same with respect to the sheet
8   fed accounts, to your knowledge does Unisource
9   have any guidelines or any policies stating what
10  type of skills or knowledge a sales representative
11  needs to have in order to handle that type of
12  account?
13      A.    We have no written policy on what they
14  need for skills.  When we hire a salesman, they're
15  given tests, challenges, would they fit the
16  profile that we're looking for.  It doesn't
17  necessarily have to be in paper but are they
18  trainable.  This Chally test does yield a lot of
19  that in answers --
20      Q.    Now --
21      A.    -- as a guideline for hiring.
22      Q.    Are you saying that there are some
23  guidelines that the company follows with respect
24  to determining if a sales representative is
25  qualified to handle a sheet fed account?

1        A.    No.    I said if they have - if they're
2    qualified -- or it's not even the word
3    "qualified."   It is when they rerun the Chally
4    test it's just another tool.    It doesn't mean you
5    can or cannot hire the person.    When they're given
6    this it will tell you that yes, they would have a
7    good chance of becoming successful because of
8    their closing skills.    It's just nothing more than
9    I think a scientific evaluation.
10       Q.    Okay.    Now this test that you just
11   mentioned, Chally, can you spell that?
12       A.    C-H-A-L-L-Y.
13       Q.    And this test is administered when
14   you're hiring a sales representative?
15       A.    Interviewing, that's correct.
16       Q.    And have you ever seen any policies or
17   any guidelines from Unisource that outlines what
18   exactly the Chally test consists of?
19       A.    No.
20       Q.    So is the Chally test something that -
21   is it a written test that is given to a candidate?
22       A.    That's correct.
23       Q.    And is the Chally test administered to a
24   sales representative at any point after the
25   representative is hired?

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    A.    No.

2    Q.    Now, after the representative is hired -

3    let me rephrase it.  If the sales representative

4    passed the Chally test and is hired by Unisource,

5    what type of accounts is the representative

6    qualified to handle?

7    A.    Well, depending what accounts you have

8    open at the time and what you are trying to

9    achieve in your sales force.  In other words, the

10   accounts, did someone leave?  Why did you hire

11   this person?  I'm sure you just don't hire for the

12   sake of hiring.  Someone left or there's accounts

13   available, you're trying something different in

14   your marketing or sales approach.

15   Q.    And what's the purpose of the Chally

16   test?  What is the company testing for?

17   A.    This is just a profile of the person if

18   they are orientated to sales.  That test just

19   stated in the last - that I'm aware of it - five

20   years when we put the corporation - the companies

21   together.  It does not go back that far.

22   Q.    Now to your knowledge, does the company

23   administer any tests to current sales

24   representatives within the past five years to

25   determine if he or she is qualified to handle all

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1    the accounts that Unisource handles?
 2         A.    I'm not aware of anything like that.
 3         Q.    Have you ever supervised Betty Ortega?
 4         A.    Yes, I have.
 5         Q.    During what timeframe?
 6         A.    I hired Betty in I think 1988, early
 7    part of 1988, and then I was her supervisor until
 8    we put the divisions together, late 1994 in that
 9    area.  And then she was off and on under my
10    supervision and she is also supervised by John
11    Glaze.
12         Q.    So you started supervising her in 1988?
13         A.    That's correct.
14         Q.    And when did you stop?
15         A.    I supervised her up through the
16    divisions and then when we put the division
17    together, I supervised her probably for a year or
18    so after that, then we split the sales force up
19    and at that time she came under John Glazes'
20    wings.  John took on some sales responsibilities
21    so it would have been from '88 to -- I'm sorry,
22    '88, '96, '97, in that range.
23         Q.    And other than Ms. Ortega, did you also
24    supervise other sales representatives in the Miami
25    division between '88 and '97?
```

```
 1        A.    Yes, I did.

 2        Q.    During the timeframe that you supervised

 3   Ms. Ortega, was she qualified to handle sheet fed

 4   accounts?

 5        A.    Yes.

 6        Q.    Was she qualified to handle export

 7   accounts?

 8        A.    Yes.

 9        Q.    Was she qualified to handle all of the

10   web accounts that Unisource handled?

11        A.    No.   I don't think Ms. Ortega showed me

12   any interest at all that she wanted to work in the

13   web area.

14        Q.    My question was whether or not you felt

15   she was qualified to handle the web accounts that

16   the company has.

17             MR. STEVENS:   I'm going to object as

18        asked and answered, but if you want to go

19        ahead, you can go ahead.

20             MS. DALEY:   He needed to make his

21        objection.

22             THE WITNESS:   Okay.

23   BY MS. DALEY:

24        Q.    Okay.   What I asked you is if you

25   believe that Ms. Ortega was qualified to handle
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1  the web accounts that the company has during the
2  time frame that you supervised her.
3          MR. STEVENS:  I'm going to object, but
4      you can go ahead and answer.
5          THE WITNESS:  I think Ms. Ortega could
6      have been trained to handle the web
7      account.
8  BY MS. DALEY:
9      Q.  So you're saying that she was not
10  qualified to handle them?
11     A.  She never showed any interest in web
12  accounts to me.
13     Q.  I'm trying to distinguish whether or not
14  she showed any interest or whether or not she was
15  qualified.  Was she qualified or not?
16         MR. STEVENS:  I'm going to object, but
17     you can answer the question.
18         THE WITNESS:  She could have been
19     trained but she wasn't qualified to handle
20     a large account, web account, you know, as
21     such.
22  BY MS. DALEY:
23     Q.  Was she qualified to handle any web
24  account, in your opinion?
25         MR. STEVENS:  I'm going to object

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1          again but you can answer the question.
 2               THE WITNESS:  With training, she could
 3          have handled them I imagine.  That's all I
 4          can tell you.  There was never any interest
 5          showed with web accounts from Ms. Ortega,
 6          or bring me a web account.
 7   BY MS. DALEY:
 8          Q.   Do you know if she has ever handled any
 9   web account?
10          A.   To my knowledge, I don't recollect any.
11          Q.   Do you know if anyone at the company
12   ever offered her any training that she needed in
13   order to handle web accounts?
14          A.   I don't know of any.
15          Q.   Now as her manager, did you ever offer
16   her any training to handle web accounts?
17          A.   No.
18          Q.   Now, what type of training do you think
19   Ms. Ortega -- let me rephrase it.  What type of
20   training could the company have offered Ms. Ortega
21   to allow her to handle web accounts?
22          A.   Would you ask me that again, please.
23          Q.   Sure.  You testified that with training
24   you believed that Ms. Ortega could have handled
25   web accounts.  I'm trying now to determine what
```

1   type of training you were referring to.

2       A.    If there was a web account that she

3   would work or -- there's not a lot of web

4   accounts, very, very few of these.  If she was

5   interested, she could go to the mill.  The mill

6   reps come in to our division all the time, sit

7   down with them and spend some time at a web shop.

8       Q.    Okay.  So other than her taking the

9   initiative to go to the mill was there any other

10  form of training that you were referring to that

11  she could have gotten in order to allow her - in

12  order to make her qualified to handle web

13  accounts?

14          MR. STEVENS:  I'm going to object to

15       the form of the question.  He didn't limit

16       it to what you said.

17          MS. DALEY:  I'm confused by the

18       objection, but I'll ask the question again.

19  BY MS. DALEY:

20      Q.    Other than your testimony as to what

21  Ms. Ortega could have done with respect to going

22  to the mill, was there any other form of training

23  that Ms. Ortega could have gotten?

24      A.    We offered no others.

25      Q.    Okay.  Now, do you know if Continental

1    Printing is a web account?

2        A.    Continental Printing is a web account.

3        Q.    And how about Lenotal?  Is that a web

4    account?

5        A.    Don't know anything about Lenotal.  I

6    know they're in Haiti, that's all.

7        Q.    Now you testified earlier that you hired

8    Ms. Ortega?

9        A.    Yes.

10        Q.    And who, other than you, was involved in

11    the decision to hire Ms. Ortega?

12        A.    It was strictly my decision.

13        Q.    And did she pass the Chally test that

14    you just referred to or was it administered at

15    that time?

16        A.    It was not administered at that time.

17        Q.    Was there any other form of test that

18    was administered at that time by the company with

19    respect to hiring representatives?

20        A.    No, ma'am.

21        Q.    Now at the time that you hired

22    Ms. Ortega, did she have any experience as a sales

23    representative?

24        A.    Not to my knowledge, no.

25        Q.    She never brought to your attention that

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    she had any background in sales?

2         A.    No, no.

3         Q.    And what was your understanding as to

4    what Ms. Ortega did with respect to work before

5    she came - before you hired her?

6         A.    I had a call from the present owner of

7    Madison Paper, Jerry, and he said I'm not going -

8    "We had a fire.  I'm not going to reopen the

9    facility."  He said, "I'm trying to find

10   placements for the people."

11              I said, "Yeah."  He said, "I have a

12   young lady here," he said "would do good for you."

13              I said, "Yeah?  Who is it?"  He said,

14   "Betty Ortega."  I said, "What does she do?"  He

15   said, "She is my assistant."

16              I said, "Any sales experience?"  He

17   said, "No."  I said, "Okay.  Let me - I will talk

18   to her."  I said, "Would she make a good sales

19   rep?"  He said, "I think so."

20              Betty came over, presented her card that

21   said Madison Paper, Assistant to the President on

22   her card.  We sat down and the relationship grew

23   from there.

24         Q.    So in the job interview did you ask

25   Ms. Ortega what exactly she did for Madison Paper?

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1          A.    She assisted Jerry, but she said she

 2    would like to get into sales.

 3          Q.    So she said she assisted Jerry and she

 4    would like to get into sales?

 5          A.    That is correct.

 6          Q.    Did she say anything else about her

 7    background during the interview?

 8          A.    Not that I recall or anything that would

 9    surface.  It was a nice interview.  We talked.  I

10    thought she had the personality to do it.

11          Q.    And did you ask her what she did

12    work-wise before she worked for Madison Paper?

13          A.    I'm sure I did, but evidently there was

14    no conflict or anything there that bothered me so

15    we went on with that she wanted to get into sales.

16    I'm sure we did cover it on the interview but just

17    not present in mind right now what we discussed.

18          Q.    So after Ms. Ortega was hired did the

19    company give her any form of training in order for

20    her to become a sales representative?

21          A.    Well, I was also the Printing Paper

22    Sales Manager.  We had our sales meetings weekly

23    and like I said I put on the meetings myself about

24    our product, the mill reps were in and this was

25    continuous for years.
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1              You know, where we had the

 2    representatives of the product come in, they would

 3    put it on as a training session.  I personally

 4    with my background put them on, filing of

 5    complaints, the dos and the don'ts, so I think it

 6    was quite extensive.  It was a weekly deal.

 7        Q.   Okay.  So you're saying that the

 8    training that was offered to Ms. Ortega consisted

 9    of weekly sales training meetings?

10        A.   We had our sales meetings weekly.  I

11    don't say we didn't skip a week here or there but

12    we usually had them on a Thursday evening and we

13    would have to average at least three month.

14        Q.   How long did those meetings last?

15        A.   They still go on.  I mean it's basically

16    now in the last year or so they have tapered off

17    to maybe two a month because I have been out of

18    management now for eighteen months but while I was

19    there I pretty much had mine weekly like I said at

20    least three a month.

21        Q.   Okay.  Were they like a half an hour, an

22    hour --

23        A.   It goes for a good hour.

24        Q.   So each one was about an hour?

25        A.   An hour.
```

1        Q.    Now as part of her training was
2   Ms. Ortega provided with any type of literature or
3   documents to help train her to become a sales
4   person?

5        A.    She was already a salesperson.  It just
6   helps the sales techniques.  What most every sales
7   meeting where the mill reps were involved they
8   hand out literature on their products, the
9   changes, the colors, you know, what's going on in
10  the industry and in Betty's case, she also had
11  supply system background so she got a double
12  barrel, she worked in the supply system area, too.

13       Q.    And how long did the training period
14  last for Ms. Ortega?

15       A.    It goes on.  Our training session goes
16  on.  It's ongoing not just Ms. Ortega, it's for
17  everyone, including me.

18       Q.    So was Ms. Ortega provided with any
19  specific timeframe that was devoted specifically
20  to training to become a sales representative?

21       A.    No, the training was ongoing.  There was
22  no specific timeframe.  She was given a guarantee
23  for her salary until she went on commission like
24  every other sales rep and then we went from there.

25       Q.    What was Ms. Ortega's title when she was

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1  hired by the company?

2      A.    Sales Rep Printing.  I don't know if it

3  had the connotation printing on it, but it was

4  sales rep.

5      Q.    And as far as you know, was her title

6  ever changed from sales representative to anything

7  else?

8      A.    John might have put Exporter on her

9  card.  I didn't do that, John might have done

10  that.

11      Q.    Okay.  Now when you were Ms. Ortega's

12  supervisor, did you prepare any performance

13  evaluations or sales goals for her?

14      A.    Yes, I did.

15      Q.    Let's deal first with the issue of

16  performance evaluations.  How often were those

17  done?

18      A.    Yearly.

19      Q.    And did you prepare those by yourself or

20  in conjunction with anybody else?

21      A.    I prepared those by myself.

22      Q.    And with respect to the sales goals were

23  Ms. Ortega's sales goals set at the time that you

24  were preparing the performance evaluation?

25      A.    They didn't coincide to the date.  The

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    performance evaluations were done once a year when

2    designated by our HR, they were sent out.  And

3    then the sales goals were set out in conjunction

4    with our business plan.

5         Q.    Now when you were a manager, what role

6    did you play in developing the business plan?

7         A.    We have a very heavy business plan that

8    usually rolls down from corporate and they'll tell

9    you pretty much the number that you will need and

10   then you back into that number.

11        Q.    But what role did you play or what input

12   did you have if any at all with respect to that?

13        A.    From that number to the sales force it

14   was my role.

15        Q.    Okay.  So corporate would give you a

16   number --

17        A.    The manager.

18        Q.    -- as a manager and then what would you

19   do with the number that corporate gave to you?

20        A.    Okay.  I would look at it and then

21   pretty much divide it up with the sales reps

22   including myself, sales reps and manager, I'd take

23   my load, too.

24        Q.    Now when you say corporate would give

25   you a number what would the number represent that

```
 1   corporate gives?
 2        A.    What they wanted in growth and profit
 3   and sales.  They would tell you ten percent is
 4   acceptable and so on and so forth or whatever that
 5   number may be.
 6        Q.    Ten percent of what?
 7        A.    Increase we want or whatever the
 8   increase they wanted plus increase in profit they
 9   would tell you pretty much where you had to be if
10   it would be acceptable.
11        Q.    And you would take that number and do
12   what with respect to the sales representatives?
13        A.    Divide it up.
14        Q.    What do you mean by "divide it up"?
15        A.    Well, if they said we want a ten percent
16   increase maybe a new sales rep might get twenty,
17   maybe a more established rep might get eight
18   depending on what the growth would look like.  I
19   tried to divide that number up.
20        Q.    And when you say maybe a new sales rep
21   would get eight and somebody may get twenty, what
22   do those numbers represent, eight percent of what?
23             MR. STEVENS:  I'm going to object
24        because he said a new sales rep would get
25        twenty.
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1  BY MS. DALEY:

2      Q.   Fine.  The numbers that you just

3  testified about that you may give to either a new

4  sales rep or an old sales rep whatever the numbers

5  were, what do those numbers represent?

6      A.   What we would need in growth, but it

7  wasn't given to the sales rep.  It was negotiated.

8  The sales rep would sit down face to face, we

9  negotiated it.  Can you handle it?  Can't you

10  handle it?  Why can't you handle it?  How about

11  this account?  It was done by an account.  It

12  wasn't done, here's a number.

13          In other words, we would sit down and

14  discuss it.  If I said I wanted eight, they may

15  walk out with seven.  If they show me, well, I

16  feel I can't grow here but I can grow over here.

17  They may come out with seven, so it's negotiable

18  we still have to come up with a number.  I may

19  have to take more to offset them or vice versa but

20  we have to come up with that number so it's not,

21  here's the number, that's it.  It's not like that.

22      Q.   So what are you growing?

23      A.   Sales and profit.

24      Q.   And did you follow any criteria, any

25  guidelines for determining which salesperson got

1    which number?

2    A.    Not a guideline.    I looked at their

3    territory, the accounts, I also watched very

4    closely on their salary, how their salary was

5    doing from year to year.    I watched that closely.

6    Q.    So you say you took into consideration

7    the territory, the type of accounts and the sale

8    person's salary?

9    A.    I watched that.    In other words, to make

10   sure that they're growing and moving in the right

11   direction.

12   Q.    And was there anything else that you

13   took into consideration in deciding which sales

14   person got which number?

15   A.    No.    I mean we discussed it.    We would

16   sit down and we talked about it.

17   Q.    Now, with respect to those three items

18   that you just mentioned, did Unisource have any

19   written policies or any written guidelines telling

20   you that you must consider territory accounts and

21   salary?

22   A.    There's no written guidelines that I

23   know of.    It's strictly managerial decision.

24   Q.    Did you always take territory accounts

25   and salary into consideration with respect to

1   every sales representative each year?

2        A.    I tried to follow that.  I should say on

3   the salary end when I did the review and I looked

4   over it, it pretty much tracked because I looked

5   at it three years, how they were growing, was the

6   sale rep growing.  If they would lose an account

7   they may have a dip but how was the salary

8   growing?  Were they growing in that area where

9   they need to grow.

10       Q.    And did you have any guidelines from any

11  place that told you for example you assign X, Y, Z

12  number if the person's salary was at a certain

13  level, like for example were there any guidelines

14  that you followed in determining this number

15  should be applied in light of this territory, this

16  account, and this salary?

17       A.    No.  The main guideline that I used, the

18  main one was how well are we doing in a particular

19  account, do we have ten percent of their business,

20  do we have twenty percent of their business, can

21  we grow there, what can we do to grow, that type

22  of thing.

23       Q.    So this is just something that you

24  decide after you discussed it with the sales rep?

25       A.    We sit down and discuss it.  How many

1   new accounts did you open this year, that type of

2   thing.

3        Q.    Now after you sat down and had the

4   discussion with each one of the sales

5   representatives with respect to what the number

6   should be, did you memorialize that or put down in

7   writing what you and the sales representative had

8   agreed to?

9        A.    They got a copy of the agreement.

10       Q.    And what is the agreement called, if it

11   has a title?

12       A.    It's their business plan for next year.

13   They're given a number, you know, X number of

14   dollars of sales and profit by quarter, each

15   quarter of the four quarters.

16       Q.    And with respect to the business plan is

17   the sales plan then made a part of the business

18   plan for the division?

19       A.    Yes, it is, it rolls up.

20       Q.    And once this business plan is put

21   together is there somebody in corporate that it's

22   provided to afterward?

23       A.    Yes.   The managers go to a designated

24   place and they tell the corporate this is the plan

25   and they'll accept it or say we need this or we

1   need that.  And if it's accepted, then it's in

2   black and white.  That's what you must do for next

3   year.

4        Q.    Now when you were a manager, did you

5   make decisions concerning which accounts should be

6   assigned to which representatives?

7        A.    From time-to-time I did, yes.

8        Q.    Now when you made the decision with

9   respect to which accounts should be assigned to

10   which representatives, what criteria did you

11   follow in deciding how the accounts should be

12   assigned?

13        A.    Personally when I made the decision it

14   was very rare for me to switch an account only

15   because it takes a long time to build that

16   relationship and it was the last thing that I

17   wanted to do.

18             The account would almost have to be dead

19   on a salesman account list for me to switch it.

20   If they were doing business and the salesman said

21   I can get a break there and I could do better, I'd

22   let it go for another ninety days and we'd talk

23   about it but it was very rare that I would just

24   switch an account for whatever reason.  It's just

25   not my style.

BRICKEL GOMBERG & ASSOCIATES   954-522-0067

1          Q.    Okay.  But I want to know on the

2    occasions when you did assign accounts to

3    representatives whether or not it's actually an

4    initial assignment versus a reassignment, did you

5    follow any criteria or any guidelines?

6          A.    The account would have to be dead in the

7    water for me to do that.  In other words, if

8    they're doing nothing with the account and it's

9    just sitting on the salesman's account list and

10   we're not getting anything out of it.

11         Q.    Okay.  Let me try it this way.

12         A.    Okay.

13         Q.    On the occasions when you were assigning

14   accounts did you follow any criteria or were there

15   any factors that you took into consideration in

16   deciding who should get which accounts?

17         A.    There was no criteria.  Once in a while

18   I would look at geographical operational area.  If

19   it was way north, if it was way south, what other

20   accounts was it close to that another person might

21   be down the street from would call on an account.

22   I think I looked at some geographic things at

23   times.  If it was way far north, it would probably

24   go to one of the sales reps up there.  If it was

25   far south, it would go to someone in the south or

1    central, whatever.

2        Q.    So other than the geographic things that

3    you looked at, did you look at any other factors

4    or any other criteria in deciding which sales

5    representative should get which account that needs

6    to be assigned?

7        A.    No, no.

8        Q.    And as far as you know, did the company

9    have any written or unwritten guidelines for you

10    to follow in deciding which sales representatives

11    should get which account?

12        A.    Not that I know of.

13        Q.    When you were a manager, did you ever

14    place any of the sales representatives on any form

15    of probation or any form of corrective action?

16        A.    I might have done it once or twice but I

17    just don't remember when.

18        Q.    And do you remember the name of the

19    sales representatives?

20        A.    I don't even know if it was a sales

21    representative.  It might have been a sales

22    promotion representative that calls on ad agencies

23    or something.  I don't recall when or who I did it

24    to.  It is something very rare for me.

25        Q.    From the time that Ms. Ortega was hired

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1   until now are you aware of any sales

2   representative who was ever placed on any type of

3   probation, performance improvement plan or any

4   other type of corrective action?

5       A.   Printing?  Are you talking about a

6   printing rep?

7       Q.   I'm sorry, in the Miami division.  Any

8   representatives in the Miami division.

9       A.   We have two divisions.  You mean

10   printing my division, or the supply systems?

11       Q.   On either one of them.

12       A.   I don't know much about the supply

13   system.  That's operated sort of -- they just come

14   in to us.  But as far as the printing goes, I

15   might have put some on a disciplinary note but I

16   just don't remember who, if I did it.

17       Q.   Regardless of whether or not you put the

18   person on probation or corrective action or not

19   are you aware of anyone who was placed on any type

20   of corrective action or probation?

21       A.   Personally, I'm not.

22       Q.   Do you know if Rosa Gonzalez was ever

23   placed on any type of probation or corrective

24   action?

25       A.   Again, to the best of my knowledge, I

BRICKEL GOMBERG & ASSOCIATES   954-522-0067

1    don't know.  She was in the supply stuff.  I

2    didn't know much about Rosa.

3         Q.    How about Ellie Jablansky?  Do you know

4    if she was ever placed on any type of probation or

5    corrective action?

6         A.    I don't know if she was or not.  I hired

7    Ellie and when we put the division together she

8    went to the supply system and she never was back

9    in the printing.  I don't know.  She may have or

10   may not have.  I don't know.

11        Q.    Now when you were manager were there any

12   occasions when any of the sales representatives

13   who you supervised failed to meet the sales goals

14   that were set for him or her?

15        A.    There were times they fell short, yes.

16        Q.    And can you give me the names of some

17   people who fell short of meeting the goals?

18        A.    Off the top of my head not individually.

19   I could tell you that when I would see this happen

20   we would talk and work together and try to get

21   them back.  It was a team effort.  It didn't worry

22   me that much because we had very aggressive goals.

23   We had very aggressive goals and if you lose one

24   account or something happened and one or two

25   accounts it would put you short.  That doesn't

1   mean you're a bad person or you're not a good

2   sales rep. You just hit some hard times and I

3   would try to work with the people to get them back

4   on track. That's all I can tell you about that.

5       Q.   Do you recall any percentage that any of

6   the sale representatives at issue, how far any of

7   the sales representatives at issue were away from

8   meeting the goal that was set for him or her?

9       A.   Again, I can't say because we have a

10  very aggressive goal and I took that in mind

11  knowing that we would do better next year, you

12  know. I happen to think we have a very good sales

13  force.

14      Q.   Now on the occasions when the sales

15  representatives failed to meet the sales goals was

16  any type of disciplinary action or any type of

17  corrective action imposed on any of the sales

18  representatives that you supervised?

19      A.   That I supervised, as I mentioned before

20  I may have filled out one or two of those things

21  over the years. I just don't remember who or

22  when. I believe more in coaching and talking to

23  them one on one, what's the problem? We would sit

24  down, what can we do to help each other, that type

25  of thing. It wasn't a disciplinary thing at all,

```
 1   just getting them back on track, you know, what is
 2   the problem?
 3        Q.   From the time that you hired Ms. Ortega
 4   coming up to the present, did anyone at Unisource
 5   ever bring to your attention his or her belief
 6   that male sales representatives were treated
 7   differently from females?
 8        A.   No.  Wait.  Repeat that question.
 9             MS. DALEY:  Can you read it back for
10        me.
11             (Whereupon, the last question was read
12        back by the court reporter.)
13             THE WITNESS:  Okay.  Mr. Law and
14        Mr. Huffner accused me - they said I
15        favored the ladies, other than that, so I
16        didn't know how that question really rang
17        to come around to it.  Those two said that
18        I favored the females on just whatever.
19   BY MS. DALEY:
20        Q.   On what?
21        A.   Well, if an account, coaching, what's
22   available.  Maybe I took more time.  I don't know.
23   That's what they said, those two.
24        Q.   Okay.  And when did Mr. Law and
25   Mr. Huffner raise those concerns to you?
```

1          A.    I can't give you an exact date.

2          Q.    Was it while you were a manager?

3          A.    Yes, ma'am.

4          Q.    And do you recall the year?

5          A.    I would have to say '97.  I'm not sure,

6     '98.  '96, '97.

7          Q.    And did you bring that matter to the

8     attention of anybody in Human Resources or any of

9     your supervisors?

10         A.    No, because I knew it wasn't true.

11         Q.    And why did you know it was not true?

12         A.    Because I treat everybody equally.

13         Q.    Now as a manager, did anyone at

14    Unisource ever tell you that if a complaint of

15    discrimination was brought to your attention that

16    you had to forward it to someone else in the

17    company?

18         A.    We have a policy sure, if you're accused

19    you know if somebody accuses you of something

20    you're supposed to call it to your supervisor and

21    they notified HR.

22         Q.    Did you feel that Mr. Law and

23    Mr. Huffner were accusing you of something?

24         A.    They really weren't accusing me.  They

25    felt that they weren't getting their share of

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1  accounts is what it was.  In other words, they

2  never got any accounts, you never give me any

3  accounts, blah, blah, blah.  It seems like the

4  ladies get them.  What's going on here?  It was

5  crazy.

6      Q.   And you did not feel that you had to

7  forward that one to the Human Resources?

8      A.   No.

9      Q.   Or to your supervisors?

10     A.   No.

11     Q.   Now other than Mr. Law and Mr. Huffner,

12 did any other person at Unisource ever bring to

13 your attention his or her belief that males were

14 treated differently from female sale

15 representatives?

16     A.   No.

17     Q.   When you were a manager were all sales

18 representatives paid according to the same type of

19 commission structure?

20     A.   Not exactly.  We had a commission

21 matrix.  Everyone was paid off of that and then on

22 the web accounts corporate put out - if you had

23 web accounts I think there was a little different

24 commission on those accounts.  But like I said,

25 that came out of corporate as just as I guess a

1  policy and we had a few sales reps that fell under

2  that.

3      Q.   Now, when did corporate send out this

4  matrix or this schedule for web accounts?

5      A.   I don't know the exact date on it.

6      Q.   Do you remember the year?

7      A.   Again, time goes so fast.  I just know

8  that it came out.  I know that Mr. Charles White

9  was our President at that time and he put it out,

10  I guess through HR.

11      Q.   And when you say HR put it out, did you

12  ever see it written down on paper?

13      A.   I didn't see it, personally.

14      Q.   But how did you find out about it?

15      A.   I think there was a memo that came out

16  on it but I personally never saw the matrix.

17      Q.   And do you know who the representatives

18  were who had the different pay systems with

19  respect to the web accounts?

20      A.   The three I know of was Mr. Law,

21  Mr. Huffner and Bob Peterson.  That's all that I

22  know of for sure.

23      Q.   And how did you know that the three of

24  them had this pay structure with respect to the

25  web accounts?

```
 1           A.    They had some large web accounts, they
 2    had large web accounts.
 3           Q.    Did you supervise the three of them?
 4           A.    Initially I did but I supervised Dennis
 5    Law and then John supervised John Huffner and Bob
 6    Peterson.
 7           Q.    Okay.  So you supervised Mr. Law and
 8    John Glaze supervised Huffner and Peterson?
 9           A.    That's correct.
10           Q.    And do you know how the commission
11    structure for the web accounts differed from the
12    structure that was used for the other accounts?
13           A.    I do not know exactly.
14           Q.    And did anyone at Unisource ever tell
15    you why there was a different commission structure
16    for the web accounts as opposed to the other type
17    of accounts?
18           A.    No, ma'am, it just came out of
19    corporate.
20           Q.    And this is still with respect to the
21    memo that you mentioned previously?
22           A.    It was something on it, nothing big.  It
23    just said there would be a different whatever.
24           Q.    And do you know why Law, Huffner and
25    Peterson were the only three who had this
```

```
 1   different commission structure with respect to the
 2   web accounts?
 3             MR. STEVENS:  I'm going to object as
 4        asked and answered.
 5             THE WITNESS:  Pardon?
 6             MR. STEVENS:  I'm objecting because
 7        she has asked the question before, but if
 8        you want to answer it, go ahead.
 9             THE WITNESS:  Repeat the question.
10             MS. DALEY:  Can you read it back?
11             (Whereupon, the last question was read
12        back by the court reporter.)
13             THE WITNESS:  They are the only ones
14        to the best of my knowledge that had large
15        web accounts.
16   BY MS. DALEY:
17        Q.   And when you said large web accounts,
18   what do you mean by "large"?
19        A.   A large web account would be someone
20   would have what they call a full web, thirty-five
21   inches or larger.
22        Q.   I'm sorry, say that again.
23        A.   A large web account would be somebody
24   running a web at say thirty-five inches or larger.
25   A small web account would be somebody running half
```

1    rolls, seventeen, eighteen inches.  DD Glaze or

2    something like that.

3        Q.   When you say thirty-five inch, you mean

4    the width of the roll?

5        A.   Yes, ma'am.

6        Q.   And when you say a large web account

7    does large have any - do you have any -- let me

8    rephrase it.

9             When you refer to a large web account,

10   do you take the income or the sales that's

11   generated from that account into consideration in

12   describing it as a large web account?

13       A.   I don't take it into consideration.

14       Q.   Now do you know if Steve Sullivan ever

15   handled any web accounts?

16       A.   Years ago Steve Sullivan handled web

17   accounts, large web accounts.  One went out of

18   business.  He was asked to leave the other account

19   that I know.

20       Q.   And how about Bill Brechnahan

21   (phonetic); do you know if he handled any web

22   accounts?

23       A.   I don't know, off the top of my head.

24       Q.   When you made account assignments did

25   you ever prepare any type of paper work to

```
1    document that you had assigned an account to

2    someone?

3        A.    Initially I did or I would tell the

4    sales rep, this account, we're going to work on it

5    for ninety days and I kept a little tickler file

6    in my office, but I got rid of all them when I

7    moved out of my office a year-and-a-half ago.  It

8    was just for my own use, anyway.

9        Q.    So you said you kept a tickler file to

10   keep track of the assignments that you made?

11       A.    If I had an account, I'd say let's work

12   on it for ninety days and I put a little Joe Doe

13   and go through it in ninety days, "Hey, Joe, how

14   are you doing?"  And like I say, it was just

15   nothing more than that you know, a little file

16   there with sales follow up but like I said, it was

17   in my office and I would just go through it.  In

18   other words, it was a tickler file to remind me to

19   ask them.

20       Q.    When you say you got rid of it what did

21   you do with it?

22       A.    Tore it up and threw it away.

23       Q.    When was that?

24       A.    See, what happened with the account.  In

25   other words, did the account make progress?  It
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1    was just a reminder for me.  There was no official

 2    records.

 3         Q.   You said you tore it up and threw it

 4    away, when?

 5         A.   Just to remind me to ask.  After the

 6    ninety days or whatever, I would say.

 7         Q.   This tickler file that you had, when did

 8    you get rid of the tickler file?

 9         A.   Completely?

10         Q.   Yes.

11         A.   When I stopped being a manager I just

12    took it and got rid of the whole thing because I

13    was no longer involved with it then.

14         Q.   Was that in 1996?

15         A.   No, that was just eighteen months ago

16    when I took Tony's territory.

17         Q.   Now other than this tickler file, did

18    you do any type of paperwork to document that you

19    had actually assigned an account to a

20    representative?

21         A.   No, ma'am.

22         Q.   So how would the company know that you

23    had assigned an account to a particular

24    representative?

25         A.   Oh, okay.  When that change was made
```

1    there was a copy of it given to the credit

2    department to change the salesman's number on it

3    and that was signed by the sales manager or

4    general manager.

5        Q.   A copy -- I'm sorry.  Did you finish

6    your answer?

7        A.   It was signed by the manager or the

8    sales manager and given to the credit department

9    to make sure that the salesman got credit for the

10   sales.

11       Q.   What was signed?

12       A.   The account would change.  It would go

13   from my account to another person's account or

14   whoever is assigned the account.  It was just --

15   we use it to this day.  It's going from salesman

16   to what salesman, what sales manager signed it and

17   it goes to the credit department so they change

18   the record so the salesman gets credit for that

19   sale, the sale from that point on.  That's what

20   it's for.

21       Q.   So it's an account change form?

22       A.   That's correct.

23            MS. DALEY:  I just need to take a

24       couple minutes' break and I'm almost

25       finished.

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1              (Whereupon, a brief recess was taken.)
 2   BY MS. DALEY:
 3        Q.   Do you know when Gene Press left the
 4   company?
 5        A.   I can't give you an exact date.  When we
 6   put the companies together he was there somewhere
 7   about a year after that but I don't have the exact
 8   date.
 9        Q.   Now do you know who reassigned
10   Mr. Press' accounts after he left, Gene Press?
11        A.   Who reassigned them?
12        Q.   Yes.
13        A.   There wasn't much reassigning.  I didn't
14   give any of those accounts up.  I pretty much left
15   them lay on the house just where they were.
16        Q.   And why did you do that?
17        A.   I did it particularly because they were
18   Gene's accounts, they were handled by the clerical
19   people mostly Marlene Moody and Sue Pullin and I
20   use some of that profit from those accounts to
21   defray the expenses for the division, so to the
22   best of my knowledge if there was anything there
23   wasn't much moved there it pretty much stayed
24   intact.
25        Q.   And how many accounts are we talking
```

1  about?

2      A.   I would be guessing -- not a great

3  number, but I would be guessing.

4      Q.   Was it over ten?

5      A.   It would be slightly over ten if it

6  would be over ten.  It wasn't a lot of accounts.

7      Q.   And were they all export accounts?

8      A.   Yes, ma'am.

9      Q.   And did you consider giving them to

10  Ms. Ortega?

11     A.   I didn't consider giving them to anybody

12  because they were being handled by the clerical

13  people.

14     Q.   So the accounts that Mr. Press left were

15  being serviced by clerical people rather than

16  sales representatives?

17     A.   That's correct.

18     Q.   And why were they being serviced by

19  clerical people as opposed to sales

20  representatives?

21     A.   Well, Gene, being the manager was on the

22  inside as the manager.  The clerical people are

23  right there with him and over a period of time the

24  clerical people basically became the salesmen.

25         They would call and speak to them and

```
 1    they became friendly and Gene more or less managed
 2    them and that was about it.  Made any decisions
 3    with the account that had to be made but he would
 4    tell the two people that basically were handling
 5    them.
 6         Q.    And why did you not give them to
 7    Ms. Ortega?
 8         A.    I didn't give them to anyone.  I kept
 9    them on the house to use that profit to defray the
10    expense of the house, and putting it back into the
11    pot.
12         Q.    How long did these clerical people
13    service the accounts?
14         A.    Up until they left, up until they left.
15         Q.    And for what timeframe for example a
16    year, two years?
17         A.    It would have been going on the better
18    part of a year.
19         Q.    And were these clerical people
20    supervised in any capacity?
21         A.    They were still handling the accounts.
22    When the clerical people left, some of the
23    business went away and then at that time John had
24    given some of these accounts to Betty, Ms. Ortega.
25         Q.    Okay.  Let me see if I understand what
```

```
 1   you just said.  Clerical people serviced the
 2   accounts for a timeframe and then Mr. Glaze gave
 3   some of the accounts to Ms. Ortega?
 4        A.   Yes, he did.
 5        Q.   And that was after the clerical people
 6   left?
 7        A.   Yes, ma'am.
 8        Q.   Now during the timeframe that the
 9   accounts were serviced by the clerical people did
10   anybody earn commissions on those accounts?
11        A.   No, ma'am, not that I know of.
12        Q.   So were those accounts profitable during
13   the timeframe when the clerical people serviced
14   them?
15        A.   Yes, ma'am.
16        Q.   And what happened to the profits?
17        A.   It went to the house.  It went in as
18   house accounts same as the manager's accounts,
19   same as my accounts.  When I'm a manager it goes
20   into the house.
21        Q.   So the profits -- so did you personally
22   get any percentage of the profits for those
23   accounts?
24        A.   No, ma'am.
25        Q.   So they were just given to Unisource?
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1            A.    Unisource, yes, ma'am.
 2            Q.    Did any of the profits trickle down to
 3    you in the form of a bonus?
 4            A.    No, ma'am.
 5            Q.    And was that the only time, to your
 6    knowledge, that the company has ever had this type
 7    of arrangement where clerical people are servicing
 8    accounts rather than sales representatives?
 9            A.    To the best of my knowledge, I think it
10    is.
11            Q.    Did you have to get approval from
12    somebody higher up in order to have this type of
13    arrangement?
14            A.    No.
15            Q.    You said John Glaze gave some of the
16    accounts to Ms. Ortega after the clerical people
17    stopped servicing them?
18            A.    Yes.
19            Q.    Do you know how many of them Ms. Ortega
20    got?
21            A.    I don't know exactly.  I do know that
22    Lenotal was one of them, Gispert was another one.
23    those two are the only two I know off the top of
24    my head.
25            Q.    And do you know who got the rest?
```

```
 1          A.   No.
 2          Q.   How do you know Mr. Glaze gave those two
 3   to Ms. Ortega?
 4          A.   I saw them on her sales list and also I
 5   saw orders going through for those two.
 6          Q.   Did you see what was going through for
 7   the other accounts?
 8          A.   No.
 9          Q.   Did you seek input from anybody when you
10   made the decision not to reassign the accounts to
11   a sales representative?
12          A.   No.
13          Q.   Did you ever have any conversation with
14   Ms. Ortega about who would get accounts that
15   Mr. Gispert handled?
16          A.   No.  Tony did not report to me.
17          Q.   So you're saying you and Ms. Ortega
18   never had any conversation about her getting any
19   accounts that Tony Gispert handled?
20          A.   No.
21          Q.   So you never told Ms. Ortega that she
22   would get the accounts that Tony Gispert used to
23   handle?
24          A.   No, I never expected Tony to retire, to
25   be honest.
```

```
 1        Q.   I mean before Tony, before Mr. Gispert
 2   retired, did you ever have any conversation with
 3   Ms. Ortega in which you told her she would get
 4   accounts that Tony Gispert handles or handled?
 5        MR. STEVENS:   I'm going to object as
 6        asked and answered.   That's the fourth time
 7        you have asked that same question, the
 8        fourth exact time.
 9        THE WITNESS:   No.
10        MS. DALEY:   Thank you.   What is your
11        response?   "No"?
12        THE WITNESS:   No.
13   BY MS. DALEY:
14        Q.   Thank you.   Now during any of the
15   performance reviews that you had with Ms. Ortega
16   did the issue of her handling Mr. Gispert's export
17   accounts ever come up?
18        A.   Not to my knowledge.
19        Q.   And were you ever Tony Gispert's
20   immediate supervisor?
21        A.   Early on but when we split the sales
22   forces, Tony reported to John.
23        Q.   For how long were you Mr. Gispert's
24   immediate supervisor?
25        A.   Again, this is a guess.   It would have
```

```
 1    been when we first put the division together.  For
 2    a couple years Tony like I said, Tony more or less
 3    reported to John, sat right outside of his office.
 4        Q.   Okay.  So you're saying you were
 5    Mr. Gispert's supervisor for about a couple of
 6    years?
 7        A.   Again, that's a guess.  Like I said, he
 8    reported to me but not for a long period of time.
 9        Q.   Earlier you testified about someone in
10    corporate who had sent a memo out about the
11    different commission structure for web accounts.
12    Now do you know the name of the individual in
13    corporate who sent out the memo?
14        A.   I don't.
15        Q.   Do you recall if it was Caeser McClary?
16        A.   I don't.
17        Q.   Do you recall if it came from the Human
18    Resources Department?
19        A.   I don't know.  I didn't pay that much
20    attention to it at the time.  I just know it was
21    from corporate as a directive and that was the end
22    of it.
23        Q.   Now when you say "corporate," where is
24    the corporate office located?
25        A.   Jacksonville.
```

```
 1          Q.    So it came from Jacksonville?
 2          A.    It would have had to have come from
 3   Jacksonville.
 4          Q.    Now earlier you testified about some
 5   complaints Mr. Law and Mr. Huffner made about
 6   females being treated more favorably than males by
 7   you with respect to assignment of accounts.  What
 8   exactly did Mr. Law tell you with respect to that
 9   issue?
10          A.    He just simply came in and says, "You
11   favor the ladies."  That's all the comment was
12   made.  I favor the ladies.
13          Q.    So the only comment he made was about
14   your favoring the ladies?
15          A.    That's what he said.
16          Q.    And did you ask him what he meant by
17   that?
18          A.    Not really.  I worked with Dennis over
19   twenty years.  Those comments were not anything
20   that were not uncommon for Dennis.
21          Q.    So you did not ask him what he meant by
22   that phrase?
23          A.    No.
24          Q.    And why not?
25          A.    Because I know I'm fair with managerial
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    type responsibilities.  I evaluate myself.

2        Q.   Did you consider Dennis Law to be a

3    truthful person?

4        A.   Yes, at times think he would wave a

5    little bit, but you know, he was a sales rep.

6        Q.   And did he tell you this in person or

7    over the phone?

8        A.   In person.

9        Q.   And where were you when he told you

10   that?

11       A.   In my office.

12       Q.   And was anyone else present other than

13   you and Mr. Law?

14       A.   No.

15       Q.   Now, were you guys talking about

16   anything else other than his comment that you

17   favored the ladies at the time when he raised that

18   comment?

19       A.   Not really.  He felt I never gave him

20   any accounts, you know he never got any accounts

21   from me.  He was indicating I never gave him any

22   accounts.  I don't know what he meant by that

23   comment, but hey, I never get any accounts.  You

24   give them to the ladies.  I don't know what he

25   meant by it.

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1          Q.    Okay.  So he said in addition to your
 2   favoring the ladies, he also said that you never
 3   gave him any accounts?
 4          A.    That's what he said.
 5          Q.    Did he say anything else during that
 6   conversation?
 7          A.    No, no.
 8          Q.    Did you ask him what he meant?
 9          A.    No.
10          Q.    What did you say during that
11   conversation?
12          A.    Nothing, because I knew it wasn't true.
13   Why belay something that is just an untruth?
14          Q.    How did --
15          A.    It just ended like that.  That's the way
16   it ended.  I said, "Hey, you know better than
17   that."  That was the end of it.
18          Q.    And who made their - who raised the
19   concern first to you, Law or Huffner?
20          A.    It was right at the same time, as a
21   matter of fact.  When you saw John Huffner come
22   around the corner, Dennis was right behind him.
23   They were very, very close.
24          Q.    But Huffner was not around when Law
25   spoke to you?
```

```
 1         A.    To the best of my recollection I don't
 2    recollect, you know, him being there at that
 3    particular moment.
 4         Q.    Okay.  But they both told you it on the
 5    same day?
 6         A.    Around the same time, yes.
 7         Q.    When you say around the same time --
 8         A.    In the afternoon of the day, so they
 9    might have discussed it out in the general office
10    area and then come in my office.  I don't know,
11    but it was right around the same time and it
12    wasn't said in a mean fashion.  It was just, you
13    know, at first I thought it was said in jest but I
14    thought as long as you asked the question, I'd
15    answer it.
16         Q.    Now when Mr. Huffner raised his concern
17    what exactly did he say?
18         A.    Something very similar.  You know, the
19    lady sales reps seem to get the breaks or
20    whatever.
21         Q.    And did you ask him what he meant by
22    that?
23         A.    Again, I never give him any accounts.
24         Q.    Did you ask him what he meant by those
25    statements?
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    A.    No.    Again, because I knew it wasn't

2  true.

3    Q.    Did Mr. Huffner say anything else during

4  the conversation?

5    A.    Not that I recollect.   I think he

6  laughed a little bit.  He did laugh a little bit

7  but he didn't say anything.  Just that smirky

8  laugh and I said, "Believe what you want to

9  believe.  You know better," and that was the end

10  of the conversation.

11    Q.    And do you believe Mr. Huffner to be a

12  truthful person?

13    A.    I'm not absolutely sure how deep it

14  runs.

15    Q.    Other than this one occasion were there

16  any other occasions when you believe that

17  Mr. Huffner had lied to you?

18        MR. STEVENS:  Object, he never said

19        that Mr. Huffner lied to him during that

20        conversation.

21        MS. DALEY:  When Mr. Huffner -- let me

22        have the court reporter read it back first

23        because I think he did.  Can you read back

24        the last I think --

25        MR. STEVENS:  The question was whether

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1            or not you had to do with --
 2                MS. DALEY:  No, it was the question
 3            before that.
 4                MR. STEVENS:  -- truthful or something
 5            like that.
 6                MS. DALEY:  It was two or three
 7            questions back.
 8                (Whereupon, the last question was read
 9            back by the court reporter.)
10                MR. STEVENS:  I'm going to object to
11            that again.
12                THE WITNESS:  Not that I know of.
13    BY MS. DALEY:
14        Q.   Now earlier you testified that the
15    criteria you considered in assigning accounts was
16    geography.
17        A.   That's one of them, yeah.
18        Q.   Okay.  Now are you saying that there was
19    another criteria that you considered?
20        A.   No.  You can go back to your question.
21    There was three areas we said, wasn't there?
22        Q.   No.  Are you saying now that there were
23    three areas that you considered in assigning
24    accounts?
25        A.   No, geographic is very important, let's
```

1   put it that way.  Go ahead.

2       Q.   But what I'm trying to get from you is

3   if you're saying now that there's some other

4   factor that you considered in assigning accounts.

5       A.   Geographic is I think is very important.

6   Okay.  You know I look at the account, the size of

7   the account, the -- like I said, again,

8   geographical is very important to me.  Sometimes I

9   even look at you know, what's around that account,

10  other accounts.  You know, is there a rep that's

11  very close to that account that could handle that

12  account.  That type of thing.  Because I think

13  that's very important as far as time because time

14  is so expensive.

15      Q.   So you're saying now that you consider

16  geography, the size of the account and what is

17  around the account, and is there anything else?

18      A.   If a sales rep has something else around

19  the account that's what I mean by that.

20      Q.   Anything else?

21      A.   And the experience.  You know of the

22  particular sales rep also, but I don't do a lot of

23  reassigning.  I mean, these accounts just don't

24  come up and you look at a book.  It's very - I do

25  very little reassigning of accounts.

1       Q.  Okay.  Well, just think about the

2 occasions -- I am not just talking about

3 reassignment.  I'm talking about any type of

4 assignment whether it's an initial assignment or

5 reassignment.  Is there anything else that you

6 consider?

7       A.  No, that pretty much does it.

8       Q.  Now, going back now to the issue of

9 geography is each sales representative assigned a

10 particular territory, as far as you know?

11       A.  Not as such.  They are in general areas

12 but there is not a street boundary on it.  Some

13 work Miami, some work Broward, some work Dade, but

14 there is some overlapping.

15       Q.  What are the counties that are covered

16 or the territory covered by the entire Miami

17 division?

18       A.  We go from Vero Beach and actually to

19 the Keys there's a few accounts in the Keys,

20 Monroe County, but for the most part it's Dade,

21 Broward, Palm Beach.

22       Q.  Now when you supervised Ms. Ortega,

23 where did she have her territory?

24       A.  Most of her's was in Miami.

25       Q.  Did she have any in Broward and Palm

1   Beach, to your knowledge?

2       A.   To my knowledge, she didn't.

3       Q.   Now other than Ms. Ortega, how many

4   other sales representatives did you supervise?

5       A.   In what period of time?

6       Q.   When you were a manager.

7       A.   At Unisource?

8       Q.   Yeah.

9       A.   It was as high as fifteen, I believe in

10  that range, and then John and I split it up.

11      Q.   Now when you supervised Ms. Ortega, did

12  she have an account for FPL in Jensen Beach?

13      A.   Yes, she did.

14      Q.   And that's outside of Dade County?

15      A.   It was part of Power and Light that was

16  out on West Miami.  She handled the entire FPL

17  account.  There was the one in Miami and then that

18  one came along but that started back in the Butler

19  days.  That wasn't at Unisource.

20      Q.   I'm confused.  Did she handle an account

21  for FPL at Unisource?

22      A.   Yes, she did.

23      Q.   Okay.  Now with respect to the four

24  factors that you said you considered in assigning

25  accounts, did you always consider all four factors

```
 1   every time you assigned an account?
 2        A.   I couldn't say that happened every time.
 3   There were times even an account would call and
 4   request a certain rep and I hear that so and so is
 5   very good or they -- reps, they network.
 6        Q.   Excluding the times that a business
 7   would call and request a particular
 8   representative, when you were assigning accounts
 9   did you always consider all of the four factors?
10        A.   For the most part, yes, I did.
11        Q.   Where there occasions in which you did
12   not consider any four factors excluding the
13   circumstances where someone called for a
14   particular rep?
15        A.   Not to the best of my recollection.  I
16   did my best to stick within that parameter.
17        Q.   But you can't recall any particular
18   occasion where you did not consider all four
19   factors?
20        A.   I can't recall where there was a
21   situation like that.  I don't say there wasn't,
22   but I just don't recall it.
23        Q.   Now when you were assigning the
24   accounts, did all of these factors weigh equally?
25        A.   I can't say that each time that I did.
```

1    I did my best to try to do that but I can't say

2    that it happened each and every time.  Like I say,

3    there was not a lot of reassigning and assigning

4    for me.

5        Q.    Were there times when one or more of the

6    factors weighed more heavily than another

7    excluding the occasions when someone called for a

8    particular representative?

9        A.    Not that I can recall.

10       Q.    So how do you take geography into

11   consideration with respect to assigning the

12   account?

13       A.    What I try to do initially I try to see

14   who is in that area, what sales reps are generally

15   in that area.  If it's an implant type shop or

16   what type of an account it is and then who calls

17   on accounts in that area as far as the sales reps,

18   what sales reps are in that area.  In other words,

19   to help cut down their operating expense and also

20   that they're not running all over the county and

21   can spend their time with the customer.

22       Q.    Anything else?

23       A.    That's basically it.

24       Q.    How do you take the size of the account

25   into consideration?

```
 1        A.    The potential that they would buy in
 2   paper.  You know that's usually if they buy one
 3   carton a year or four car loads that would
 4   determine the size of the account.  What's the
 5   potential for Unisource.
 6        Q.    Now when you say the potential, do you
 7   mean the potential in terms of income?
 8        A.    Sales, sales.
 9        Q.    Okay.  When you were considering this
10   particular factor were there certain
11   representatives that you would prefer to assign
12   certain size accounts to as opposed to others?
13        A.    No.  If I had a trainee so to speak, I
14   would probably like them with smaller quick copy
15   type shops to gain some experience.
16        Q.    But other than trainees, excluding
17   trainees, were there any particular
18   representatives that you preferred to assign
19   certain size accounts to as opposed to other
20   representatives?
21        A.    Not really.  Very qualified, our reps
22   are, for the most part.
23        Q.    Now what do you mean when you say you
24   considered if the sales representative had
25   something else around the account?  What does that
```

1    mean?

2         A.    Another account.

3         Q.    You mean another account with that

4    particular customer?

5         A.    No.    In other words geographically I

6    have an account on Broward Boulevard so one on

7    Federal Highway the 200 hundred block north of

8    Federal Highway would be pretty close to me.    I

9    could park and hit the two accounts from one

10   space, you know, instead of bringing another sales

11   rep into that particular area.

12        Q.    And what consideration -- let me

13   rephrase it.   How do you consider the experience

14   of the sales representative?

15        A.    The sales reps, our sales reps for the

16   most part are very experienced.   We have some that

17   you know do better in areas than others.   For

18   example, I think Betty does a very good job on

19   implant shops.

20             Like I say, a trainee on small copy

21   shops.   But they're all very experienced.   If

22   Betty knocked on the door of a print shop today

23   she should have no problem at all, you know.   She

24   has got a lot of experience now.

25        Q.    Now, when you say "experience," do you

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1  mean experience with Unisource or experience that
2  they got before they came to Unisource?  What do
3  you mean by "experienced"?

4      A.    Experience gained on the street, calling
5  on customers, you know what's the product we're
6  selling now?  What are the in colors?  What are
7  the advertising agencies specifying?  What should
8  I be looking for?  It's around election time,
9  they're going to use a lot of poster board,
10  they're having a convention in Miami Beach.
11  They're doing this, what's going on?  What can I
12  sell here?  What's going on around their
13  community?  What's going on in the industry?

14      Q.    And do you take into consideration the
15  experience that the representative may have gained
16  before the representative came to Unisource or one
17  of its predecessors?

18      A.    I think it's more important what they
19  gain while they're here you know, as far as most
20  of our reps, including Betty have been here a long
21  time.  They've gained a lot.

22      Q.    But do you ever take a sales
23  representative's experience before coming to
24  Unisource or its predecessor into consideration?

25      A.    Yes.

```
 1              MS. DALEY:  One more break.  I'm
 2        almost finished.
 3              (Whereupon, a brief recess was taken.)
 4   BY MS. DALEY:
 5        Q.   When Larry Press left the company, do
 6   you know who reassigned his accounts?
 7        A.   When Larry Press left, I did not.  It
 8   must have been the manager.  I did not reassign
 9   those accounts.
10        Q.   Do you know who got the accounts that he
11   used to handle?
12        A.   Specifically, I don't.  If you would
13   mention the account I could probably tell you who
14   has it but I don't know specifically who they went
15   to.
16        Q.   Were you Larry Press' supervisor when he
17   left?
18        A.   No, ma'am, I wasn't.  He reported to the
19   manager.  He ran the graphics department and
20   electronics department.
21        Q.   Now before Mr. Press left, did you have
22   any conversations with him with respect to who
23   should get his accounts when he left?
24        A.   No, ma'am, I didn't.
25        Q.   When you were Ms. Ortega's supervisor
```

```
 1   did you provide her with any form of training with
 2   respect to how she should handle export accounts?
 3        A.   No formal training.
 4        Q.   Any form of training?
 5        A.   Pardon?
 6        Q.   Did you provide her with any form of
 7   training?
 8        A.   Just what we had in our weekly sales
 9   meetings, that was my basis.  From time-to-time we
10   you know, would have special guests in from our
11   suppliers but our weekly sales meeting was our
12   training ground.
13        Q.   These sales meetings were attended by
14   the other sales representatives, as well?
15        A.   Yes, ma'am.
16        Q.   Do you recall any of the sales meetings
17   that focused on export accounts, specifically?
18        A.   Sales meetings, no.
19        Q.   And when you were Ms. Ortega's manager
20   did you do anything to help her develop her
21   business?
22        A.   Every time I got an account that was
23   offshore, particularly in Central and South
24   America, I would forward that to Betty in her
25   mailbox, in her correspondence, and also when we
```

1    participated in the graphic art show on Miami

2    Beach, that's an ideal time for Betty to make

3    contacts and I know she put extra time in those

4    shows.

5         Q.    Anything else?

6         A.    She got everyone that I had.

7         Q.    I'm sorry?

8         A.    She got every lead that I had as far as

9    for Central and South America.

10        Q.    So you gave those leads only to

11   Ms. Ortega?

12        A.    Yes, ma'am.

13        Q.    And with respect to the offshore

14   accounts that you get, can you give me the names

15   of the offshore accounts that you forwarded to

16   Ms. Ortega?

17        A.    I can't give you exact names because

18   sometimes there was a fax would come in and

19   sometimes it was in Spanish, sometimes it was in

20   English and I would just give it to - in

21   Ms. Ortega's box to respond to it.  I can't tell

22   you the exact name on the account.  A lot of times

23   they were faxed in from offshore.

24        Q.    But do you recall any particular

25   offshore accounts that you actually assigned to

1    Ms. Ortega?

2        A.    Well, when I fax this to her if she

3    follows it up and there's business there all she

4    has to do is register the account.  It would be

5    her account I mean from that point.  How many

6    blossom -- I can't tell you how many blossomed.

7    It may be one or whatever.  When I give her that

8    lead that account basically is tentatively hers if

9    she develops business there.

10        Q.    And on how many occasions did you --

11        A.    Numerous.

12        Q.    I need to finish the question.

13        A.    Oh, I'm sorry.

14        Q.    On how many occasions would you give her

15    a lead that you got on an offshore account?

16        A.    Numerous times.

17        Q.    When you say "numerous times," is it

18    over ten?

19        A.    Yes.

20        Q.    Over twenty?

21        A.    Over what period of time?

22        Q.    The time that you supervised her.

23        A.    I don't know the exact number.  I can

24    say many.

25        Q.    And were all of these leads documented

```
 1   in the form of a memo or something?

 2        A.    Many times it was a fax which was

 3   documented that I passed on to Betty because I

 4   couldn't answer many of them anyway.  Many of them

 5   were in Spanish and whatever.

 6        Q.    Anything else that you did to help

 7   Ms. Ortega grow her business?

 8        A.    I think I encouraged her, I think I

 9   supported Betty.  We never had a word.  She spent

10   very little time in my office.  I did everything I

11   could do to support her if she needed something.

12        Q.    What do you mean by "support"?

13        A.    Special pricing from IP for FPL, a

14   special pricing for Carnival Cruise Lines, talked

15   to Kimberly Clark while she worked out deals for

16   Carnival Cruise Lines with Mario, the rep and so

17   forth.  Just sales support type things.

18        Q.    Now what special pricing did you give

19   Ms. Ortega for FPL?

20        A.    I didn't have the authority to give the

21   pricing.  What I helped was talk to the mill to

22   get her special pricing on many occasions.

23        Q.    What mill did you talk to?

24        A.    International Paper was one and talking

25   to Mario from Kimberly Clark to make sure that --
```

1   and she did a good job on it, with Carnival Cruise

2   Lines.

3        Q.   But let's go back to FPL.  What exactly

4   did you do in order for Ms. Ortega to get this

5   special pricing for FPL?

6        A.   Talk to the mill reps.

7        Q.   And who did you talk to?

8        A.   Jerry Coleman.

9        Q.   Anybody else?

10       A.   He was our mill rep, he handled it.

11       Q.   And what type of special pricing did

12   Ms. Ortega get for FPL?

13       A.   Deviated from the going price, deviated

14   pricing, special pricing on product.

15       Q.   How did it deviate?

16       A.   Pardon?

17       Q.   How did it differ from the other prices?

18       A.   It was lower, her cost would be lower

19   than what another accounts would be for.  It was

20   special pricing.

21       Q.   And did you do that type of thing for

22   other sales representatives as well?

23       A.   Yes.

24       Q.   Now other than Ms. Ortega, how many

25   female representatives did you supervise?

| | |
|---|---|
| 1 | A. In what time frame? |
| 2 | Q. While you supervised Ms. Ortega. |
| 3 | A. Okay. Ellie Jablansky, Barbara Vega, |
| 4 | Alga Oucha, Ellie Jablansky in the early part, |
| 5 | Bobby Vega, you got Barbara and you got Bobby, |
| 6 | there is two. Cathy Healy, and off the top of my |
| 7 | head, that's what I remember. |
| 8 | Q. And other than Ms. Ortega, how many |
| 9 | Hispanic representatives have you supervised? |
| 10 | A. Alga Oucha, Barbara Vega, Bobby Vega. |
| 11 | Off the top of my head, that's it. |
| 12 | Q. And the rest of them to your knowledge |
| 13 | were white males that you supervised? |
| 14 | A. No, I had white females. I had Cathy |
| 15 | Healy, white female, Ellie Jablansky, white |
| 16 | female. I had Michelle Walbert, sales promotion, |
| 17 | white female. |
| 18 | Q. Michelle Walbert, was she a sales |
| 19 | representative? |
| 20 | A. She was sales promotion. She did report |
| 21 | to me though. You asked who reported to me. |
| 22 | Gloria Homan. |
| 23 | Q. Was she a sales representative? |
| 24 | A. She was promotion also but she did |
| 25 | report to me, white female. |

```
 1          Q.    Tell me just the sale representatives.

 2          A.    Okay.  Off the top of my head, that's

 3    what I have.

 4          Q.    Okay.  I'm going to hand you a book of

 5    exhibits that we have been using in all of the

 6    depositions and ask you to turn to the document

 7    under tab No. 3.

 8          A.    Tab No. 3?

 9          Q.    Yes.

10          A.    Okay.

11          Q.    Tell me -- and it's stamped EEOC 178.

12    Tell me if you recognize it and if so what it is.

13          A.    Yes.  This is a statement that I made

14    when I guess we first realized that there was a

15    problem here or Betty thought she had a problem

16    and this is a statement that I made to an HR

17    representative that came to our division.

18          Q.    And who was the HR representative?

19          A.    Oh, gosh.  I'm not sure I didn't do this

20    over the phone.  I did make the statement to our

21    HR department.

22          Q.    It was somebody from Mr. McClery's

23    office?

24          A.    It would have had to have been.  Like I

25    said I'm not sure it wasn't over the phone.
```

1          Q.   I'm sorry.  Did you finish your answer?

2          A.   Yeah, like I said it would have had to

3    have been someone from Mr. McClery's office,

4    naturally.

5          Q.   And did you provide HR with a draft of

6    this statement before you actually signed it?

7          A.   I made this statement to him and I had

8    notes.

9          Q.   So you sent some notes to HR before this

10   statement was done?

11         A.   No, I made notes.  I'm trying to

12   recollect before I mentioned - said this to HR.  I

13   just didn't come off the top of my head and come

14   down.  I said well, Betty so and so blah, blah.

15   And then I don't know if I dictated it over the

16   phone or there was one here.  Like I said, it was

17   over a year but this is the statement I made.

18         Q.   What happened to those notes that you

19   made?

20         A.   It was just -- it was like I say it was

21   on a scratch pad or something.  I was just trying

22   to put in chronological order when I hired Betty.

23   It was just I dictated it to the person.

24         Q.   But what happened to the notes after you

25   were finished with them?

```
 1          A.    In the trash, I threw them in the trash.
 2          Q.    You did not turn them over to anybody?
 3          A.    No.
 4          Q.    Did you make any statements that were
 5    recorded?
 6          A.    If it was over the phone, I couldn't
 7    swear it wasn't recorded if I made statements over
 8    the phone but I didn't do any recording on it or
 9    no one came to me and recorded anything.
10          Q.    Can you turn to the document under tab
11    No. 4, please.
12          A.    Okay.
13          Q.    Tell me -- it's stamped EEOC 183.  Tell
14    me if you've ever seen this before.
15          A.    No.
16          Q.    Can you turn to the document under tab
17    No. 5, please.  It's stamped EEOC 185 and tell me
18    if you've ever seen it before.
19          A.    No, ma'am, I've never seen it before.
20          Q.    Same thing with the document under tab
21    No. 6 stamped EEOC 186.  Have you seen that
22    before?
23          A.    No, ma'am.
24          Q.    Same thing with the document under tab
25    No. 7 stamped EEOC 187.
```

        1        A.    Never seen it.

        2        Q.    Same with the document under tab No. 8

        3    stamped EEOC-188.

        4        A.    Never seen it.

        5        Q.    Same with the document under tab No. 9

        6    stamped EEOC-189.

        7        A.    Never seen it.

        8        Q.    Okay.  Same with respect to the document

        9    under tab No. 10 stamped EEOC 190.

       10        A.    Never seen it.

       11        Q.    Were you ever interviewed by Caesar

       12    McClery about any complaint that Betty Ortega had

       13    made to the company?

       14        A.    No, ma'am.

       15        Q.    And other than the conversation that you

       16    had with the Human Resources person about your

       17    witness statement, were you interviewed by anyone

       18    from Mr. McClery's office about any claims that

       19    Ms. Ortega had made?

       20        A.    Other than the witness statement, no,

       21    ma'am.

       22        Q.    Now how about by John Glaze?  Have you

       23    ever been - have you spoken to him about any of

       24    the claims that Ms. Ortega is making in this

       25    lawsuit against Unisource?

                BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    A.   We never discussed it.   The only thing
2  we discussed is what time he has to come here and
3  I told him I had to come there, other than just,
4  you know.   But we never discussed anything about
5  this thing other than the time to be here and I
6  had to leave early.   Other than that, we didn't
7  discuss it.

8    Q.   So you never spoke to John Glaze about
9  whether or not you thought there were any merits
10  to the claims that Ms. Ortega was making against
11  the company?

12    A.   In our discussion with John Glaze with
13  John and I?

14    Q.   Yes.

15    A.   The only comment I ever made to John
16  about it that I have made, I said I don't
17  understand it, John.   I mean I said you treat this
18  young lady like a daughter.   I mean you've been
19  very good to Ms. Vega, believe me.   I mean you've
20  taken her under your arm and your wing and
21  everything else.   I just don't understand it.
22  Maybe we'll understand it later but I don't
23  understand it now and that's about the topic of
24  conversation right there.

25    Q.   Do you mean Ms. Vega or Ms. Ortega?

1      A.    No, Ms. Ortega.

2      Q.    Okay.  And did Mr. Glaze give you any

3   comments about his opinion as to the merits?

4      A.    He just shrugged his shoulders and that

5   was it.

6      Q.    Nothing else?

7      A.    That was it.

8      Q.    Now have you ever spoken with Bob

9   Peterson about the claims that Ms. Ortega is

10  making in this lawsuit?

11     A.    No, not about the claims.  He just told

12  me he was subpoenaed and that was it.  We didn't

13  discuss it at all.  I don't get into that.  I've

14  been around a long time and when something like

15  this happens you don't get into discussions, you

16  don't do that.  You just do what you got to do and

17  they do what they got to do.

18           He just told me he was subpoenaed and I

19  guess maybe my name was on his subpoena.  I don't

20  know if that's true or not but he knew, the word

21  got out that there was a subpoena out but other

22  than the subpoena itself to come here, we had no

23  discussion.

24     Q.    No discussion at all about the claims

25  that Ms. Ortega is making?

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1              MR. STEVENS:  I'm going to object.
 2         Just answer the question.
 3              THE WITNESS:  No, the answer to your
 4         question is, no.
 5              MS. DALEY:  Okay.  I have no further
 6         questions.
 7              MR. STEVENS:  I have no questions
 8         either.  We'd like to read.
 9    u             (Whereupon, the deposition concluded
10                  at 4:15 o'clock p.m. )
11              AND FURTHER DEPONENT SAITH NOT.
12
13
14                       _____
15                       (Signature of the Witness)
16
17
18
19
20
21
22
23
24
25
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

CERTIFICATE OF OATH

STATE OF FLORIDA    )

COUNTY OF BROWARD    )

    I, ANDREA ROBINSON-WEST, R.P.R. and Notary

Public, do hereby certify that WILLIAM JOSEPH READY

personally appeared before me and was duly sworn.

    WITNESS MY HAND AND SEAL this 16th day of

November, 2000.


_____
ANDREA ROBINSON-WEST, R.P.R.
Notary Public - State of Florida
My Commission No.

                Expires:



RULE 1.310.  FLORIDA RULES OF CIVIL PROCEDURE
PROVIDES IN PART:
(e) "...Any changes in form or substances that the
witness wants to make shall be entered upon a
separate correction page by the officer with a
statement of the reasons given by the witness for
making them . . ."

1    ERRATA SHEET

2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

3    RE:    SEE TITLE PAGE

4        Deposition of:  WILLIAM JOSEPH READY
        Date Taken:  September 21, 2000

5

    PAGE    LINE
6    NO.     NO.    CORRECTION OR CHANGE          REASON

7    _____   _____  _____  _____

8    _____   _____  _____  _____
    _____   _____  _____  _____

9    _____   _____  _____  _____
    _____   _____  _____  _____

10   _____   _____  _____  _____
    _____   _____  _____  _____

11   _____   _____  _____  _____
    _____   _____  _____  _____

12   _____   _____  _____  _____
    _____   _____  _____  _____

13   _____   _____  _____  _____
    _____   _____  _____  _____

14   _____   _____  _____  _____
    _____   _____  _____  _____

15   _____   _____  _____  _____
    _____   _____  _____  _____

16   _____   _____  _____  _____
    _____   _____  _____  _____

17   _____   _____  _____  _____
    _____   _____  _____  _____

18   _____   _____  _____  _____
    _____   _____  _____  _____

19   _____   _____  _____  _____
    _____   _____  _____  _____

20   _____   _____  _____  _____
    _____   _____  _____  _____

21

22   Under penalties of perjury, I declare that I have
     read my deposition and that it is true and correct,
23   subject to any changes in form or substance entered
     here.

24

25   _____     _____
            DATE                     WILLIAM JOSEPH READY

```
 1                         CERTIFICATE

 2   STATE OF FLORIDA  )

 3   COUNTY OF BROWARD )

 4       I, ANDREA ROBINSON-WEST, R.P.R. and Notary

 5   Public in and for the State of Florida at large

 6   do hereby certify that WILLIAM JOSEPH READY

 7   was by me first duly sworn to testify the whole

 8   truth, and that the above deposition given by him was

 9   recorded stenographically by me personally, and

10   reduced to typewriting under my direction.

11       I further certify that the said deposition was

12   commenced and completed at the time and place

13   herein set forth, and that the foregoing pages

14   numbered 1 through 99, inclusive, contain

15   a true and correct transcription of the testimony

16   of said witness.

17       I further certify that I am neither attorney

18   or party, nor am I related to or employed by any

19   attorney or party connected with the action, nor

20   am I financially interested in the action.

21       WITNESS MY HAND AND SEAL this 16th day of

22   November, 2000.

23       _____
                 ANDREA ROBINSON-WEST, R.P.R.
24

25
```

BRICKELL, GOMBERG & ASSOCIATES, INC.
521 South Andrews Avenue, Suite One
Fort Lauderdale, Florida 33301
Broward (954) 522-0067
Dade (305) 949-5814

July 16, 1998                          COPY

William Joseph Ready
1227 Southwest 87th Terrace
Plantation, Florida   33324

RE: ORTEGA VS. UNISOURCE

(Mailed and attached to deposition.)

                    NOTICE OF FILING

     The deposition of William Joseph Ready

taken on September 29tht, 2000, is available at my

office for reading, the making of any corrections,

additions or alterations, and signing.


     Please call for an appointment, if you wish

to read.

                    _____
                    Andrea Robinson-West,
                    Registered Proffesional Reporter



```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2

 3
                 CASE NO. 00-6126-CIV-Dimitrouleas/Johnson
 4

 5
      BETTY ORTEGA,                     )
 6                                      )
                      PLAINTIFF,        )
 7                                      )
          v.                            )       ORIGINAL
 8                                      )
      UNISOURCE WORLDWIDE, INC., a      )
 9    foreign corporation,              )
                                        )
10                   DEFENDANT.         )
                                        )
11    - - - - - - - - - - - - - - - - - x

12
                         500 N.E. 4th Street
13                       Ft. Lauderdale, Florida
                         September 28, 2000
14                       2:30 p.m.

15

16               DEPOSITION OF JOHN GLAZE

17

18

19          Taken before JACKIE JOHNSON, Professional

20    Reporter and Notary Public in and for the State of

21    Florida at Large, pursuant to Notice of Taking

22    Deposition filed in the above cause.

23               - - - - - - -

24       BRICKELL, GOMBERG & ASSOCIATES (954) 522-0067

25 521 South Andrews Avenue, Suite One, Ft. Lauderdale  33330
```

```
 1                    APPEARANCES

 2
       ON BEHALF OF THE PLAINTIFF
 3
            AMLONG & AMLONG, P.A.
 4          500 Northeast Fourth Street
            Ft. Lauderdale, Florida  33301
 5          BY:  Jennifer Daley, ESQ.

 6     ON BEHALF OF THE DEFENDANT

 7          TROUTMAN SANDERS, LLP
            600 Peachtree Street, N.E.
 8          NationsBank Plaza, Suite 5200
            Atlanta, Georgia  30308
 9          BY:  Robert C. Stevens, ESQ.

10     ALSO PRESENT:  Betty Ortega, Plaintiff
                      Amy J. George, Human Resources Manager
11                    Unisource Southeast

12                      INDEX
       Witness       Direct   Cross   Redirect   Recross
13     JOHN GLAZE
         By Ms. Daley   3               111
14       By Mr. Stevens         110

15
                       EXHIBITS
16                   NUMBER        PAGE
                       26           17
17                     27           17
                       28          113
18                     29          113

19

20

21

22

23

24

25
```

```
 1   Thereupon --
 2                      JOHN GLAZE,
 3    was called as a witness and, having been first duly
 4    sworn, was examined and testified as follows:
 5                      DIRECT EXAMINATION
 6  BY MS. DALEY:
 7       Q.    Please state your full name.
 8       A.    John Arthur Glaze.
 9       Q.    What is your date of birth?
10       A.    9-9-63.
11       Q.    What is your home address?
12       A.    4122 Boston Court, Weston, Florida.
13       Q.    What is your --
14       A.    The zip?
15       Q.    -- zip?
16       A.    33331.
17       Q.    What is your Social Security number?
18       A.    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.
19       Q.    Have you ever been convicted of a crime?
20       A.    No, ma'am.
21       Q.    Ever arrested?
22       A.    No, ma'am.
23       Q.    I am going to hand you a book of exhibits
24    right now.  Can you turn to the one under Tab No. 11.
25    Under Tab Number 11 should be four pages tabbed EEOC
```

```
 1    192 through 194; do you have those?

 2               MR. STEVENS:   Three pages?

 3               THE WITNESS:   Three pages, yes, ma'am.

 4 BY MS. DALEY:

 5    Q.    Do you know what those are?

 6    A.    Uh-huh, yes, ma'am.

 7    Q.    Can you tell me what they are?

 8    A.    They are our Commission Matrix, for

 9 computation purposes, in computing the commission

10 that our sales reps earn on a sale.

11    Q.    And looking at the first one entitled

12 Warehouse Commission Schedule Supply Systems and

13 Printing, what is that a Commission Schedule for?

14    A.    For sales of stock product from our

15 warehouse that are delivered from our trucks.

16    Q.    And can you explain to me how this schedule

17 works?

18    A.    Sure.   In order to earn a commission, based

19 on this schedule, you'd to have a minimum gross

20 profit in the sale of $75.00, and you had to have a

21 minimum gross profit percentage of four percent.

22 That's the very bottom, but whatever gross profit

23 dollars were in the sale, that's the left or --

24 excuse me -- the vertical axis that you go to and

25 whatever percentage that equated to, that's the
```

1    horizontal bar that you go to, and where the two meet

2    in the chart is the percentage of payout for the

3    sales rep of the gross profit in the sale.

4        Q.    With respect to this first page, EEOC 192,

5    does this schedule apply to any particular type of

6    account?

7        A.    I am not sure I understand the question,

8    but it applies to -- it's designed for warehouse

9    sales.

10       Q.    When you say warehouse sales, are there any

11   specific accounts that this schedule applied to, for

12   example, web accounts, sheet fed accounts?

13       A.    All accounts through the warehouse that

14   have sales that run through the warehouse.

15       Q.    So you're saying that this schedule, EEOC

16   192, would apply to web accounts, to export accounts

17   and sheet fed accounts?

18       A.    If it's a warehouse sale, yes.  This may

19   not be the only schedule that exists for that, but

20   this schedule applies to warehouse sales for those

21   accounts.

22       Q.    So this would apply to warehouse sales for

23   web accounts, this schedule?

24       A.    It could, yes.

25       Q.    When you say could, just so I can

```
 1   understand what you're saying, I am looking at the
 2   document that's stamped EEOC 192 --
 3        A.    Yes, ma'am.
 4        Q.    -- and you're saying this particular
 5   schedule could apply to some web accounts that have
 6   been handled by sales representatives?
 7        A.    That's correct.
 8        Q.    And to your knowledge, beginning with the
 9   effective date 2-1-1999, were there any web accounts
10   to which this schedule did not apply, with respect to
11   the Miami Division?
12        A.    There's another Commission Matrix for some
13   web accounts that exists for three particular
14   salespeople.  The specific accounts, I could not
15   name.
16        Q.    Look at the document under Tab No. 11 and
17   tell me if that different schedule is under this tab?
18        A.    No, ma'am.
19        Q.    And have you ever seen that different
20   schedule that applies to those other representatives
21   that you just mentioned?
22        A.    Stated like this, no, ma'am.
23        Q.    Have you seen it stated in any other form?
24        A.    Only in the way that it computes the
25   commissions on the Commission Statement.
```

| | | |
|---|---|---|
| 1 | Q. | Have you seen it in a written form? |
| 2 | A. | I have not. |
| 3 | Q. | And has anyone told you how the Commission |

4 Schedule works with respect to those three other
5 representatives?

| | | |
|---|---|---|
| 6 | A. | Those web accounts? |
| 7 | Q. | Correct, the web accounts, but those other |

8 representatives?

| | | |
|---|---|---|
| 9 | A. | Because it's not all their sales.  It's |

10 their web accounts.

| | | |
|---|---|---|
| 11 | Q. | Let me rephrase the question again. |
| 12 | | Has anyone in the company ever told you how |

13 the Commission Schedule works with respect to the web
14 accounts handled by those other representatives?

| | | |
|---|---|---|
| 15 | A. | Yes. |
| 16 | Q. | Who told you? |
| 17 | A. | I think the first person would have been |

18 Bill Ready.

| | | |
|---|---|---|
| 19 | Q. | Anyone else? |
| 20 | A. | Later, Cecil McClary. |
| 21 | Q. | Anyone else? |
| 22 | A. | Not to my recollection. |
| 23 | Q. | When did that different schedule come into |

24 effect with respect to web accounts?

| | | |
|---|---|---|
| 25 | A. | It was prior to my joining South Florida |

1    Unisource.  So I can't answer that.

2         Q.    When did you join?

3         A.    I joined South Florida, this location, in

4    October of '99.

5         Q.    And what did --

6         A.    Excuse me.  October of '96.  Sorry.

7         Q.    And what did Bill Ready tell you with

8    respect to how the other Commission Schedule works

9    for web accounts?

10        A.    That there were three salespeople in South

11   Florida that had heat set web -- heat set web

12   accounts that were on a Commission Matrix computed at

13   a straight 30 percent of the gross profit that is

14   generated on the sale.

15        Q.    Anything else that Mr. Ready told you with

16   respect to how the Commission Schedule works for

17   those web accounts?

18        A.    How the Commission Schedule worked?  I

19   don't believe so.

20        Q.    And who were the three people that

21   Mr. Ready was talking about?

22        A.    John Huempfner, Dennis Laux and Bob

23   Peterson.

24        Q.    And did Mr. Ready ever tell you why those

25   three representatives had a different Commission

1    Schedule with respect to those web accounts?

2        A.    Specifically, no.

3        Q.    Did you ever ask him?

4        A.    Mr. Ready, no.

5        Q.    And did anyone ever tell you how

6    Mr. Huempfner, Mr. Laux and Mr. Peterson were paid

7    under this different Commission Schedule?

8        A.    Can you repeat the question?

9        Q.    Sure.

10            Did anyone ever specify to you how

11    Mr. Huempfner, Mr. Laux or Mr. Peterson were paid

12    with respect to this different commission structure?

13        A.    How?  Mr. Ready and Mr. McClary explained

14    that, and I saw it on the commission structure.

15        Q.    So what, if anything, did Mr. Ready say

16    with respect to how Mr. Huempfner was paid under that

17    different commission structure?

18        A.    As I had indicated before, it was a 30

19    percent straight percentage of the GP for all heat

20    set web accounts, and it was done under a separate

21    sales number.

22        Q.    When you say GP, do you mean gross profit?

23        A.    I do mean gross profit, yes, ma'am.

24        Q.    And did either Mr. Ready or Mr. McClary

25    tell you whether or not that same system, the 30

```
 1    percent straight percentage of the gross profit also

 2    applied with respect to Mr. Laux's web account that

 3    had the different Commission Schedule?

 4         A.    Please repeat the question.

 5         Q.    Sure.

 6               That 30 percent commission structure with

 7    respect to the gross profit, did that also apply to

 8    Mr. Laux, as far as you know?

 9         A.    To his heat set web accounts, yes, ma'am.

10         Q.    And did the same structure work with

11    respect to Mr. Peterson's heat set web account?

12         A.    Yes, ma'am.

13         Q.    Other than Mr. Huempfner, Mr. Laux and

14    Mr. Peterson, do you know of any other sales

15    representatives who handled heat set web accounts?

16         A.    No, ma'am. Excuse me. I am sorry. At the

17    time, currently?

18         Q.    Ever?

19         A.    Mr. Laux and Mr. Huempfner no longer work

20    for Unisource. The rep that took some of those

21    accounts, his name is Jim Ware. Jim Ware has some

22    heat set web accounts. There's been other

23    reassignments, and I can't specifically tell you

24    where all those accounts are now.

25         Q.    Do you know when Mr. Ware got the heat set
```

1    web accounts?

2    A.    Approximately Spring of last year.

3    Q.    And do you know if those accounts were

4    assigned to him by someone?

5    A.    Yes, ma'am.

6    Q.    And who did the assignment?

7    A.    I did.

8    Q.    What criteria, if any, did you follow in

9    assigning those accounts to Mr. Ware?

10    A.    I recruited Mr. Ware because of his large

11    account experience, and most of these were large

12    accounts.

13    Q.    Any other criteria?

14    A.    I felt he was qualified to work the

15    accounts.

16    Q.    Any other criteria?

17    A.    Not that I can recall.

18    Q.    Now, the criteria that you followed, were

19    they ever memorialized in any written form?

20    A.    No, ma'am.

21    Q.    And were you following any particular

22    policy or any guidelines that were provided to you

23    with respect to what criteria you need to consider in

24    assigning the accounts to Mr. Ware?

25    A.    Guidelines are established by industry

1    norm, industry practice stated.  Not that I am aware

2    of.

3         Q.    Were any guidelines provided to you by the

4    company, Unisource?

5         A.    Specific guidelines?  Please let me make

6    sure I understand what you're asking.

7         Q.    Sure.

8               With respect to the assignment of the

9    accounts to Mr. Ware, I want to know if you followed

10   any criteria that were given to you by anybody at

11   Unisource?

12        A.    Written, no.

13        Q.    How about verbal, did anybody sit down and

14   discuss with you a criteria you needed to follow in

15   assigning the accounts that Mr. Ware eventually got?

16        A.    Specifically, no.  It's industry -- it's

17   industry experience.

18        Q.    So the decision that you made to assign the

19   accounts to Mr. Ware was, basically, subjective?

20        A.    Based on my industry experience.

21        Q.    And did anybody else have any input with

22   you with respect to the decision to assign the

23   accounts to Mr. Ware?

24        A.    I would say no.

25        Q.    Did you consider Miss Ortega as a possible

1   candidate for these heat set web accounts?

2        A.    I considered all employees.

3        Q.    And why were they not assigned to Miss

4   Ortega?

5        A.    Miss Ortega had a full book of accounts.  I

6   lost two salespeople with Dennis Laux and John

7   Huempfner, and I identified the accounts that I

8   assigned to Jim Ware, accounts that needed a lot of

9   attention, somebody with large account background,

10   large account experience, and that was the criteria

11   for my decision.  I recruited Mr. Ware for that

12   position from another location.

13        Q.    Now, when you said you were looking for

14   someone with large account experience, what, in your

15   mind, is large account?  What does the phrase large

16   account mean?

17        A.    Web or large format presses, multi million

18   dollar paper purchasers, large volume, large press

19   formats.

20        Q.    To your knowledge, had Miss Ortega ever

21   handled any heat set web accounts in the past?

22        A.    Heat set web accounts, not that I am aware

23   of.

24        Q.    And was she qualified to handle those

25   accounts?

1    A.    She didn't have the experience that I was
2    looking for, but I am not sure -- I mean, she is
3    qualified to be a paper sales representative.
4    Q.    What experience did she not have?
5    A.    Specifically, I wasn't aware of any heat
6    set web experience.  I also wasn't aware of any
7    multiple -- well, that was, primarily, the driving
8    motivation.
9    Q.    So you're saying it's because she did not
10   have any heat set web experience, to your knowledge?
11   A.    No, ma'am, that's not what I am saying.
12         The other part of the equation was someone
13   that had the time to dedicate to these accounts, that
14   had the experience, and had the time to be able to
15   focus on these accounts.
16   Q.    But to your knowledge, did she have the
17   experience that you were looking for?
18   A.    Not all the experience that I was looking
19   for.
20   Q.    What experience did she lack that you were
21   looking for?
22   A.    Well, one of the things is I was not aware
23   of any heat set web experience that she had.
24   Q.    And did Mr. Ware have any heat set web
25   experience?

1      A.      It was my understanding that he did.

2      Q.      And how much experience did he have

3  handling heat set web accounts?

4      A.      He worked in our Colombia location and had

5  two major printers.  He had -- the exact volume, I am

6  not aware of, but they were very large multiple

7  format printers.  The recommendation came from Glenn

8  White, our manager there.

9      Q.      Anything else that Miss Ortega lacked with

10  respect to her qualifications to handle the accounts

11  that were assigned to Mr. Ware?

12      A.      Not that I can think of at this moment.

13      Q.      Now, how do these heat set web accounts

14  differ from any other web accounts, if at all?

15      A.      From any other web accounts?

16      Q.      Yes.

17      A.      Heat set web implies coated books,

18  oftentimes publishing.  Heat set web is when the

19  product is coated, and it requires that it go through

20  pass-through dryers.  Those accounts tend to be very

21  high volume.  Those presses are very expensive, very

22  high volume.  They eat a lot of paper.  It's a very

23  fast paced sophisticated industry.

24              Cold set web is, basically, uncoated

25  offset.  The presses that run the uncoated offset are

1    relatively simple.  The quality of work that you can

2    get off a cold set web is very basic, and the

3    sophistication level is not as high, but both are

4    different than sheet offset printing.

5        Q.    Did the company require any special skills

6    in order to sell heat set web accounts, as opposed to

7    the regular web account?

8        A.    Did the company require?

9        Q.    Yes.

10       A.    I specifically looked for someone that has

11   experience in that.  I am not sure if I answered your

12   question.

13       Q.    When you say you looked for someone who has

14   experience in the area, is that a requirement of

15   Unisource or is that just your personal requirement?

16       A.    I can't speak for any stated policy of

17   Unisource.  It is a requirement that I like to have,

18   yes.

19           MS. DALEY:  Let me talk to Karen for a

20       minute.

21               (Thereupon, a brief recess was taken,

22               after which the following proceedings

23               were had:)

24           MS. DALEY:  I am prepared to continue with

25       Mr. Glaze's deposition today, unless there's any

```
 1        objection.  I am going to depose him today in

 2        his individual capacity, pursuant to the notice

 3        that we served, unless there is an objection.

 4             MR. STEVENS:  He is here in his individual

 5        capacity.  He is available in his 30(b)6

 6        capacity to respond to questions 16, 17, 18, 19,

 7        20, 21, 22, 23, 24 and 26.  I am making him

 8        available in both capacities today.

 9             MS. DALEY:  And I am saying that we are not

10        prepared to depose him as a 30(b)6

11        representative today, and I am going to mark the

12        Deposition Notices as exhibits.  I think we

13        stopped at No. 25 in this book, and I am going

14        to mark them No. 26 for the individual notice

15        and 27 for the 30(b)6 notice.

16                  (The documents referred to were

17                   thereupon marked Plaintiff's Exhibit

18                   Nos. 26 and 27 for Identification.)

19             MS. DALEY:  If there's no objection, I am

20        going to proceed to depose him in his individual

21        capacity, and then expect him to come back on

22        the day that we have the 30(b)6 representative

23        noticed for.

24             MR. STEVENS:  Can I see the notice?

25             MS. DALEY:  Sure.
```

```
1              MR. STEVENS:  The notices I am looking at,

2         I don't know when they were served.

3              MS. DALEY:  Look at the last page.

4              MR. STEVENS:  August 30th is one of them,

5         and the other one is September 2nd.  These have

6         changed dramatically through discussions between

7         Plaintiff's counsel, primarily through

8         Plaintiff's counsel's assistant and our

9         attorneys.  We have rearranged these schedules

10        numerous times.  We have not agreed to depose

11        the 30(b)6 corporate rep on September 29th at

12        10:00.  In fact, we have agreed to move that

13        several times.  There's been no agreement to do

14        it then, and based on recommendations of counsel

15        and their assistant, we can't produce a 30(b)6

16        witness tomorrow at 10:00 a.m., because we were

17        told we didn't have to.

18             Mr. Glaze is being made available today in

19        both capacities, and if you only want to depose

20        him as an individual and make a decision on

21        30(b)6 or say you're not doing it today, that's

22        fine.

23             MS. DALEY:  We are not doing 30(b)6 today.

24        I made that clear.  He was noticed today in his

25        individual capacity, only, and we are not going
```

```
 1        to do both today.

 2             If you want to move for Protective Order

 3        with respect to the 30(b)6, you're free to do

 4        so.  So unless you're instructing him not to

 5        answer questions, I am going to continue with

 6        the deposition.

 7             MR. STEVENS:  I am not instructing him not

 8        to answer questions.  You understand my

 9        position.

10             MS. DALEY:  And we need to talk about the

11        30(b)6 afterwards, if you have a few minutes,

12        because we haven't gotten -- my understanding

13        was Miss George was unavailable because she had

14        vacation.  That's the reason why we agreed to

15        move it.  She had vacation.

16             Can you go off the Record.

17                  (Discussion off the record.)

18  BY MS. DALEY:

19        Q.   Now, are the web rolls sold by truckload,

20    as far as you know?

21        A.   Not exclusively, no.

22        Q.   Are there some web rolls that are sold by

23    the truckload?

24        A.   Yes, ma'am.

25        Q.   And are there any other types of paper that
```

1    the company sells that are sold by truckload?

2         A.    Yes, ma'am.

3         Q.    And what other type of paper?

4         A.    Just about all types could be sold by

5    truckload.

6         Q.    And with respect to the other types that

7    are sold by truckload, are those -- what is the

8    commission structure with respect to the other type

9    of paper that is sold by the truckload?

10        A.    Other than web?  Other than those three

11   salespeople?  I am asking for clarification.

12        Q.    What I am trying to ask you is with respect

13   to the other type of paper that the company sells by

14   the truckload, other than this heat set web, what

15   type of commission structure is used for paying sales

16   representatives with respect to those other types of

17   paper?

18        A.    Okay.  If it's a full truckload delivered

19   by Unisource, by our trucks, it's the warehouse

20   commission structure, assuming we stock it.  If it's

21   a product we don't stock sold by the truckload, it's

22   the indirect commission structure, and we deliver it.

23   If it's a product that we don't stock and we don't

24   deliver and the mail delivers it, it's done on the

25   direct schedule.

```
 1        Q.    Other than excluding the heat set web
 2   accounts and the paper that is sold under those type
 3   of accounts, is there any type of paper that is sold
 4   by the truckload that has a similar profit margin
 5   that the heat set web accounts have?
 6        A.    I'm afraid you're going to have to define
 7   similar.
 8        Q.    With respect to the heat set web accounts,
 9   let's deal with that first, is there a special profit
10   margin with respect to those type of accounts?
11        A.    There's a range.
12        Q.    And what's the range?
13        A.    Approximately two percent to eight percent
14   is a normal range, but it's sold on either end of
15   that.
16        Q.    And that's two to eight percent of what?
17        A.    Gross margin.
18        Q.    And what is the profit margin with respect
19   to the other type of web accounts?
20        A.    Other type of web accounts?
21        Q.    Yes.  Other than the heat set web?
22        A.    The margins tend to be slightly higher.
23        Q.    And in what range?
24        A.    A few points higher, but it's not a fixed --
25   I mean, this is only a range.  It's only an
```

1    approximation.

2        Q.    And do you know what the profit margin is

3    with respect to, let's say, sheet fed --

4        A.    Again --

5        Q.    -- is it higher or lower than the heat set

6    web?

7        A.    As a rule, generally, it's a little higher.

8    It's higher, and these are all generalizations.    You

9    have asked for ranges.

10       Q.    Why is there a different commission

11   structure set up with respect to the heat set web, as

12   opposed to the other types of paper that you sell?

13       A.    I wasn't involved in that decision.    I

14   can't answer that question.

15       Q.    Do you know who in the company can answer

16   that question?

17       A.    With certainty, no.

18       Q.    Do you supervise any sales representatives

19   today?

20       A.    Directly or --

21       Q.    Let's deal with directly first.

22       A.    In the absence of a Graphics Sales Manager,

23   I directly supervise Graphics sales reps.

24       Q.    And who are the Graphics sales

25   representatives today?

```
 1      A.    Mario Pettineo.

 2      Q.    Anybody else?

 3      A.    Directly, no, not that I can think of.

 4      Q.    Do you have any other people who you

 5  supervise directly, other than Mario Pettineo?

 6      A.    Yes, ma'am.

 7      Q.    And who else?

 8      A.    I will try to provide you a list, but I

 9  will probably leave some people out.

10      Q.    Tell me who you can recall that you

11  supervise today.

12      A.    I supervise Mike Butler, the Packaging

13  Sales Manager, Chris Todd, the Supply Systems Sales

14  Manager, Norman Pena, the Operations Manager, a soon

15  to be Graphics Manager to be determined, Lou Kaminow,

16  the Printing Paper Sales Manager, David Sell is the

17  Division Manager for the Orlando Division, Lou

18  Warren, Division Manager for the Tallahassee

19  Division, Bruce Spencer, Division Manager for the

20  Jacksonville Division, Jen Frahm, Division Manager

21  for the Tampa Division.  I have some Florida

22  specialists, Pat Thomas, the Grocery Specialist, Tim

23  Wilhelm, the Corrugated Specialist, PJ Leonardi,

24  she's a Bid Specialist.

25      Q.    Anybody else that you can recall?
```

```
 1      A.    Not that I can recall.

 2      Q.    And do you directly supervise any sales

 3   representatives?

 4      A.    The only one that I directly supervise

 5   today is Mario Pettineo, that I can recall, because

 6   he does not have a sales manager at the moment.

 7      Q.    Have you ever directly supervised any sales

 8   representative?

 9      A.    Yes, ma'am.

10      Q.    And which sales representatives have you

11   directly supervised from the Miami Division?

12      A.    Again, I will try to give you a list, but I

13   may omit some people because of inability to remember

14   them all.  John Huempfner, Betty Ortega.  We just

15   said Mario Pettineo.  Tony Gispert.  Actually, at one

16   point, I had all the sales reps on the printing side.

17   Bobby Vega, Bob Peterson, Bill Ready, Steve Sullivan,

18   Phil Hazan.

19      Q.    Anybody else that you can recall?

20      A.    There are more, but I am sorry.

21      Q.    What are your duties today, your job

22   duties?

23      A.    I have operational responsibility for the

24   division in South Florida, Miramar and Medley

25   distribution facilities.
```

```
 1      Q.    Any other job duties?

 2      A.    Yes, and I also have operational

 3   responsibilities, which includes sales and

 4   operations, for the state of Florida.

 5      Q.    Any other?

 6      A.    No, I think that just about covers it.

 7      Q.    Now, with respect to the sales

 8   representatives in the Miami Division, are sales

 9   goals set for the sales representatives?

10      A.    Yes, ma'am.

11      Q.    And who sets the sales goals?

12      A.    Their sales manager.

13      Q.    And do you have any input with respect to

14   the sales goals that are set for representatives?

15      A.    Yes, I have input.

16      Q.    And what type of input?

17      A.    Well, in some cases, guidelines are set

18   even above me, but my input is based on what I know

19   the sales reps' territory is capable of, and I share

20   my feelings with the sales manager.

21      Q.    Now, how often are the sales goals set for

22   the sales representatives?

23      A.    Annually.

24      Q.    And what type of input do you provide with

25   respect to the sales goal?
```

1      A.     I am sorry.  I thought I just answered that
2    question.

3      Q.     It's my understanding that you said you set
4    sale goals based on what you know.

5             What type of information do you provide to
6    the people who actually set the goal with respect to
7    what the goal should be for each representative?

8      A.     What are the -- I am sorry.  I don't
9    understand the question.

10     Q.     Now, let's say, for example, with respect
11   to Miss Ortega, when her sales goals are being set,
12   what type of input would you provide to the sales
13   manager with respect to the goals that should be set
14   for her?

15     A.     My input or data that they use?

16     Q.     Do you distinguish between input and data?

17     A.     Well, if you're asking what is input, I
18   give -- you know, we sit down with the sales
19   managers, and we look at what the division, as a
20   whole, is responsible for in growth, plus inflation,
21   to Corporate, and then those numbers are sort of
22   spread to the sales force.

23     Q.     What exactly do you personally do with
24   respect to the process of setting the sales goals, if
25   anything?

```
 1      A.      When I had direct responsibility for the
 2   same people, I did the whole process.  Now, since
 3   they all have sales managers or will have sales
 4   managers for the planning process, I will provide my
 5   input based on what I know the company is looking
 6   for, in terms of growth of the coming year, and what
 7   I know to be the potential in the territories that
 8   are possessed by the salespeople.  I hope I have
 9   answered your question.
10      Q.      When did you stop having direct
11   responsibility for setting sales goals for the sales
12   representatives?
13      A.      Because I have a sales manager for Printing
14   Paper, now I have sales managers that do that with
15   the sales reps.
16              Mario Pettineo is my own direct sales
17   report, because his sales manager isn't hired.  I
18   made an offer to him.  So when I hire sales managers,
19   between myself and the salespeople, is when I stop
20   having direct responsibility.
21      Q.      Excluding Mr. Pettineo, when did you stop
22   having direct responsibility for setting sales goals
23   for representatives, including Miss Ortega?
24      A.      Specific to Miss Ortega?
25      Q.      Let's deal, first, with Miss Ortega.
```

```
 1              When did you first stop having direct
 2    responsibility for setting her sales goals?
 3         A.    When I hired Lou Kaminow.
 4         Q.    And what year was that?
 5         A.    The year 2000.
 6         Q.    And when in 2000?
 7         A.    Approximately June.
 8         Q.    Now, with respect to the other sales
 9    representatives in Miss Ortega's division, we're
10    again excluding Mr. Pettineo, when did you stop
11    having direct responsibility for setting their sales
12    goals?
13         A.    I am sorry.  Repeat the question.
14         Q.    Excluding Miss Ortega and excluding
15    Mr. Pettineo, when did you stop having direct
16    responsibility for setting sales goals for sales
17    representatives?
18         A.    For Printing Paper, which is the only group
19    I have had direct responsibility for since I have
20    been in South Florida, that was when I hired
21    Mr. Kaminow.
22         Q.    And do you have a time frame with respect
23    to that?
24         A.    Yes, ma'am.  I just stated it.  I hired
25    Mr. Kaminow in June of 2000, approximately June of
```

```
 1   2000.

 2      Q.    So you stopped, with respect to the other

 3   sales representatives and Miss Ortega, at the same

 4   time?

 5      A.    Yes, ma'am.

 6      Q.    Now, with respect to the sales goals that

 7   you set for -- going back to the time frame when you

 8   were directly responsible for setting the sales goal --

 9      A.    For?

10      Q.    -- for Miss Ortega and the other

11   representatives, were any of those sales goals ever

12   written down after they were set?

13      A.    Yes, ma'am.

14      Q.    And in what form?

15      A.    The salespeople had a plan, and there was a

16   plan that was provided to each sales rep for each

17   quarter and a total annualized sales and gross profit

18   plan, and those numbers were included in my

19   division's Business Plan.

20           MS. DALEY:  Read back that answer, please.

21                     (The question referred to was

22                      thereupon read by the reporter as

23                      above recorded.)

24 BY MS. DALEY:

25      Q.    What records are kept of the sales goals
```

1    that are kept for each -- that are made for each

2    sales representative, other than this sales plan that

3    you just talked about?

4        A.    The sales plan is -- I am not sure I

5    understand your question.  I am sorry.

6            We keep the Business Plans, generally, for

7    the prior year, but not much further beyond that.

8    That's where that record is kept.  It's recorded on

9    the Commission Statements, because it tracks the

10   sales rep's performance against the plan.  So if you

11   go back on the Commission Statement, you can

12   calculate the plans that way, but that's all I can

13   recollect.

14       Q.    Now, this Business Plan that you're talking

15   about, does this have a title?  For example, if I

16   want to get a copy of a Business Plan, what would I

17   ask you for?

18       A.    The Business Plan, Miami Business Plan.

19       Q.    Just so I can see if I understand.  Is

20   there a separate Business Plan that's made up for

21   Miss Ortega?

22       A.    There's a section in my Business Plan that

23   includes sales reps' plans, and Miss Ortega has, you

24   know, her sheet in there.

25       Q.    So you're saying that you have a Business

```
 1   Plan for you?

 2        A.    For the Division.

 3        Q.    So, for example, if I wanted to ask you for

 4   your Business Plan, I would ask you for John Glaze's

 5   Business Plan?

 6        A.    No, ma'am.  You would ask me for the Miami

 7   Business Plan.

 8        Q.    And the Miami Business Plan would include

 9   the sales goal for each representative, including

10   Miss Ortega?

11        A.    Yes, ma'am.

12        Q.    Are any other records kept, other than this

13   Business Plan, that states what the sales goals are

14   for each sales representative?

15        A.    As I stated before, you can find that it's

16   a function of percentage against plan on the

17   Commission Statement.

18        Q.    Is a Commission Statement prepared with

19   respect to each sales representative in the Miami

20   Division?

21        A.    Yes, ma'am.

22        Q.    And how often are those Commission

23   Statements generated?

24        A.    Weekly.

25        Q.    And let's say at the end of the year, is a
```

```
 1    Commission Statement generated with respect to the

 2    sales made by each representative in the Miami

 3    Division?

 4         A.    Yes, ma'am.  It's the last week of the last

 5    month of the year.

 6         Q.    And with respect to the Commission

 7    Statements that you're just referring to, what type

 8    of information is provided on that Commission

 9    Statement that's issued the last week of the last

10    month at the end of the year?

11         A.    It's the same as every other Commission

12    Statement.  It just happens to be the last week of

13    the last month of the year.  So it has the year to

14    date totals.

15         Q.    And what type of information would be

16    provided on these Commission Statements?

17         A.    It would have the sales transactions for

18    that week, including sales, gross profit, margin or

19    commission rate, commission dollars earned.  Then it

20    has a summary of sales and gross profit and margins

21    by warehouse, indirect and direct sale for the week,

22    for the month and for the year, and it has your

23    percentage of plan attainment for the year to date.

24         Q.    Now, did you provide your attorneys with

25    copies of the Business Plan for the Miami Division?
```

1     A.   I can't recall.

2     Q.   Do you know if anyone else provided your

3 attorneys with copies of the Business Plan for the

4 Miami Division?

5     A.   I don't know.

6     Q.   Once the Business Plans are set, are there

7 any changes that are made to the Business Plan

8 throughout the year, as far as you know?

9     A.   Occasionally.  It's on rare occasions.

10     Q.   And on the occasions, that you're aware of,

11 when changes were made to the Business Plan, how were

12 those changes made?

13     A.   Are you speaking specifically to the

14 Business Plan or the Sales Plans?

15     Q.   The Business Plan.  Let's start with the

16 Business Plan first.

17     A.   In my tenure there, there have only been a

18 few Business Plan adjustments, and it's been because

19 of inflation or no inflation, and they have adjusted

20 for that sometimes, not always.

21     Q.   And on the occasions, that you're aware of,

22 when changes were made to the Business Plan for the

23 Miami Division, were any of those changes made in

24 writing?

25     A.   I can't recall.

```
 1        Q.    Now, let's go to the changes that were made
 2   to the Sales Plan for representatives like Miss
 3   Ortega.  If changes are made to the Sales Plan that
 4   is set for a representative, how is that change made?
 5        A.    If a major, by major, I mean significant
 6   gross profit dollars are transferred in or out of a
 7   sales reps territory, and it has proper approvals,
 8   then those adjustments have occasionally been made.
 9        Q.    Now, whose approval is needed in order to
10   make a major change to the Sales Plan for a
11   representative?
12        A.    Sales Manager, Division Manager, and we
13   send them to Corporate.
14        Q.    Anybody, in particular, in Corporate?
15        A.    No, ma'am.
16        Q.    And are the changes documented after they
17   are made, to your knowledge?
18        A.    They become the revised plans that are
19   tracked on their Commission Statements.
20        Q.    During the time frame when you prepared
21   Sales Plans for representatives, did you sit down and
22   discuss the plan that would be made with respect to
23   each one of the representatives that you were
24   preparing the plans for?
25        A.    Yes, ma'am.
```

1       Q.    And during those discussions that you were

2    having with the sales representatives, did you make

3    any type of notes or document the things that you

4    were discussing with the sales representative?

5       A.    I have in the past, not in all occasions,

6    yes.

7       Q.    Now, are there any records kept by

8    Unisource with respect to the occasions or the times

9    in which you had discussions with sales

10   representatives concerning their Sales Plans?

11      A.    I don't believe so.

12      Q.    Let's say you want to check back in the

13   company to determine if you had a meeting with each

14   sales representative, from '96 through the time frame

15   when you were doing the plans, is there anything that

16   you would go to look at to determine whether or not

17   you actually met with each one of the

18   representatives?

19      A.    Not really.  As a rule, we don't keep those

20   records very long.

21      Q.    How long do you keep those records?

22      A.    It's not consistent.

23      Q.    And what reports are you talking about?

24      A.    I assume you're talking about the actual

25   Business Plan, itself, because that's where I would

1    make some of those notes.

2         Q.    So you're saying you would make notes on

3    the Business Plans with respect to the meetings that

4    you had with the representatives?

5         A.    They had, in the past, a form that had

6    their quarter numbers on it, and I would have a copy

7    of that, and if I made notes, I would make notes on

8    that form; that would not go in my final book.

9         Q.    And what form are you talking about?  Did

10   the form have a title or a name?

11        A.    Sales Rep Plan.

12        Q.    So there's a form entitled Sales Rep Plan?

13        A.    I don't know that that's the exact title,

14   but that's, basically, what it is, Sales

15   Representative Plan.

16        Q.    Was a Sales Rep Plan prepared with respect

17   to each of the sales representatives that you

18   prepared a Sales Plan for?

19        A.    Yes, ma'am.

20        Q.    And what type of information would be

21   reported on the Sales Rep Plan?

22        A.    Previous year's sales history, forecasted

23   or planned sales for the coming year, margins, gross

24   profit dollars, broken out by quarter, and the new

25   form has target account information on it, too, I

1   believe.

2       Q.    And after those forms are completed, those

3   Sales Rep Plan Forms are completed, is there a

4   particular place in the company where those forms are

5   kept, as far as you know?

6       A.    That form goes into the Miami Division

7   Business Plan.

8       Q.    Now, is the Miami Division Business Plan a

9   book that's compiled after these reviews are done?

10      A.    Yes, ma'am.

11      Q.    And is the Business Plan created every year

12  with respect to the Miami Division or some other time

13  frame?  I am trying to determine if it's done every

14  year, as opposed to every month, every quarter?

15      A.    It's done on an annual basis.

16      Q.    Now, as a manager today, what input do you

17  have in creating this Business Plan, on a yearly

18  basis?

19      A.    I believe I answered that.  We get some

20  input from Corporate as to what the expectation is

21  for company growth.  I share that with the sales

22  manager, what the total division is being expected to

23  produce, and then based on what I know about the

24  sales rep's territory and its potential, I will give

25  them my feedback, my input.

```
 1      Q.   Can you turn to the document under Tab
 2   No. 4, please?
 3      A.   Yes, ma'am.
 4      Q.   It's stamped EEOC-183; do you recognize
 5   that?
 6      A.   You said Tab No. 14?
 7      Q.   Tab No. 4.
 8      A.   Excuse me.  I didn't understand.  What was
 9   your question?
10      Q.   Do you know what this is?
11      A.   It appears to be a listing of accounts.
12      Q.   And do you know who created this document?
13      A.   Specifically, no.
14      Q.   And have you seen it before today?
15      A.   Yes.
16      Q.   And when did you see it?
17      A.   I saw it yesterday.
18      Q.   And can you look at that list and tell me
19   which accounts on this list, if any, Miss Ortega
20   handled?
21      A.   It appears to be all of her accounts.  I
22   couldn't say with certainty that every one was.
23      Q.   Can you read down the list and tell me if
24   you're aware of any accounts on this list that Miss
25   Ortega did not handle?
```

```
 1      A.   Did not handle?
 2      Q.   Correct.
 3      A.   I would not want to do that with certainty,
 4   no.
 5      Q.   Well, I am going to go through each one of
 6   them.
 7      A.   Okay.
 8      Q.   Now, looking at this list, do you know what
 9   type of account Continental Printing Company is?
10      A.   It's a printing account.  Is that what
11   you're asking?
12      Q.   Is it a web account, a sheet fed account or
13   some other type of account --
14      A.   I am not certain --
15      Q.   -- if you know?
16      A.   I am not certain of the equipment that they
17   have.
18      Q.   Can you turn to the document under Tab
19   No. 5, please, and it's stamped EEOC 185.
20      A.   Okay.
21      Q.   And do you know who created this document?
22      A.   No, ma'am.
23      Q.   And have you ever seen it before?
24      A.   This document?
25      Q.   Yes.
```

```
 1      A.    No, ma'am.
 2      Q.    Turn to the one under Tab No. 6 stamped
 3   EEOC-186 and tell me if you have ever seen it before?
 4      A.    No, ma'am.
 5      Q.    Same with the document under Tab No. 7
 6   stamped EEOC 187, have you ever seen that before?
 7      A.    No, ma'am.
 8      Q.    And do you know who created the one under
 9   Tab No. 7?
10      A.    No.
11      Q.    Same under Tab No. 8 stamped EEOC-188, have
12   you ever seen that before?
13      A.    No, ma'am.
14      Q.    Can you turn to the one under Tab No. 9,
15   please; have you seen that one before?
16      A.    No, ma'am.
17      Q.    Can you turn to the one under Tab No. 10,
18   please, stamped EEOC 190 and tell me if you have ever
19   seen that one before?
20      A.    No, ma'am.
21      Q.    Now, with respect to the accounts that are
22   handled by the representatives of the Miami Division,
23   are there any records kept of which accounts are
24   assigned to which representative?
25      A.    We keep a file of a form that we have
```

1    developed that has the account name, the account

2    number, the from sales rep and the to sales rep; that

3    form is not always used, but Credit makes the changes

4    in the computer, and they keep a file of those forms

5    or notes.

6        Q.    Does the form have a name?

7        A.    I can't recall the name.

8        Q.    Is there any other way that the company

9    keeps track of accounts that are assigned to the

10   representatives in the Miami Division?

11       A.    Can you rephrase that question very

12   carefully?

13       Q.    Sure.   Other than the form that you just

14   mentioned, are there any other records that the

15   company keeps to keep track of which accounts are

16   assigned to which representative in the Miami

17   Division?

18       A.    Assigned or reassigned?

19       Q.    Yes.   Let's deal with -- to me it's the

20   same thing, but if it's a distinction for you, let me

21   start with assigned first.

22       A.    We have many, many, many, many reports that

23   detail the accounts that are currently assigned to

24   salespeople.

25       Q.    Give me the name of the report, that you

```
 1    know of, that details which accounts are assigned to
 2    which individual.
 3         A.    MC3050.
 4         Q.    I am sorry.  Can you say it slowly, MC3050?
 5         A.    Yes, ma'am.
 6               MC3110, MC3112, Commission Detail Analysis.
 7         Q.    Any others?
 8         A.    There are others.  I can't recall the
 9    names.
10         Q.    Is there another name for MC3050?
11         A.    There may be.  I have no idea what it is.
12         Q.    How about for MC3110?
13         A.    Same.
14         Q.    And the same with MC3112?
15         A.    Yes, ma'am.
16         Q.    Now, how often is the Commission Detail
17    Analysis generated?
18         A.    Monthly.
19         Q.    And is a yearly report done with respect to
20    the Commission Detail Analysis, as well?
21         A.    Not specifically.  The last month of the
22    year reflects year to date numbers.
23         Q.    Now, the MC3050, how often is that one
24    generated?
25         A.    I can't be sure.
```

```
 1        Q.    How about the MC3110, do you know how
 2    often?
 3        A.    I can't be sure.
 4        Q.    How about MC3112?
 5        A.    I can't be sure.
 6        Q.    Now, are there any reports that keep track
 7    of which accounts are reassigned to which sales
 8    representative?
 9        A.    I am not aware of any reports, no, that
10    track specifically the accounts that are reassigned,
11    per your words.
12        Q.    Is there any written record made of what
13    accounts are reassigned to what representatives, as
14    far as you know?
15        A.    The answer that I gave you regarding the
16    form that I generated that has the account name, the
17    account number, the from sales rep, the to sales rep.
18    It's not used in all cases.  Sometime it's done with
19    a note, but those are kept -- the Credit Department
20    keeps a file of those.
21        Q.    The Credit Department?
22        A.    That has been provided.
23        Q.    And who in the Miami Division, today, makes
24    the decision with respect to which accounts are first
25    assigned to which sales representative?
```

```
 1        A.    The term assigned means accounts that are
 2   currently under the sales rep's number, sales number
 3   and responsibilities.  In most cases, I mean, the
 4   sales manager is responsible for the accounts that
 5   are assigned to each sales rep.
 6        Q.    Now, with respect to Miss Ortega, do you
 7   know which sales manager would be in charge of
 8   assigning accounts to her today?
 9        A.    Today?
10        Q.    Yes.
11        A.    Lou Kaminow.
12        Q.    And before Mr. Kaminow, who was responsible
13   for assigning accounts to her?
14        A.    The one manager previous was me.
15        Q.    And before that, who was it?
16        A.    Bill Ready.
17        Q.    When you made the decision with respect to
18   assigning accounts to Miss Ortega and the other sales
19   representatives, what criteria, if any, did you
20   follow in making those assignments?
21        A.    Experience level, previous product
22   expertise, potential personality fits, territory
23   geographies, time available, work habits of the sales
24   rep.  There may be others that I can't recall.
25        Q.    Now, were these criteria that you just
```

```
 1    mentioned ever documented in any type of written

 2    guidelines for you to follow?

 3        A.    Not that I'm aware of.

 4        Q.    Did anyone ever tell you what specific

 5    criteria you need to apply with respect to the

 6    assignment of accounts?

 7        A.    Could you repeat the question?

 8        Q.    Sure.  Did anyone at Unisource ever tell

 9    you that you had to follow any particular criteria in

10    assigning accounts to sales representatives?

11        A.    Not that I can recall.

12        Q.    So how did you come up with these criteria

13    that you just listed for assigning the accounts?

14        A.    General industry experience, my sales

15    manager, and me, basic common sense.

16        Q.    So these were basically subjective criteria

17    that you set?

18        A.    I am not going to respond to that.  I don't

19    think that's subjective.  I think they were

20    measurements of the person's capabilities versus the

21    opportunities.

22        Q.    But these were measurements that you

23    personally set, and no one at the company told you to

24    set?

25        A.    I suppose that you if you look at it that
```

```
 1    way, they were my decision, yes.

 2         Q.    Were you following any guidelines when you

 3    came up with these criteria that you applied?

 4         A.    Ma'am, you have asked me that three times.

 5               MR. STEVENS:  I am going to object to that

 6         as asked and answered.

 7               MS. DALEY:  Okay.  Thank you.

 8               THE WITNESS:  Geez.

 9    BY MS. DALEY:

10         Q.    Let me re-ask my question.  Were you

11    following any written guidelines with respect to the

12    criteria that you just mentioned?

13         A.    You asked that question.

14               MR. STEVENS:  Same objection.

15    BY MS. DALEY:

16         Q.    I still want an answer.

17               Were you following any written guidelines?

18         A.    Not that I can recall.

19         Q.    Now, with respect to the criteria that you

20    just mentioned, first, with respect to work habits,

21    what type of work habits did you take into

22    consideration in assigning accounts?

23         A.    Someone that was diligent, followed up

24    well, had selling skills, knew how to probe for

25    customer concerns, knew how to resolve customer
```

1    concerns.

2        Q.    Anything else?

3        A.    Those are the ones that come to mind.

4        Q.    What type of experience level did you

5    consider in assigning accounts?

6        A.    Depending upon the type of account that it

7    was, that they had some exposure, ideally, with that

8    type of account in the past.  If it was a label

9    printer, it would be nice if they had ever sold a

10   label printer or had been working with label

11   printers, as a customer service rep, in their

12   history, etcetera.

13       Q.    With respect to selling sheet fed accounts,

14   was there a specific number of years of experience

15   that you are required to assign a sheet fed account

16   to a sales representative?

17       A.    No, ma'am.

18       Q.    How about the regular web accounts, was

19   there any particular type of experience that you were

20   looking for in assigning those accounts?

21       A.    Ideally, if they had worked with web

22   accounts before.

23       Q.    And did you set a number of years with

24   respect to that?

25       A.    No, ma'am.

```
 1        Q.    How about the heat set web accounts, was
 2    there any particular type of experience that you were
 3    looking for in assigning those accounts?
 4        A.    Ideally, that they had worked with heat set
 5    web accounts before.
 6        Q.    Any other things that you were looking for,
 7    in terms of experience, in assigning heat set web
 8    accounts?
 9        A.    Someone that had had experience working
10    with large businesses, large commercial printers.
11        Q.    Anything else?
12        A.    Not that come to mind.
13        Q.    Now, with respect to previous product
14    knowledge, what type of previous product knowledge
15    did you use or did you consider in assigning web
16    accounts?
17        A.    It would be helpful if they understood web
18    paper.  Web paper is sold in varying sizes.  It's
19    much more custom.  They have to understand machine
20    trims and waste factors and roll widths and machine
21    schedules, and these type of things would be helpful.
22        Q.    Anything else?
23        A.    I am sure there are more, but this is all
24    that comes to mind.
25        Q.    Now, with respect to selling sheet fed
```

```
 1    accounts, what factors did you consider with respect
 2    to the area of previous product experience?
 3        A.    I think that's a very broad category, sheet
 4    fed accounts; that consists of quick printers.  Large
 5    commercial printers consists of digital printers,
 6    copy center printers.  So each one of those, it has a
 7    different level of experience that you look for.
 8            If it's a quick copy, not so many years of
 9    experience or maybe that's where you start someone.
10            Commercial printers, we look for more time,
11    look for more experience working with large
12    commercial printers.
13        Q.    Did you have any guidelines with respect to
14    the number of years that a person needed to have to
15    handle a particular type of sheet fed account?
16            MR. STEVENS:  I am going to object.
17            THE WITNESS:  Can I ask?  That's not the
18        same question, is it, that you just asked?
19            MR. STEVENS:  Go ahead.  You can answer.
20 BY MS. DALEY:
21        Q.    Did you understand the question that I just
22    asked you?
23        A.    Was that a different question than the
24    question that you asked me before?
25        Q.    Probably, yes.
```

1      A.    I think it was.

2      Q.    I don't have to stay on the same line.  But
3    did you understand the question that I just asked
4    you?

5      A.    Let me ask you to ask it again.

6      Q.    Now, with respect to the area of product
7    knowledge for sheet fed accounts, did you, in
8    assigning the accounts, take into consideration a
9    different type of product knowledge with respect to
10   the different type of sheet fed accounts that the
11   company handled?

12     A.    Yes, ma'am.

13     Q.    And how did the different product knowledge
14   that you took into consideration differ with respect
15   to the type of sheet fed accounts?

16     A.    As I just mentioned, if it's a quick copy,
17   the products are a cut size and basically simple, not
18   as much experience is required.  If it's a commercial
19   printer that prints coated paper for magazines and
20   publications, then I look for some experience in
21   handling those papers in those type printers.  It's
22   one of the considerations.

23     Q.    But were you looking for any particular
24   type of knowledge that the sales representative have
25   with respect to deciding if he or she could handle

1    certain types of sheet fed accounts?

2            MR. STEVENS:  I am going to object.  It's

3        asked and answered.

4  BY MS. DALEY:

5        Q.    Did you understand the question that I just

6    asked you?

7        A.    I thought it was the one I just answered.

8            Basically, I look for them to have product

9    knowledge in the kind of products that that

10   particular commercial printer segment would use.

11   Does that make any sense?

12       Q.    Frankly, no, and that's why I am asking you

13   the way I did.

14       A.    Large commercial coated sheet fed printers

15   run a lot of different coated papers.  Those are

16   products that have a different set of criteria,

17   different set of characteristics than cut sheet paper

18   run through copy machines.  So if I am assigning a

19   copy machine account, it would be helpful if they had

20   some copy machine experience, not as much so as if I

21   am assigning a commercial printer account.  It's

22   helpful that they understand coated papers.

23       Q.    Now, did the company ever provide any type

24   of training to sales representatives to allow them to

25   gain the type of product knowledge that you're

1    looking for with respect to different types of
2    accounts?
3        A.    We have sales meetings.  We make supplier
4    reps available to the salespeople.
5        Q.    Now, at these sales meetings, does the
6    company actually provide training with respect to
7    providing the sales representative with product
8    knowledge of the different types of products that the
9    company sells?
10       A.    We provide product knowledge.
11       Q.    Now, with respect to the factor that you
12   mentioned entitled Potential Personality Fit, what do
13   you mean by that?
14       A.    Frankly, we have some customers in South
15   Florida that many salespeople won't call on, because
16   of their abrasive personality.
17       Q.    So do you look for anything, in particular,
18   with respect to personality?
19       A.    Someone that can handle someone with an
20   abrasive personality, for example.
21       Q.    And if you have non abrasive customers,
22   what type of factors do you look for?
23       A.    It may not be a factor in those cases.
24       Q.    Now, with respect to territory and
25   geography, what are the factors that you consider

1    with respect to that item?

2        A.    As best we can, we try not to have
3    salespeople covering both ends of the territory and
4    spending, you know, their time, their selling time,
5    driving, instead of in front of customers.

6            So, for example, generally, our salespeople
7    in West Palm don't have South Miami accounts.
8    Generally, our salespeople in Miami don't have West
9    Palm accounts or Boca accounts.

10        Q.    So you, generally, try to assign accounts,
11    with respect to that factor, near where the sales
12    representative resides?

13        A.    Not necessarily where they reside, although
14    sometimes it parallels that.  No, primarily so that
15    when they go to the territory, they can stay in the
16    territory and not have to spend selling time driving.

17        Q.    Now, what do you mean by time available?

18        A.    I am not sure how I used that.  Can you
19    repeat the --

20        Q.    You said that one of the criteria that you
21    considered --

22        A.    Oh, time available.  Some accounts require
23    extensive support, a lot of time.  Other accounts are
24    low maintenance accounts, and based on the load or
25    based on the activity level of the sales rep, that

1    can be a criteria.

2        Q.    But is it always a criteria, when you're
3    assigning an account to somebody?

4        A.    It's not always a criteria, no.

5        Q.    Now, of the six criteria that you gave to
6    me, are there any that you always consider with
7    respect to assigning accounts?

8        A.    It's always some combination of.

9        Q.    So you cannot point to any particular one
10    or any particular two, three, four or five that you
11    always apply when you assign accounts?

12        A.    I don't think I could make that statement.

13        Q.    To your knowledge, did Betty Ortega handle
14    any export accounts, while she worked for Unisource?

15        A.    Yes, ma'am.

16        Q.    And what, if anything, did you do to
17    support her efforts to grow her business in that
18    area?

19        A.    I assigned her many export accounts.  I
20    traveled internationally with her to develop her
21    export accounts.  In many cases, I funded those
22    trips.  I instructed the customer service
23    representatives to direct all leads for export to
24    Miss Ortega for a long period.  It's been a while
25    since I did that.  But that's where the leads go.

1           We supported a Graphics of the America
2   show, which has two primary functions, one is to sell
3   equipment, and the other is to sell export.  We have
4   supported that every year, except last, and all leads
5   from that show we gave to Betty.
6       Q.   Anything else?
7       A.   We have paid for her customers to come to
8   the United States to attend open house functions.  We
9   have paid for her international telephone calls.  We
10  have paid for Fed-Ex costs, and I am sure there are
11  many other ways that we have supported -- I have
12  supported her growth.
13      Q.   Now, when did you instruct customer service
14  representatives to assign calls to Miss Ortega?
15      A.   It was to Jeannie Holmes, and it was
16  approximately in 1990.  I am sorry.  I can't say with
17  certainty.
18      Q.   Do you recall the year?
19      A.   I was trying to, and I can't recall with
20  certainty.
21      Q.   And what did you tell --
22      A.   What did I tell?
23      Q.   I am sorry.  What exactly did you tell
24  Jeannie Holmes to do or instruct Jeannie Holmes to do
25  with respect to the calls that came in?

1    A.    Any export leads, forward the name and
2    contact information to Betty Ortega.
3    Q.    And do you know if Miss Holmes had, in
4    fact, assigned all of the export leads that came into
5    Miss Ortega after you instructed her?
6    A.    I can recall that she forwarded leads.  She
7    cannot assign.
8    Q.    But do you know if Miss Holmes forwarded
9    all of the leads that came in, with respect to
10   export, to Miss Ortega?
11   A.    With certainty, I can't say.
12   Q.    What do you mean by a lead?
13   A.    If we don't currently do business with
14   someone, and they represent themselves as a potential
15   buyer of our product, that person becomes a lead of
16   that entity.
17   Q.    And with respect to all of the leads that
18   were forwarded to Miss Ortega, do you know if
19   Unisource eventually got that person as an account?
20   A.    No, ma'am.
21   Q.    And would you know if, with respect to all
22   of the leads that were forwarded to Miss Ortega, do
23   you know if those leads eventually resulted in an
24   export account being assigned to Miss Ortega?
25   A.    I thought that was the question you just

1    asked.  No, ma'am.  I am not sure.

2        Q.    Let me just go back.

3            The first question I asked was with respect

4    to the leads, do you know if each one of the leads

5    eventually became a client of Unisource?

6        A.    I can't recall.

7        Q.    And the second question I asked is whether

8    or not each one of the leads eventually became a

9    client of Miss Ortega's?

10       A.    I can't recall.

11       Q.    Do you know if any of the leads that Miss

12   Holmes forwarded to Miss Ortega resulted in Miss

13   Ortega getting an account?

14           MR. STEVENS:  I am going to object, but go

15       ahead.

16           THE WITNESS:  I can't recall.

17 BY MS. DALEY:

18       Q.    Did you ever have any follow-up discussions

19   with Miss Holmes to determine if she was, in fact,

20   forwarding these leads to Miss Ortega?

21       A.    I recall discussions about her forwarding

22   leads, but the details of which I can't recall.

23       Q.    Do you recall when you had those

24   discussions with Miss Holmes?

25       A.    No, ma'am.

1    Q.    Do you recall how many such discussions you

2    had with Miss Holmes about the leads that she had

3    referred to Miss Ortega?

4    A.    A specific number, no, ma'am.

5    Q.    No, with respect to the telephone calls and

6    the Fed-Ex costs that the company paid for Miss

7    Ortega, was this a practice that the company did with

8    respect to other sales representatives, as well?

9    A.    Did we do it with other representatives,

10   yes, ma'am.

11   Q.    And have you traveled with any other

12   representative in order to develop his or her sales

13   on accounts?

14   A.    Yes, ma'am.

15   Q.    Did you ever have a conversation with Bill

16   Ready about an open sales representative position?

17   A.    About which?

18   Q.    An open sales representative position?

19   A.    Yes, ma'am.

20   Q.    And when did you have that conversation?

21   A.    I can't recall specifically.

22   Q.    Do you recall if it was within the last two

23   years?

24   A.    We had a discussion about Tony Gispert's

25   open territory sometime March of last year.

```
 1      Q.    And who initiated that conversation?

 2      A.    I can't recall.

 3      Q.    And did you have that discussion with him

 4   in person or was it over the telephone?

 5      A.    Both.

 6      Q.    And which one was first, phone conversation

 7   or the one in person?

 8      A.    I have no -- I can't recall.

 9      Q.    What, if anything, did Mr. Ready say to you

10   during the first conversation?

11      A.    Ma'am, I can't recall the sequence of

12   conversations.

13      Q.    What, if anything, do you recall Mr. Ready

14   said to you during either the conversation or the in

15   person meeting that you had?

16      A.    I informed Mr. Ready that Tony had retired,

17   and he asked me what we were going to do about it,

18   and we discussed possible candidates.

19      Q.    Now, was anyone else a party to those

20   conversations that you had with Mr. Ready?

21      A.    I can't recall.

22      Q.    I'm sorry?

23      A.    I said I can't recall.

24      Q.    And which candidates did you discuss with

25   Mr. Ready?
```

```
 1      A.     We discussed Barbara Vega, from Max Papers,
 2   that had previously been with Butler.  I think that's
 3   where we knew her from.  We discussed Maggie
 4   Martinez, a previous Unisource employee, Alex Gomez
 5   from Law Paper, Sue Pollen from Max Paper.
 6      Q.     Anybody else?
 7      A.     I think that's it.
 8      Q.     Anybody else?
 9      A.     I think that's it.  I can't recall if there
10   were any more.
11      Q.     And who eventually got the position?
12      A.     Bill Ready.
13      Q.     And who made the decision to select
14   Mr. Ready for the position?
15      A.     I made the decision.
16      Q.     How soon after this conversation that you
17   had with Mr. Ready about the possible candidates was
18   Mr. Ready selected for the position?
19      A.     Tony advised us that he was leaving one
20   week, and the next week, by Friday, he left.  During
21   that period is when we discussed the candidates.
22             The Monday after Tony left, Bill Ready came
23   in my office and expressed an interest in the
24   position, and I basically decided that day.
25      Q.     So Mr. Ready expressed his interest after
```

1      you guys had discussed these four candidates?

2          A.     Yes, ma'am.

3          Q.     Were you the only person who made the

4      decision to select Mr. Ready for the position?

5          A.     It was my decision.

6          Q.     And did you have input from anybody else?

7          A.     I discussed this with my boss at the time,

8      Bruce Alex, and I discussed this with Cecil McClary.

9          Q.     Now, the discussions that you had with your

10     boss and Mr. McClary, were those two separate

11     discussions or did you discuss it with both of them

12     together?

13         A.     Two separate discussions.

14         Q.     What were the qualifications for the

15     position that Mr. Ready eventually got?

16         A.     Can you repeat the question, please?

17         Q.     What were the qualifications for the

18     position that you selected Mr. Ready for?

19         A.     I was looking for someone with industry

20     experience.  I was looking for someone that had

21     export experience, mature, able to devote, you know,

22     a substantial amount of time to the territory.  I am

23     sure there are others.  I can't recall.

24         Q.     Now, were those qualifications ever reduced

25     to writing?

```
 1        A.    No, ma'am, not that I can recall.

 2        Q.    Did you discuss with Mr. McClary what type

 3   of qualifications were needed for the position?

 4        A.    I can't recall.

 5        Q.    Did you discuss with your boss the type of

 6   qualifications that were necessary for the position?

 7        A.    I am sorry.  I can't recall.

 8        Q.    And what criteria, if any, did you consider

 9   in selecting Mr. Ready for the position?

10        A.    We were under a pretty strict directive to

11   reduce costs.  In fact, we had been given a head

12   count reduction number of $150,000 in head count.  So

13   by Mr. Ready's interest in this position, I was able

14   to move him, because he had the background and the

15   experience, into this job, and have his salary count

16   towards my head count reduction goal and save another

17   employee, Faith Fray, who still works with us.

18        Q.    Any other criteria that you considered in

19   selecting Mr. Ready for the position?

20        A.    That he had paper knowledge and he had

21   knowledge of the accounts and he had knowledge of

22   export.

23        Q.    Anything else?

24        A.    Not that I can recall.

25        Q.    Now, what position did Mr. Ready hold
```

```
 1    before he was selected for the position that you
 2    selected him for?
 3        A.    Can you be more specific?  I just want to
 4    make sure that we're --
 5        Q.    Sure.  We're talking about the position
 6    that you said you made the decision to select
 7    Mr. Ready for?
 8        A.    The sales position?
 9        Q.    Correct.  What position did Mr. Ready hold
10    before the sales position?
11        A.    He was sales manager.
12        Q.    And what type of compensation did Mr. Ready
13    receive as a sales manager, before he was selected
14    for this sales representative position?
15        A.    Are you asking for his specific salary?
16        Q.    I am asking for your knowledge as to what
17    type of compensation Mr. Ready received as a manager,
18    before he was selected for a sales representative
19    position?
20        A.    He was salaried, plus bonus.
21        Q.    And do you know what his salary was?
22        A.    I can't recall.
23        Q.    Did he get any other benefits from the
24    company, as far as you know?
25        A.    His expenses, his business expenses were
```

1   paid.  There may have been others that don't come to

2   my mind.

3      Q.   So was Mr. Ready's movement from a manager

4   to a sales representative a demotion?

5      A.   If a sales rep goes to a sales manager, he

6   is promoted.  So I suppose it works the other way.

7   Honestly, it was his -- yes, I guess it was a

8   demotion.

9      Q.   And did anybody ever tell you why Mr. Ready

10  would no longer be a manager with the company?

11     A.   Did anyone ever tell me why Mr. Ready would

12  be a manager with the company?

13     Q.   Would no longer be a manager with the

14  company, before he was selected for this sales

15  representative position?

16     A.   I am not sure I understand the question.  I

17  am sorry.

18     Q.   Sure.  As far as you know, were there any

19  performance issues, with respect to Mr. Ready, before

20  you selected him for the sales representative

21  position?

22     A.   Not that I can recall.

23     Q.   Did anyone ever tell you that there was

24  some performance issues with Mr. Ready, before he was

25  selected for the sales representative position?

```
 1      A.    Did anyone ever tell me, not that I can
 2   recall.  I am truly not sure I understand that
 3   question.
 4      Q.    I will try to rephrase it.
 5            Did anyone tell you that anyone in the
 6   company had any concerns with Mr. Ready's work
 7   performance, before he was selected by you for the
 8   sales representative position?
 9      A.    Not that I can recall.
10      Q.    Now, was Miss Ortega ever considered for
11   the sales representative position for which you
12   selected Mr. Ready?
13      A.    In the sense that we looked at all of our
14   salespeople, yes, but not we were looking to -- we
15   were looking to replace the position, not spread the
16   accounts.
17      Q.    So why was Miss Ortega not selected for the
18   position for which you selected Mr. Ready?
19      A.    Because we were looking to replace the
20   position, not spread the accounts.
21      Q.    What do you mean by replace the position?
22      A.    I am sorry.  I think that's --
23      Q.    What does replace the position mean?
24      A.    That means hire someone else, bring someone
25   new into that position, replace the position.  I am
```

```
 1   sorry.  I don't know how else to express that.  Not
 2   someone -- that's bad terminology.  Bring someone
 3   into that position.
 4      Q.    Isn't that, essentially, what you did by
 5   giving the position to Mr. Ready?
 6      A.    I put someone in that position.  I kept
 7   that territory, that position, basically, whole.
 8      Q.    Now, I am confused.
 9      A.    Well, I think you confused me with the
10   question.
11          MS. DALEY:  Can you read back the question
12       when he said replace -- in which he gave the
13       answer replace someone with the position.
14              (The question referred to was
15              thereupon read by the reporter as
16              above recorded.)
17          THE WITNESS:  Can we give that a try again?
18          MS. DALEY:  Yeah, let's try again.
19 BY MS. DALEY:
20      Q.    Now, and correct me if I'm wrong, I think
21   when I asked you why Miss Ortega was not considered
22   for the position, you said it was because we wanted
23   to replace someone in the position; is that why Miss
24   Ortega was not selected?
25      A.    Part of the criteria -- part of the
```

1    reasoning, yes.

2              The other was that I was trying to --
3    ultimately, I was trying to address my head count
4    reduction, but also that I wanted to have -- you have
5    two options, when a sales rep leaves. I either don't
6    replace the sales rep and spread the accounts or you
7    replace the sales rep. We wanted to replace the
8    sales rep, and I had an opportunity to do that with a
9    qualified person and address my head count reduction
10   issue. I hope that's --

11   Q.    Now, what head count issue are you talking
12   about; what do you mean by that?

13   A.    In approximately March of last year, during
14   the same time period, we were given directives from
15   Unisource Worldwide that our company was in some
16   fairly tight financial times, well, very tight
17   financial times, and we were given -- each division
18   was given a head count reduction goal, a dollar
19   amount that you had to reduce from your operation in
20   head count. You had to do that. You could tell them
21   how and then, of course, HR had to look at, you know,
22   those candidates, but basically we were required to
23   address $150,000 worth of head count.

24   Q.    So how was that addressed by giving
25   Mr. Ready the position, as opposed to spreading the

 1    accounts out?

 2         A.    I originally submitted a list of employees,

 3    that included several employees, to Faith Fray.

 4         Q.    What was the last name that you said?

 5         A.    I originally gave Corporate a list of

 6    employees that would be selected for a reduction,

 7    including a woman named Faith Fray.

 8               When this issue came on the table about

 9    replacing -- when Tony Gispert told us that he was

10    going to retire, imminently by replacing Bill Ready

11    for Tony Gispert and not replacing Bill Ready's

12    position, I could show those dollars, Bill Ready's

13    manager's salary dollars as a head count reduction

14    and thereby saving Faith Fray.

15         Q.    Was Mr. Ready's position being considered

16    for elimination at the time?

17         A.    Not specifically, no.  All positions were

18    being considered for head count reduction.

19         Q.    Including Mr. Ready's?

20         A.    Including, yes.

21         Q.    Now, at the time, was the company

22    considering terminating Mr. Ready for any reason,

23    other than the head count reduction?

24         A.    Not that I am aware of.

25         Q.    So in your assessment, the company would

```
 1   have saved more by giving the accounts to Mr. Ready,

 2   as opposed to spreading the accounts out to the other

 3   representatives?

 4        A.   Yes, ma'am.

 5        Q.   Did Miss Ortega ever complain to you about

 6   unfair treatment?

 7        A.   Yes, ma'am.

 8        Q.   On how many occasions?

 9        A.   I can recall one specifically.

10        Q.   And when was that?

11        A.   Shortly after my arrival in South Florida.

12        Q.   And when did you arrive?

13        A.   I arrived in October of '96.

14        Q.   And what, if anything, did she say to you?

15        A.   She expressed concerns that we had

16   employees that were physically threatening to her.

17   She expressed concerns that her customers' orders

18   were being shorted because of theft in our warehouse,

19   and she expressed concerns that Bill Ready had

20   favored male sales reps.

21        Q.   And did she tell you about all of this in

22   one conversation?

23        A.   It was a lunch, actually, yes.

24        Q.   And who was present, other than you and

25   Miss Ortega?
```

```
 1      A.    No one.

 2      Q.    And what, if anything, did you say to her

 3   about the three things that she told you about?

 4      A.    Regarding the physical threatening portion,

 5   we immediately launched an investigation, and we

 6   brought Cecil McClary down, and there might have been

 7   others brought down.  Ultimately, when we identified

 8   that -- when we were able to substantiate that things

 9   had happened in the past, we brought the employee

10   that was named as the threatening employee into a

11   meeting and made clear that this was unacceptable

12   behavior and that any future expression of that type

13   of behavior would be dealt with with disciplinary

14   action leading up to -- possibly leading up to

15   termination.

16            The second thing that she asked me was

17   about the theft, which we soon thereafter launched an

18   investigation involving our internal audit people,

19   and we hired outside people, and the net of that was

20   that there were quite a few employees that were

21   released for improper behavior activities in the

22   warehouse.

23            As to her statements around Bill Ready, she

24   really didn't offer specifics, but I told her that

25   that was not going to be tolerated when I was there,
```

```
 1    and if she had any instances come up, then I would
 2    address them.
 3        Q.    Now, going back to the occasion when Miss
 4    Ortega expressed the three things to you, what, if
 5    anything, did you say to her at the time about the
 6    concerns that she made about the employees who she
 7    felt were physically threatening her?
 8        A.    That I would investigate it and put a stop
 9    to it --
10        Q.    Anything else?
11        A.    -- if it were found to be so.  Not that I
12    can recall.
13        Q.    Did she tell you which employees she
14    thought were physically threatening?
15        A.    Specifically, she listed Dennis Laux.
16        Q.    Anybody else?
17        A.    Not that I can recall.
18        Q.    And did she say what Dennis Laux did or did
19    not do that she considered to be physically
20    threatening?
21        A.    Raising his voice, standing over female
22    employees.  He was a tall, big man, threatening body
23    language.
24        Q.    Anything else?
25        A.    There may have been.  I can't recall.
```

 1        Q.    And when she mentioned the concern about

 2    Bill Ready favoring male sales representatives over

 3    female sales representatives, did you ask her what

 4    she meant by that?

 5        A.    I can't recall the specific conversation.

 6    No, I can't recall the specifics.

 7        Q.    Do you recall asking her how she felt Bill

 8    Ready was favoring male sales representatives over

 9    female sales representatives?

10        A.    The complete text of the conversation, I

11    can't recall.  I know that I didn't walk away with

12    any specifics, but I told her it would not be

13    tolerated.  If she had examples, I would deal with

14    them.

15        Q.    And did she at any time ever provide you

16    with examples of what she meant?

17        A.    I can't recall.

18        Q.    Did you ever take any notes about the

19    concerns that Miss Ortega had expressed to you at

20    that meeting?

21        A.    When I prepared my statement.

22        Q.    No.  Before that, did you take any notes?

23        A.    I can't recall if I did or didn't.

24        Q.    After Miss Ortega expressed the concerns to

25    you, at the meeting sometime in 1996, who, if anyone,

```
 1    within the company did you report those concerns to?
 2         A.    Cecil McClary.
 3         Q.    Anybody else?
 4         A.    I can't recall.
 5         Q.    And what was Mr. McClary's title at the
 6    time?
 7         A.    Excuse me.  Paul McGowen, on the theft
 8    issues.
 9         Q.    I am sorry.  Cecil McClary and Paul
10    McGowen.  So McGowen you reported the theft issues,
11    only?
12         A.    To the best of my knowledge, that's my
13    recollection.
14         Q.    And you reported the rest of the stuff to
15    Mr. McClary?
16         A.    (Nodding head affirmatively).
17         Q.    You need to answer.
18         A.    I am trying to.
19         Q.    Only because the court reporter --
20         A.    You will have to give me a moment.
21         Q.    Okay.  Sure.
22         A.    To the best of my recollection, yes.
23         Q.    When you reported Miss Ortega's concern to
24    Mr. McClary, was this done orally or in writing?
25         A.    This was done in a telephone discussion.
```

```
 1      Q.    Was it done in more than one telephone

 2   discussion?

 3      A.    He ultimately investigated it.  We had many

 4   discussions.

 5      Q.    But initially you reported it to him in a

 6   telephone discussion?

 7      A.    Yes.

 8      Q.    And when you reported it to Mr. McGowen,

 9   how was that done?

10      A.    It started the same way.

11      Q.    Now, who conducted this investigation that

12   you are talking about?

13      A.    Which one?

14      Q.    The first one with respect to the concerns

15   that you talked to Mr. McClary about?

16      A.    Be more specific.

17      Q.    Did you conduct an investigation concerning

18   the complaints that Miss Ortega made about Dennis

19   Laux and about Bill Ready favoring males sales

20   representatives?

21      A.    We conducted an investigation and dealt

22   with the issue of Dennis Laux.  She did not offer

23   specific about Bill Ready.

24      Q.    So an investigation was done concerning the

25   concerns that were expressed about Dennis Laux?
```

1      A.    Yes.

2      Q.    And none was done with respect to the

3  concerns expressed about Bill Ready?

4      A.    I left it that if she had anything for me

5  to deal with, I would deal with it.

6      Q.    I just want to make sure that one was done

7  as to Laux, and none was done as to Ready; is that

8  correct or incorrect?

9      A.    That's correct.

10      Q.    Now, after that conversation that you had

11  with Miss Ortega in 1996, at which she expressed

12  years of concerns, did you, Mr. McClary or anyone

13  else, to your knowledge, go to Miss Ortega and ask

14  her for specifics with respect to what she meant

15  about her concerns that she expressed about Bill

16  Ready?

17      A.    I asked her to bring any instances to me.

18      Q.    And when did you ask her to do that?

19      A.    In our discussion, I said that I would deal

20  with any instances, that it would not be tolerated.

21      Q.    And after that initial conversation that

22  you had in 1996, did you, Mr. McClary, or anyone else

23  ask Miss Ortega to give specifics with respect to

24  what she meant by the concerns she had expressed

25  about Bill Ready?

```
 1       A.    Not that I recall.

 2       Q.    And when was the investigation conducted

 3   with respect to the concerns that were expressed

 4   about Dennis Laux?

 5       A.    Soon thereafter.  I can't recall the

 6   specific dates.

 7       Q.    Do you recall if it was within a month, a

 8   year?

 9       A.    No.  It was soon thereafter, within weeks.

10       Q.    And what did the investigation consist of?

11       A.    We questioned several female employees.

12       Q.    Anything else?

13       A.    We questioned Dennis Laux.

14       Q.    Anything else?

15       A.    That's how we investigated it.

16       Q.    And which female employees were questioned?

17       A.    Kathy Healy, Bobby Vega.

18       Q.    Anybody else?

19       A.    Not that I can recall.

20       Q.    And did you get any statements from any of

21   those women?

22       A.    I wasn't conducting it.  Cecil was the one

23   conducting those investigations.  I don't know if he

24   took them or not.

25       Q.    Did Mr. McClary ever report to you what
```

```
 1    Miss Healy, Miss Vega and Miss Ortega told him during
 2    his investigation?
 3         A.    We discussed some of that.  For some of
 4    that, I was present.  Specifically, I can't recall.
 5         Q.    For which interviews were you present?
 6         A.    I can't recall.
 7         Q.    Do you know if Mr. McClary made any
 8    findings after he conducted the investigation?
 9         A.    We determined that Mr. Laux had acted
10    improperly, and we wanted to ensure that this never
11    repeated itself.
12         Q.    And was any discipline imposed on Mr. Laux?
13         A.    He was counseled.
14         Q.    By whom?
15         A.    Cecil McClary and myself.
16         Q.    And what was he told?
17         A.    As I stated before, that if there was a
18    reoccurrence, that it would be dealt with in a
19    disciplinary action leading up to -- it could lead up
20    to dismissal.
21         Q.    Was anything placed in his personnel file
22    about this?
23         A.    I am almost certain.
24         Q.    Did you ever see any document that was
25    eventually placed in his personnel file about that?
```

```
 1      A.    No.
 2      Q.    And to your knowledge, did either you,
 3   Mr. McClary, or anybody else report to Miss Ortega
 4   what the findings were of the investigation?
 5      A.    I can't recall.
 6      Q.    Were any written findings made after the
 7   investigation?
 8      A.    I can't recall.
 9      Q.    Did anybody take any notes during the
10   investigation?
11            MR. STEVENS:  I am going to object as asked
12       and answered.  You asked this question.  You
13       asked him if he did it.  You asked him if
14       McClary did it already, and he has already
15       answered it.
16            If you want to answer it again, go ahead.
17            THE WITNESS:  I can't recall.
18 BY MS. DALEY:
19      Q.    Excluding Miss Ortega, did any other
20   employee make any complaints to you of either gender,
21   race or national origin discrimination?
22            MR. STEVENS:  I am going to object to the
23       form of the question.  You can answer.
24            MS. DALEY:  Why are you objecting?
25            MR. STEVENS:  Sorry?
```

```
 1                MS. DALEY:  Why are you objecting?
 2                MR. STEVENS:  I am objecting because you're
 3           characterizing it as she complained of
 4           discrimination.  I am objecting to the form of
 5           the question.
 6                MS. DALEY:  Thank you.
 7   BY MS. DALEY:
 8        Q.   Excluding Miss Ortega, did any employee
 9     complain to you about gender discrimination, national
10     origin discrimination or race discrimination?
11                MR. STEVENS:  I am going to object to the
12           form of the question.
13                If you can answer it, go ahead.
14                MS. DALEY:  Thank you.
15                THE WITNESS:  Specifically, I can't recall.
16   BY MS. DALEY:
17        Q.   Now, other than Miss Ortega, were there any
18     other female employees who worked in the Miami
19     Division as a sales representative, that you're aware
20     of?
21        A.   Yes, ma'am.
22        Q.   Who was it?
23        A.   Bobby Vega, Kathy Healy.
24        Q.   Anybody else?
25        A.   Holly Hernandez worked there for a while.
```

```
 1      Q.    Anybody else, that you're aware of?
 2      A.    Yes, there's more.  I am just trying to --
 3   was the question printing or --
 4      Q.    In the Miami Division?
 5      A.    Lynn Bonovich.  I am forgetting so many.
 6   Leslie Stewart had worked there.  Oh, this is
 7   terrible.  There are others.  I can't recall.
 8      Q.    Now, excluding Miss Ortega, did you
 9   supervise any other of these female representatives
10   whose names you just mentioned?
11      A.    Directly supervise?
12      Q.    Either direct or indirect?
13      A.    All of those.
14      Q.    Excluding Miss Ortega, with respect to the
15   female representatives that you supervised, either
16   directly or indirectly, were any of them ever
17   terminated by the company, and by terminated, I mean
18   left involuntarily?
19      A.    I don't know, in the names that I just gave
20   you, if any of them were.  I am thinking of new
21   names, now when you say that.  Rosa Gonzalez.  No.
22   She quit.
23      Q.    So you said Rosa Gonzalez quit?
24      A.    Uh-huh.
25            Holly Hernandez quit.  Leslie quit.
```

```
 1    Terminating?  Terminating?  Gosh, I can't recall.
 2        Q.    How about Ellie Jablonski, was she a female
 3    employee that you supervised?
 4        A.    She was, and she was terminated.
 5        Q.    So she left the company involuntarily?
 6        A.    Yes, ma'am.
 7        Q.    And do you know why she left?
 8        A.    Poor performance.
 9        Q.    And how was her performance poor, if you
10    know?
11        A.    She wasn't drawing her sales, bringing in
12    new business.
13        Q.    Anything else?
14        A.    Not that I can recall.
15        Q.    And when was she terminated?
16        A.    I can't recall specifically.
17        Q.    Did you have any input in her termination?
18        A.    Yes.
19        Q.    What type of input did you have?
20        A.    Ellie was part of a program around sales
21    rep productivity, underperforming sales reps.  So I
22    was working with the sales managers to see that those
23    salespeople could grow their business and get off
24    that list of underperforming salespeople.  If they
25    didn't, then it was my recommendation that they be
```

1    terminated.

2        Q.    So you recommended that Miss Jablonski be
3    terminated?

4        A.    I had unput into that decision, yes, ma'am.

5        Q.    Who made the final decision?

6        A.    Ultimately, it was my responsibility.  Her
7    sales manager was Jack Kelley.

8        Q.    But did Mr. Kelley make the final decision
9    or you or both?

10       A.    Both, but I am responsible for everything
11   that happens in that building.

12       Q.    So was Miss Jablonski on any type of
13   probation or performance improvement plan before her
14   termination?

15       A.    She was being counseled, yes.

16       Q.    Now, were any of the other female
17   representatives that you supervised placed on any
18   type of probation or performance improvement plan?

19       A.    I recall that Rosa Gonzalez was, also.

20       Q.    And why was she placed on either probation
21   or a performance improvement plan?

22       A.    Because she was having poor performance.
23   She wasn't growing her business.  She wasn't bringing
24   up new accounts.  She wasn't growing her business at
25   an acceptable rate, and she wasn't bringing in new

```
 1    business.  She didn't maintain a high enough total
 2    GTMGP.
 3         Q.    Any other female sales representatives that
 4    you recall?
 5         A.    That were placed on --
 6         Q.    Probation?
 7         A.    Not that I can recall.
 8         Q.    How about Miss Ortega, is she now on some
 9    form of probation or performance improvement plan?
10         A.    Currently, Miss Ortega is on -- there's a
11    program -- excuse me.  This is something that's going
12    on right now.  Betty Ortega is on an underperforming
13    list; that's happening now, yes.
14         Q.    So she is on a list of underperforming
15    employees?
16         A.    The company has a requirement that if you
17    have been with the company, you know, over I think
18    the number is, basically, two years that you should
19    have or be maintaining $350,000 in annualized GTM.
20    Those employees that aren't tracking to $350,000 are
21    being counseled.
22         Q.    You said over 350,000 in what?
23         A.    GTM, gross trading margin dollars.  I am
24    sorry.
25              When you asked me the question before, I
```

```
 1    thought you were talking about in the past, but this

 2    is an ongoing program.  This is a current program.

 3        Q.    Is there a name for this program?

 4        A.    I think there is, but I can't remember what

 5    it is.  It's a minimum GP program, minimum GTM.

 6        Q.    Are any other employees, other than Miss

 7    Ortega, on this minimum GTM program today?

 8        A.    Currently, yes, ma'am.

 9        Q.    Who else?

10        A.    Stan Kurceba, John Price, Bob Gennell,

11    Kathy Healy, Anna Valdez.

12        Q.    Anybody else?

13        A.    That's all that I can recall.

14        Q.    And when was Miss Ortega placed on this

15    plan?

16        A.    I don't know the specific date.  It's

17    within the last few months.

18        Q.    Who made the decision to put her on the

19    plan?

20        A.    It's a function of how many years meeting

21    the minimum after you have been with us for a certain

22    number of years and not producing $350,000

23    annualized.  It's a spread sheet.

24        Q.    I will go into what that consists of in a

25    minute.
```

```
 1              Did anybody in the company make the
 2    decision to place her on this minimum GTM program?
 3        A.    This list came from Human Resources to me.
 4    It was sent to me -- the list was sent to me by Human
 5    Resources.
 6        Q.    So you did not make the decision to place
 7    Miss Ortega on this program?
 8        A.    Absolutely not.
 9        Q.    Do you know who, within the company, made
10    that decision?
11        A.    Ma'am, it was a function of how many years
12    they have been with the company and how much gross
13    profit they have produced; it's a function of those
14    two factors.  There is not someone sitting in a room
15    going, "I think I will pick him."
16        Q.    Let me ask you the question, again.
17              Do you know if anyone in the company made
18    the decision to place Miss Ortega on this program?
19        A.    Do I know of anyone, no, ma'am.
20        Q.    Now, this list that you said you got from
21    Human Resources, when did you get the list?
22        A.    A few months ago, two to three months,
23    approximately.
24        Q.    And do you still have the list in your
25    possession today?
```

1    A.    Yes.

2    Q.    And was the list a part of a memorandum or
3    separate document?

4    A.    It was a memorandum sent to me by e-mail.

5    Q.    From whom?

6    A.    Human Resources.

7    Q.    Who in Human Resources?

8    A.    I think Amy may have sent it to me.  I am
9    not positive.

10    Q.    And other than the list of names of people
11    who are on the program, was there anything else in
12    the document that you got from Human Resources; was
13    there any other information?

14    A.    Can you ask the question again, please?

15    Q.    Sure.  With respect to the document you
16    just mentioned you got from Human Resources, was
17    there anything on that document, other than the names
18    of the people who would be placed on the program?

19    A.    It had all the sales reps names, their
20    gross profits produced, and those that met under
21    350,000 for printing, the criteria is different by
22    segment, were highlighted.

23    Q.    Anything else that you recall that was on
24    that document that you got from Human Resources?

25    A.    Not that I can recall.  I am sure there was

1    other information.

2         Q.    Did you ever talk to anybody in the company
3    as to how the decision was made with respect to who
4    would be placed on the list?

5              MR. STEVENS:   I am going to object as asked
6         and answered.  He has already said he doesn't
7         know the answer to that question or he already
8         answered that question.  Excuse me.

9              MS. DALEY:   Thank you.

10   BY MS. DALEY:

11        Q.    Did you ever talk to anybody in the company
12   as to how the decision was made to place these people
13   on the list?

14             MR. STEVENS:   I object.

15             John, if you can answer, go ahead and
16        answer the question.

17             THE WITNESS:   It was a function of how many
18        years.

19   BY MS. DALEY:

20        Q.    But listen to the question.

21             Did you ever talk to anybody in the company
22   with respect to how the decision was made to put the
23   people on the list?  Do you understand that question?

24             MR. STEVENS:   I am going to object, but you
25        can answer.

 1              MS. DALEY:  Thank you.

 2              THE WITNESS:  I don't recall ever calling

 3         anyone and saying, "How did we come up with this

 4         criteria?"

 5  BY MS. DALEY:

 6       Q.    All I am asking you is if you ever spoke

 7  with anyone?  I am not asking if you called anyone.

 8              Did you ever speak to anybody in the

 9  company about how the decision was made to put people

10  on the list?

11              MR. STEVENS:  I object, but you can answer,

12         John.

13              MS. DALEY:  Thank you.

14              THE WITNESS:  I spoke to my boss.  I spoke

15         to Human Resources about the criteria that were

16         spelled out.

17  BY MS. DALEY:

18       Q.    Anybody else?

19       A.    The sales managers and, ultimately, we

20  talked to the salespeople that were affected by the

21  program.

22       Q.    Who in Human --

23       A.    But I don't think I answered.

24       Q.    I am asking you something else.

25       A.    Then let's do it again.

```
 1        Q.    I am asking you who you spoke with with
 2    respect to how the decision was made to put these
 3    people on the list?
 4              MR. STEVENS:  And I am going to object.
 5              MS. DALEY:   Thank you.
 6 BY MS. DALEY:
 7        Q.    And you just said you spoke to your boss.
 8    You spoke to Human Resources.  You spoke to your
 9    sales manager and sales representative?
10        A.    Not about how the decision was made, no.
11        Q.    But did you understand the question that I
12    just asked you?
13        A.    If I am answering the question the way you
14    just asked me, I am going to tell you that the Human
15    Resources Department sent me a memorandum that said
16    any employees, and this was -- this is, obviously, a
17    directive from Unisource Corporate, any employees,
18    salespeople that have been here over a certain number
19    of years that don't produce a certain number of GP,
20    depending on their segment, will be placed on this
21    list and will need to be worked with to get their
22    production up over this number.
23        Q.    After you got that list, did you speak to
24    anybody in Human Resources with respect to how the
25    list was generated?
```

```
 1        A.      You mean who put the sales spread sheet in
 2    the computer?  It's very simple.  You just take the
 3    GP production, and you apply it on a matrix.
 4        Q.      But did somebody in Human Resources tell
 5    you that or is that just something that you're
 6    guessing?
 7        A.      I am guessing.
 8        Q.      But did you speak to anyone in Human
 9    Resources who told you this is how we generated the
10    list of people who would be placed on the program?
11        A.      No, not specifically did I ask anybody that
12    question, if I understand the way you asked it.
13        Q.      Now, with respect to the goal that was set
14    of I think you said the $350,000 goal?
15        A.      No, I didn't.
16        Q.      I am sorry.  350?
17        A.      For printing or salespeople.
18        Q.      Now, with respect to the $350,000 goal,
19    what, if anything, did you explain to Miss Ortega
20    that she needed to do in order to retain her job?
21        A.      First of all, the counselings have been
22    that, "We need to get you up over that number, and we
23    will be working with you in the coming months.  Lou
24    Kaminow and your sales manager will be working with
25    you in specific accounts on your target account to
```

1    help you get your production up over that limit over
2    that number."

3         I recall specifically saying that to Betty
4    that she was very close to tracking at that number,
5    anyway, and it wouldn't take a great deal of growth
6    to, you know, to get her above that number.

7    Q.    And have either you, Mr. Kaminow or anybody
8    else done anything to help Miss Ortega to attempt to
9    reach the $350,000 goal?

10   A.    I am not aware of what Mr. Kaminow has
11   done.  I am in a new capacity and have not worked
12   with Miss Ortega in the past month or two.

13   Q.    Do you know if anyone else in the company
14   has done anything to help her?

15   A.    I just said that I am not aware of what
16   Mr. Kaminow has done.

17   Q.    Excluding you and Mr. Kaminow, anybody else
18   that has been helping her, to your knowledge?

19   A.    I am not aware.

20   Q.    What, if anything, did Miss Ortega say when
21   you informed her that she would be placed on this
22   program?

23   A.    You know, I can't recall the specific
24   conversation.  We had five meetings.

25   Q.    The first meeting that you had?

```
 1      A.    I mean, we had this meeting with several
 2   employees.  I can't recall the specific context of
 3   each one of those meetings.
 4      Q.    And what, if anything, will happen to Miss
 5   Ortega, if she fails to meet this $350,000 goal?
 6      A.    I can't tell you.  I don't know.
 7      Q.    No one in the company ever told you what
 8   would happen to Miss Ortega, if she fails to meet the
 9   goal?
10      A.    The way it was phrased to me is it may lead
11   to additional disciplinary action leading up to --
12   which may lead up to termination.
13      Q.    Who told you that?
14      A.    Human Resources.
15      Q.    Who in Human Resources?
16      A.    Amy George.
17      Q.    So this program that Miss Ortega was placed
18   on, was this a form of disciplinary action?
19      A.    I suppose you could phrase it that way.
20      Q.    Did anyone in Human Resources or anyone
21   else explain to you whether or not being placed on
22   this program was a form of discipline?
23      A.    My sense is that it would -- it was never
24   termed this is a disciplinary action.  Although,
25   frankly, whenever you're working with an employee to
```

```
 1    bring up their performance, and there's the
 2    possibility of additional disciplinary action, then I
 3    would say, yes, that's disciplinary action.
 4        Q.    When did you have that conversation with
 5    Miss George in which she said further disciplinary
 6    action may be imposed?
 7        A.    I can't recall the specific date.
 8        Q.    Do you recall if it was before or after you
 9    informed Miss Ortega that she would be placed on the
10    program?
11        A.    No, I can't recall.
12        Q.    And was Miss Ortega given any end period
13    for meeting the goal?
14        A.    The idea is that by year's end, we need to
15    be tracking at that number.  This is how I expressed
16    it to her.
17        Q.    So that's by the end of this year?
18        A.    (Nodding head affirmatively).
19        Q.    Are you aware of any written guidelines
20    that the company has with respect to who would be
21    placed on this program?
22        A.    There was a memo that accompanied the
23    spread sheet that, basically, spelled out the minimum
24    GP requirements in a year.
25        Q.    What spread sheet are you talking about?
```

```
 1       A.     The one that had the names of the

 2   salespeople, all salespeople, and those that were

 3   under the minimum requirement were highlighted.

 4       Q.     And that's the document that you got from

 5   HR?

 6       A.     Yes.

 7       Q.     So it's, actually, a spread sheet with some

 8   guidelines attached?

 9       A.     Yes.

10       Q.     Did you get anything else from Human

11   Resources that addressed --

12       A.     Not that I know of.

13       Q.     -- addressed the minimum GTM program?

14       A.     Not that I can recall.

15       Q.     Were all of the sales representatives who

16   were placed on the program given the same deadline of

17   the end of the year to meet the goal?

18       A.     To the best of my recollection, yes.

19       Q.     Now, other than Mr. Ready, did any other

20   sales representatives get the accounts that

21   Mr. Gispert used to handle, before Mr. Gispert left

22   the company?

23              MR. STEVENS:  I am going to object to the

24       form of the question, just because I don't know

25       if you're talking about an account or accounts.
```

1              MS. DALEY:  Let me rephrase it.

2  BY MS. DALEY:

3      Q.    It's my understanding, from your testimony,

4  that Mr. Ready got the accounts that Mr. Gispert used

5  to handle before Mr. Gispert left the company; is

6  that correct?

7      A.    I don't know that it was every single one

8  but, yes, he got accounts from Tony Gispert.

9      Q.    So other than Bill Ready, are you aware of

10  any other sales representatives who got the accounts

11  that Mr. Gispert used to handle before Mr. Gispert

12  left the company?

13     A.    There were some accounts that were given to

14  inside sales, because I didn't think they were worth

15  being called on by outside salespeople.

16     Q.    And which inside salespeople got those

17  accounts?

18     A.    I don't recall.

19     Q.    And who gave those accounts to the inside

20  salespeople?

21     A.    I can't recall if it was me or Bill.

22     Q.    And is there anything that you can check to

23  see if you made that decision or if Bill made it?

24     A.    I could see if there's a copy of the form

25  that we use, when we reassign accounts.  If that file --

1    if there is one, I can answer that question.  If

2    there is not, then I can't recall.

3        Q.    Just so I can understand what you're

4    saying, after Mr. Ready became a sales

5    representative, did he assign some of Tony Gispert's

6    accounts to some inside salespeople?

7        A.    It would have been at the same time.

8    Basically, I would have had to have been the one who

9    said okay, but we were going through the list and

10   doing that together.

11       Q.    So with respect to the accounts that went

12   to the inside salespeople, you're saying that you had

13   a conversation with Mr. Ready, and the two of you sat

14   down and discussed what accounts would be given to

15   the inside salespeople?

16       A.    That were not worth the outside

17   salesperson's time.  I can't recall what those

18   specific accounts are, though.

19       Q.    Now, did you ever have a conversation with

20   Miss Ortega in which you indicated to her that she

21   would get Tony Gispert's accounts when he retired?

22       A.    No, ma'am.

23       Q.    Did you ever have any conversations with

24   Miss Ortega where she expressed interest in obtaining

25   Mr. Gispert's accounts when he retired?

```
 1      A.    I don't recall any conversations.
 2      Q.    Do you recall ever having any conversations
 3   with Miss Ortega about any account handled by
 4   Mr. Gispert?
 5      A.    Do I recall? Can you repeat the question?
 6      Q.    Sure.  Do you recall having any
 7   conversations with Miss Ortega about any accounts
 8   that Mr. Gispert handled before he retired?
 9      A.    We had a big blow-up over her calling his
10   reseller to the Bahamas, an account called CWT, and
11   that was affecting CWT's reseller, some of his
12   accounts in the Bahamas, and he mentioned, I think,
13   Nassau Guardian was one, but I don't think that's
14   what you're after.
15            Yeah, I remember that we had discussions
16   around Tony Gispert's territory with regard to what
17   she was doing with the reseller in the Bahamas.
18      Q.    So this big blow-up was between you and
19   Miss Ortega?
20      A.    No, ma'am.  It was between Miss Ortega and
21   Mr. Gispert.
22      Q.    And did Mr. Gispert tell you what happened,
23   during this big blowout, what happened between Miss
24   Ortega and Mr. Gispert?
25      A.    Yes.
```

1    Q.    What did he say happened?

2    A.    He said that Miss Ortega was dumping

3    products into his market and destroying his margins,

4    and she didn't care what happened to his margins, and

5    that she was reckless and I was to get involved.

6    Q.    Anything else he said about the blowout

7    that he had with Miss Ortega?

8    A.    Just that he wouldn't have anything to do

9    with Miss Ortega after that, and I had to say, "You

10   will be civil."

11   Q.    And do you know if he identified any

12   specific accounts that he thought that Miss Ortega

13   was affecting, any of his accounts that he thought

14   that Miss Ortega was affecting?

15   A.    See, I think I just answered that.  I

16   recall Nassau Guardian being one he was worried

17   about.  There may have been others.

18   Q.    Nassau Guardian, was that an account that

19   was eventually given to Miss Ortega?

20   A.    No, ma'am.

21   Q.    And did Mr. Gispert ever tell you that he

22   thought that a female may encounter certain problems

23   or certain resistance in the Bahamas culture?

24   A.    He did.

25   Q.    When did he tell you that?

```
 1        A.    When we were -- when he was about to leave,
 2    during the time between his notice of resignation and
 3    actually leaving.
 4        Q.    And did you ask him what he meant by that?
 5        A.    I think I understood what he meant by that.
 6        Q.    And what did you understand that to mean?
 7        A.    I think he was trying to imply that they
 8    may encounter resistance.
 9        Q.    Did you understand what he meant by
10    resistance?
11        A.    I thought that I did, yes.
12        Q.    What was your understanding as to what
13    resistance meant?
14        A.    That a woman might find it more difficult
15    to deal with the customers in the Bahamas.
16        Q.    And did you ask him for any details as to
17    what he meant by a woman may find resistance?
18        A.    No, ma'am.
19        Q.    And did you agree with the statement that
20    he made about the resistance that females may feel
21    dealing with the Bahamian culture?
22        A.    No, ma'am.
23        Q.    And did you tell him that?
24        A.    I believe I did.
25        Q.    What did you tell him?
```

```
1       A.    I can't recall specifically.

2             We continued to look at female candidates

3    for the job.  I mean, there was no credence put in

4    the comment.

5                  (Thereupon, a brief recess was taken,

6                  after which the following proceedings

7                  were had:)

8  BY MS. DALEY:

9       Q.    Can you turn back to Exhibit No. 4, please.

10   I am looking at the list.  About a third of the way

11   down, there's an account Editorial Televisa; do you

12   know what type of account that one is?

13      A.    Not specifically, I can't recall, no.

14      Q.    How about the one Entitled Serol

15   Publications, do you know what type of account that

16   one is?

17      A.    No, ma'am.

18      Q.    How about the one Sep's Neg's,

19   Incorporated?

20      A.    That was a pre press account in Puerto

21   Rico.

22      Q.    I am sorry?  A pre press?

23      A.    I don't know if they printed there or not.

24   Yeah, I think they did some digital printing, pre

25   press.  Separations in negatives is what that stands
```

```
 1      Q.    How about the heat set web accounts, was
 2   there any particular type of experience that you were
 3   looking for in assigning those accounts?
 4      A.    Ideally, that they had worked with heat set
 5   web accounts before.
 6      Q.    Any other things that you were looking for,
 7   in terms of experience, in assigning heat set web
 8   accounts?
 9      A.    Someone that had had experience working
10   with large businesses, large commercial printers.
11      Q.    Anything else?
12      A.    Not that come to mind.
13      Q.    Now, with respect to previous product
14   knowledge, what type of previous product knowledge
15   did you use or did you consider in assigning web
16   accounts?
17      A.    It would be helpful if they understood web
18   paper.  Web paper is sold in varying sizes.  It's
19   much more custom.  They have to understand machine
20   trims and waste factors and roll widths and machine
21   schedules, and these type of things would be helpful.
22      Q.    Anything else?
23      A.    I am sure there are more, but this is all
24   that comes to mind.
25      Q.    Now, with respect to selling sheet fed
```

```
 1    accounts, what factors did you consider with respect

 2    to the area of previous product experience?

 3         A.    I think that's a very broad category, sheet

 4    fed accounts; that consists of quick printers.  Large

 5    commercial printers consists of digital printers,

 6    copy center printers.  So each one of those, it has a

 7    different level of experience that you look for.

 8              If it's a quick copy, not so many years of

 9    experience or maybe that's where you start someone.

10              Commercial printers, we look for more time,

11    look for more experience working with large

12    commercial printers.

13         Q.    Did you have any guidelines with respect to

14    the number of years that a person needed to have to

15    handle a particular type of sheet fed account?

16              MR. STEVENS:  I am going to object.

17              THE WITNESS:  Can I ask?  That's not the

18         same question, is it, that you just asked?

19              MR. STEVENS:  Go ahead.  You can answer.

20    BY MS. DALEY:

21         Q.    Did you understand the question that I just

22    asked you?

23         A.    Was that a different question than the

24    question that you asked me before?

25         Q.    Probably, yes.
```

1      A.    I think it was.

2      Q.    I don't have to stay on the same line.  But

3      did you understand the question that I just asked

4      you?

5      A.    Let me ask you to ask it again.

6      Q.    Now, with respect to the area of product

7      knowledge for sheet fed accounts, did you, in

8      assigning the accounts, take into consideration a

9      different type of product knowledge with respect to

10     the different type of sheet fed accounts that the

11     company handled?

12     A.    Yes, ma'am.

13     Q.    And how did the different product knowledge

14     that you took into consideration differ with respect

15     to the type of sheet fed accounts?

16     A.    As I just mentioned, if it's a quick copy,

17     the products are a cut size and basically simple, not

18     as much experience is required.  If it's a commercial

19     printer that prints coated paper for magazines and

20     publications, then I look for some experience in

21     handling those papers in those type printers.  It's

22     one of the considerations.

23     Q.    But were you looking for any particular

24     type of knowledge that the sales representative have

25     with respect to deciding if he or she could handle

1    for.

2        Q.    Can you turn to the document under Tab

3    No. 16, please.  It's stamped EEOC 207; do you

4    recognize that as one of the policies for Unisource?

5        A.    It appears to come from our policies and

6    procedures book, yes, ma'am.

7        Q.    Have you seen it before today?

8        A.    I have read our EEO policy, but I can't say

9    in unequivocally this is it but, yes, I have seen our

10   EEO policy before.

11       Q.    Can you turn to the document under Tab

12   No. 17, please, stamped EEOC 208 through 210, and

13   tell me if you recognize that?

14       A.    Again, it looks like it came from our book,

15   but I can't be sure.

16       Q.    Can you turn to the document under Tab

17   No. 18, please.  It's stamped DEF 03621; tell me if

18   you recognize this as a memorandum that you prepared?

19       A.    Yes, it has my initials on it.

20       Q.    Turn to the document under Tab No. 19,

21   please.  The same, do you recognize that as a

22   memorandum that you prepared?

23       A.    Yes.

24       Q.    And do you know whose handwritten notations

25   are on this exhibit?

```
 1      A.    The one that says Sheila, please change
 2    back to Ortega cc Herard was mine, from 6995 to 6030
 3    was Sheila Sullivan's.
 4      Q.    Sheila Sullivan, was she your secretary?
 5      A.    She is our Credit Manager.   4
 6      Q.    Do you know what 6995 means?
 7      A.    6995 is the sales number for Bill Herard.
 8      Q.    Can you turn to the document under Tab
 9    No. 20, and it's stamped DEF03623, and tell me if you
10    recognize that as a memorandum that you prepared?
11      A.    Yes, I do.
12      Q.    And do you know whose handwritten notations
13    are on this document?
14      A.    SS is Sheila Sullivan's initials.  So it
15    appears to be Sheila Sullivan, except for the JAG by
16    my name, that's mine.
17      Q.    Do you know who made the handwritten
18    notations under the column entitled Account Name?
19      A.    No.
20      Q.    Do you know what 6844 means?
21      A.    It's a previous sales number.
22      Q.    Do you know for whom?
23      A.    No, ma'am.
24      Q.    Can you turn to the document under Tab
25    No. 21, please, and it's stamped DEF03624, and tell
```

 1   me if you recognize it?

 2        A.    Yes.  It looks like my handwriting.

 3        Q.    And what was the purpose for preparing this

 4   document?

 5        A.    I don't recall.  I don't know if this is

 6   what I assigned it to or what it is.  I don't recall.

 7        Q.    About halfway down the page, there's a

 8   number 2 that's circled.  Can you read to me what's

 9   in that block, after the number 2 that's circled?

10        A.    It says also number 2, Nassau Hotel

11   46-10869, also, and then over on the side, it says

12   salesman change.

13        Q.    And do you know what 46-10869 represents;

14   is that an account number?

15        A.    It appears to be.

16        Q.    And the same thing with 4511960, is that

17   also an account number?

18        A.    It appears to be, from the note at the top

19   of the page, where it says to Betty O; this appears

20   to be the document where I was assigning these

21   accounts to her, but I am not sure.

22        Q.    And have you made out an account assignment

23   or reassignment using similar types of notes?

24        A.    Yes.  I explained that earlier.

25        Q.    And Sheila is still Sheila Sullivan who you

```
 1   referred to on the previous exhibits?

 2        A.    Yes, ma'am.

 3        Q.    And can you turn to the document under Tab

 4   No. 22, please?

 5        A.    Yes.

 6        Q.    And it's stamped DEF03625, and tell me if

 7   you recognize it?

 8        A.    No.

 9        Q.    So you have never seen this exhibit before?

10        A.    DEF03625?

11        Q.    Yes, under Tab No. 22?

12        A.    I can't recall that I have ever seen it

13   before.  It says per JG, which is me, but this isn't

14   my writing.

15        Q.    Can you turn to the documents under Tab

16   No. 1 stamped EEOC 174 through 176 and tell me if

17   this is your statement?

18             MR. STEVENS:  174, is that right?

19             MS. DALEY:  174 through 176.

20             MR. STEVENS:  Okay.

21             THE WITNESS:  Yes, ma'am.

22 BY MS. DALEY:

23        Q.    And you signed this statement under oath?

24        A.    Yes, ma'am.

25        Q.    Let me rephrase it.  You signed this
```

1    statement in the presence of a notary?

2    A.    Yes.    I can't recall but, yes, it looks

3    like I did.

4    Q.    Do you know how many years of experience

5    Bill Ready has has handling export accounts?

6    A.    Definitely, no.

7    Q.    I am sorry?

8    A.    You want an approximation?

9    Q.    Yes.

10    A.    I know that he has managed Betty for ten

11    years, and Betty has proclaimed that she's been in

12    export for ten years.    So I would assume at least

13    that long.    He has been in the paper business thirty.

14    Q.    So to your knowledge, he has managed Betty

15    Ortega for a period of ten years?

16    A.    To my knowledge.

17    Q.    And during that ten year time frame, Miss

18    Ortega handled export accounts?

19    A.    By her statements to me, yes.

20    Q.    And do you know if Mr. Ready, himself,

21    personally serviced any export accounts?

22    A.    Mr. Ready has told me about past trips to

23    the Bahamas.    He knew some of the people that were

24    there before I was in the business, I think, but I

25    know he had been there before.

1       Q.    Do you know for how many years Mr. Ready

2    personally serviced export accounts?

3       A.    Specifically, no.

4       Q.    And do you know if Mr. Ready has more years

5    of experience servicing export accounts than Miss

6    Ortega?

7       A.    Specifically, I couldn't say.  I know he

8    has more years in the business.

9       Q.    Now, with respect to the export accounts

10    that the company handles, is Miss Ortega qualified to

11    handle all types of export accounts that Unisource

12    handles?

13       A.    I don't like the term all.  There may be

14    extenuating circumstances why she would not be the

15    right fit, but she does have export experience.

16       Q.    Are there any type of export accounts that

17    Unisource handles that you believe that Miss Ortega

18    is not qualified to handle?

19       A.    I couldn't say.  I don't think so.

20       Q.    Now, with respect to the regular web

21    accounts, are there any of those regular web accounts

22    that you believe Miss Ortega is not qualified to

23    handle?

24       A.    I believe that she doesn't have the level

25    of experience that would be optimum.

```
 1      Q.    And what is the optimum level of experience
 2    that you are referring to?
 3      A.    Someone who is currently working with web
 4    accounts.
 5      Q.    So, to your knowledge, Miss Ortega is not
 6    currently working with any web accounts; is that
 7    correct or incorrect?
 8      A.    I don't --
 9            MR. STEVENS:  Just for my clarification,
10        are we talking about heat set web?
11            MS. DALEY:  Regular web.
12            MR. STEVENS:  Or all web?
13            MS. DALEY:  I am going to move to heat set
14        web afterwards.
15            Let me rephrase that.
16            THE WITNESS:  I can't be sure.  I don't
17        believe so.
18  BY MS. DALEY:
19      Q.    Let me rephrase that, just to address the
20    concern.
21            Excluding heat set web accounts, to your
22    knowledge, is Miss Ortega qualified to handle the
23    regular web accounts?
24      A.    She does have carbonless web account forms,
25    bond account web.  She does have cold set.
```

```
 1        Q.     And is she qualified to handle the web
 2   accounts that the company has?
 3        A.     She does not have the optimum experience
 4   for the heat set web, no.
 5        Q.     I am going to address that afterwards.
 6   Let's just deal with accounts other than the heat set
 7   web.
 8               Is she qualified to handle web accounts,
 9   excluding the heat set web?
10        A.     She could call on those, yes.
11        Q.     She is qualified to handle those?
12        A.     She is qualified.
13        Q.     Now we'll move on to the heat set web
14   accounts.
15               Is Miss Ortega qualified to handle heat set
16   web accounts?
17        A.     See, my issue is with the term qualified.
18   Is she the best candidate?  If there's someone that
19   had more experience working with web accounts, then
20   she would not be the more qualified candidate.
21        Q.     I am not asking you whether or not she is
22   more qualified than anybody else.  For right now, I
23   am asking you if she meets the minimum qualifications
24   for handling heat set web accounts?
25        A.     She might meet the minimum qualifications.
```

1    Q.    When you say she might, do you know for

2    sure or not?

3    A.    Why don't I just say I am not sure.

4    Q.    Do you know if there's anyone, within the

5    company, who would know whether or not Miss Ortega is

6    qualified to handle heat set web accounts?

7    A.    Mr. McClary may be more qualified to answer

8    that question than I.  He has worked with her longer.

9    Q.    I am sorry.  You say he has worked with

10   Miss Ortega longer?

11   A.    (Nodding head affirmatively).

12   Q.    Now, with respect to the income or the

13   sales that are generated by the accounts handled by

14   the Miami Division, is Miss Ortega qualified -- and

15   let me rephrase this.

16         In this question, I am going to ask you to

17   exclude the heat set web accounts.  Now, with respect

18   to certain income levels that these accounts

19   generate, are there any accounts that you feel that

20   Miss Ortega is not qualified to handle because of the

21   volume of income that is generated by the account?

22   A.    Because of the volume of income that is

23   generated?

24   Q.    Yes.

25   A.    That's not how we measure it.  We measure

 1    it by sophistication level, the experience.  So I am

 2    not sure I know how to answer your question.

 3        Q.    Do you know how many total years of sales

 4    experience Miss Ortega has?

 5        A.    I can't be certain.

 6        Q.    Has any of Miss Ortega's supervisors ever

 7    raised any concerns with you about her work

 8    performance?

 9        A.    Not that I can recall.

10        Q.    Now, other than this program that Miss

11    Ortega is presently on, excluding that, has Miss

12    Ortega ever been placed on any form of disciplinary

13    action by the company?

14        A.    Not that I am aware of.

15            MS. DALEY:  Let me take a minute.  Then I

16        am almost finished.

17                (Thereupon, a brief recess was taken,

18                after which the following proceedings

19                were had:)

20            MS. DALEY:  I have no further questions.

21            MR. STEVENS:  I have just a couple real

22        quick questions.

23                CROSS EXAMINATION

24 BY MR. STEVENS:

25        Q.    With respect to giving Mr. Ready most of

```
 1    the accounts that Tony Gispert had, did he express

 2    interest to you in that position?

 3        A.    Yes, he did.  He came to me and asked for

 4    the job.

 5        Q.    And earlier you testified that you

 6    considered several candidates?

 7        A.    Uh-huh, yes, I did.

 8        Q.    Did any of them inform you that they were

 9    not interested in the position?

10        A.    A couple of them did, yes.

11        Q.    Who was that?

12        A.    Alex Gomez and Barbara Vega.

13        Q.    And the fact that Mr. Ready was interested

14    in the position, was that another factor that you

15    considered in making the decision?

16        A.    Certainly, yes.

17              MR. STEVENS:  That's the only questions

18        that I have.

19              MS. DALEY:  I have some follow-up.

20                   REDIRECT EXAMINATION

21 BY MS. DALEY:

22        Q.    So your testimony is that Mr. Ready came to

23    you and asked you for the job; is that correct?

24        A.    Yes, it is.

25        Q.    And who initiated the conversation where
```

1    Mr. Ready came to you and asked you for the position?

2        A.    Mr. Ready.

3        Q.    And when he asked you for the position, was

4    it an in person conference or was it over the

5    telephone?

6        A.    No.  He walked in my office.  He shut the

7    door, and he said, "I've been thinking about this all

8    weekend, and I think it would be a good opportunity

9    for me.  Would you consider me?"

10       Q.    Now, was there anybody else, other than

11   Mr. Ready, who expressed interest in getting the

12   accounts that Tony Gispert had?

13       A.    Internal candidates?

14       Q.    Let me rephrase it.

15             Was there anybody, other than Mr. Ready,

16   who expressed interest to you in getting the accounts

17   that Tony Gispert had?

18       A.    Sue Pollen wanted that job.  She wanted

19   those accounts.

20       Q.    Anybody else?

21       A.    Not that I can recall.

22       Q.    Did Betty Ortega ever tell you that she

23   wanted Tony Gispert's accounts?

24       A.    No.

25             MS. DALEY:  I have no further questions.

```
 1              MR. STEVENS:  Okay.  Real quick, before we
 2         head out --
 3              MS. DALEY:  You want to make these
 4         exhibits?
 5              MR. STEVENS:  I would like to, yeah,
 6         because I think you did 26 and 27 for the
 7         notices.  This is 28 and 29.
 8                   (The documents referred to were
 9                   thereupon marked Defendant's Exhibit
10                   No. 28 and 29 for Identification.)
11              MR. STEVENS:  28 is a letter dated
12         September 13th from Juan C. Enjamio to Jennifer
13         Daley.  Paragraph 4 on Page 1 states, "Unisource
14         will designate Amy George and John Glaze as its
15         corporate representatives, pursuant to your
16         30(b)6 Deposition Notice.  I am going to
17         introduce that as Exhibit 28.
18              As I stated earlier, with respect to
19         Exhibit 27, which is Plaintiff's Notice of
20         Deposition, attached thereto is a list of
21         questions for the 30(b)6.  Mr. Glaze was
22         available to discuss questions 16, 17, 18, 19,
23         20, 21, 22, 23, 24 and 26 and.
24              Exhibit 29 is a letter from Juan C. Enjamio
25         to Jennifer Daley dated September 22nd which
```

```
 1        confirms the deposition schedule for this week,
 2        and on Friday, September 29th, at 1:00 Dennis
 3        Laux, 3:00 Bill Ready.  I'd like to introduce
 4        that, and that's all I have.
 5            MS. DALEY:  I just want to note, for the
 6        Record, that the letters specifically reference
 7        Mr. Glaze as an individual for today.  There's
 8        nothing in any of those letters that said
 9        Mr. Glaze would be produced as a corporate rep
10        today, and that's all.
11            Does he want to read or waive?
12            MR. STEVENS:  He will read.
13                (Thereupon the taking of the
14                deposition was adjourned).
15                - - - - - - - - -
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2            I, JOHN GLAZE, do hereby certify that I
 3   have read the foregoing deposition and that the same
 4   is a true and accurate transcript of my testimony,
 5   except for attached amendments, if any.
 6
 7
 8
 9
10
11
12
13
14            ----------------------------------
15            The signature above of JOHN GLAZE was
16   subscribed and sworn to before me this ____ day of
17   ____ 2000.
18
19
20            ----------------------------------
21                 Notary Public
22                 My commission expires
23
24
25
```

```
 1                    CERTIFICATE

 2     STATE OF  FLORIDA:
                     : SS.
 3     COUNTY OF BROWARD:

 4

 5
            I, JACKIE JOHNSON, being a Professional
 6     Court Reporter and Notary Public for the State of
       Florida at Large, do hereby certify that I was
 7     authorized to and did stenographically report the
       foregoing deposition and that the transcript is a
 8     true record of the testimony given by the witness.
            I further certify that I am not a relative,
 9     employee, attorney or counsel of any of the parties,
       nor am I a relative or employee of any of the
10     parties' attorney or counsel connected with the
       action, nor am I financially interested in the
11     action.
            Under penalties of perjury, I declare that
12     I have read the foregoing document and that the facts
       stated in it are true.
13          The foregoing certification of this
       transcript does not apply to any reproduction of the
14     same by any means unless under the direct control
       and/or direction of the certifying reporter.
15          WITNESS my hand and official seal in the
       City of Ft. Lauderdale, County of Broward, State of
16     Florida, this 20th day of November, 2000.

17

18     _____
       JACKIE JOHNSON, NOTARY
19     PUBLIC AT LARGE.
       MY COMMISSION EXPIRES:
20     MAY 20, 2003

21

22                          Jackie Johnson
                            My Commission CC838278
23                          Expires May 18, 2003

24

25
```

```
 1               IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2

 3
                 CASE NO. 00-6126-Civ-Dimitrouleas/Johnson
 4

 5
     BETTY ORTEGA,                     )
 6                                     )
                      PLAINTIFF,       )
 7                                     )
          v.                           )        ORIGINAL
 8                                     )
     UNISOURCE WORLDWIDE, INC., a      )
 9   foreign corporation,              )
                                       )
10                   DEFENDANT.        )
                                       )
11   - - - - - - - - - - - - - - - - - x

12
                            500 N.E. 4th Street
13                          Ft. Lauderdale, Florida
                            October 25, 2000
14                          2:00 p.m.

15

16            CONTINUED DEPOSITION OF JOHN GLAZE

17

18

19            Taken before JACKIE JOHNSON, Professional

20   Reporter and Notary Public in and for the State of

21   Florida at Large, pursuant to Notice of Taking

22   Deposition filed in the above cause.

23                    - - - - - - -

24         BRICKELL, GOMBERG & ASSOCIATES (954) 522-0067

25 521 South Andrews Avenue, Suite One, Ft. Lauderdale  33301
```

```
 1                    APPEARANCES

 2
     ON BEHALF OF THE PLAINTIFF
 3
         AMLONG & AMLONG, P.A.
 4       500 N.E. 4th Street
         Ft. Lauderdale, Florida  33301
 5       BY:  Jennifer Daley, ESQ.

 6   ON BEHALF OF THE DEFENDANT

 7       HUNTON & WILLIAMS
         Two South Biscayne Boulevard
 8       One Biscayne Tower, Suite 2500
         Miami, Florida  33131
 9       BY:  Juan C. Enjamio, ESQ.

10   ALSO PRESENT:  Betty Ortega, Plaintiff
                    Amy George, Human Resources Manager
11                  Unisource Southeast

12                    INDEX
     Witness          Direct    Cross    Redirect    Recross
13   JOHN GLAZE
       By Ms. Daley    3
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  Thereupon --
 2                    JOHN GLAZE,
 3  was called as a witness and, having been first duly
 4  sworn, was examined and testified as follows:
 5             DIRECT EXAMINATION CONTINUED
 6  BY MS. DALEY:
 7      Q.    Please state your full name.
 8      A.    John Arthur Glaze.
 9      Q.    By whom are you employed?
10      A.    Unisource Worldwide.
11      Q.    Were you designated by Unisource Worldwide
12  as one of its corporate representatives?
13      A.    Today, yes.
14      Q.    And let me show you what has been marked as --
15      A.    Is there a book I can reference?
16            MS. DALEY:  Yes.  Let's go off for one
17       minute.  Let me find it.
18                 (Discussion off the record.)
19  BY MS. DALEY:
20      Q.    I'm going to show you what has been
21  included under Tab No. 26 in the deposition exhibit
22  notebook, the Notice of Taking Deposition of
23  Corporate Representative and Combined Request to
24  Produce.
25            Can you tell me for which areas you have
```

```
 1   been designated as the corporate representative?

 2           MR. ENJAMIO:  Can I just speak to that real

 3       quickly?

 4           MS. DALEY:  Sure.

 5           MR. ENJAMIO:  That way -- and John you can

 6       follow along.  That would be number 16, number

 7       17, 18, 19, 20, 21, 22, 23, 24 and 26, and that

 8       is in all of those, he will be the person with

 9       the most knowledge presently employed or the

10       corporate representative for Unisource.

11 BY MS. DALEY:

12       Q.   Can you tell me the process by which you

13   were chosen to be corporate representative with

14   respect to the areas that were just mentioned?

15           MR. ENJAMIO:  I object to the extent that

16       calls for him to reveal conversations with his

17       attorneys.  I mean, if he knows outside of

18       conversations with his attorneys, then certainly

19       he may answer.

20 BY MS. DALEY:

21       Q.   What I am trying to, without disclosing any

22   attorney/client communication, which I don't think

23   that's a proper objection, but I am going to ask you,

24   anyway, who made the decision to designate you as the

25   corporate representative for these areas?
```

1          MR. ENJAMIO:  Jennifer, I don't want to
2      instruct him not to answer.  My only concern is
3      I don't want to waive any attorney/client
4      privilege.  So some of that may have been done
5      in conjunction with speaking to a lawyer and,
6      obviously, that's a third party communication.
7          MS. DALEY:  All I want to know is if he is
8      going to tell me who made the decision?  I mean,
9      if you are instructing him not to answer, then I
10     will move on.
11         MR. ENJAMIO:  No.  I mean, I don't want to
12     instruct him not to answer, unless it was part
13     of a communication with an attorney.  If was it
14     was done outside of that, then certainly he can
15     answer.
16         THE WITNESS:  It was part of a
17     communication with an attorney.
18 BY MS. DALEY:
19     Q.   So you're not going to tell me who made the
20 decision?
21     A.   It's part of --
22     Q.   I just need to know, for the Record, if
23 this issue needs to come up again, if you're going to
24 tell me who made the decision or whether or not your
25 relying on the attorney/client privilege?

```
 1       A.    I am relying on the attorney/client
 2   privilege.
 3            MR. ENJAMIO:  But I just want to be clear.
 4       I mean, the company is putting him up as the
 5       corporate representative on those particular
 6       areas you have designated, and we have discussed --
 7            MS. DALEY:  I think we have a right to know
 8       how the decision was made and who made it.
 9   BY MS. DALEY:
10       Q.    Now, who did you speak to to prepare you to
11   provide the testimony today with respect to these
12   areas?
13       A.    That was involved in an attorney/client.
14   Should I --
15            MR. ENJAMIO:  You can say who you spoke
16       with.
17            THE WITNESS:  I spoke with my attorney.
18   BY MS. DALEY:
19       Q.    Which attorney?
20       A.    Juan Enjamio.
21       Q.    Anybody else?
22       A.    Also, briefly, Amy George.
23       Q.    Anybody else?
24       A.    I think that's it.  There were people that
25   helped me prepare documents, copy documents but, no,
```

1    that would be it.

2        Q.    You spoke with Mr. Enjamio.  You spoke with
3    Mrs. George, and you also spoke to the people who
4    pulled the documents and copied them?

5        A.    No, I didn't speak with them.  They just
6    helped me pull documents.  I didn't speak to them in
7    preparing for this, no.

8        Q.    And what did you speak with Amy George
9    about with respect to your testimony today?

10       A.    Just making sure I understood what pieces
11   she had answered in her portion.

12       Q.    And did you review any documents today upon
13   which you rely in giving your testimony today?

14       A.    Yes, I did.

15       Q.    Which documents did you review?

16       A.    Some Commission Detail Analysis Reports,
17   some reported on MI3050.

18       Q.    Can you say the title for that again?

19       A.    It's a 3050 report.

20       Q.    3050 report?

21       A.    Uh-huh.

22       Q.    Anything else?

23       A.    Some Commission Reports.  I am trying to
24   think what else is in that.

25       Q.    I am sorry.  You said some Commission

1    Reports.   Anything else?

2        A.    I am thinking.

3              That's all that I can recall at this

4    moment.

5        Q.    So you believe that there were some other

6    documents that you reviewed, but you cannot recall

7    which ones?

8        A.    No, I don't believe.  I think I covered it.

9    There were Commission Reports, Commission Detail

10   Analysis Reports.

11       Q.    The 3050 report?

12       A.    Which talks about sales and gross profit.

13       Q.    For what time frame did you review -- for

14   what time frame were the Commission Detail Analysis

15   Reports that you reviewed?

16       A.    Basically, from period 12, 1998, which

17   would be September '98, until present.

18       Q.    And what is the purpose of the Commission

19   Detail Analysis Reports?

20       A.    It lists the accounts assigned to a

21   particular salesperson, the sales and gross profits

22   generated for a period of time, the commission rate

23   paid, and the commission dollars earned.

24       Q.    Did you review the Commission Detail

25   Analysis Reports for any period, other than period

1   12?

2       A.      Basically, that's the oldest one I think
3   that I pulled and looked at.  It's the oldest one,
4   and I looked at several since then.

5       Q.      For purposes of clarification, you reviewed
6   the period 12 Commission Detail Analysis Reports for
7   each year from '98, '99 and forward?

8       A.      No, ma'am.

9       Q.      Then explain to me what you mean by period
10  12 for 1998 until the present.

11      A.      Period 12, 1998 September of 1998.  That's
12  pretty clear, I think.  Then I looked through the
13  book of reports that have been generated in the
14  period since then.  Specifically, which periods, I
15  cannot recall, but certainly since then.  Does that
16  clarify that pretty well?

17      Q.      And did you bring all of the documents that
18  you looked at, to prepare yourself for this
19  testimony, with you today?

20      A.      To the best of my recollection, yes.

21      Q.      So you brought all of the Commission Detail
22  Analysis Reports that you reviewed to prepare
23  yourself for your deposition here today?

24      A.      Yes.

25      Q.      And you brought all of the 3050 reports

1    that you reviewed here with you today?

2         A.    Uh-huh.

3         Q.    And you also brought all of the Commission

4    Reports, that you reviewed, here with you today?

5         A.    No.  I guess there are some Commission

6    Reports that I did not bring with me.

7         Q.    So which Commission Reports did you not

8    bring with you?

9         A.    Ma'am?

10        Q.    Let me me -- I need to finish.

11        A.    That's not --

12             MS. DALEY:  Let's stop.  I need to finish,

13         because the court reporter needs to take it

14         down.  When I am finished, you can answer.

15   BY MS. DALEY:

16        Q.    Now, which Commission Reports that you

17   reviewed did you not bring with you today?

18        A.    Ma'am, there is no way in the world that I

19   could possibly know that.  Did I let you finish?

20        Q.    Correct.  Tell me, to the best of your

21   knowledge, which Commission Reports you reviewed that

22   you did not bring with you today.

23        A.    I can't recall.

24        Q.    When did you review those Commission

25   Reports?

```
 1    A.    Earlier today.

 2    Q.    And how many?  Were those reports in boxes?

 3    A.    Yes, they were.

 4    Q.    How many boxes are we talking about?

 5    A.    Approximately 15.

 6    Q.    And you reviewed all 15 boxes today?

 7    A.    No, ma'am.

 8    Q.    How many of the 15 boxes did you review?

 9    A.    Specifically, I looked at a few reports out

10    of three or four boxes.

11    Q.    And would you be able to tell which reports

12    you looked at from which boxes?

13    A.    No.

14    Q.    Where are those boxes today?

15    A.    Well, they were -- today, they are in the

16    Miramar office.  These are the boxes that have been

17    available for you all for the last three months.

18    Q.    But all I am asking you is if you can tell

19    me if you can go back and reconstruct which reports

20    you looked at from which boxes?

21    A.    No, ma'am.

22    Q.    Can you tell me the names of all of the

23    accounts that Betty Ortega handled in 1996?

24    A.    No, I cannot.

25    Q.    What, if anything, did you do, prior to
```

```
 1    your deposition, to determine which accounts Betty
 2    Ortega handled in 1996?
 3         A.    I have a report that's from 1996 through --
 4    its period 6.  It lists all the accounts that she had
 5    on the books as of period 6.  That's the only account
 6    listing I could find that goes back that far.
 7         Q.    And you have that report with you here
 8    today?
 9              MR. ENJAMIO:  You have to say yes or no.
10              THE WITNESS:  Yes.
11 BY MS. DALEY:
12         Q.    Can I see it?
13         A.    It's in my car.
14              MR. ENJAMIO:  Oh, it's in your car?
15              THE WITNESS:  Uh-huh.
16              MS. DALEY:  We'll wait for it.  Can you go
17         get it?
18              THE WITNESS:  Sure.
19              MR. ENJAMIO:  Okay.  Let's go.
20                   (Thereupon, a brief recess was taken,
21                   after which the following proceedings
22                   were had:)
23 BY MS. DALEY:
24         Q.    Can you tell me the name of all of the
25    accounts that Miss Ortega handled in 1996?
```

```
 1      A.      I cannot tell you the names of all of the
 2   accounts that Miss Ortega handled in 1996.
 3      Q.      And why not?
 4      A.      The only supporting documents that I could
 5   find that exist were these, and this was through six
 6   months.  It's possible that there are accounts added
 7   after, added and taken away after, added and taken
 8   away before.
 9      Q.      When you say these, to what documents are
10   you referring?
11      A.      I am referring to an MC3112, which is a
12   Customer Sales Report.
13      Q.      You can continue.
14      A.      The only other way to find out all the
15   accounts assigned to Betty Ortega, in 1996, would be
16   to go to the Commission Reports, which we have
17   provided previously, and list them one by one.
18      Q.      And did you do that to prepare yourself to
19   answer questions at this deposition today?
20      A.      No, ma'am.  We provided those documents to
21   you.
22      Q.      What I am asking you is if, in preparing
23   for your deposition today, did you take any efforts
24   to determine all of the accounts that Miss Ortega
25   handled in 1996?
```

1      A.      Yes, I did take efforts.

2      Q.      And what efforts did you take?

3      A.      I researched and found this document that I

4      am holding here and provided for you, Counsel, the

5      documents, the Commission Reports.

6      Q.      So you're saying, in preparing for your

7      deposition today, you provided me with documents?

8      A.      No.  I am sorry.  In preparing today, I

9      pulled this document and brought this with me.

10     Q.      So you pulled the MC3112 Customer Sales

11     Report that shows the accounts for a six month time

12     frame?

13     A.      That's correct.

14     Q.      And as for the other six month time frame,

15     you're not prepared today to tell me what the other

16     accounts are; is that correct?

17     A.      That information is available, as far as I

18     can be aware.  I am just trying to answer your

19     question as best I can.  That information, the only

20     way to get to that information would be to pull every

21     account from the Commission Reports that we have

22     provided.

23     Q.      So you are not prepared to tell me today

24     the names of all of the accounts that Miss Ortega

25     handled in 1996?.

```
 1              MR. ENJAMIO:  Object to the extent it's
 2         been asked and answered, and it's argumentative.
 3         You may answer.
 4              THE WITNESS:  This is what I have prepared
 5         for you today.  So the answer is this is not
 6         complete.
 7  BY MS. DALEY:
 8         Q.   Can I see what you brought here today?
 9         A.   Sure.
10         Q.   And to which pages are you referring?
11         A.   Page 45, Page 46 and Page 47.
12         Q.   I am looking at an MC3112 report dated
13    March 30, 1996; is that correct?
14         A.   Yes, ma'am, you are.
15              MR. ENJAMIO:  I am sorry.  The date was
16         March 30th?
17              MS. DALEY:  March 30, 1996.
18              MR. ENJAMIO:  Okay.
19  BY MS. DALEY:
20         Q.   And is it your testimony today that this
21    report covers her accounts for what time frame?
22         A.   For six months.
23         Q.   What six month time frame?
24         A.   First six months of that fiscal year, which
25    would have covered October, November, December of
```

```
 1   1995, January and February and March of 1996.
 2       Q.   So this report does not cover accounts that
 3   she may have handled from February 1996 and forward
 4   in the year of 1996; is that correct?
 5       A.   No.  I just explained to you that it was
 6   through March.
 7       Q.   March of 1996?
 8       A.   Yes.
 9       Q.   Which accounts did Miss Ortega handle for
10   the year 1997?
11       A.   I produced the same documents for that
12   year, that month.
13       Q.   You produced another MC3112 report?
14       A.   Yes, ma'am, Pages 72 through 74.
15       Q.   So I am looking at an MC3112 report dated
16   March 29, 1997, Pages 72 through 74?
17       A.   Yes, ma'am.
18       Q.   And for what time frame does this report
19   cover?
20       A.   It would cover from October, November,
21   December of '96, January, February, March of '97.
22       Q.   Did you bring anything that shows which
23   accounts she handled from March of '97 through
24   December of 1997?
25       A.   Can I see the MC3050?  No, ma'am.
```

```
 1        Q.    And do you know if the company has any
 2   records that would show what accounts Miss Ortega
 3   handled, what other accounts Miss Ortega handled in
 4   1997 that is not covered by the MC3112 report dated
 5   March 29, 1997?
 6        A.    That information is available through the
 7   Commission Reports that were provided previously.
 8   You, basically, have to go through them week by week
 9   and list the accounts that appear for the first time.
10        Q.    And you did not do that prior to this
11   deposition today, correct?
12        A.    No, ma'am.
13        Q.    Which accounts did Miss Ortega handle for
14   the year 1998?
15        A.    I provided for you the same document from
16   the same period from 1998.
17        Q.    I am looking at an MC3112 report dated
18   March 29, 1998; is that correct?
19        A.    Yes, ma'am.
20        Q.    And you're referring me to Pages 67 through
21   which page?
22        A.    No, ma'am.  Pages 68, 69, 70 and 71.
23        Q.    And what time frame does that report cover?
24        A.    It covers October, November, December of
25   1997, January, February, March of 1998.
```

1      Q.     Did you provide any other documents?  Did
2   you bring any other documents with you today with
3   respect to which accounts Miss Ortega handled for
4   1998?
5      A.     Excuse me one second.  I seem to have, in
6   her territory book for 1998, a Detail Analysis Report
7   through 11 periods or through the end of August of
8   1998.
9      Q.     I am sorry.  Did you say you have a
10   territory book for Miss Ortega?
11      A.     Yes.
12      Q.     Do you have such a book for each one of the
13   representatives in the Miami Division?
14      A.     Yes, ma'am.
15      Q.     And what type of information is kept in the
16   territory book?
17      A.     These were provided, by the way.  It has a
18   Commission Detail Analysis Report.  This is something
19   that I put together when I was given responsibility
20   for the salespeople sometime in late '98.  So that's
21   about as far back as it goes, Commission Detail
22   Analysis Report.  It has an SAP808 Customer
23   Performance Report by assigned rep, which was not all
24   inclusive, Salesman's Comparison Report, which
25   basically tells you how the salesperson is doing, you

```
1    know, this year versus previous, and just gross
2    sales, GP commissions, order size, etc.  There's a
3    3050 report which, basically, gives you one year
4    versus previous year.
5        Q.    Anything else?
6        A.    And I am trying to see if this -- none of
7    those go back to 1998.  Then there's a section for
8    plan and action items.
9        Q.    And you're saying that a territory book was
10   provided to the Plaintiff with respect to each of the
11   representatives in the Miami Division?
12       A.    We put every territory book that existed
13   for every salesperson in cartons and delivered it to
14   the offices downtown for your office to go through.
15   They were there for approximately two months.
16       Q.    Can I see the book?
17       A.    Sure.
18       Q.    Would you have any way of telling me which
19   box the book was in?
20             MR. ENJAMIO:  Which box?  You mean the
21         number?
22             MS. DALEY:  Which box number?
23             I am going to take a break now, and I am
24         going to give you a list -- an inventory of the
25         boxes that we did, to see if you can give me any
```

```
 1          guidance as to which box these reports that you
 2          are mentioning were in.  Can we take a break?
 3                    (Thereupon, a brief recess was taken,
 4                    after which the following proceedings
 5                    were had:)
 6 BY MS. DALEY:
 7     Q.    Now, you were looking for some documents to
 8 tell me the rest of the accounts that Miss Ortega
 9 handled in 1998; which documents were you referring
10 to?
11     A.    I was looking in the Commission Detail
12 Analysis to see how back -- what the most complete
13 one was, and the only one that I see, the most
14 complete one in her binder, is through 11 periods,
15 which would be through August of 1998.
16          Now, not to confuse this, but this SAP808
17 report does go back and give history back into -- I
18 think the oldest one has history that goes back in
19 '96, but it's by assigned rep, assigned now.  So if
20 it's been reassigned, any accounts that she may or
21 may not have anymore will not show up here.  This is
22 not a reliable history of what she had at that
23 particular time.  So I am not looking at this.
24     Q.    So the document that you are referring to
25 now that would tell me the rest of the accounts is
```

 1    the Commission Detail Analysis Report?

 2         A.    It goes through 11 months.  So it gives you

 3    any accounts that she sold through 11 months.  It's

 4    not complete.  It's not through 12 months.

 5         Q.    Can I see the document that you're

 6    referring to?

 7         A.    Yes, ma'am.

 8         Q.    I am looking at a Commission Analysis

 9    Reporting System Customer Detail Report dated August

10    25, 1998, period 1 through 11.

11              Now, during what time frame does this

12    report cover?

13         A.    It covers from October of 1997 through

14    August of 1998.

15         Q.    And is there anything else that I can look

16    at to tell me what the other accounts were from

17    August 1998 through the end of that year?

18         A.    The other thing that I can think of would

19    be the Commission Reports that we have already

20    provided.

21         Q.    To which Commission Reports are you

22    referring?

23         A.    The Commission Statements that show the

24    earnings per week.

25         Q.    And do you have those with you today?

```
 1      A.    No, ma'am.   That was part of that 15 boxes,
 2   approximately.
 3      Q.    And for the year 1999, did you bring any
 4   documents that show which accounts she handled?
 5      A.    Yes, ma'am.   I brought the same MC3112
 6   through period 6, 1999, those pages.
 7      Q.    And is that dated April 4, 1999?
 8      A.    Yes, it is.
 9      Q.    And which pages are you referring to?
10      A.    Pages 52 through 55.
11      Q.    I am sorry.   For what time frame does that
12   cover?
13      A.    That covers from 1999 -- excuse me.   That
14   covers from October of '98 through March of '99.
15            I need to back up a second.   These are --
16   what we have been discussing so far are her printing
17   paper accounts.   This report also contains -- no, it
18   does not.   These are her printing paper accounts.   I
19   have no reports, no documents like this for the
20   supply accounts that we maintain.
21      Q.    Does the company have any reports that
22   would show me which supply accounts Miss Ortega
23   handled between 1996 and 1999?
24      A.    The Commission Statements from 1996 through
25   1999.   She has a separate sales number, 0030, that
```

1      could be compiled that way.  You'd have to go through

2      every week, and every time you see a new entry, add

3      that.

4         Q.    But did you bring those today?

5         A.    No, ma'am.  It's part of the 15 boxes.

6         Q.    Did you take any effort to compile a list

7      of the supply accounts that she handled between '96

8      and '99?

9         A.    Just that they were provided.

10        Q.    Which accounts did Miss Ortega handle this

11     year?

12        A.    I have a Commission Detail Analysis Report

13     through period 9, which is through approximately

14     three weeks ago.  Wait a minute.  I have through

15     period 5 on supply.

16        Q.    Can I see that?

17        A.    That's supply.  That's printing.

18        Q.    Now, the accounts for supply, you're

19     referring me to a Commission Analysis Reporting

20     System Report dated June 6, 2000?

21        A.    Yes, ma'am.

22        Q.    And for her printing accounts, you're

23     referring me to a Commission Analysis Report

24     Reporting System Account dated October 3, 2000.

25        A.    Yes, ma'am.  There may be additional

1    documents for this year, if you'd like them.

2    Q.    I am sorry?

3    A.    There may be additional documents that are

4    at least that current.  If you'd like, I will check

5    in that book.

6    Q.    Sure.

7    A.    I have an SAP808 report dated December 2nd

8    which details the accounts that were assigned to her

9    at that time.

10    Q.    Is that December 2, 1999?

11    A.    No, 2000.  I am sorry.  I thought the

12    question was 2000.

13    Q.    You said December 2nd?

14    A.    Oh, God.  October 2nd.  I guess it's not

15    December yet.  I am sorry.  These are the printing

16    accounts that she had assigned to her as of that

17    date.

18           I have an MC -- excuse me -- an MI3050,

19    which is a comparison of this year versus last year,

20    dated October 1st of 2000 printing accounts.

21    Q.    So the SAP808 report that you're referring

22    to is the one that appears on Page 17 of this report?

23    A.    Actually, this is a binder.  This is a

24    compilation of reports.  It's under Tab 2.

25    Q.    So the first report that you are referring

1    to, the Customer Performance Report, is the one under

2    Tab 2 numbered Page 17?

3        A.    Uh-huh, 17, 18, 19, 20, 21, 22, 23, 24, 25.

4        Q.    And you referred to an MI3050 report dated

5    October 1, 2000?

6        A.    It's under Tab No. 4.  It's a single page,

7    Page No. 7.

8        Q.    Now, do you know or did you bring any

9    reports that would tell me the total yearly income

10   that was generated by each account that was handled

11   by Betty Ortega?

12       A.    The report, that would show you that.

13       Q.    Let me finish.  For each year from 1996

14   forward?

15       A.    The report that would give you that

16   information that is available that exists would be

17   the weekly Commission Reports.

18       Q.    Now, is there a weekly Commission Report

19   for a specific time frame that would give me the

20   total yearly figure for each year?

21       A.    Yes, but it won't give it to you by

22   account.  You'd have to go week by week and compile

23   the account and the commissions earned by the

24   transaction.

25              Now, the report titled Commission Analysis

1    Reporting System Customer Detail Report, the SC9131

2    that we have been talking about, does detail for you

3    the account, the sales and gross profit generated,

4    and the commission dollars earned.  I think the

5    oldest one that we have for Miss Ortega that's in

6    this book -- well, here's a stray one that came from

7    1996.  I don't know where we found this.  There's one

8    in here from 1996 through period 3, but then there's

9    not another one until August of 1998.

10    Q.    So for the Commission Analysis Detail

11    Reports, is there a specific period that I need to

12    look at, with respect to each year, that would tell

13    me, for example, what her year to date was for the

14    prior year?

15    A.    You'd want period 12 for each year, to give

16    you the total for that year that she just finished.

17    The fact is I do not have one for period 12 in 1996.

18    I do not have one for period 12, 1997.  I have one

19    for period 11, 1998 and 1999.  We have one for 1999,

20    and 2000 is not finished, but I have through period 9

21    that tells you what she has done year to date.

22    Q.    So for 1998, today, you have a period 11?

23    A.    Yes, ma'am.

24    Q.    For 1997, which period do you have?

25    A.    I don't have anything for 1997 that details

1    the commissions earned by an account.

2        Q.    But what you have today is just something

3    that shows me what her total commissions were with

4    respect to all of her accounts; is that correct?

5        A.    Total commission dollars, total commission

6    dollars for all of her accounts is what was provided

7    on the previous documents.  Hold on one second.

8        Q.    I am just trying to clear up what we have

9    today and what we don't.

10        A.    Yes, ma'am.  That's it.  What I have today

11    are her total commissions paid in 1996, 1997, 1998,

12    projected '99.  Well, actually, I have that from '99

13    here, and year to date 2000 that's total.  It doesn't

14    break down customer specifics.

15        Q.    And to which documents are you referring

16    to?  Are you referring to something in a deposition

17    notebook?

18        A.    Yes, ma'am.

19            MR. ENJAMIO:    Some of them are there.

20 BY MS. DALEY:

21        Q.    I am sorry?  Which tab?

22        A.    It goes back to 1995, but you asked for

23    '96.  Tab No. 7 is '96.  Tab No. 8 is '97.  Tab No. 9

24    is '98.  Tab No. 10 was projected 1999, but that

25    information is projected, because it was compiled

1    before the close of '99.  I have some of that detail

2    here.  Was this updated?  I believe this was updated.

3    Then I have period 12 here, which are her printing

4    accounts, commissions earned through all of 1999.

5        Q.    Now, going back to the exhibits that you

6    referred to in the notebook, 7, 8 and 9, who prepared

7    those documents?

8        A.    Our Human Resources group.

9        Q.    Who in the Human Resources group?

10       A.    Specifically, I am not sure.

11       Q.    And who in the company would know that?

12       A.    Cecil McClary would know that.  Excuse me.

13   Becky Javurek would know that.

14       Q.    And what's her title?

15       A.    I am sorry.  I am not positive of her

16   title.  She is responsible for Human Resources in the

17   Southeast.

18       Q.    And did you speak to her to determine if

19   the figures that are listed on Exhibits 7, 8 and 9

20   are correct?

21       A.    No, I did not call her and ask her if they

22   are correct.

23       Q.    Did you speak to anyone in the company to

24   determine if the figures on 7, 8 and 9 are correct?

25       A.    I spoke with Amy George briefly this

29

```
 1    morning about these pages.  The only one that we have
 2    apparently got an issue with is 1998, and we don't
 3    have possession of a particular report that is the
 4    source for this.
 5        Q.    So you spoke with Amy George today about
 6    Exhibits 7, 8 and 9.  Did she tell you that the
 7    information that is listed on Exhibit 7 is correct?
 8        A.    To her knowledge, it was correct, yes.
 9        Q.    And did she give you any indication as to
10    how the person who created these charts came up with
11    the figures?
12        A.    It was from the Source Report that's listed
13    at the bottom of the page.
14        Q.    So you're saying that there are reports
15    that the company generated that are entitled Source
16    Report SCW0993B?
17        A.    Yes, ma'am.
18        Q.    And other Source Reports that are listed on
19    the bottom of each one of the exhibits?
20        A.    It's the same report, different time period
21    it covers, I believe, yes, ma'am.
22        Q.    Have you ever seen any of those reports?
23        A.    Yes, ma'am.
24              Excuse me.  The Source Report, no, ma'am,
25    not to my knowledge.
```

```
 1      Q.    And do you know if those Source Reports
 2   were included in any of the boxes that were
 3   previously produced to Plaintiff?
 4      A.    I do not know if they were.  They were not
 5   part of the boxes that I prepared.  They would have
 6   been sent to you by our Human Resources group under
 7   separate cover.
 8      Q.    What was the issue or the concern about the
 9   report for 1998 under Tab No. 9?
10      A.    It's my understanding that they were unable
11   to locate that base report.
12      Q.    And did anybody tell you why?
13      A.    No, ma'am.
14      Q.    Now, you testified earlier that you could
15   tell me what the total commissions were for 1998 by a
16   document that you had in the book?
17      A.    For printing accounts, yes, ma'am, I can.
18      Q.    And what documents are you referring to?
19      A.    You said -- I am sorry.  What year did you
20   just say?
21      Q.    I am sorry.  For 1999 for Miss Ortega?
22      A.    Yes, ma'am.  Okay.  The report is titled
23   SC9131.
24      Q.    Under which tab is it in Miss Ortega's
25   territory book?
```

 1      A.    Tab No. 1, Page 19, but the pages are not
 2   in numeric sequence.
 3      Q.    But it's Page 19?
 4      A.    It's period 1 through period 12 dated
 5   December 5, 1999.
 6      Q.    And for what time frame does that report
 7   cover?
 8      A.    It covers from October 1st of -- well,
 9   basically, October of 1998 through September of 1999,
10   fiscal year 1999; that's a listing of her accounts
11   and the commissions earned by account.
12      Q.    Now, going back to Exhibits 7, 8 and 9,
13   with respect to Miss Ortega, do you know if it lists
14   her commissions, for example, on Exhibit No. 7, with
15   respect to both her printing and her supply accounts?
16      A.    That's supposed to be a consolidated
17   report.  I am sorry.  The answer is, yes, it should
18   be both.
19      Q.    And is it a consolidated report with
20   respect to all of the individuals listed on Exhibits
21   7, 8 and 9?
22      A.    It is supposed to be, yes, ma'am.
23      Q.    And do you know if with respect to Exhibits
24   7, 8 and 9, if these are gross figures or net
25   figures, by net, meaning after taxes?

1  A.  I can't be 100 percent sure, but I am 98
2  percent sure that it is a gross figure.
3  Q.  Do you know who in the company would know?
4  A.  Amy George would know.
5  Q.  Now, is there anything I could look at to
6  tell me what Miss Ortega's 1999 total commission
7  figures were for supply?
8  A.  That document doesn't appear to be in
9  existence.  I was unable to locate it.
10  Q.  And what documents were you searching for?
11  A.  This same SC9131 Commission Analysis Detail
12  Report for her supply number, which was 0030.
13       Again, the way that that information would
14  be gotten is to go through her weekly Commission
15  Reports and list them by account and total them up.
16  Q.  Did you do that before this deposition?
17  A.  No, ma'am.
18  Q.  And what document would I look at for the
19  2000 figures for Miss Ortega?
20  A.  I have her 2000 printing numbers through
21  period 9.
22  Q.  What report are you looking at?
23  A.  SC9131.
24  Q.  Under which tab?
25  A.  It's the same Tab 1.

```
 1     Q.    Of the territory book for Miss Ortega?

 2     A.    Yes, ma'am.

 3     Q.    And is there a page number?

 4     A.    Sure.  It's 12.

 5     Q.    And what's the date for the SC9131 report

 6  that you are looking at?

 7     A.    It's through October of -- excuse me --

 8  October 3rd.

 9     Q.    For what time frame does that report cover?

10     A.    That covers a calendar year January through

11  September.

12     Q.    Of 2000?

13     A.    Yes, ma'am.

14     Q.    And that was just for printing?

15     A.    Yes, ma'am.

16     Q.    Is there anything that I can look at for

17  her supply figures?

18     A.    I have supply through June.  It appears

19  that the Supply Reports were handed out and not

20  retained.

21     Q.    I am sorry.  One minute.  Let me just put a

22  tab --

23     A.    You want me to find that?

24     Q.    Let me just put a tab on Page 12.

25           Now, for the supply, what are you referring
```

```
 1    to?
 2         A.    It's SC9131 through July.
 3         Q.    What's the date on the report?
 4         A.    July 5th -- excuse me -- through June.
 5    You're right.  July 5, 2000.
 6         Q.    For what time frame does that report cover?
 7         A.    January through June.  Oh, God.  It's the
 8    same information, but it's through period 5.  It's
 9    dated 6-6-00.
10         Q.    So the SC9131 that you're referring to for
11    the supply figures is the one dated --
12         A.    6-6-00.  I am sorry.  They start looking
13    the same.
14         Q.    And the page number for that one is Page 5?
15         A.    5.
16         Q.    We are still under Tab 1?
17         A.    Yes, ma'am.
18         Q.    Now, the 30(b)6 Deposition Notice, Item
19    No. 9, requested total yearly income for several of
20    the representatives; did you bring all of that
21    information with you today?
22               MR. ENJAMIO:  You mean 19?
23  BY MS. DALEY:
24         Q.    No. 19.
25         A.    To the extent that I have those reports,
```

1    you're asking for income by account?

2        Q.    First, let me deal with No. 19.  No. 19

3    said the total yearly income generated by each

4    account handled by each by the following, from 1996

5    to present, and then a number of representatives are

6    listed.

7            Now, did you bring anything that would show

8    me that today?

9        A.    I brought you all the documents that I can

10   find in existence for that, irrespective of the

11   Commission Statements that were provided.  The

12   information is available by going week by week

13   through all these different sales reps, but I have

14   the Commission Detail Analysis Reports that are in

15   existence for these reps going back to -- let's find

16   the oldest one.  I have through period 12 of '98.

17   The rest of them are in the box in my car.  My

18   secretary copied through period 2, instead of through

19   period 12 of '99, and then I have -- this is a little

20   bit of a complicated gap.

21           Our company was on a fiscal year through

22   September of 1999.  We were acquired, in June of '99,

23   by Georgia-Pacific that works on a calendar year.  So

24   that would have been -- period 1 through 3 of the

25   year 2000 was sort of its own little time period.  I

1    have those reports captured, and I have through

2    period 9 of 2000.

3              So I brought with me today through period

4    12 of 1998, through period 12 of 1999 that are in the

5    territory book in my car through those three periods

6    at the end of 1999 and then year to date calendar

7    2000.

8       Q.    So summarize for me which time frames you

9    have provided stuff for today, with respect to

10   No. 19.

11      A.    This would cover the oldest one going back,

12   and then it goes all forward.  So the oldest one

13   going back covers from September -- excuse me -- from

14   October of 1997 to date.

15      Q.    And before October of 1997, you're saying

16   that the documents that would show me the information

17   are in the boxes that you referred to previously?

18      A.    No.  I am saying I cannot find the Detail

19   Report that details, by customer, amount by amount --

20   oh, I am sorry.

21              I can't find this.  This is a nice

22   consolidated easy to look at report.  I cannot find

23   those going back any further than what I have just

24   given you.  The information is available.  It's on

25   the Commission Reports that can be added up by weekly

1    sales reps in the boxes that were provided, yes,

2    ma'am.

3        Q.    Can I see what you brought today?

4        A.    Sure.  This is through '98.  This was

5    supposed to be through period 12 of '99, which it

6    isn't, but I have the territory books for these reps

7    that are in existence.  Then I have through period 3

8    of -- this covered that period October, November,

9    December of last year.  Then I have -- excuse me.

10   This is a consolidated.  That's the consolidated.

11   Then I have through period 9, which covers this year.

12           Dennis Laux and John Huempfner and Bill

13   Brsnehan do not have territory books, because when I

14   started them, they had left.  So their documents are

15   not here.

16       Q.    I am sorry.  Mr. Laux, Mr. Bresnehan and

17   Mr. Huempfner?

18       A.    Because they left, and I do not have

19   territory books.  Their detail information is going

20   to be available through the Commission Statements

21   provided in those 15 boxes.  Their sheets were not

22   retained, unless they were, by accident, stuck in one

23   of the books.

24           Now, I am first looking at -- you gave me a

25   set for the year 2000.  I am looking at the

1    Commission Analysis Reporting System, a stapled set

2    of reports dated October 3, 2000?

3         A.    Yes, ma'am.

4         Q.    And for what time frame does this cover?

5         A.    It covers from January through September of

6    the year 2000.

7         Q.    I am looking at a Set Commission Analysis

8    Reporting System Report dated January 1, 2000; for

9    what time frame does that cover?

10        A.    The calendar months of October through

11   December of 1999.

12        Q.    I am looking at a Commission Analysis

13   Reporting System Report dated February 29, 2000; for

14   what time does that cover?

15        A.    Ma'am, that's the one that should have been --

16        Q.    So this one is incomplete?

17        A.    In fact, you really don't even need that.

18   That information is incorporated in this other one,

19   in this, through period 9.

20        Q.    Then let me give that back to you.

21              I am looking at the Commission Analysis

22   Detail -- I am sorry -- the Commission Analysis

23   Reporting System Report dated October 6, 1998; what

24   period does that cover?

25        A.    That covers the calendar months of October

```
 1    of 1997 through September of 1998.  The gap I have in
 2    the car.  It's in all those boxes.
 3        Q.    Now, what type of commission structure was
 4    used, with respect to the sales representatives in
 5    the Miami Division, from '96 to present?
 6        A.    I have with me the current commission
 7    structure which had been in place since February of
 8    1999.
 9        Q.    And to what are you referring?
10        A.    It's under Tab 11.
11        Q.    And is that the document stamped EEOC 192?
12        A.    Yes, ma'am.
13        Q.    Through 194?
14        A.    Yes, ma'am.
15              Then I have, under Tab No. 13, the
16    commission matrix that was in place from January of
17    1998.
18        Q.    Until what time frame?
19        A.    Until the other one superseded it, which
20    was, what, February of 1999.
21              Then under Tab No. 14, I have the
22    commission matrix from March of '96 until the other
23    one supersedes it in '98.
24              Since that's not all of 1996, I have, under
25    Tab No. 15, the matrices that cover from March of
```

 1    1995 till the other one in '96 superseded it.

 2              The only additional commission structure

 3    that was in place, in my division, during those years

 4    was a web commission structure.  There are no

 5    supporting documents that I can find that state what

 6    that commission matrix was.  There are Commission

 7    Statements which show that matrix calculated at 30

 8    percent of the earned gross profit dollars produced.

 9    To the best of my knowledge, that was in place for

10    Mr. Peterson, Mr. Laux and Mr. Huempfner.

11        Q.    Any other type of commission structure that

12    existed from '96 until the present for sales

13    representatives in the Miami Division?

14        A.    To the best of my knowledge, no.

15        Q.    Going back to the document under Tab

16    No. 11.

17        A.    Yes, ma'am.

18        Q.    Except for the web accounts that you just

19    mentioned, did these schedules apply to all types of

20    accounts that were handled by the representatives in

21    the Miami Division?

22        A.    Yes, ma'am.

23        Q.    And can you tell me how this schedule

24    works?

25        A.    Basically, the vertical axis refers to the

1    amount of gross profit dollars that are in any

2    particular order.  If you have a $1,000 order with

3    $250.00 gross profit, then you would identify the box

4    on the vertical axis that contains $250.00.  So that

5    would be the one that says 200 to 299.99.

6         The horizontal axis refers to the

7    percentage of margin in the sale.  In that particular

8    sale, a $1,000 sale with $250.00 gross profit would

9    be 25 percent.  So you move across the bottom axis

10   until you find the box that contains 25 percent,

11   which would be the one 24 to 25.99.  You trace those

12   two boxes across the matrix where they collide.  It's

13   a 22.7 percent earned commission rate of the $250.00

14   gross profit.

15        Q.   Was there a minimum amount of gross profit

16   that had to be generated in order for the sales

17   representative to earn a commission under this

18   schedule?

19        A.   Ma'am, I am sorry.  You just made me

20   remember something else.  Oh, God.

21             In approximately March of this year, the

22   commission matrix was adjusted, and the lowest bar

23   was taken off.  $75.00 to $99.00 was removed.  So the

24   new minimum became $100.00.

25        Q.   And how did the company inform the

1    representative that the matrix changed in March of

2    this year?

3         A.    By memo, but we had a meeting.  We showed

4    that.  I have not seen a revised matrix published.

5         Q.    So you're saying according to the memo that

6    was sent out in March, the line on EEOC 192 that

7    begins with $75.00 to $99.00 was taken out?

8         A.    Yes, ma'am.

9         Q.    So the minimum is now 100?

10        A.    Yes, ma'am.  To answer the question that

11   you originally asked me on this matrix, the minimum

12   was $75.00 gross profit.  I am sorry.  I had

13   forgotten that.

14        Q.    And so looking at the other charts under

15   this tab, for example, the one stamped EEOC 193,

16   entitled Indirect Commission Schedule, was the

17   minimum on that chart $100?

18        A.    It was then, and it is now.

19        Q.    And looking at this other one, the Direct

20   Commission Schedule, is the minimum still 75?

21        A.    That bar was removed, as well.  It's a

22   $100.00 minimum across all three charts matrices.

23        Q.    Now, other than the three people who you

24   just mentioned who had the different commission

25   structures, did the sales representatives who handled

1   web accounts, in '96, from '96 forward, get paid

2   according to the commission structures under Exhibits

3   11, 13, 14 and 15?

4       A.    Those sales reps I mentioned had two sales

5   numbers.  They ran their non web accounts through a

6   sales number that these matrices applied to, the ones

7   that I have mentioned to you, and they ran their web

8   accounts through a sales number that had the 30

9   percent straight commission matrix applied or rate

10  applied.

11      Q.    Now, excluding those three people, was

12  there anyone, who handled web accounts, who were paid

13  strictly according to the commission schedules under

14  Exhibits 11, 13, 14 and 15?

15      A.    That had web accounts?

16      Q.    Correct.

17      A.    Heat set or non heat set, yes, there were,

18  yes.

19      Q.    And who were those people?

20      A.    I know that Bill Bresnehan had a cold set

21  web account.  I know Bobby Vega had Web Printer and

22  Best Litho in Miami.  Jim Ware had Review Printers

23  Media and others.  He is under the normal matrix.

24  Rich Creane has taken Media and, also, Review

25  Printers now and is under the same matrix.

```
 1      Q.    So why do the three individuals who you
 2   just mentioned have a different commission structure?
 3      A.    That decision was made by a corporate
 4   president that's no longer with our company.
 5      Q.    And which corporate president are you
 6   referring to?
 7      A.    The president of Unisource at the time.
 8   His name was Charles White.
 9      Q.    So he made the decision to give Mr. Laux,
10   Mr. Huempfner and Mr. Peterson a different commission
11   structure?
12      A.    For their web accounts.
13      Q.    For their web accounts?
14      A.    Yes, ma'am.
15      Q.    And why did he do that?
16      A.    I can't say.
17      Q.    Why not?
18      A.    I don't know why he did that.
19      Q.    Did you ask anybody else why?
20      A.    I can conject, but I don't think that's of
21   value here.
22      Q.    And they are still paid according to this
23   different commission structure for their web
24   accounts?
25      A.    The only one that's still with our company
```

1    and still under this matrix is Bob Peterson.

2         Q.    Do you know who, within the company, would

3    know why Mr. Huempfner, Mr. Laux and Mr. Peterson

4    were given this different commission structure?

5         A.    Mr. McClary instituted the policy or

6    implemented the policy, but in terms of the decision,

7    it was Charles White's decision, and he is no longer

8    with the company.

9         Q.    So by Mr. McClary, you're referring to

10   Cecil McClary?

11        A.    Yes, ma'am.

12        Q.    Other than the web accounts that you

13   described, the regular web and the heat set web

14   accounts, what other type of accounts are handled by

15   the representatives in the Miami Division between '96

16   and present?

17        A.    I am sorry.  Can you repeat the question?

18        Q.    Sure.  We were just talking about web

19   accounts, the heat set web and the other type of web

20   accounts.

21             What other type of accounts are handled by

22   representatives in the Miami Division, from 1996 to

23   the present?

24        A.    That list is very long.  The way you asked

25   that question includes both our packaging business

1    and our maintenance business.

2        Q.    Then let me limit it to the division where

3    Miss Ortega worked.

4        A.    She worked in all of those.  I mean, the

5    accounts vary from manufacturing facilities to food

6    processing facilities to distribution facilities to

7    entertainment cruise line facilities to commercial

8    printers.  I mean, the list is honestly too long.

9        Q.    In your previous deposition, we talked

10   about certain types of accounts.  We talked about web

11   accounts.  We talked about sheet fed accounts.  We

12   talked about export accounts.

13            Now, are there any others, with respect to

14   the different type of accounts that you just named,

15   do those types of accounts fall within any of those

16   that I just mentioned?

17       A.    Did the ones I just named fall within the

18   ones you just mentioned?

19       Q.    Yes, heat set web, cold web, export or

20   sheet fed?

21       A.    I believe I mentioned commercial printers.

22   Can you read back my list?  I was just spewing off as

23   much as I could think of.

24       Q.    Let me start over again.

25       A.    Okay.

```
 1        Q.     In the depositions that have been taken in
 2   this case, certain type of accounts were identified
 3   heat set web accounts, cold web accounts, export
 4   accounts.
 5              MS. DALEY:  Can you read back what I just
 6        said?
 7                   (The question referred to was
 8                   thereupon read by the reporter as
 9                   above recorded.)
10 BY MS. DALEY:
11        Q.     And sheet fed accounts?
12        A.     No.
13        Q.     Now, are there any other type of accounts
14   that are handled by the divisions that Miss Ortega
15   worked from 1996 to the present?
16        A.     Yes, ma'am.
17              The accounts that you just listed are
18   primarily printing paper type accounts.  She also
19   worked in Supply and Maintenance.  She worked in
20   Maintenance and Packaging, although to a very much
21   smaller degree.  So I'm afraid that list would be
22   enormous.
23        Q.     From '96 to present, which divisions did
24   Miss Ortega work in?
25        A.     The word division is what's confusing us
```

1   here.

2      Q.   What department in the company did Miss

3   Ortega work from 1996 to the present?

4      A.   She was primarily in Printing, but she

5   worked in all three.

6      Q.   All three what?

7      A.   Packaging, Maintenance and Printing.

8      Q.   And are those departments or divisions or

9   something else within the company?

10     A.   It's a bad description.

11          The Miami business is called the Miami

12   Division, but they also -- we also often delineate

13   between the different product segments, category

14   segments, as divisions.  So, unfortunately, I would

15   describe them as business segments.

16     Q.   So we have the Miami Division, and under

17   the Miami Division, there are business segments?

18     A.   Yes, ma'am.

19     Q.   And the three business segments in which

20   Miss Ortega worked are Packaging, Maintenance and

21   Printing?

22     A.   Yes, ma'am.

23     Q.   And what type of accounts are handled by

24   the representatives in the Packaging segment, from

25   '96 to present?

1    A.    It's truly too many to list, but would you
2    like me to give you the main categories?
3    Q.    Let me refer you to area number 26 that I
4    had listed on the 30(b)6 Deposition Notice.  It asks
5    you to be prepared to testify about any and all
6    qualifications for handling accounts serviced by the
7    representatives in the divisions where Plaintiff
8    worked, including but not limited to web accounts and
9    export accounts.
10    A.    Okay.  I am prepared to discuss that.
11    Q.    So, first, I need to determine what the
12    types of accounts are, and let's start with the
13    Packaging.
14         If you can, tell me all of the accounts
15    that are handled by representatives in the Packaging
16    Division from '96 to present.
17    A.    Ma'am, I don't know how else to say this to
18    you, except that the variety of accounts handled by
19    the packaging representatives in the division are so
20    varied, I don't know where to start, food processing,
21    general manufacturing, light manufacturing, retail,
22    you know, grocery chains.  There's just so many, I
23    can't even -- electronics manufacturing,
24    pharmaceutical.  I mean, that really is a very, very
25    broad question.

```
 1        Q.      What did you do, prior to coming to the

 2   deposition today, to educate yourself on the type of

 3   accounts that are handled by the representatives in

 4   the divisions where Miss Ortega worked?

 5        A.      I have worked with this company for 19

 6   years.   So I know what the qualifications are, and I

 7   know what the accounts are.

 8        Q.      Then tell me, with respect to each one of

 9   the accounts that are handled by the representatives

10   in the divisions where Miss Ortega worked, what the

11   accounts are and what the qualifications are for each

12   type of account.

13        A.      Ma'am, I am suggesting it's not possible,

14   and I certainly couldn't do it without referring to

15   the entire branch file.

16        Q.      You're free to refer to whatever you need

17   to refer to today.

18              MR. ENJAMIO:    I am not sure that that is --

19              THE WITNESS:    Are we not understanding the

20         question?

21              MR. ENJAMIO:    Yeah.   There's something

22         here.   I don't think he is understanding your

23         question or you're not understanding his answer.

24 BY MS. DALEY:

25        Q.      What I want you to do is look at the
```

```
1    deposition notice, read the notice and tell me the
2    answer.
3        A.    And respond to this answer?
4        Q.    Yes.  I have read it a couple of times
5    already.
6              MR. ENJAMIO:  Yeah, but what you have read
7         is not there.  You talked about types of
8         accounts, qualifications for handling accounts.
9  BY MS. DALEY:
10       Q.    How are we going to discuss qualifications
11   if we don't know what the accounts are?
12       A.    Ma'am, the accounts are as varied as there
13   are businesses in the South Florida area.
14       Q.    Let me ask it this way:  What are the
15   qualifications for handling the accounts?
16       A.    Under the Packaging group?
17       Q.    I want to know if you can tell me, today,
18   what the qualifications are for handling the accounts
19   serviced by the representatives in the divisions
20   where Plaintiff worked?
21       A.    Okay.
22       Q.    And if you can do that without telling me
23   the names of the accounts, I would like to know.
24       A.    Generally, you would need product knowledge
25   in each of the core segments.
```

```
 1      Q.    Any other qualifications?

 2      A.    You would need some sales skills.

 3      Q.    Anything else?

 4      A.    Organizational skills.

 5      Q.    Anything else?

 6      A.    Verbal and written communication skills.

 7      Q.    Anything else?

 8      A.    Basic math.

 9      Q.    Anything else?

10      A.    Give me a moment.  Ideally, industry

11   knowledge.

12      Q.    Anything else?

13      A.    Those would be the core.

14      Q.    I want to know if there are any other

15   qualifications that the company requires for handling

16   the accounts that are serviced by the representatives

17   in the divisions where Miss Ortega worked?

18      A.    Your question is any and all qualifications

19   for handling accounts.  Those are the qualifications

20   that we look for.  You said required.  That's a

21   different thing.  We look for those qualifications in

22   handling the accounts.

23      Q.    Are there any other qualifications that are

24   necessary to handle the accounts serviced by the

25   representatives in the divisions where Miss Ortega
```

1    worked?

2       A.    You need to have a driver's license.    You
3    need to be properly insured.

4       Q.    Anything else?

5       A.    High school diploma is required.

6       Q.    Anything else?

7       A.    Those are to the best of my knowledge
8    today.

9       Q.    What, if anything, did you do, prior to
10   this deposition, to determine if there are any other
11   qualifications other than the ones that you have just
12   listed?

13      A.    I read this question and knew that I
14   understood the basic qualifications for doing this
15   job.

16      Q.    So other than reading the question, what
17   else did you do, if anything?

18      A.    I read the question and considered, in my
19   mind, what the key qualifications were, which I just
20   shared with you.    You mean, did I prepare any
21   document to that effect, no, ma'am.

22      Q.    So there are no other qualifications that
23   are necessary to handle the accounts serviced by the
24   representatives in the divisions where Miss Ortega
25   worked?

```
 1              MR. ENJAMIO:  Object to the extent it's
 2         been asked and answered.  You may answer.
 3              THE WITNESS:  To the best of my knowledge
 4         today, those are the qualifications that we look
 5         for.
 6  BY MS. DALEY:
 7      Q.   Now, is there anyone else, other than you,
 8  within the company, who would know if there are any
 9  other qualifications?
10      A.   Not to my knowledge.
11      Q.   Now, with respect to the qualifications
12  that you just listed, do they apply to all of the
13  accounts that are serviced by the representatives in
14  the divisions where Miss Ortega worked?
15      A.   Could you read those back to me again?
16              MR. ENJAMIO:  I've got a list here.
17  BY MS. DALEY:
18      Q.   You listed sales skills, organizational
19  skills, verbal and written communication skills,
20  basic math, industry knowledge, driver's license, to
21  be properly insured, and a high school diploma.
22      A.   I would say those apply to all of the
23  accounts.  Those are things we look for.
24      Q.   Now, if a sales representative possesses
25  all of these -- I am sorry.  You also listed product
```

1   knowledge.

2       A.    Uh-huh.

3       Q.    If a sales representative possesses all of

4   these qualifications that you listed, can he or she

5   handle all of the accounts that are serviced by the

6   divisions in which Miss Ortega worked?

7       A.    If they possess all of those attributes,

8   because industry knowledge varies by customer

9   segment.

10      Q.    We will go into each one of those.

11            If an individual possesses all of these

12  skills, can he or she handle all of the accounts that

13  are serviced by the divisions in which Miss Ortega

14  worked?

15      A.    To the best of my knowledge, they should be

16  able to, if they possess all of those skills, yes.

17      Q.    Can you tell me what you mean by product

18  knowledge in each core segment?

19      A.    Well, within Packaging, there are many

20  different types of products that we sell.  We sell

21  tapes.  There are a great many types of tapes.  We

22  sell shrink films.  There are a great many different

23  manufacturers in types of shrink films.  There are

24  stretch films.  There are many different

25  manufacturers and many different types of stretch

1    films.   There are banding equipment and materials.

2    There are many different manufacturers, and I could

3    go on.

4            Then web printing paper, there's web

5    accounts, web paper manufacturers that make heat set

6    web papers and all different basis weights and

7    grades.   You should have an understanding of those.

8            In sheet fed, there's a great many

9    different manufacturers of coated sheet fed paper,

10   text and cover paper, publishing grades.   So within

11   each customer segment, there's a group of products

12   that kind of fits that customer segment that you need

13   to have some -- you need to be up to speed on.

14   Q.    You have mentioned core segment and

15   customer segment; is there a difference between those

16   two phrases?

17   A.    The business segment tends to be focused

18   around product grouping, but with those products come

19   specific customers that tend to buy those products.

20           Customer segment would be commercial

21   printers, general manufacturing, you know, the cruise

22   industry, hotel lodging and so on.

23   Q.    Now, are the qualifications, in the area of

24   product knowledge, reduced to writing someplace; have

25   you ever seen it reduced to writing?

1      A.      It's too broad to be reduced to writing.

2      It's too broad.

3      Q.      I am asking you:  Has it ever been reduced

4      to writing?

5      A.      I have never seen it reduced to writing.

6      Q.      What, if any, criteria does the company use

7      to determine if a representative has the product

8      knowledge in each one of the core segments that you

9      just discussed?

10      A.      Well, the sales manager that's responsible

11      for the individual salesperson should be able to

12      assess that sales rep's skill level or product

13      knowledge level.

14      Q.      How?

15      A.      Through joint sales calls, through product

16      training sessions, through general interaction

17      around, primarily, through joint sales calls through

18      working together.

19      Q.      Now, with respect to the qualification of

20      sales skills, has that ever been reduced to writing?

21      A.      Not that I have ever seen.

22      Q.      And what do you mean by sales skill?

23      A.      The ability to assess a customer's need and

24      match a relative feature, a relative product, based

25      on the features and advantages of that product, to

1    the customer's need and present those.

2        Q.    Present those to what?

3        A.    To the customer and affect a sale.

4        Q.    Are there different types of sales skills

5    that are required for different types of accounts

6    that the company handles?

7        A.    I think it deals with -- there's a level of

8    sophistication based on the type of customer, yes.

9        Q.    What types of customers are you talking

10    about?

11        A.    You know, if you're calling on a, you know,

12    corporate end user, and you're dealing with CFOs and

13    CEOs, then your level of proficiency in your selling

14    skills, obviously, needs to be better than if you're

15    calling on the housekeeping crews in hotels and

16    lodging, for example.

17        Q.    Now, with respect to organizational skills,

18    has that qualification ever been reduced to writing?

19        A.    I don't believe I have ever seen that

20    reduced to writing, no, ma'am.

21        Q.    And what do you mean by organizational

22    skills?

23        A.    The ability to plan, to manage their time,

24    is probably the biggest piece, proper time management

25    skills, the ability to catalogue data and be able to

1   retrieve information, client information, product

2   information, to be present and be on time with

3   paperwork.

4       Q.    To what basic math skills are you

5   referring?

6       A.    Well, in our business, you know, it's not

7   sophisticated math, but it's basic algebraic math,

8   being able to compute a margin, being able to convert

9   a basis weight, being able to take a per hundred

10  weight cost of paper and convert it to a per thousand

11  sheet price, based on the M weight of the product.

12  It's basic algebraic math.  It's very simple.

13      Q.    And has that qualification ever been

14  reduced to writing?

15      A.    Not that I have seen.

16      Q.    And what do you mean by industry knowledge?

17      A.    Well, within each one of these core

18  businesses, there are industry cultures that you need

19  to have an appreciation for.  You know, if you're

20  call on an automobile manufacturer, they have their

21  own set of sort of business norms that would help you

22  be successful that you really kind of need to know to

23  go and call on the automotive manufacturer.  So we

24  tend to group salespeople around industries that they

25  have some understanding or proficiency in.

```
 1      Q.    And was Miss Ortega grouped around any
 2   particular industry?
 3      A.    Primarily export, which is -- it's a broad
 4   brush, but exporting products to the Caribbean and
 5   Latin America.
 6      Q.    And has the industry knowledge
 7   qualification ever been reduced to writing?
 8      A.    Not that I have seen, but there are a great
 9   many documents that you have to be aware of when
10   managing export.
11      Q.    What documents are you referring to?
12      A.    Shipping, freight documents, insurance.
13   Industry knowledge around export is probably -- I
14   mean, because laws vary in each country that you do
15   business in.
16      Q.    What type of insurance is required?
17      A.    You're not referring to my properly insured
18   statement there, are you or are you?
19      Q.    Yes.
20      A.    Because I just said insurance.  In dealing
21   with ocean freight, there is insurance, also.
22      Q.    I am sorry.  What type of insurance is
23   required with respect to the qualification of being
24   properly insured?
25      A.    Unisource Georgia-Pacific requires that our
```

```
 1    commissioned salespeople have a valid driver's

 2    license and also possess a certain amount of

 3    coverage, liability and collision coverage.

 4        Q.    Has that been reduced to writing?

 5        A.    It has.

 6        Q.    And in what form?

 7        A.    Memo form, and I believe it's also in our

 8    policies and procedures book.  I am not sure.

 9        Q.    And is Miss Ortega qualified to handle all

10    of the accounts that are serviced by the

11    representatives in her division?

12        A.    She does not have indepth product knowledge

13    and indepth industry knowledge to service all of the

14    accounts in the division, no, ma'am.

15        Q.    Which accounts is she not qualified to

16    handle?

17        A.    Sophisticated packaging applications, large

18    heat set web applications.  I don't believe she's got

19    any specific experience around that.  She wouldn't

20    have -- gosh, without sitting down and trying to map

21    out all the categories, those are just a few general

22    ones that she wouldn't have complete indepth product

23    knowledge and understanding of.

24        Q.    Who, within the company, would know which

25    ones Miss Ortega is not qualified to handle?
```

```
 1        A.    Each sales manager for each business
 2   segment would have a better understanding of each
 3   business segment, which area she would not be able to
 4   work.
 5              For example, my background is printing
 6   paper.  I understand the printing paper side, and
 7   that's why I said that she doesn't have the heat set
 8   web experience that we would generally look for to
 9   call on heat set web accounts.
10              Mike Butler is our packaging manager.  Mike
11   Butler understands the packaging business
12   substantially better than I do, and he would say that
13   she should or shouldn't, based on her industry
14   knowledge and experience, be able to call on a food
15   processing plant or a, you know, automated poultry
16   line or I don't know.  You understand what I am
17   trying to say?
18              The individual segment manager could
19   probably better identify customer segments, business
20   segments that she is not qualified to work in.
21        Q.    Now, what qualifications does Miss Ortega
22   lack to enable her to handle the large heat set web
23   accounts?
24        A.    I think you need to, one, understand all of
25   the products, the machine trims, you know, what mills
```

1    make what different grades.  If you're not working

2    with those, those change, what the brightness levels

3    are, what the opacity levels are of the individual

4    grades.  There's also industry knowledge.  It's an

5    original unique culture where you know who's doing

6    what work for who, and you know what products the

7    other guys are using, so that you can, you know,

8    consult with your customer on products that would be

9    competitive, etcetera, etcetera.

10    Q.    Now, the etcetera, etcetera, does etcetera,

11    etcetera include qualifications that Miss Ortega

12    lacks to handle heat set web accounts?

13    A.    I was speaking of the two primary areas

14    that she would lack a great deal of experience in for

15    qualifications would be product knowledge and

16    industry knowledge.

17    Q.    What, in the area of industry, does she

18    lack?

19    A.    Understanding who does whose work and what

20    grades major publications are on, so that you can

21    consult with your customer around comparable grades,

22    competitive grades, etcetera.

23    Q.    What does etcetera mean?

24    A.    I am going to take the word etcetera off

25    the end of that statement and leave the statement as

```
1    it stood.  That, basically, explains what I am trying
2    to say.
3         Q.    Now, when you say large heat seat web
4    accounts, does the large refer to the type of income
5    that is generated or something else?
6         A.    Large refers to large format presses, full
7    web presses, truckload buyers, volume and sales;
8    those things sort of go together.
9         Q.    When you say volume and sales, what does
10   volume and sales mean?
11        A.    The volume of print sales that the web
12   customer does.
13        Q.    Does volume refer to any minimum or maximum
14   monetary amount?
15        A.    No.  The terminology was large.  It's very
16   vague by format.
17        Q.    So by large heat set web accounts, you're
18   not necessarily referring to the type of sales or
19   income that is generated by the accounts?
20        A.    I am referring to the type of sales.  It
21   would be -- a large heat set web account would be an
22   account with large format presses, wide format
23   presses that buy, generally, in truckload quantities
24   and are large manufacturers and large sellers --
25   purchasers of paper and sellers of printing millions
```

1   of dollars.

2        Q.    When you say millions of dollars, what I am

3   trying to determine, within what range is there?  For

4   example, is it a two to four million dollar range or

5   some other type of range that we're talking about?

6        A.    No.  I think the primary driver is are they

7   a large format, the wide format full webs, and do

8   they buy in full truckload quantities.

9        Q.    Just so that I am clear here, I am trying

10  to determine if large in any way, whether it's

11  primary or secondary, refers to any dollar amount

12  that is generated by these accounts?

13       A.    There is no such criteria that's written.

14            MR. ENJAMIO:  Jennifer, Miss Daley, when

15       you get to a breaking point, if we could have a

16       little break, just a five minute break.

17            MS. DALEY:  Yeah.  Let me just finish up

18       with this.  You can have the break now, but I am

19       going to need the books that he said he has in

20       his car.

21            THE WITNESS:  You want me to bring them up?

22            MS. DALEY:  Okay.  Let's go off the Record.

23                 (Thereupon, a brief recess was taken,

24                 after which the following proceedings

25                 were had:)

1 BY MS. DALEY:

2      Q.   When Gene Press left the company, who, if
3 anyone, made the decision to reassign his account?
4      A.   I think two managers prior to me made the
5 decision not to reassign the accounts.  My
6 predecessor, at the division management level, Bobby
7 McKee, I am unaware of any accounts that he
8 reassigned.  Bill Ready maintained a group of the
9 export accounts that Gene Press had, because he felt
10 that the division could manage those without a
11 salesperson, and we could save on sales expense.  I
12 ultimately assigned many of those accounts to Miss
13 Ortega.

14      Q.   After Mr. Press left the company, which two
15 managers made the decision not to assign the
16 accounts?

17      A.   There is no way for me to know, and I don't
18 believe there's any document that exists to know that
19 there wasn't some of his house business reassigned,
20 but the bulk of his export accounts, which I think is
21 where he focused his time and energy, the two
22 managers that did not reassign the both of those were
23 Bob McKee and Bill Ready.

24      Q.   Just so I am clear on what you're saying.
25 Are you saying that Bob McKee and Bill Ready made the

1    decision not to initially assign or reassign the

2    accounts that Gene Press handled?

3         A.    To be more clear, I don't think Bob McKee

4    made any decision whatsoever.  I don't think he did

5    anything without them, period.  That sounded bad, but

6    I meant it in a way that I don't think he even dealt

7    with the accounts that were vacated that were left

8    when Gene Press left.  Bill Ready knew of the

9    accounts and chose not to reassign the accounts,

10   because he felt that they could be handled by the

11   house, by the Customer Service group.

12        Q.    And how is it that you know that Mr. McKee

13   did not do anything with the accounts?

14        A.    Bill Ready recounted the story to me, told

15   me the history of these.

16        Q.    So tell me what Mr. McKee told you with

17   respect to the history of the accounts that were

18   handled by Mr. Press.

19        A.    Mr. McKee is no longer with the company,

20   and I haven't spoken to Mr. McKee about that.

21        Q.    So you're basing your testimony today about

22   what Mr. McKee did based on something he told you in

23   the past?

24        A.    Based on what Bill Ready told me happened,

25   yes, ma'am.

```
 1      Q.    And when did Mr. Ready tell you that?
 2      A.    Gosh.  I am sorry.  I can't remember the
 3  specific date.
 4      Q.    And so what exactly did Mr. Ready do now
 5  with respect to those accounts?
 6      A.    I think he left them as house accounts.  He
 7  did not assign an outside salesperson to them.
 8      Q.    And for how long were they house accounts?
 9      A.    I am trying to give you an approximation.
10  Approximately two plus years.
11      Q.    And why did Mr. Ready decide to make them
12  house accounts, as opposed to assigning them out to a
13  salesperson?
14      A.    You had asked that question, that's because
15  he felt that they could be managed by inside, by our
16  customer sales people and avoid the selling expense.
17      Q.    And were those accounts eventually, at some
18  point after the two year time frame, assigned to an
19  outside salesperson?
20      A.    Many of them were, yes.
21      Q.    Were there any that were not assigned out,
22  eventually, to an outside salesperson?
23      A.    I do not -- I am not in possession of the
24  original list.  So I can't say.  I don't think anyone
25  can say, with certainty, that all of the accounts
```

1    were or all of the accounts were not.  Many of the

2    accounts were, because they were brought to my

3    attention by Betty Ortega, and we went through and

4    assigned those accounts to Betty.

5         Q.    And to what original list are you

6    referring?

7         A.    In the original account list from Gene

8    Press.

9         Q.    Now, to which sales representatives were

10   the accounts eventually assigned, after they were

11   made house accounts?

12        A.    Primarily, Betty Ortega.

13        Q.    How many were assigned to Betty Ortega?

14        A.    From Gene Press' original list, I can't be

15   sure.  I don't think anyone can be sure.  I know of

16   several.

17        Q.    Which ones?

18        A.    Lena Tel.

19        Q.    Are you referring to something to help you

20   with your testimony?

21        A.    Yes.

22        Q.    What are you referring to?

23        A.    The exhibit under Tab 4, the EEOC document

24   183.

25        Q.    And which accounts are you referring to?

1    A.    I am looking for Lena Tel. Lithographic
2    Printers.
3    Q.    Any others?
4    A.    There were others, but I can't be -- since
5    I don't have the original list, I can't be sure that
6    they were accounts from the original list.
7              (Discussion off the record.)
8              MS. DALEY:  We are going to reconvene the
9         deposition on a day that we can reschedule it
10        for, and then we will pick up from there.
11             MR. ENJAMIO:  Okay.
12             (Thereupon the taking of the
13             deposition was adjourned)
14             - - - - - - - - -
15
16
17
18
19
20
21
22
23
24
25

```
 1
 2              I, JOHN GLAZE, do hereby certify that I
 3    have read the foregoing deposition and that the same
 4    is a true and accurate transcript of my testimony,
 5    except for attached amendments, if any.
 6
 7
 8
 9
10
11
12
13
14              ----------------------------------
15              The signature above of JOHN GLAZE was
16    subscribed and sworn to before me this ____ day of
17    ____ 2000.
18
19
20              ----------------------------------
21                   Notary Public
22                   My commission expires
23
24
25
```

```
 1                        CERTIFICATE

 2    STATE OF  FLORIDA:
                         : SS.
 3    COUNTY OF BROWARD:

 4

 5
                I, JACKIE JOHNSON, being a Professional
 6    Court Reporter and Notary Public for the State of
      Florida at Large, do hereby certify that I was
 7    authorized to and did stenographically report the
      foregoing deposition and that the transcript is a
 8    true record of the testimony given by the witness.
                I further certify that I am not a relative,
 9    employee, attorney or counsel of any of the parties,
      nor am I a relative or employee of any of the
10    parties' attorney or counsel connected with the
      action, nor am I financially interested in the
11    action.
                Under penalties of perjury, I declare that
12    I have read the foregoing document and that the facts
      stated in it are true.
13              The foregoing certification of this
      transcript does not apply to any reproduction of the
14    same by any means unless under the direct control
      and/or direction of the certifying reporter.
15              WITNESS my hand and official seal in the
      City of Ft. Lauderdale, County of Broward, State of
16    Florida, this 21st day of November, 2000.

17

18              _____
                JACKIE JOHNSON, NOTARY
19              PUBLIC AT LARGE.
                MY COMMISSION EXPIRES:
20              MAY 20, 2003

21

22                        Jackie Johnson
                          My Commission CC838278
23                        Expires May 18, 2003

24

25
```

1    IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2    Case No:00-6126-Civ-Dimitrouleas/Johnson

3

4

     BETTY ORTEGA,                    )
5                                     )
                    Plaintiff,        )
6                                     )
     vs.                             )
7                                     )
     UNISOURCE WORLDWIDE, INC., a     )
8    foreign corporation,            )
                                     )
9                    Defendant.       )
     _____)

10

11                                   ORIGINAL
12

13              CONTINUATION

14                OF THE

15              DEPOSITION

16                 OF

17              JOHN GLAZE

18

19

20

21                      Amlong & Amlong, P.A.
                        500 Northeast 4th Street
22                      Second Floor
                        Fort Lauderdale, Florida
23                      October 30, 2000
                        1:48 p.m. - 5:08 p.m.
24

25

     BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

APPEARANCES:


        AMLONG & AMLONG, P.A.
        BY:   JENNIFER DALEY, ESQ.
        500 Northeast Fourth Street
        Second Floor
        Fort Lauderdale, Florida  33301
        Appearing on behalf of the Plaintiff.


        HUNTON & WILLIAMS
        BY:   JUAN C. ENJAMIO, ESQ.
        One Biscayne Tower
        2 South Biscayne Boulevard, Suite 2500
        Miami, Florida  33131
        Appearing on behalf of the Defendant.


                    -- -- -- -- --


                    I N D E X

Witness                                       Page

JOHN GLAZE

    Direct Examination by Ms. Daley             3



                    E X H I B I T S

                        None

```
 1            Deposition of JOHN GLAZE, taken pursuant
 2       to the Rules and notice heretofore filed before
 3       MAUREEN A. VISCUSO, RPR, a Notary Public, State of
 4       Florida at Large, at 500 Northeast 4th Street, Second
 5       Floor, Fort Lauderdale, Broward County, Florida, on the
 6       30th day of October, 2000, commencing at 1:48 p.m.
 7                       -- -- -- -- --
 8       Thereupon:
 9                        JOHN GLAZE,
10       a witness herein, and having been first duly sworn by
11       the court reporter and cautioned to tell the truth of
12       his knowledge as to the within matters, was thereupon
13       examined and testified upon his oath as follows:
14                     DIRECT EXAMINATION
15       BY MS. DALEY:
16            Q.    Please state your full name.
17            A.    John Arthur Glaze.
18            Q.    And are you the same John Glaze whose
19       deposition was adjourned on October 25th that is being
20       continued today?
21            A.    Yes, ma'am.
22            Q.    Now, in the break that we had from
23       October 25th until today, did you review any additional
24       documents to help you prepare to give your testimony
25       today?
```

1          A.      Actually, I've been traveling most of that

2     time.  Did have some documents pulled which are being

3     faxed to your office.

4          Q.      Now, in the first part of the deposition, you

5     asserted the attorney/client privilege with respect to

6     the process by which you were chosen to be the 30(b)(6)

7     representative.  Have you reconsidered that position?

8          A.      No.

9          Q.      Now, in the first part of the deposition, you

10    identified at least two types of accounts that you felt

11    that Ms. Ortega was not qualified to handle.  Are there

12    any additional accounts that are handled by the

13    representatives in the divisions where Ms. Ortega works

14    that the company feels she is not qualified to handle?

15         A.      Are you able to repeat that question again?

16    Not the one you just asked me, but from the first time.

17         Q.      The area listed on the notice is as follows:

18    Any and all qualifications for handling accounts

19    serviced by the representatives in the divisions where

20    plaintiff worked including but not limited to web

21    accounts and export accounts.

22         A.      I was trying to explain in my last testimony

23    that there are so many very different type of accounts

24    that it would be difficult to list all the ones that she

25    would not be qualified for.  We are -- we sell to --

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1   Unisource has three business segments. She sells in all
2   three, Betty does, so when you ask me in the division
3   she worked in, she sells all three business segments,
4   products. In each one of those business segments has a
5   myriad of different customers. It would be too many to
6   mention here today, but I think I cited that she didn't
7   have, you know, full heats at web experiences is one
8   area. I may have cited automatic packaging applications
9   is another area.

10      Q.   Your previous testimony referred to
11  sophisticated packaging application, is that different
12  from automatic packaging application?

13      A.   Not really, no.

14      Q.   Any other type of accounts?

15      A.   I feel like I've answered the question.
16  There are great many accounts. There are accounts that
17  use very specific types of tape and strapping equipment,
18  and I don't know that she has any experience around that
19  either, so it's really more than I can list today.

20          MS. DALEY:  Go off the record.

21          (Thereupon, a discussion was had off the

22      record.)

23  BY MS. DALEY:

24      Q.   So you're saying today that you're unable to
25  give me a list of any other accounts that you feel that

1    Ms. Ortega is not qualified to handle?

2              MR. ENJAMIO:  I object to the prior

3         testimony.  Mischaracterizes prior testimony.

4         You may answer.

5              THE WITNESS:  No, it's not what I'm

6         saying.  I said there were a great many I could

7         list, you know, food service applications.  I

8         don't know if she has an understanding of

9         hazlip (phonetic) and hazmat to sell to, you

10        know, food processing plants, you know.

11        There's just -- I don't even know where to

12        start.  There's a great many industry segments

13        that she hasn't background or knowledge, and I

14        wouldn't choose her as the logical person to go

15        and -- I wouldn't say that she has the

16        qualifications to go and call on these type of

17        accounts, and it's not all product related.

18              Sometimes it's industry knowledge

19        related, and when you make it industry

20        knowledge related, it could be everything from

21        freight companies to chip manufacturers to, you

22        know, telecommunications companies, etc., etc.,

23        etc.  It's easier to say the ones that I feel

24        she's best qualified for.

25    BY MS. DALEY:

1    Q.    But I want to deal with -- the way I want --

2    who within the company would have knowledge as to which

3    accounts the company handled that Ms. Ortega is

4    qualified to handle?

5    A.    I think in the last testimony, I said that if

6    I brought in my segment managers, my packaging manager

7    and I sat him down and I said okay, based on what you

8    know of Ms. Ortega's background and experience and what

9    you know of your marketplace -- because he's much more

10   knowledgable of packaging -- you know, give me all the

11   product customers -- customer segments that you don't

12   feel she's qualified to handle.  Mike could probably

13   produce a list of those.  If I ask the supply systems

14   manager, I believe he might be able to do the same

15   thing.  I represented the printing side.  That's my

16   background and expertise.

17   Q.    Prior to -- you've been designated as the

18   30(b)(6) representative to address this particular

19   question.

20   A.    Yes.

21   Q.    Now, prior to either your deposition on the

22   25th or today, did you speak with either Mike or the

23   packaging manager to determine which accounts the

24   company handles in the divisions where Ms. Ortega worked

25   that she is not qualified to handle?

BRICKELL, GOMBERG & ASSOCIATES, INC.    (954) 522-0067

```
 1              A.     I have not spoken to those gentlemen since
 2      the last testimony.
 3              Q.     And what's the name of the packaging manager?
 4              A.     Mike Butler.
 5              Q.     And what's the name of the segment manager?
 6              A.     Chris Tile.
 7              Q.     Why is Ms. Ortega not qualified to handle
 8      sophisticated or automatic packaging application?
 9              A.     Because she does not possess the industry
10      knowledge or the product knowledge to represent her or
11      our company well.
12              Q.     And what does that mean?
13              A.     Customers that buy very expensive automated
14      packaging systems are looking for suppliers that are
15      knowledgable and consultative, and she would not be able
16      to be knowledgable or consultative around packaging
17      systems that she has not -- you know, doesn't have the
18      industry experience or product knowledge of.
19              Q.     Now, which accounts is Ms. Ortega qualified
20      to handle of the accounts that are handled by the
21      representatives in the divisions where she worked
22      between '96 and the present?
23              A.     She's most qualified to handle export
24      accounts.
25              Q.     You limited it by saying most qualified.  I
```

1    want to know which ones she is qualified to handle.

2        A.    I just started the list.  That's her greatest

3    concentration.  She, also, has -- she can handle the

4    average commercial printer, sheet fed printer, certainly

5    quick printers, the average sheet fed implant print

6    shop.

7        Q.    Any others?

8        A.    She has some experience with forms printer.

9            (Thereupon, Ms. Ortega entered the deposition

10   room.)

11   BY MS. DALEY:

12       Q.    Any others?

13       A.    I think that's pretty generally inclusive

14   there, yes.

15       Q.    When you said the average like sheet fed and

16   printing shop account, does average refer in any way to

17   any monetary value?

18       A.    No.

19       Q.    So what do you mean by average?

20       A.    I mean as long as the shop wasn't dealing in

21   some sort of, you know, sublimation type printing or

22   some kind of unusual printing method.

23       Q.    What is sublimation?

24       A.    Sublimation is where you print dyes instead

25   of inks onto a paper, and those are transferred from

```
 1          paper to cloth with some sort of heat and gas extrusion
 2          method or method of displacing the dyes from the paper
 3          to the cloth.  I mean, that's just an example of one of
 4          the type of unusual sheet fed commercial print shop
 5          applications, but the average commercial print shop
 6          application is a sheet fed shop with -- you know, with a
 7          dark room or a prepress department, and they run sheet
 8          fed coded papers and uncoded papers and, you know,
 9          standard inks or in which case she'd be qualified for
10          that.
11               Q.    Last week we started to talk about area
12          number 24 which addresses -- let me direct your
13          attention to the exhibit number 26, and it's the second
14          deposition notice.
15               A.    Okay.
16               Q.    Last week we started to talk about area
17          number 24 which is the total commissions paid to each
18          sales representative or employees who worked as sales
19          representatives in plaintiff's division in 1996, 1997,
20          1998, 1999 and 2000, and the identity of the
21          representatives.  And in your testimony, you referred to
22          some charts that had been produced by Unisource under
23          tabs number -- or exhibit numbers seven, eight, nine and
24          ten.  Do you see those?
25               A.    Yes.
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1          Q.    You brought some documents here with you

2    today.  Now, you brought some of the source reports that

3    are listed on the bottom of exhibit number seven,

4    SCW0993.  You brought 0993A.  Did you bring any of the

5    0993B?

6          A.    Can I see one of the books?

7          Q.    Sure.  Let me show you the book of the

8    SCW0993A reports that you brought, and I'm not sure if

9    it's just a typo or if the A report is different from

10   the B report.

11         A.    No, there's a different report.  This is the

12   993B.  I have '96 and '97 here.

13         Q.    Was that something that you brought with you

14   on the 25th?

15         A.    I didn't have this with me.

16               MR. ENJAMIO:  Actually, we had it.  It's

17         been produced to you before.

18               MS. DALEY:  Can I see it?

19               MR. ENJAMIO:  Yes.  Just for the record,

20         I believe for 1996, it's DEF03450 through

21         DEF03460 and for '97 is DEF03470 through 03480.

22   BY MS. DALEY:

23         Q.    And how about for the other years, did you

24   bring any of the ones for the other years here today?

25         A.    No, sir -- no, ma'am.

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1          Q.    So what is the difference between the

2     SCW0993A report and the SCW0993B report?

3          A.    Let me study two of them side by side.

4                MS. DALEY:   Can you mark the previous

5          question for me?

6                THE WITNESS:   The SCW0993B appears to be

7          all inclusive.

8     BY MS. DALEY:

9          Q.    All inclusive of what?

10         A.    It says with division summarized, it would be

11    their sales and in any divisions that they had sales

12    number -- sales numbers on file; in other words, Betty

13    has a sales number in the supply side and she, also, has

14    a supply number on the printing side.  If she sold

15    anything out of the Tampa division, she'd have a supply

16    or printing number in the Tampa division.  It appears

17    that these numbers are inclusive of sales in other

18    divisions as well because the numbers in SCW0993A are

19    slightly smaller than the numbers in 3B which would

20    explain those were the numbers taken to the summation

21    pages that were provided.

22         Q.    Under these SCW0993A I see reports -- for

23    example, I'm looking at the one for fiscal year 1996.  I

24    see some reports, for example, 452 Miami Printing, and

25    then under that, there's a report for 461 Miami Supply

1    Systems.

2        A.    Right.

3        Q.    And for some other divisions.

4        A.    Paper stores, etc.  Yeah, see that details --

5    this report details what they earned in each -- in each

6    division, supply printing or paper store, and it appears

7    that this report summarizes all these in one place.

8        Q.    So you're saying that the B reports is a

9    summary of all of the A reports for one year?

10        A.    It says with division summarized, so yes.

11        Q.    And these A and B reports are -- both of

12    these reports are computer generated?

13        A.    I'm sorry, can you ask the question again?

14        Q.    Are the A report and the B report both

15    computer generated?

16        A.    Yes, they are.

17        Q.    So for the missing years that we do not have

18    here today, is that something that the company can

19    generate from the computer?

20        A.    As I understand our IT process, they can't

21    just go in and rerun a file.  They have to write

22    software to do it.  It takes a considerable amount of

23    time and expense, but they don't just -- they can't just

24    go back and rerun a file because to rerun this file now

25    would have this year's dating in it.

```
 1          Q.    But let's suppose they want just the data
 2    that's contained in, for example, the 1998 report for
 3    the SCW0993A that we do not have.  Would the company be
 4    able to run a report that shows me the information for
 5    the fiscal year 1998 for example?
 6          A.    They would have to rewrite software to do it.
 7    They couldn't just go to the computer and say okay,
 8    rerun this report and here's the time period.  They'd
 9    have to write the software to re -- to do that to go
10    back and pull that data out of data storage.
11          Q.    Now, after these reports are prepared, both
12    the SCW0993A and the SCW0993B, after both of them are
13    prepared, does the company retain it in a certain form
14    where it can be easily accessed?
15          A.    These reports are provided for our human
16    resources and payroll group.  They're not provided for
17    the divisions.
18          Q.    So the human resources and the payroll people
19    should have copies of them?
20          A.    I'm sure they've provided you what they had
21    retained copies of.
22                (Thereupon, Ms. Ortega exited the deposition
23    room.)
24    BY MS. DALEY:
25          Q.    When you say you're sure, did you actually
```

```
 1      check to see if the company provided the plaintiff
 2      Ms. Ortega with everything that it had?
 3          A.    The files are maintained in Jacksonville,
 4      Florida.
 5          Q.    But I'm asking you you just testified that
 6      you're sure the company produced it.  Did you actually
 7      check with someone to produce that?
 8          A.    No, ma'am, I'm sorry, I didn't.
 9          Q.    Now, going back to the charts that we have
10      under tabs number seven, eight, nine and ten, are the
11      figures on these charts for the fiscal year for each one
12      of the years listed or for the calendar year?
13              (Thereupon, Ms. Ortega entered the deposition
14      room.)
15              THE WITNESS:  Give me just a moment.
16          They appear to be fiscal year.
17      BY MS. DALEY:
18          Q.    Now, in the first part of your deposition,
19      you were unable to testify with respect to who --
20          A.    Excuse me, allow me to check one more.
21          Q.    Sure.
22          A.    Just to be sure.
23              Fiscal year.  I'm sorry, what was the next
24      question?
25          Q.    In the first part of this deposition, you
```

1    were unable to give me the name of the person who

2    actually created the charts.  Do you know who the person

3    is now?

4         A.    I thought I did testify it was produced by

5    our human resources group.  Specifically, Cecil McClary

6    would know who prepared this document.

7              MS. DALEY:  Can you mark the previous

8         question?

9    BY MS. DALEY:

10        Q.    Were you able to determine between the break

11   who actually prepared that?

12        A.    No, ma'am.  I've been traveling as I

13   mentioned earlier.  Or Becky Javore (phonetic).  Suzie

14   McClary or Becky Javore would know.

15        Q.    Now, I'm looking at the SCW0993A report for

16   the fiscal year 1996.  There are commissions that are

17   listed for the division manager and for the sales

18   manager.  Do you know who the division manager and the

19   sales manager were in -- during that fiscal year?

20        A.    Can you tell me what page specifically?

21        Q.    Sure.  The SCW0993A, page 103 for fiscal year

22   1996.

23        A.    Page 103.  The sales manager at that time

24   should have been Mr. Bill Ready, and the division

25   manager through this fiscal year 1996 was Bob McKey.

1      Q.    You produced reports -- those type of reports

2  for fiscal year 1994 through fiscal year 1998 at least

3  through period 12 of 1998. Were Bill Ready the sales

4  manager and Bob Mckey the division manager for all of

5  the reports that you produced?

6      A.    I can't be sure about 1994. 1995 and 1996,

7  that would be accurate. I can't be sure about 1994.

8      Q.    Who were the sales manager and division

9  managers for 1995?

10     A.    Bob Mckey was the division manager in '94 and

11  '96. Bill Ready was sales manager in '95 and '96.

12  Ninety-four is -- at some point in '94 and '93, and I

13  can't recall -- I wasn't in South Florida at the time

14  was when Bill Ready got the sales manager's job for the

15  combined companies of Unisource, Burt Guschelle

16  (phonetic) had been the sales manager previous to that

17  and Bob Mckey was appointed division manager after Gene

18  Press, and, again, sorry, the specific years I don't --

19  I don't know specific.

20     Q.    So how about for 1997 and 1998?

21     A.    1997 the sales manager -- the division

22  manager was me. In 1998 the division manager was me.

23  Fiscal year 1998 ended in September of 1998, so sales

24  manager should have been Bill Ready, also, for that

25  period of time.

1          Q.    For 1997 and 1998?

2          A.    Yes, ma'am.  So I would have been division

3     manager and Bill Ready sales manager.

4          Q.    Now, going now to area number 17, in the

5     first part of your deposition, you referred to some

6     documents that addressed the commission structure for

7     web accounts --

8          A.    Tab 17?

9          Q.    I'm sorry.  Area number 17 in the corporate

10    representative notice, and that's under Tab Number 26.

11         A.    We got it separately now.

12         Q.    You referred to some documents that addressed

13    the commission structure for the web accounts, and

14    during the time frame from the first part of this

15    deposition until today, were you able to locate any of

16    those documents?

17         A.    I don't know that I referred to any

18    documents.  I wasn't aware that there was anything like

19    that in writing.  Certainly, I'm not in possession of

20    anything like that.  That -- the only place that I ever

21    saw that commission structure -- that's the word I'm

22    looking for -- manifest it was in the commission

23    statements which we have provided you.  I've never seen

24    it written in any form nor do I believe that --

25         Q.    So you've never seen any documents that refer

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    to the percentage or how to compute the commissions that

2    are earned on web accounts that Mr. Peterson, Mr. Laux

3    and Mr. Huempfner received?

4    A.    Other than the commission statements, no, I

5    have not.

6    Q.    And in the first part of your deposition, you

7    referred to a change that was made in March of this year

8    to the commission structure or an adjustment to the

9    commission matrix.  Were you able to obtain a copy of

10    that between the first part of this deposition and the

11    second part?

12    A.    As I mentioned, I haven't seen them reproduce

13    the matrix without that first bar.  It doesn't mean that

14    it doesn't exist, but I have not seen anything like

15    that.

16    Q.    Now, was Cathy Healy recently this year given

17    another commission structure or a new commission

18    structure?  This year was Cathy Healy given a different

19    or a new commission structure from what she previously

20    had?

21    A.    She would have been impacted by the same

22    minimum gross profit dollar.

23    Q.    And --

24    A.    That was this year.

25    Q.    What same minimum profit gross dollar are you

1     talking about?

2          A.     Where they took from the matrix that was on

3     page --

4          Q.     You mean on exhibits 13 and 14?

5          A.     I'm trying to find the one that's current.

6     It should be dated '99.

7          Q.     Look at the one under Tab Number 11.

8          A.     Yeah, okay.  If you go up the vertical

9     access, you'll see that the bar, the first block says

10    $75 to 99.99.  That block no longer exists.  It starts

11    at $100.  So Cathy Healy would have been impacted by

12    that as well.

13         Q.     But other than that one change, was there any

14    change made to Cathy Healy's commission structure?

15         A.     I don't -- I don't understand the question.

16    She's not under any special program.  What -- I'm trying

17    to think of what you might be referring to.

18         Q.     What I'm trying to ask you is that other than

19    the one change that you just explained, did the company

20    make any other change concerning how Cathy Healy is

21    compensated?

22         A.     She handles -- she handles a lot of bid

23    business.  We recently had a KC bid that went bad.

24    We're having to handle the gross profit in that bid with

25    a charge back, and we're applying, basically, this --

1      the matrix in commission rate percentage to the charge

2      back because we can't show it as gross profit, but it's

3      not a separate commission structure, and it's based on

4      how this would compute, so I think I can say to your

5      question, no.

6          Q.    Now, with respect to the commission structure

7      or plan that governed the sales representatives today,

8      in a previous deposition, witnesses referred to a sales

9      goal that was set in at least that the sales

10     representatives were informed of in July of this year.

11     Are you aware of the sales goals that Ms. Ortega and

12     other representatives were informed about this year?

13         A.    There's a program, it's not -- I wouldn't

14     consider it sales goal.  If you -- I should almost get

15     you to ask the question right to make sure that I'm on

16     the right track --

17         Q.    Let me ask it this way:  The day before

18     Ms. Ortega's deposition, did the company inform her that

19     her gross profit or her sales goal was changed in any

20     way?

21         A.    Her gross profit goal for the year is the

22     same in July and August as it was in February and March.

23     There is a minimum gross profit program that is specific

24     in Unisource that they're requiring of all reps that at

25     year's end they need to be tracking at a certain level,

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    but her sales goals and commission dollar goals or gross

2    profit dollar goals for commission multiplier purposes,

3    100 percent club purposes has not changed.

4        Q.    Now, how if at all does that minimum gross

5    profit program effect the commission schedule that is

6    under Tab Number 11?

7        A.    I don't know how it would.  We're saying that

8    this gross profit minimum goal is saying that each sales

9    rep needs to produce a certain amount, minimum amount,

10   and it varies by department of gross profit to be

11   considered, you know -- if you're beneath a certain

12   point, you're considered underperforming, and the sales

13   manager's goal between now and the end of the year is to

14   bring them up to the level that they're performing at

15   what is considered an acceptable level.

16       Q.    So looking at the chart under Tab Number 11,

17   so the area that the minimum -- the area that you're

18   referring to, the minimum gross profit goal, would it be

19   the area under GP dollar sign?

20       A.    No, it's an annualized.  It's a total number.

21       Q.    What's the difference between that number and

22   the GP dollar sign number that's listed under Tab Number

23   11?

24       A.    This is individual gross profit for

25   computation of the commission on a particular sale and

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    the minimum for the sales rep is their total production

2    gross profit production on every sale.  Even if it

3    doesn't qualify for commissions, those gross profit

4    dollars count toward their gross profit production, so

5    even if it's not -- never applied to the matrix, they

6    never earned a commission dollar on that.  The total

7    gross profit production is what's used to calculate

8    whether they're on this minimum gross profit level or

9    not.

10        Q.    Are there any documents that explains how

11   that minimum gross profit goal or quota or whatever you

12   call it is set?

13        A.    Are there any documents that explain how that

14   number was set?

15        Q.    Yes.

16        A.    How it was set, no, ma'am.  There are --

17   there are internal company memos that talk about the

18   minimums and tracking the minimums and -- and who -- you

19   know, which sales reps are considered underperforming at

20   the current time, but how those numbers were set, no,

21   ma'am, not that I'm aware of.

22        Q.    So you're saying that they're just company

23   memos that explain which sales representatives are

24   underperforming?

25        A.    They're company memos that do that by

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    division, show you which sales reps are under certain

2    level under the minimum, and there's a memo that

3    explains that we need to, you know, improve sales rep

4    productivity and what the number needs to be for

5    printing.  If you've been with the company over a

6    certain number of years, you need to be at 350,000

7    supply packaging, etc.

8         Q.    Now, with respect to that minimum gross

9    profit that was set this year, how, if at all, does it

10   effect Ms. Ortega or any other sales representative's

11   commission?

12        A.    I don't know how it would.  Maybe I'm not

13   understanding your question.

14        Q.    I'm trying to determine if the minimum gross

15   profit margin or the minimum gross profit amount that

16   was set if a representative fails to meet the minimum

17   gross profit, is there any effect on the commissions

18   that the representative eventually earns at the end of

19   the year or the end of the fiscal year?

20        A.    I think -- I think I'm getting you.  Maybe

21   we're confusing this 350,000-dollar annual gross profit

22   minimum requirement and the minimum gross profit

23   required to earn commissions on a sale.  If you're

24   asking that --

25        Q.    No, that's not what I'm asking.  I'm asking

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    you if there's any relationship, if at all, between the

2    minimum gross profit that was set for Ms. Ortega and the

3    other representatives and the amount of commission that

4    Ms. Ortega or the other representatives may earn at the

5    end of the fiscal year?

6         A.    Well, Ms. Ortega and the other reps were

7    effected both by the 350,000-dollar minimum at the end

8    of the year as well as this, though I'm still not sure I

9    understand your question.  Are you talking about the GP

10   350,000-dollar program or are you talking about the

11   minimum GP here?

12        Q.    Let's deal with the GP 350,000-dollar

13   program.  Now, under that program, is there any effect

14   on the amount of commissions that Ms. Ortega or any

15   representative may earn at the end of the year?

16        A.    I can't see how there would be.  Except that

17   if they made that 350,000-dollar number, they'd make

18   more commissions.

19        Q.    Is there a bonus rewarded if --

20        A.    No.

21        Q.    -- the employee meets the 350,000-dollar

22   commission level?

23        A.    No, ma'am.

24        Q.    And is there any commission that is taken

25   away if the employee fails to meet the 350,000-dollar

1    goal?

2          A.    No, ma'am.

3          Q.    Is there any penalty imposed if the employee

4    fails to meet the 350,000-dollar goal?

5          A.    The way that it's been expressed to me by

6    human resources is additional disciplinary action

7    leading up to -- possibly leading up to termination, but

8    additional disciplinary action can include many things.

9          Q.    And have you seen that additional

10   disciplinary action language documented in any form?

11         A.    Not that I can recall.  I don't think that's

12   part of this question, though.

13         Q.    In the previous depositions, there were

14   references made to a division plan and sales plans for

15   the divisions where Ms. Ortega worked.  How, if at all,

16   does the division plan impact on the compensation that

17   Ms. Ortega and other representatives in her division

18   receives?

19         A.    How does the division plan impact the

20   compensation that the sales rep receives?

21         Q.    Yes.

22         A.    Well, if the division -- if the expectations

23   of our division are that we grow a certain percentage,

24   you know, an example 25 percent or 15 percent, then what

25   we do is go back to our sales reps and ask that they

1    grow their individual territories by that percent plus

2    in some cases we pad that a little bit, that plus 2 or

3    3 percent, whatever based on the opportunity within the

4    territories.

5          And then what becomes their final individual

6    goal when they achieve that goal at any point during the

7    year, when they hit -- let's say your plan was to

8    achieve $400,000 in gross profit and in September you

9    hit $400,000 in gross profit, you still have three

10   mother months of selling time, then for each -- you

11   know, for everything you do over that you're paid a

12   multiplier. And there's two multipliers: One for new

13   accounts and one for over goal, and one's 20 and one's

14   25 percent. And to be honest, the specific percentage

15   for that is -- I want to say is 20 percent, but I'm not

16   positive. So in that way, I guess it does impact the

17   sales person.

18         Q.    And the division plan, is that something that

19   is in writing?

20         A.    Yes, ma'am.

21         Q.    In a written form? And did you bring that

22   with you today?

23         A.    I believe I brought that with me Friday;

24   didn't I?

25               MR. ENJAMIO:   Wednesday you mean.

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1          THE WITNESS:  Wednesday.  I believe that

2      was part of all that stuff that I left.

3     BY MS. DALEY:

4          Q.   Let me show you all of the stuff that you

5     left and tell me if you can tell me where the division

6     plan is.  Can we go off the record?

7          (Thereupon, a discussion was had off the

8     record.)

9     BY MS. DALEY:

10         Q.   So you're handing me now --

11         A.   -- several different reports.

12         Q.   Tell me what the reports are.

13         A.   The first one is a CI6100.  It shows you what

14    sales Betty did in the supply side year to date and how

15    many tickets that was and what -- how many credit memos

16    she wrote.  This report is a CI5065 which charts what

17    her -- for her smallest customers, S and V customers,

18    assigned to her number and how they performed year to

19    date, how many orders, how much gross profit order, etc.

20    This is part of that.  Then I have the SAP08 which

21    details her supply systems customers, their sales and

22    gross profit tracking back three years and five

23    quarters.  Category grouping which talks about her sales

24    by category.

25         Q.   And the division plan is being faxed?

1          A.    The sales reps commitments and forecasts are

2    being faxed.  It's the division plan for the sales reps.

3          Q.    Just so I can understand what you're saying,

4    is the division plan different from the commitment plan

5    that you're talking about?

6          A.    Sale rep commitments are part of the division

7    plan.  The division plan, also, includes total division

8    sales, expenses, gross profit, bottom line profit broken

9    out per month.  The sales rep commitments are part of

10   that plan that we have to turn in.

11         Q.    I'll see what comes back faxed.

12               Now, the division plan is done for each

13   fiscal year?

14         A.    Yes, ma'am.

15         Q.    Now, how, if at all, do the sales

16   representative commitment plans effect the commission

17   that a sales representative earned?

18         A.    The sales reps commitment plans effect the

19   commissions -- I'm repeating the question.  Once a sales

20   rep attains their plan, they can then be paid a

21   multiplier on commissions after -- on sales after

22   they've achieved their plan until the year finishes.

23   For example, if they did 350,000 last year and their

24   goal this year is 400,000 in gross profit and they

25   achieved $400,000 in gross profit through September,

1    then for the months of October, November, December, all

2    the gross profit that they earn then when we apply this

3    commission matrix to it, we calculate their commissions

4    earned and then we apply a multiplier to that of 20 or

5    25 percent, so they earn, you know, a kicker for over

6    plan sales, that's how their plan effects their incomes.

7         Q.    Now, with respect to products that are sold

8    by truckload in the division where Ms. Ortega works, is

9    the commission calculated based on schedules under, for

10   example, tab number 11 or by some other structural plan?

11        A.    In tab number 11, the last matrix is direct

12   commission schedule.  If the sales rep sells something

13   in a truckload and it's delivered from the manufacturer

14   to the customer and we don't touch it, it's considered a

15   direct, but we do deliver some truckloads off the floor

16   which would mean that it applies to the first matrix

17   which is warehouse.

18        Q.    When you say by the floor, what does by the

19   floor mean?

20        A.    Off the floor.  In other words, it's a stock

21   item in our warehouse or something that we maintain an

22   inventory and we use our trucks to deliver it.

23        Q.    So if the item is sold by the truckload, we

24   use this direct commission schedule?

25        A.    Only if it goes from the manufacturer

1    directly to the customer and our floor isn't touched and

2    our trucks, you know, are not utilized.

3         Q.    And otherwise, if it's sold off the floor and

4    it's a stock item in the warehouse, do you use the

5    indirect commission schedule under warehouse commission

6    schedule?

7         A.    Where I might use the indirect is if the

8    product is not a standard stocked product for us, but

9    the manufacturer will not ship directly to an end user,

10   the manufacturer will only ship to a merchant or

11   distributor, then it comes in to our floor and we have

12   to redistribute it.

13        Q.    Now, is the web paper sold by the truckload?

14        A.    Generally, yes.

15        Q.    But they do not use this direct commission

16   schedule that we're talking about?

17        A.    No.    They -- they would only in the exception

18   of cases of Huempfner, Laux and --

19        Q.    Peterson?

20        A.    Peterson would they not.    If it were a direct

21   truckload of web paper and it went from the manufacturer

22   to the end user, it -- this matrix would apply, the

23   direct matrix would apply.

24        Q.    Except for the three people who you just

25   mentioned?

```
 1              A.    (Nods head.)
 2                    MR. ENJAMIO:  You need to answer the
 3         question.
 4                    THE WITNESS:  Sorry.  Yes.
 5    BY MS. DALEY:
 6         Q.    Now, I'm moving on to area number 18 on the
 7    corporate representative notice.  Area number 18 is the
 8    decision to assign and/or transfer accounts to plaintiff
 9    from 1996 to present, identify of accounts, dates of
10    assignments and/or transfer and the value of the account
11    upon assignment or transfer.
12                    Now, with respect to the first area, who made
13    the decision to assign accounts with respect to
14    Ms. Ortega from 199 -- in the year 1996?
15         A.    Her sales manager Bill Ready would have been
16    the primary person to do that.  She, also, had a sales
17    manager on the supply side in 1996 that would have been
18    Jack Kelly, and I could assign her accounts on either
19    side.
20         Q.    How about for 1997?
21         A.    Bill Ready and, again, Jack Kelly.
22         Q.    How about you?
23         A.    And I'm sorry, me.
24         Q.    1998?
25         A.    Bill Ready, myself, Jack Kelly for a portion
```

1    of 1998 Bob Libon.

2         Q.    Spell his last name.

3         A.    L-I-B-O-N.

4         Q.    What was his title -- I'm sorry?

5         A.    He took Jack Kelly's place as supply systems

6    manager.  He came in the late fall, early winter of 1998

7    which would have been fiscal year 1998, calendar year

8    1998.

9         Q.    For 1999?

10        A.    1999, I was her direct sales manager for the

11   entire year I believe.

12        Q.    Anyone other than you who assigned accounts

13   or transferred accounts to Ms. Ortega in 1998 other than

14   you?

15        A.    Who could have?  Bob Libon for the majority

16   of 1999 on supply, and at the last month of 1999 like

17   December, Bob Libon was promoted and Chris Todd.

18        Q.    Anyone else?

19        A.    Yes, I'm sorry.  We have to go back to 1996,

20   '97, '98, '99 and today.  On the packaging side, Mike

21   Butler could have assigned her accounts also.  Sorry.

22        Q.    How about for the year 2000?

23        A.    2000 it's been myself, Chris Todd, Mike

24   Butler and in July, we hired a new sales manager on the

25   printing side that is now Betty's direct supervisor --

```
 1        June, July is her direct supervisor and his name is Lou
 2        Kaminow, K-A-M-I-N-O-W.
 3             Q.    Anyone else?
 4             A.    Gary Forest.  I don't think she ever had a
 5        single account with Gary Forest, but Gary Forest was a
 6        graphics manager that was here from 1996 until 2000, but
 7        I can list him in case he would have been able to if it
 8        were a graphics account.  I just don't think he ever
 9        did.  And we just hired a gentleman named Lou -- I mean
10        Ron Gisbert (phonetic) to handle graphics and that would
11        have been -- he's only been with us now about a month.
12             Q.    Did he replace Forest?
13             A.    He did, but I don't think that Betty had much
14        to do, if anything, with those -- with the graphics.
15             Q.    Anyone else for the year 2000?
16             A.    In terms of accounts being transferred.  In
17        the year 2000, I don't believe so.
18             Q.    Now, can you turn to the document under tab
19        number four please?
20             A.    Tab number four?
21             Q.    Yes.  And it's stamped EEOC183.  Do you see
22        that?
23             A.    Uh-huh.
24             Q.    Now, this particular list was attached to
25        Unisource's position statement.  Do you know what this
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
1    list represents?

2         A.    Yes, ma'am.

3         Q.    What is it?

4         A.    We maintain very loose files, as I'm sure you

5    saw, of the accounts that are transferred from one sales

6    rep to another.  That's either on a form that we use

7    that states the date or -- I mean not the date, but

8    states the account and the account transfer sales reps.

9    We went through that file, our credit people did, and

10   pulled these accounts out as accounts that had been

11   transferred to Ms. Ortega in the past four years.

12        Q.    So this list lists accounts -- lists all of

13   the accounts that was transferred to Ms. Ortega from

14   1996 up to the date when it was created?

15        A.    The best we can -- we could discover in those

16   files.

17        Q.    And the day that that was used to create this

18   list, is it the one in the box that you provided to me

19   on --

20        A.    Those four.

21        Q.    -- on the 25th?

22        A.    They had been provide earlier.  They were

23   part of the original boxes that were sent over, but yes,

24   I left them here.  There may have been -- looks like

25   they may have been pulled out and provided in another
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1   format too because some of them are here.

2       Q.   So this list represents -- withdraw that

3   question.

4           And do you know when this list was actually

5   created?

6       A.   It was sometime in 1999 during the production

7   of documents for the EEOC.

8       Q.   And do you know the name of the person who

9   created it?

10      A.   I had Sheila Sullivan pull the data.  I don't

11  know the specific person in human resources that typed

12  this list, no, ma'am.

13      Q.   What was Sheila Sullivan's title at the time?

14      A.   She was the credit manager.

15      Q.   Now, are there any other accounts that were

16  assigned to Ms. Ortega between 1996 and 1999 when this

17  list was prepared that is not listed on the list under

18  tab number four?

19      A.   Ma'am, there could be.  Those, as you saw,

20  those are fairly loose documents, loose files.

21      Q.   And today, can you tell me which, if at all,

22  accounts that were assigned to Ms. Ortega between 1996

23  and 1999 that are not listed here?

24      A.   I'm sorry, can you repeat the question?

25      Q.   Sure.  Can you tell me which accounts that

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1   were transferred to Ms. Ortega between 1996 and 1999

2   when this list was created that are not listed on the

3   list under tab number four?

4       A.   No.   To best of my knowledge, this should

5   be -- the best of our knowledge, this came from these

6   files that we maintain, this should be the list, but

7   there may be additional ones.   Those records weren't

8   maintained.

9       Q.   Now, going to this list, can you tell me the

10  dates when the accounts on the list under tab number

11  four were transferred to Ms. Ortega?

12      A.   No, ma'am.

13      Q.   And prior to preparing yourself for this

14  deposition today, did you -- what, if any, efforts did

15  you take to determine the dates when the accounts on

16  exhibit number four were assigned to Ms. Ortega?

17      A.   I asked Ms. Sullivan if the date that the

18  account was assigned to the rep were recorded in the

19  system somehow, were recorded in our computer that I

20  could go to and see a date in the screen, and the answer

21  is -- the answer is no, so the system does not record

22  the date or at least it's not available without some

23  substantial software writing and you saw the quality of

24  the notes, most of the notes do not have dates or

25  volumes at the time of transfer.

1          Q.   But did you do anything to try to match up

2    the accounts on the list under tab number four and the

3    dates when the accounts were assigned to Ms. Ortega?

4          A.   It's -- it's -- the only way to do that would

5    be to go back and try to locate on the commission

6    statements the first date of sales showed up and that

7    would be an approximate -- I'm trying to think of any

8    other way.  That would be the best way to do that.

9          Q.   What I'm trying to determine is whether that

10    was actually done in preparation for telling me the

11    dates when accounts were assigned to Ms. Ortega between

12    1996 and the present?

13          A.   That would have been -- that -- no.  The

14    answer is no, that would have taken -- that could have

15    taken weeks.  I don't think it would have.  It would

16    have taken a huge amount of time.

17          MS. DALEY:  Can you mark that question

18        please?

19    BY MS. DALEY:

20          Q.   Now, the last part of this particular area,

21    number 18 on the 30(b)(6) notice asks you to testify

22    about the value of the accounts upon assignment or

23    transfer to Ms. Ortega.

24          Can you tell me what the value was of each

25    one of the accounts that are listed under tab number

1    four on the date that the account was transferred to

2    Ms. Ortega?

3        A.    No, ma'am.

4        MS. DALEY:  Can you mark this question?

5    BY MS. DALEY:

6        Q.    What, if any, efforts did you take to

7    determine what the value of the accounts were on the

8    dates that they were assigned to Ms. Ortega.

9        A.    Again, if I knew the date that they were

10   transferred, then I could go back and find the

11   information.  Based on some of the other reports, I

12   could piece it together, but the answer is without the

13   dates, there's no way to have done that and to find the

14   dates would have meant going through commission

15   statements after commission statements.  And even that

16   wouldn't be accurate because I could have assigned it to

17   her and she may not have written a sale on it for six

18   months or a year and it wouldn't show up there until she

19   wrote a sale, so that wouldn't even have been fruitful

20   time.

21       Q.    Now, is there a report that the company

22   generates that could tell me which accounts Ms. Ortega

23   handled in 1996?

24       A.    Yeah.  I provided one, MC3112.  Provided what

25   I had from those years.  Again, that wouldn't indicate

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

|     |     |
| --- | --- |
| 1   | the date that the account was transferred or the volume |
| 2   | of the time of the transfer.  I could assign her AB |
| 3   | graphics which is, I guess, the first one on the list, |
| 4   | and if she didn't write a sale on that account for 12 |
| 5   | months, it would never start tracking on these documents |
| 6   | until she did which would not give you the date of the |
| 7   | transfer or the value of the account at the time of |
| 8   | transfer. |
| 9   | Q.    The MC3112 that you referred to -- |
| 10  | A.    3110. |
| 11  | Q.    Which one are those? |
| 12  | A.    I'm not sure either.  I'm sorry. |
| 13  | Q.    These are the MC3112 and they're entitled |
| 14  | "Customer Sales Report."  Are those the ones that you're |
| 15  | referring to? |
| 16  | A.    Does it say consolidated, paper plus? |
| 17  | Q.    Yeah. |
| 18  | A.    It does?  Okay.  These documents, the |
| 19  | documents that are contained in her territory book, |
| 20  | these are what we have that would demonstrate the |
| 21  | accounts that have been assigned to Ms. Ortega. |
| 22  | Q.    Now, her territory notebook does not contain, |
| 23  | for example, statements for every single year? |
| 24  | A.    You're right, they only go back since the |
| 25  | time -- I created that book when I took over as direct |

1    sales manager, and I'm the one that started maintaining

2    these records.  In the past, those records according to

3    Mr. Ready were handed out to the reps.

4          Q.    Is there a report called a circle of

5    excellence verification report?

6          A.    A circle of excellence verification report,

7    yes, there was such a report.

8          Q.    During what time frame was that report

9    generated?

10         A.    I'm afraid I can't give you specific dates.

11   I can tell you that we had a circle of excellence

12   program that existed until such time as Georgia Pacific

13   acquired us in 1999.  Prior to that, circle of

14   excellence was approximately two -- three to four years

15   old.

16         Q.    Just so I -- was the circle of excellence

17   verification report generated between 1996 and 1999?

18         A.    For at least -- for at least '97 and '98,

19   probably '96 also, yes.

20         Q.    And what type of information would be listed

21   on that report?

22         A.    I don't maintain those reports.  I don't

23   know.

24         Q.    Who within the company maintains that report?

25         A.    I don't know why anyone would maintain the

1 report.

2   Q. And the circle of excellence verification

3 report, was that report generated with respect to each

4 sales representative?

5   A. Yes.

6   Q. Going back to the chart under tab number

7 nine, you had mentioned in the first part of this

8 deposition that there was an error or something that

9 needed to be corrected with respect to this chart.  Were

10 you able to determine what needed to be corrected with

11 respect to this chart?

12   A. I was informed by my human resources group

13 that the base report, SCW0993B, they couldn't locate the

14 report for 1998, so the specific changes I'm afraid I

15 don't know what they would be.  I don't think they know

16 what they would be without that report.

17     MS. DALEY:  Can you mark that question

18   and answer?

19     THE WITNESS:  Without the report, they...

20 BY MS. DALEY:

21   Q. And who within the human resources department

22 did you talk to about not being able to find the source

23 report for this chart?

24   A. Amy George.

25   Q. Now, the commission statements that are

```
 1      generated with respect to each one of the sales
 2      representatives, would a period 1 through period 12
 3      report tell me all of the accounts that the sales
 4      representative handled for that particular fiscal year?
 5              A.     Period 1 through period 12?
 6              Q.     Correct.
 7              A.     Would -- you'd find any account -- well, any
 8      account that they sold that year would show up.  Whether
 9      it was assigned in to them or out from them, if they
10      sold it during that year would show up in periods 1
11      through period 12 week 5.
12              Q.     Periods 1 through 12 week 5.
13              A.     Uh-huh, period 1 week 1 through period 12
14      week 5.
15              Q.     Let me see if I get that correct.  The
16      commission statement I need to get period 1 through 12,
17      week 1 through 5?
18              A.     No, I'm sorry, that's not one statement.
19      That's --
20              Q.     Tell me again because I didn't get -- so I
21      need to get the commission statement for period 1
22      through 12?
23              A.     Which is 12 months, 4 to 5 weeks per month.
24      It's a lot of statements which we provided, but it's a
25      lot to go through.  In other words, if you wanted to
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    capture every customer that she sold during that year,

2    if you went from period 1 week 1 and you started writing

3    down every time a name showed up of a customer and you

4    stopped at period 12 week 5, you would have a record of

5    every customer that she sold in that year.

6    Q.    But isn't there a year end report that would

7    tell me the same information consolidated?

8    A.    The year end report would be period 12 week 5

9    which would give you the sales dollars consolidated, but

10    would not list all the accounts that she sold during the

11    year.  That would be very convenient, but that doesn't

12    exist.

13    Q.    How about the customer list of sales and

14    gross profit, would that list all of -- if I get period

15    1 through 12, would that list all of the accounts that

16    the representative handles in that particular fiscal

17    year?

18    A.    What's the number of that report, customer

19    list of sales and gross profit; is that the MC3112?

20    Q.    No.  It's the MI looks like 3050.  Look under

21    tab number 25 and it's stamped DEF3200.

22    A.    That would list all the ones that were

23    assigned to her as the -- as of the end of the year.

24    Q.    Would it include the assignment period

25    beginning from the start of the fiscal year all the way

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1     until the end of the fiscal year?

2          A.    It would unless an account was assigned away

3     from her in which case it may not show up on the last

4     statement or that whatever statements after the month

5     that it was assigned away from her.

6          Q.    And so I would need the one for periods 1

7     through 12; is that correct?

8          A.    You'd want, yes, 1 through 12.  The problem

9     is we don't maintain all of those.  We give those --

10    some of those to the reps and we maintain some for the

11    file books for our reference.

12         Q.    So if the company doesn't maintain these type

13    of reports, how if at all does the company track the

14    history for the performance of a sales representative?

15         A.    We can -- we track -- we track gross

16    profit -- total gross profit production year over year.

17         Q.    And in what type of report do you track that?

18         A.    Commission -- well, the information is found

19    on period 12 week 5 on the commission statements, but

20    it's also found on the commission detail analysis

21    report.  The problem is once you've used that to plan

22    the next year, often times those backup terms aren't

23    maintained.  I'm sorry, we use MC3112, but, again, once

24    you've used it, they aren't always maintained.

25         Q.    Moving now to area on the 30(b)(6) notice,

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1      who made the decision to reassign Tony Ginsberg's
 2      accounts?
 3           A.    It was my decision.
 4           Q.    And did you make that decision in conjunction
 5      with anyone?
 6           A.    In conjunction?  No, I ran that by my boss
 7      and my human resource manager.
 8           Q.    And who were those people?
 9           A.    Chris Alecson (phonetic) and Cecil McClary.
10           Q.    And when was that decision made?
11           A.    Ma'am, I don't have the exact date with me
12      today.  I know I testified to that in my personal
13      testimony, but I'm afraid I don't have the date with me
14      now.
15           Q.    And to whom were the accounts that
16      Mr. Gisbert used to handle transferred?
17           A.    The bulk of which -- the bulk of the accounts
18      were assigned to Bill Ready.
19           Q.    And who got the rest of them?
20           A.    Some went into a SOC, small order customer,
21      which are accounts that we, basically, designate as
22      unprofitable accounts, and they have minimal orders and
23      we don't put salespeople in them at all.  And a couple
24      of accounts we gave to telemarketing inside sales.  And
25      one account -- looks like one account at least we gave
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    to Betty.

2        Q.    What type of accounts did Mr. Gisbert

3    handle?

4        A.    Primarily English speaking Caribbean export

5    accounts.  He had a few accounts in the Keys.  He had a

6    few accounts -- couple of accounts in the Dutch Islands.

7    That's the best of my -- the best of my knowledge.

8        Q.    And which one was assigned to Ms. Ortega?

9        A.    Editorial America SA, which I think was the

10   only Miami based account, but I'm not positive.

11       Q.    Where were the rest of them based?

12       A.    Really?  Acme Printers was in the Bahamas.

13   Freeport is Bahamas.  Nassau Guardians in Bahamas.

14   Executive Print is in Bahamas.  Wong's is in Bahamas.

15   John Bull Off is in Bahamas.  Island Images Advertising,

16   I'm not positive which island it was from.  Nassau

17   Guardian was in the Bahamas.  Caribbean Printing, I'm

18   not positive.  The Printshop and Vad NV were from a

19   Dutch island, but I'm not positive which one.  There are

20   some smaller accounts here that I don't know which

21   islands are from.

22       Q.    You're saying here are you referring to some

23   particular document?

24       A.    Yes.

25       Q.    What document are you referring to?

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

```
 1          A.    Customer list of sales and gross profit, the
 2     MI3050 we talked about from Tony Gisbert, the month
 3     before  -- actually, was like the month before he gave
 4     notice, period four, January 31st of '99, so it's...
 5          Q.    Which of Mr. Gisbert's accounts were assigned
 6     to Mr. Ready?
 7          A.    Acme Printers, Freeport Advertising, Nassau
 8     Guardian, Executive Printer of Bahamas, Wong's, John
 9     Bull, Island Images, Nassau Guardian, Caribbean
10     Printing, the Printshop, Vad NV, Express Press, Printing
11     & Office Supply, the Draughting Shaft, Raul Fiorito,
12     F-I-O-R-I-T-O, the Mapco Business Printers, Sands of the
13     Keys, Elmendorf Colors, Office Stop, Bahamas Office
14     Supply.
15               MS. DALEY:  Can you mark that question
16          for me please?
17               (Thereupon, a recess was taken.)
18               MR. ENJAMIO:  We're now producing to you
19          what will be or has been Bate stamped DEF03786
20          through DEF03812, and those are the sales
21          representative commitments for fiscal years
22          1997, 1998, 1999 and 2000.  Again, it's with
23          the W-2's that we produced last week as well as
24          with the documents that we produced in
25          connection with this 30(b)(6) depo, they're
```

```
 1              not -- they have not been stamped with the
 2              label confidential, but we are treating them as
 3              confidential and --
 4                   THE WITNESS:  Extremely.
 5                   MR. ENJAMIO:  -- and if there is any
 6              issue with that because they're not stamped --
 7                   MS. DALEY:  That's fine.
 8                   MR. ENJAMIO:  -- so they are to be
 9              treated as confidential.  I'll probably send
10              you a replacement set at some point with that
11              label, but so you can have it for purposes of
12              this depo.  They also have some notation with a
13              fax from my office because they were faxed here
14              today.  I mean, obviously that's to be
15              disregarded and I'll have delivered to you a
16              clean set sometime later this week you can
17              substitute if you want.
18                   MS. DALEY:  Okay.
19                   THE WITNESS:  The only way to get 1996 is
20              to look -- because it was prior to my getting
21              there, and I can find no written record, is to
22              go to the commission statements period 12 week
23              5 and look at the sales reps' performance
24              against plan and do the math for all the
25              salespeople.
```

```
 1    BY MS. DALEY:

 2         Q.    Period 1 through 12 week 5?

 3         A.    No, just period 12 week 5 which is how they

 4    ended up the year, and then do the math against how they

 5    performed to plan.  That would tell you what their plans

 6    were.

 7         Q.    I'll get to these.  Let's finish up the issue

 8    with respect to which accounts of Mr. Gisbert were

 9    assigned to Mr. Ready.  We now all have a copy of the

10    customer list of sales and gross profit dated January

11    31st, 1999 which I will make exhibit number 40 in

12    plaintiff's notebook.  There are some notations on this

13    copy.  Are the notations referenced by the handwritten

14    word "Ready" the ones that were assigned to Mr. Ready?

15         A.    Yes, ma'am.

16         Q.    And for Budd's, B-U-D-D, Office Supply, what

17    is it notation after that?

18         A.    CeCe.

19         Q.    What does that mean?

20         A.    It's a person named CeCe Romaine (phonetic),

21    inside sales.

22         Q.    And there after Souvenir Kingdom and American

23    Food Trader, there is a reference to 6,001 and what

24    looks like SOC.  What does that mean?

25         A.    Actually 6,001 is a house sales number, but
```

```
 1      that was not put on 6,001, it was put on C which is

 2      number 8,001. It means that they were assigned -- they

 3      weren't even given an inside sales rep. They're just --

 4      they're just put on the house no sales rep calls on

 5      them. If the customer calls in to buy something, we

 6      have minimum margins, we have minimum orders. We

 7      have...

 8          Q.    Did you finish your answer?

 9          A.    Yeah, basically, those are accounts that are

10      just house accounts.

11          Q.    Can you look at the document under tab number

12      39 please and tell me if you've ever seen those before?

13          A.    I do. I've seen it. It's been a long time.

14          Q.    And what are those?

15          A.    These are sales manager house accounts,

16      division manager house accounts.

17          Q.    And is the handwritten notation on the top of

18      the exhibit yours?

19          A.    It is.

20          Q.    Can you read that handwritten notation for

21      me?

22          A.    Sure. It says almost done. Please give me

23      account info on non-highlighted items, also 6035 and

24      4901 accounts as you have time. Thanks J. Glaze."

25          Q.    Did you give this set of documents to
```

```
 1    Ms. Ortega?
 2         A.    If I did, it was a long time ago.  I don't
 3    recall when this note was written other when we pulled
 4    this document.
 5         Q.    Did you give it to her in conjunction with
 6    any discussions you had about Tony Gisbert account?
 7         A.    Ma'am, I can't recall.
 8         Q.    Look at the second page of that exhibit, the
 9    customer order processing default report dated --
10         A.    Customer order processing default report.
11         Q.    -- dated April 5th, 1994.
12               Did you make those handwritten notations on
13    the document?
14         A.    No, those aren't mine.
15         Q.    Are any of the handwritten notations on this
16    document yours?
17         A.    On any of the documents?
18         Q.    Start with the first page.
19         A.    None of those look like my writing, no.
20    Excuse me, I wrote all 601 or 605 or 6901, please print
21    header info, but these sales numbers and all these
22    numbers that are handwritten on the side, that's not my
23    writing.
24         Q.    And have you ever seen these reports, these
25    customer order processing default reports with the
```

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1    handwritten notations on them except for the one that
2    you wrote yourself?
3        A.    I can't recall if that hand -- if that was on
4    there when I wrote that or not.  It would have been a
5    long time ago.
6        Q.    And do you recall having any discussions with
7    Ms. Ortega about these reports?
8        A.    I recall Ms. Ortega coming to me a long time
9    ago and saying there were some accounts that she wanted
10    from Gene Press and told her that I would look at what
11    she -- you know, what specific accounts and assign some
12    to her that made sense, and this must be from that
13    discussion many years ago.  I don't -- I haven't
14    maintained any of this, so...
15        Q.    Do you recall anything else that was said
16    during the discussion that you had with Ms. Ortega about
17    these reports?
18        A.    I know we had a long conversation, but no, I
19    can't recall specifics.
20        Q.    Now, looking at the third page of the
21    account, the customer order processing default report,
22    dated April 5th, 1994, there's a salesman number 6030,
23    and then the words "Betty Ortega."  Are you on that
24    page, and it's, also, stamped A&A103.  Are you on that
25    page?

```
1              A.    No.

2              Q.    Should be about the fourth page of the

3        exhibit.

4              A.    Uh-huh.

5              Q.    Do you know what the 8001 refers to on that

6        page?

7              A.    8001, I know what it refers to, no.  It's

8        small order customer.

9              Q.    And do you know if these reports list how

10       Mr. Press's account was and Mr. Ginsberg's accounts were

11       reassigned after both of them left?

12             A.    Mr. Gisbert's accounts were -- I'm sorry, I'm

13       repeating the question, but I hate doing that.

14             Q.    Let me do them one at a time.

15             A.    I just do it so I can clarify.

16             Q.    Do you know if A&A102 lists how Mr. Gisbert's

17       accounts were reassigned after he left?

18             A.    It doesn't appear so.  First of all, this is

19       way -- this is -- this report was dated '94, and the

20       numbers on the left-hand side that are written in are

21       mostly his numbers.

22             Q.    So you're saying the numbers 6005, 6745, 6 --

23             A.    No, I said mostly.  6005 would not be his.

24       6745 was his sales number, so, apparently, some of these

25       show house numbers after they went to -- 6005 is like a
```

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1    house number.  6001 is a house number.  8001 is like a

2    house small order customer, so --

3         Q.    And do you know what the numbers on the

4    left-hand side represent with respect to the report and

5    Tony Gisbert?

6         A.    I didn't write the numbers, so I can't be

7    sure what they mean.

8         Q.    Now, with respect to the second page of the

9    exhibit, do you know what the numbers on the left-hand

10   side, the handwritten numbers represent?

11        A.    Can you give me the second page, is what the

12   one that says what?

13        Q.    The one that says customer order processing

14   default report, it's also dated April 5th, 1994 salesman

15   number 6900?

16        A.    It was the first account.

17        Q.    First account is Graphics International?

18        A.    And the question again was?

19        Q.    Do you know what the handwritten numbers on

20   the left-hand side represent?

21        A.    Again, I didn't write them.  It appears that

22   it represents accounts -- it appears it represents sales

23   numbers and most of them are house numbers.  A few of

24   them are Betty Ortega's numbers.  A few of them are Tony

25   Gisbert's numbers, and a few of them are numbers I don't

1    recognize.

2         Q.    So the 6745 is Mr. Gisbert's?

3         A.    It is.

4         Q.    6030 is Ms. Ortega?

5         A.    It is.

6         Q.    The 6001 is whose number?

7         A.    House number.

8         Q.    And the 6986 is whose number?

9         A.    I don't know.

10        Q.    Do you know whose number the 7210 is?

11        A.    No.

12        Q.    What were the qualifications for handling the

13   accounts that Mr. Gisbert handled just before -- just

14   before he left the company?

15        A.    Knowledge of export of freight forwarders,

16   working with freight forwarders, export documents, basic

17   knowledge of business in the areas that he traded in.

18   He had to know something of the laws there etc., but he,

19   also, had to know paper, mostly sheet fed papers.

20        Q.    Any other qualifications for handling those

21   accounts?

22        A.    I'd say some knowledge of graphics as well.

23        Q.    Anything else?

24        A.    Qualifications include some of the other

25   things that we talked about.  I mean --

1          Q.    Such as?

2          A.    We would require that he have good

3      organizational skills, that -- I don't have the list in

4      front of me, but good communication skills, you know,

5      those things that I stated in my earlier testimony.

6          Q.    Now, you say the person needed to know the

7      laws there.  Where are you talking about?

8          A.    In the -- in the markets that you trade, and

9      you can't know all the laws I understand, but around

10     export, if you -- if you go to the Bahamas and you give

11     someone -- you start selling a printer, a particular

12     product line and you indicate to them that they have an

13     exclusive, that you won't sell that product line to

14     anyone else, then you may have just verbally entered

15     yourself into a life long agreement that if you ever

16     decide to give anyone else distribution rights to you to

17     pay that first business all these fines and, you know,

18     royalties, so there's laws around doing business in

19     these countries that you have to have some basic

20     understanding of before you go and start making deals.

21         Q.    Did Ms. Ortega possess all of the

22     qualifications for handling the accounts that

23     Mr. Gisbert left when he left the company?

24         A.    I would say generally she did, yeah.  She

25     didn't have as much working knowledge of the Bahamas

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1      specifically, but yes.

2           Q.    Why was only one of the accounts assigned to

3      Ms. Ortega?

4           A.    As I said in my earlier testimony, the

5      decision to assign the accounts for Mr. Gisbert to

6      Mr. Ready was based on the need to meet head count

7      reduction goals and the fact that he had come to me and

8      asked for an opportunity in outside sales, asked to

9      be -- to have this territory, so -- and he was

10     completely qualified as well.  Had more years of paper

11     knowledge than Ms. Ortega or CeCe or anyone else almost.

12     He had plenty of paper knowledge.

13           I was able to count his income towards our

14     headcount reduction goals, and so I assigned those

15     accounts to Mr. Ready.  Ms. Ortega got -- there were a

16     few accounts that didn't fit for whatever reason, a few

17     that were I thought too small to worry about that went

18     to CeCe or SOC, and an account that I thought was

19     Spanish speaking that might, you know -- Mr. Ready

20     didn't have -- doesn't speak Spanish, I thought might

21     fit Ms. Ortega.  Everything, though, I meant to give the

22     whole territory that made sense to Mr. Ready.

23           Q.    Now, was Mr. Ready an employee of the company

24     before he got Mr. Gisbert's account?

25           A.    Yes.

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1          Q.   So how did giving Mr. Gisbert the account

2     reduce the headcount if at all?

3          A.   Did I say I gave the accounts to Mr. Gisbert?

4          Q.   I'm sorry, let me rephrase it.

5               How if at all did giving the accounts to

6     Mr. Ready meet the headcount reduction goal?

7          A.   It didn't meet it.  It helped by taking

8     Mr. Ready out of the sales manager's position and only

9     replacing Mr. Gisbert, then I had a net minus one

10    headcount.  I lost two people -- two people left their

11    jobs.  Mr. Gisbert left sales.  Mr. Ready left sales

12    management, and I only hired one back, Mr. Ready, into

13    sales, so I could count Mr. Ready's salary as a head

14    manager against our reduction.  I was charged with

15    reducing $150,000 in headcount, and because I was able

16    to count him, I saved an employee, Faith Fray, who, you

17    know, I would have had to otherwise lay off.

18         Q.   So was the goal to get rid of people or just

19    to reduce some -- to reduce a number?

20         A.   The goal was to reduce expense because we are

21    as a company unprofitable or not acceptably profitable.

22         Q.   And was that goal ever reduced to writing?

23         A.   Yes, ma'am, I believe it was, and I believe

24    it was -- it was provided in earlier documents.  I don't

25    have that document with me today, but it was provided.

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1              Q.    What documents are you referring to?
 2              A.    It was a memo from human resources or Paul
 3       Stewart that, basically, spelled out the requirements.
 4       I sent a memo to Paul Stewart answering my original
 5       plan.
 6              Q.    When we take a break, I'll find that memo.
 7              So you sent a memo to Paul Stewart about this
 8       headcount reduction goal?
 9              A.    Uh-huh.
10              Q.    And how is Mr. Stewart's last name spelled?
11              A.    S-T-E-W-A-R-T.
12              Q.    And when Mr. Ready got Mr. Gisbert's
13       accounts, how if any -- what, if any, dollars did the
14       company save by giving the accounts to Mr. Ready?
15              A.    We did not replace Mr. Ready's job.
16              Q.    I'm sorry, let me rephrase this.
17              When the accounts were given from Mr. Gisbert
18       to Mr. Ready, what, if any, money did the company save
19       in expenses?
20              A.    Mr. Ready's salary as a sales manager.  We
21       continued to pay the commissions on the accounts.  In
22       the past we would have paid them to Mr. Gisbert.  In the
23       future we paid them to Mr. Ready, only now we didn't
24       continue to pay a sales manager also.
25              Q.    Now, did Mr. Ready keep the same salary after
```

1   he received the accounts from Mr. Gisbert?

2        A.    We paid him all commissions, straight

3   commissions almost from day one.  I think it was from

4   day one.  We gave him a two-year guarantee that we

5   wouldn't allow him to make less money than he had made

6   before.

7        Q.    And was that guarantee ever reduced to

8   writing?

9        A.    There is an offer letter in his human

10  resources file in Jacksonville that would have that

11  offer.

12       Q.    And what was the two-year time frame?

13       A.    I don't -- from the date of this move

14  approximately March, April of 1999 until approximately

15  March, April of 2001.

16       Q.    Now, who made the decision to reassign Gene

17  Press's account when he left the company?

18       A.    Gene Press left prior to my arriving and Gene

19  Press was replaced by Bob Mckey, so Bob Mckey and Bill

20  Ready would have been responsible for reassigning those

21  accounts.  Ultimately, I got involved and assigned some

22  accounts to -- or asked Bill Ready to assign some

23  accounts to Betty Ortega, but it was much later.

24       Q.    To whom were Gene Press's accounts reassigned

25  after he left?

```
 1              A.    You know, without knowing every account that
 2      he had ever called on, I don't know.  This list looks to
 3      be as close to any document that might exist of accounts
 4      that Gene Press had called on, but it's only a snapshot
 5      and certainly doesn't contain everything.
 6                   MR. ENJAMIO:  You say this list, what are
 7              you referring to?
 8                   THE WITNESS:  I'm sorry.  I'm referring
 9              to the list on page 39.
10                   MR. ENJAMIO:  On tab 39.
11                   THE WITNESS:  Tab 39.  So -- and I
12              haven't maintained this list anywhere.  I mean,
13              I don't have this in the file of any kind.
14                   MS. DALEY:  Can you mark my last
15              questions and the two follow-ups?
16                   THE WITNESS:  Can you repeat the question
17              again?  I'm not sure I answered your question.
18                   MS. DALEY:  Can you repeat my last
19              question.
20                   (Thereupon, the above-referred to question
21      was read back by the reporter.)
22                   THE WITNESS:  I don't know with
23              certainty.  I don't know that that's a complete
24              listing of his accounts, and without that, I
25              couldn't tell you where all those accounts were
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1              reassigned to.

2                  MR. ENJAMIO: And, again, let the record

3              reflect that when the witness said that he was

4              referring to the list on tab 39.

5      BY MS. DALEY:

6          Q.   Now, which page of the list on tab 39 are you

7      referring to?

8          A.   The first two pages after my note.

9          Q.   Now, who within the company would know which

10     accounts Mr. Press left when he separated from the

11     company?

12         A.   I don't think anyone would. It would depend

13     on some document like this that happened to be the day

14     he left, it reflected everything he was selling, and

15     I -- you know, this is the only document even remotely

16     like that, so I don't know if anyone would know. I

17     don't assume anyone would know.

18         Q.   Prior to taking your deposition today, did

19     you make any inquiry of anyone to find out which

20     accounts Mr. Press had when he left the company?

21         A.   It would either be something that Bill Ready

22     maintained or myself. I asked Bill Ready if he had a

23     record of this. He did not.

24         Q.   Did you ask anybody else?

25         A.   No. As I mentioned, it would be something

BRICKELL, GOMBERG & ASSOCIATES, INC. (954) 522-0067

1    either Mr. Ready would maintain or that I would

2    maintain.  The system -- you know, we wouldn't maintain

3    these files this old as a rule.

4              MS. DALEY:  Can you mark the next few

5              questions until I tell you to stop?

6    BY MS. DALEY:

7         Q.   So would you be able to tell me the value of

8    the accounts when they were reassigned from Gene Press

9    to whomever got it afterwards?

10        A.   No, ma'am.

11        Q.   Would you be able to tell me the

12   qualifications for handling the accounts that

13   Mr. Press -- Mr. Gene Press had when he left the

14   company?

15        A.   If I had an accurate listing, I would be able

16   to tell you what the qualifications were.  If I knew

17   what everything -- every account that was in there, if

18   they were web accounts in there or if they were export

19   accounts in there or if they were sheet fed accounts,

20   but since I don't have an accurate listing, I can't

21   answer that question.

22        Q.   Would you be able to tell me if there was any

23   type of delay in reassigning the accounts after

24   Mr. Press left?

25        A.   I understand from Mr. Ready and from my

1    conversations with Betty Ortega that there were quite a

2    few of his export accounts that were not assigned.

3    Mr. Ready stated that they were not assigned because he

4    felt the house had managed them and we could save the

5    expense to cut the selling expense.

6        Q.    And when did you have -- you stop now.  When

7    did you have the conversation with Mr. Ready in which

8    you asked him to assign some of the accounts to

9    Ms. Ortega?

10        A.    I can't recall the specific dates.

11        Q.    Do you remember the year?

12        A.    Not -- not accurately, no, ma'am.

13        Q.    And why did you have that conversation with

14    Mr. Ready?

15        A.    Ms. Ortega had come to me and asked me about

16    some of those accounts.

17        Q.    And how many were ultimately assigned to

18    Ms. Ortega?

19        A.    I can't accurately state.

20            MS. DALEY:  Can you mark that question?

21    BY MS. DALEY:

22        Q.    Now, moving now to Mike Altose --

23            MR. ENJAMIO:  Could we take a break for

24        two seconds?

25            MS. DALEY:  Sure.

```
 1              (Thereupon, a recess was taken.)

 2      BY MS. DALEY:

 3          Q.   Item 22, which accounts did Mr. Altose leave

 4      when he separated from the company?

 5          A.   I don't have those records.  If I can see

 6      MC3112.

 7               Okay.  The only record of accounts that I can

 8      find are from 1994, and I do not know if this is a

 9      complete listing.  The other way to get to this would be

10      to go through each commission statement from 1994 and

11      pull out the accounts one by one by one week by week by

12      week.  This report, it was part of what we produced, the

13      MC3110 through period six, and it has a listing of

14      accounts.  Want me to read these accounts to you or just

15      want me to cite this page --

16          Q.   Yeah, just go ahead and read the accounts.

17               MS. DALEY:  Can you mark the question and

18          his answer?

19               THE WITNESS:  Franklin Press, American

20          National, Sunniland Press, Roads Printing,

21          Central Press, Best University Printing & Copy,

22          Fafco (phonetic) Incorporated, The Menu Man,

23          Bruno Corporation, Ross Offset, Image Express,

24          Copy Express, Impressions of Miami, Jeff

25          Silverman & Associates, Rex 3, Bell Business
```

```
 1              Forms, JS Palooch (phonetic), Vista Color,
 2              Evaco (phonetic), Carry Graph Corp., Janele
 3              (phonetic), Hampshire Engraving.
 4         Q.    And just for the record, you're referring to
 5    the customer sales report for period -- for the year
 6    1994 period six; is that correct?
 7         A.    Uh-huh.
 8         Q.    And it's dated April 1st, 1994?
 9         A.    Uh-huh.
10         Q.    And it's, also, referred to as MC3110 report.
11              Now, with respect to the other steps --
12         A.    But that -- I have no idea if that's all
13    inclusive.
14         Q.    What, if any, efforts did you take to
15    determine prior to this deposition the other accounts
16    that Mr. Altose left when he separated from the company?
17         A.    I provided this, and I, also -- we, also,
18    provided all the commission statements for those years
19    which you could go back and sort week by week person by
20    person and account by account and put it together.
21         Q.    But you don't have that testimony for me
22    today; do you?
23         A.    No.  I have -- we have not gone through all
24    those commission statements and added all those accounts
25    up.  We provided this report.
```

```
 1                    MS. DALEY:  Can you mark that?

 2                    THE WITNESS:  Which is all that I could

 3          find.

 4     BY MS. DALEY:

 5          Q.   Who made the decision to reassign

 6     Mr. Altose's account?

 7          A.   Mr. Altose worked at the time for Burt

 8     Guschelle and also for Gene Press.

 9          Q.   Anybody else?

10          A.   Not that I'm aware of, no.

11          Q.   And to whom were Mr. Altose's accounts

12     reassigned after he left?

13          A.   There's no way to tell conclusively.  They've

14     been assigned many times since he's left.

15          Q.   And to whom were they initially reassigned

16     after he left?

17          A.   We have no records of that.

18          Q.   Did you speak to anyone to determine -- let

19     me rephrase that.

20               What, if any, efforts did you take to

21     determine for purposes of giving your testimony today to

22     whom Mr. Altose's accounts were reassigned after he left

23     the company?

24          A.   Mr. Press and Mr. Guschelle are no longer --

25     are no longer with the company.  I asked Mr. Ready what
```

1    he could recollect of this, and he informed me that he

2    was not involved, that he was not responsible for

3    reassigning those accounts.

4        Q.    Any other efforts to determine to whom the

5    accounts were reassigned?

6        A.    Only the commission statements that if you --

7    if you looked in the commission statements and track

8    week by week by week after his last date of termination,

9    you could find what those accounts ultimately showed up

10    again.

11        Q.    But you did not do that in preparation for

12    giving your testimony today?

13        A.    We only provided the documents.

14            MR. ENJAMIO:  I object to the line of

15        questioning to the extent there's any

16        assumption that he had a duty to do that by

17        which we do not believe.  I'm not instructing

18        him not to answer but continue.

19            MS. DALEY:  And your objection is noted,

20        I disagree, because it's a combined request to

21        produce.  And can you mark the last five

22        questions that I asked?

23            MR. ENJAMIO:  When you say combined

24        request to produce.

25            MS. DALEY:  Look at the deposition

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1              notice.  It's a combined request for

 2              production.  I'm referring to exhibit number

 3              26 -- 25, the second deposition notice.

 4                   MR. ENJAMIO:  Twenty-five?

 5                   MS. DALEY:  Sorry, 26.

 6                   MR. ENJAMIO:  Well, the only part,

 7              though, that relates to documents is a

 8              paragraph that says, "Any and all documents

 9              relied upon in giving testimony on the

10              designated matters."  Correct.

11                   MS. DALEY:  Correct, but I'm assuming

12              that he's going to come here and give testimony

13              with respect to each of one of the areas.

14                   MR. ENJAMIO:  To the extent that any

15              documents exist.

16                   MS. DALEY:  But he's telling me that

17              documents exist, but he didn't bring them.  He

18              didn't even give me information with respect to

19              Mr. Altose's account.

20                   MR. ENJAMIO:  We don't need to argue

21              this, but I thought he said we have provided

22              that information and had it available to you

23              for months.

24                   MS. DALEY:  Today.  Today is his

25              deposition.  We want to know and this is why we
```

```
 1        do a 30(b)(6).

 2             MR. ENJAMIO:  No, I understand just so

 3        it's clear because I don't want to create a

 4        problem where there isn't one, I mean, there's

 5        no way that we can construct information that

 6        doesn't exist.  To the extent there's someone

 7        in the company that assigned those accounts,

 8        for example, Mike Altose's accounts, then

 9        certainly we are under a duty to provide that

10        information and forgive it to you.

11             I think the testimony -- I may be

12        wrong -- you all can go back and read the

13        record -- was that none of those people are

14        working in the company now, and that we

15        provided you with all the information that is

16        readily available here today for that.  Now, I

17        think that's all we can do, and that's all we

18        have a duty to do.

19             MS. DALEY:  Like I said, this is an issue

20        we're going to have to brief with respect to

21        his account, and the reason why I haven't

22        briefed Amy George's portion yet because we

23        have that same type of problem and this is

24        something I disagree.  In each one of the areas

25        you're suppose to tell me, and there's a
```

```
 1              certain duty under the rules to affirmatively
 2              search for the information --
 3                   MR. ENJAMIO:  There's no question about
 4              it.
 5                   MS. DALEY:  -- and to give it to us.
 6                   MR. ENJAMIO:  But just to be clear,
 7              again, there's no reason to belabor the record
 8              a lot, but just to be clear, if the only way to
 9              gather that information is to spend days and
10              weeks going through documents that were equally
11              available to you, I don't think there's any
12              duty on the part of the deponent to do that.
13                   MS. DALEY:  There is.  This is what a
14              30(b)(6) notice is for.
15                   MR. ENJAMIO:  We disagree and there's no
16              need to argue.
17                   MS. DALEY:  And we'll address it in
18              another motion to compel.
19                   MR. ENJAMIO:  Of course, and that's
20              perfectly fine, and we can talk about it
21              outside of the record.
22                   MS. DALEY:  I've already --
23                   MR. ENJAMIO:  You've already what, I'm
24              sorry?
25                   MS. DALEY:  I'm trying to see what I have
```

1          left with respect to Mike Altose to ask.

2     BY MS. DALEY:

3          Q.    Let's move to Dennis Laux now.  Can you tell

4     me the names of the accounts that Mr. Laux handled just

5     before he left the company?

6          A.    Yes, ma'am.  KER Printing, Genesis Press,

7     Colonial Press, CPS Communications, Sepson (phonetic)

8     Eggs, Papersmith, Sun Sentinel, Ameridisk (phonetic),

9     Miami Herald, Universal Printing, The Film Company,

10     Benchmark Press, The Flyer, Graphic Technology, Health

11     Communications -- no, he didn't actually -- that may

12     have still been on his number, but he wasn't permitted

13     to call on that account at that time.  Megabyte Design,

14     Sun Art Designs, Type Works.

15          Q.    And what document are you reading from?

16          A.    I'm reading from the MI3050 report that's

17     dated 11/28/98 which was one month before he left.  To

18     the best of my belief -- this is the only document that

19     we had that was right around -- just before that I could

20     find.

21          Q.    I'll mark that report as exhibit number 41.

22               Is there any other way to tell if he handled

23     any other accounts at the time that he left the company?

24          A.    Going through all the commission statements.

25          Q.    And do you know if the commission statements

```
 1        would reveal the names of any other accounts that are
 2        not listed on the MI3050 report that you have in front
 3        of you?
 4             A.    It's my belief that these were the accounts
 5        he was selling at the time he left.
 6             Q.    And to whom were those accounts assigned
 7        after he left?
 8             A.    KER Printing was assigned to Jim Ware.
 9        Genesis Press is currently on a house, but it's because
10        of credit problems.  Colonial Press --
11             Q.    Genesis, was it assigned to someone initially
12        before it went to the house?
13             A.    I can't recall.
14             Q.    And how would you be able to determine that?
15             A.    Going back through the commission statements
16        and --
17             Q.    Did you finish your answer?
18             A.    Yes.
19             Q.    And did you do that to determine who got the
20        initial assignment before the account went to the house
21        in preparation for your deposition testimony today?
22             A.    No.  No, and the reason is is because even if
23        I assign it to someone else and they didn't write any
24        sales on it, it wouldn't show up on the commission
25        statements either, so -- we had problems with Genesis
```

```
1     Press paying, and I can't -- I don't believe I assigned
2     it to anyone else.
3          Q.    And which other accounts on the list were --
4     can you tell me who else the other accounts on the list
5     were assigned to?
6          A.    Sure.  Colonial Press, this is one that --
7     Colonial Press is where CPS Communications, Rich Crane.
8     Sepson Eggs was Betty Ortega.
9          Q.    Colonial Press was Rich Crane?
10         A.    Uh-huh.  No.  Yes.  No.  Sorry.  Colonial
11    Press was Jim Ware.  You're recording and you're
12    recording.  CPS was Rich Crane.  Sepson Eggs was Ortega.
13    Papersmith went legal.
14         Q.    What does that mean?
15         A.    Means we're suing them for payment.
16               Sun Sentinel was to Sullivan.  Ameridisk is
17    house.
18         Q.    Was it initially signed to the house after
19    Mr. Laux left?  Did you respond?
20         A.    No, I'm -- I'm sorry, I can't be sure.
21         Q.    And is there any way for us to know or any
22    steps we can take to determine if that account was
23    initially assigned to a representative after Mr. Laux
24    left before it went to the house?
25         A.    I could look through the commission
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    statements and see if it appeared on someone else's

2    commission statement.

3    Q.    Are there any other accounts on the list that

4    you did not tell me who it was reassigned to after

5    Mr. Laux left?

6    A.    No.  I'm only halfway through the list.

7    Universal Printing, Ware.  The Film Company is legal.

8    Benchmark Press is legal -- was legal at the time they

9    left.  The Flyer was -- is Bill Ready, but it was

10   initially Jim Ware.  Graphic technologies went to house.

11   Q.    Do you know if it went to someone before it

12   went to house?

13   A.    It was -- I can't be positive, but I don't

14   believe so, no.

15   Q.    Continue.

16   A.    Health Communications, at the time that he

17   left was still on his number, but they weren't buying

18   anything from Unisource.  They were upset with

19   Unisource.  It was on his number.  I began calling on

20   them myself in January, February of 1999 and got the

21   business back, and I maintained healthy communications

22   as a house account since then.

23   Q.    Continue.

24   A.    Megabyte Design, house, SOC.  Sun Art was

25   legal.  Type Works is Bobby Vega's.

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1              Q.    Are you finished?

 2              A.    Yes, ma'am.

 3              Q.    And who reassigned those accounts after

 4        Mr. Laux left?

 5              A.    I made some of these reassignments.  Bill

 6        Ready may have, also, made a couple of these

 7        reassignments.

 8              Q.    Is there any way for you to tell me which

 9        ones you made and which ones Mr. Ready made.

10              A.    Didn't keep detailed of all these, no.

11              Q.    Are there any documents you can look at to

12        tell you which ones you reassigned and which ones

13        Mr. Ready did?

14              A.    The system doesn't keep it, no, ma'am.

15              Q.    And what type of accounts did Mr. Laux leave

16        when he separated from the company?

17              A.    What kind of accounts did Mr. Laux leave when

18        he separated from the company?  I'm sorry, I'm doing

19        that again, I'm repeating the question.  Forgive me.

20                    Most of these were -- there were web accounts

21        in here.  There's a couple of zero graphics only type

22        accounts in here.  There's a couple of cut size accounts

23        in here.

24              Q.    Which ones were the web accounts?

25              A.    KER, Colonial, The Flyer, Health, Universal I
```

```
 1    believe is web.
 2         Q.    And what does cut size refer to?
 3         A.    I'm sorry, it's terminology we use for papers
 4    that are cut like this, not big folio sizes.
 5         Q.    When you say like this, do you mean eight and
 6    a half by eleven?
 7         A.    Yes, ma'am.  Well, eight and a half by
 8    fourteen, eleven by seventeen.
 9         Q.    How if at all does that differ from a sheet
10    fed account?
11         A.    It is, in fact, sheet fed.  I mean, they're
12    sheets of eight and a half by eleven.  They can be for
13    either quick prints, you know, quick prints small format
14    press shops or for resale to copiers, that kind of
15    thing.
16         Q.    Now, looking at the list in front of you, are
17    there any of those accounts that Ms. Ortega was not
18    qualified to handle?
19         A.    Ms. Ortega didn't have extensive -- she
20    didn't call on my heat set web accounts that I'm aware
21    of.
22         Q.    Tell me the names of the accounts that you
23    felt that Ms. Ortega was not qualified to handle on that
24    list?
25         A.    On that basis?
```

```
 1            Q.   On that list.
 2            A.   KER Printing, Colonial primarily.
 3            Q.   Any others?
 4            A.   There were a few other web ones here, but I
 5       think they were uncoded web.
 6            Q.   So KER and Colonial are heat set web
 7       accounts?
 8            A.   Yes, ma'am.
 9            Q.   Do you know if Colonial was an account that
10       Ms. Ortega handled when she was with Butler Paper?
11            A.   I wouldn't have that knowledge, no, ma'am.
12       If she had had it and done something with it and
13       exceeded -- or succeeded with Colonial Press, she
14       probably would still have it.
15            Q.   But I'm trying to determine if you know if
16       Colonial was an account that Ms. Ortega had at Butler
17       Paper?
18                 MR. ENJAMIO:   Asked and answered.
19                 THE WITNESS:   That's right, I answered
20            the question.
21       BY MS. DALEY:
22            Q.   And so you don't know?
23            A.   That's correct.
24            Q.   And what criteria was used for reassigning
25       the accounts that Mr. Laux handled just before he left
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    the company?

2         A.    A lot of the larger accounts were given to

3    Jim Ware.  I wanted someone that had experience working

4    with larger accounts, someone that could dedicate a lot

5    of their time.  I wanted -- I tried not to spread the

6    existing accounts around -- the bigger accounts around

7    to existing salespeople too much because I wanted the

8    territory to be really dedicated to.  It took me a

9    couple months to get someone hired, and I wanted someone

10   that could be focussed on those accounts, to bring those

11   accounts back.

12             As I say, the bigger accounts I gave to Jim

13   Ware who had big account experience and could dedicate

14   and focus his time and energy.  There was Sepson Eggs

15   was an export account that I gave to Betty Ortega.

16   Actually, it was in Puerto Rico, but for practical

17   purposes involves ocean shipping and so that was given

18   to Betty Ortega.  A lot of these went to house because

19   they were legal, you know, they were credit problems.

20   That was generally the criteria.

21        Q.    When you say larger accounts, does larger

22   refer to the income that's generated by the account?

23        A.    It refers to the -- I think I explained this

24   in my testimony the other day.  It generally refers to

25   accounts that are larger press format, can buy in full

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1     truckload quantities and yes, would relate to a greater

2     sales opportunity.

3          Q.    Now, had Ms. Ortega handled any of those type

4     accounts before you assigned these accounts for Mr. Laux

5     to Mr. Ware?

6          A.    Large accounts?

7          Q.    The larger accounts that you're referring to.

8          A.    Specifically these accounts or larger

9     accounts in general as I've described them?

10         Q.    You just told me what larger accounts are.  I

11    want to know if prior to assigning the accounts -- the

12    larger accounts that Mr. Laux used to handle to

13    Mr. Ware, if Ms. Ortega had handled similar larger

14    accounts before that time frame?

15         A.    I don't -- wasn't aware of any web -- heat

16    set web -- large heat set web accounts that she had

17    managed, but she had managed some large commercial

18    printers before, yes.

19         Q.    And how many years of experience did Mr. Ware

20    have in handling the larger accounts that were assigned

21    to him?

22         A.    Him, I don't know specifically how many

23    years.

24         Q.    Does -- I'm moving now to area 16.

25               Between 1996 and the present, did Unisource

```
 1       have any written criteria regarding how accounts should
 2       be assigned or transferred with respect to the divisions
 3       where Ms. Ortega worked?
 4               MR. ENJAMIO:   I'm going to object to the
 5           extent it was asked and answered in the first
 6           session of this 30(b)(6) deposition.  You may
 7           answer again.
 8               THE WITNESS:   I'm not aware of any
 9           written policies regarding the transfer of
10           accounts.
11       BY MS. DALEY:
12           Q.    Let me check my notes.  I don't think it was
13       covered, but I'll double check.  If it was, I'll just
14       move on.
15               What criteria was used between 1996 and the
16       present for assigning accounts to representatives in the
17       divisions where Ms. Ortega worked?
18           A.    We looked for sales reps that have the right
19       product knowledge, industry knowledge: When I say
20       industry knowledge, I'm talking about, for example,
21       export or web and intricacies of those industries.  We
22       look for the right personal skill set match.  It's a
23       corporate type account, does the sales rep have
24       corporate presentation skills.  And in some cases --
25       when you ask criteria, that's not -- it's not
```

1    motivation.  With Bill ready, you know, we were doing it

2    for the reasons that I mentioned earlier, but we still

3    needed to have product knowledge and industry knowledge

4    and the right skill set.

5        Q.    Anything else?

6        A.    I don't think so.  We considered geography --

7    excuse me, tried to keep someone focussed in a fairly --

8    it doesn't always work, but we try to pay attention to

9    geography as well.

10       Q.    Do you know if all of the people who were

11   assigning the accounts between 1996 and 1998 used the

12   same criteria for assigning accounts?

13       A.    I think so.  I think it's common sense.

14       Q.    And how do you know that everyone who

15   assigned accounts between 1996 and the present used the

16   same criteria for assigning accounts?

17       A.    Again, it's basic business sense.  I've

18   never -- it's basic business sense.  I don't know what

19   else to say about that.

20       Q.    What I'm trying to determine is if you, in

21   preparation for your deposition today, did you ask or

22   take any efforts to determine if all of the people who

23   are assigning accounts between 1996 and the present all

24   used the same criteria that you just testified about

25   with respect to assigning those accounts?

```
 1              A.    Well, I've been the division manager there

 2         during that period of time, and I've sat in on territory

 3         reviews with just about every manager that we have, and

 4         those appear to be their guiding philosophies.

 5                    MS. DALEY:  Let me look at my notes.

 6                    (Thereupon, a recess was taken.)

 7         BY MS. DALEY:

 8              Q.    Previously, you testified about the

 9         instructions that you got to reduce expenses.

10              A.    Yes, ma'am.

11              Q.    If you got that instruction, why was

12         Mr. Ready given a two-year salary commitment?

13              A.    I answered this when I talked about these two

14         gentlemen, but I'll go through this for you again.  Tony

15         Gisbert was earning I don't know the exact number, but

16         for round numbers $90,000 in commissions on the

17         territory that he managed.  Bill Ready was earning -- I

18         don't know the exact number, but for the sake of this

19         discussion $90,000 as a sales manager, okay.  If after I

20         make this transfer, I'm still only paying Bill Ready

21         $930,000 in commissions, I'm not paying anybody $90,000

22         in salary, I have reduced the headcount.  We did not

23         replace Lou cam know until a month ago.  For the

24         entire -- that year and four month period we reduced

25         that headcount.
```

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1        Q.    Would you not have saved more money if Ready

2    was just paid on straight commission as opposed to a

3    two-year salary commitment?

4        A.    He is on straight commission, but we just

5    secured his salary.  We said if something happened

6    catastrophic, we would cover you to make no less than

7    your old salary for that period of time.

8        Q.    So what I'm trying to determine is why was

9    that commitment made?

10       A.    Thirty --

11            MR. ENJAMIO:  Let me just object to the

12            extent that it's outside the scope of the

13            30(b)(6), but you may answer.

14            THE WITNESS:  Just because he's a 30-year

15            plus employee and he was making a transition

16            into a territory that was, you know -- you

17            know, he had been a manager for 30 years going

18            into sales, we just felt we owed him that --

19            that consideration.  I'm being -- exaggerating.

20            I don't know how many years it was, 30, 33

21            something like that.

22    BY MS. DALEY:

23       Q.    Did you finish your answer?

24       A.    Yes, ma'am.

25       Q.    I'm just going to ask you a few questions now

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1        about the last fax that we got, which I'm going to refer
 2        to as exhibit number 42 -- composite exhibit number 42.
 3        And these all look like sales representative commitment
 4        summaries and sales representative evaluations for the
 5        period 1997 and 1998.  I'm going to -- if you can just
 6        tell me what the purpose of each one of those reports
 7        are referring to the Bates number that's stamped on the
 8        bottom.
 9             A.    DEF03786, this representative tells us for
10        all the reps listed what their sales quotas were for
11        each quarter and then the full year, and it has their
12        gross profit quota for each quarter and then full year,
13        and then it tells me on the column here on the side what
14        their margin percentage plan was for the full year.
15        This is the second Page.  DEF03787 is just a
16        continuation of -- it has all the supply systems reps
17        listed.  Sales rep evaluation form, basically, has an
18        evaluation rating of their -- you know, how they're
19        reviewed internally and their skill set levels.
20                   It also has segments that they focussed on,
21        the core customer segments.  It has their -- it's a
22        snapshot this year versus last year in the percentage
23        chain sales.  This year versus last year percentage
24        gross profit; this year versus last year gross profit.
25             Q.    On 0787 are those figures for year end total
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    gross or actual year end numbers?

2         A.    It should be -- let's look for one here a

3    second.  All it does is this first sheet, DEF03786,

4    gives it to me by quarter and then it gives me the full

5    year of sales by quarter and full year of gross profit.

6         Q.    Are those figures projections or year end

7    figures?

8         A.    Projections.  Plans.  And if you go over here

9    on this sheet, DEF03790, you'll find Cathy Healy's.

10   That's the same number 16660 for total sales projection

11   that you found here.  This just breaks it out by

12   quarter.  This gives it to you in a one shot what's her

13   total year plan for next year sales.  This gives you

14   what she did actually in 1996 and this gives you the

15   percentage of change we're asking for from her.

16        Q.    So the last report that you're referring to

17   is DEF03790, and you're saying in the 1997 column, it

18   gives you projections and in the 1996 column it gives

19   you the actual figure on the total sales?

20        A.    That's correct.

21        Q.    How about with gross profit; how does that

22   work?

23        A.    Exact same way.

24        Q.    Can you turn to the next page and tell me

25   what that is?

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1          A.    Sure.  These are more of the same just
 2     finishing out 1997 just more of the sales receipts.
 3     Then you go to 19 -- this is DEF03792.  This is for
 4     1998.  This is the evaluation form that you saw over
 5     here, which gives you -- it's hard to read the names,
 6     but you have the names of the sales reps, their segment
 7     that they focussed in, it gives you their 1998
 8     projection versus their 1997 actual and a percentage of
 9     change.
10          Q.    So the percentage of change compares the 1998
11     projection and the 1997 actual?
12          A.    Tells you what kind of a percentage of growth
13     we were expecting by rep.
14          Q.    Continue.
15          A.    More of the same, just more sales reps
16     listed.
17          Q.    And that's -- tell me the number that you
18     said that's more of the same?
19          A.    DEF03794 that's the rest of the supply reps.
20     DEF03794, that's the the sales reps commitment, it's
21     like the first one, and it gives you the sales
22     projection for the year by quarter and full year and it
23     gives you the gross profit commitment by quarter and
24     then the full year and the full year gross profit
25     percentage plan.  This is 1998 exactly as this was 1997.
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    Q.    And that's DEF0 --

2    A.    786 is the same as DEF03794 except for the

3    different year.  This is more of the same of 03795 is a

4    continuation of continuation of 03794 just with the rest

5    of the reps listed.  1999 was a different year.

6    Q.    And is it a different form that's being used?

7    A.    It is.

8    Q.    How does the form differ?

9    A.    Well, it's just cleaner.  Actually, it breaks

10   out by sales reps instead of going to two different

11   forms, it breaks out by sales rep their fine paper sales

12   and supply system sales by each quarter, full year, each

13   quarter gross profit, full year and gross profit margin.

14   It's the equivalent of -- DEF03796 is the equivalent of

15   the very first one that I showed you, DEF03786 but for

16   year 1999.

17   Q.    Continue.

18   A.    037917 is a continuation of 796 just listing

19   more reps.  7918 i a continuation just listing more

20   reps.  03799, more reps.  Because I did it this way, it

21   takes more sheets.  03800 more reps.  03801 is more

22   reps.  Keeps on going.  03802 is more reps.  03803 is

23   more reps.  03804 is more reps.  03805 is more reps.

24   03806 is more reps.  03807 is more reps.  03808 is more

25   reps.  03809 is more reps.  See all this is the

1    equivalent of one line on there.  And then 03810 is more

2    reps and that's it for that.

3         Q.    And what --

4         A.    Am I looking at now.

5         Q.    The last page?

6         A.    03811 are the sales rep commitment sheets for

7    the year 2000, and this form goes back to -- we went

8    back to what we used to use, so D303811 is the

9    equivalent form to DEF03786, the very first one.  It

10   lists sales by quarter, sales full year, gross profit by

11   quarter, gross profit full year and gross profit

12   percentage for the full year.  And the last one, 03812

13   is the equivalent of the evaluation forms we used to

14   use.

15        In fact, they still call it evaluation form

16   which gives you the total sales, their course segment,

17   the total gross profit, and then has the versus prior

18   years, so it's sales plan versus prior year actual

19   percentage of change.  Gross profit plan versus prior

20   actual percentage of change.  Gross profit percentage

21   plan versus prior actual percentage of change.

22        Q.    I have no further questions except the

23   comment is made about moving to compel, and do you want

24   to read or waive?

25        MR. ENJAMIO:  We'll waive.  We have no

```
 1              questions.

 2                   THE REPORTER:  If this is ordered, do you

 3              want a copy?

 4                   MR. ENJAMIO:  Please.

 5                   (Thereupon, the deposition was concluded at

 6         5:08 p.m.)

 7                        -- -- -- -- --

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10                          STIPULATION
11              It is hereby stipulated by and between
12      counsel for the respective parties and the witness that
13      the reading and signing of the foregoing deposition are
14      hereby waived.
15
16
17              AND FURTHER DEPONENT SAITH NOT.
18
19
20                     -- -- -- -- --
21
22
23
24
25
```

```
1

2                          CERTIFICATE OF OATH

3

4       STATE OF FLORIDA  )
                          )   SS.
5       COUNTY OF BROWARD )

6

7                        I, the undersigned authority, certify
        that JOHN GLAZE personally appeared before
8       me and was duly sworn.

9                        WITNESS my hand and official seal this
        21st day of November, 2000.
10

11

12

13

14       _____
         MAUREEN A. VISCUSO, RPR, Notary
15       Public, State of Florida at
         Large.
16
        My Commission Expires:
17      September 27, 2000

18

19

20

21

22

23

24

25
```

MAUREEN A. VISCUSO
MY COMMISSION # CC 958945
EXPIRES: September 27, 2004
Bonded Thru Notary Public Underwriters

CERTIFICATE

STATE OF FLORIDA    )
                    )  SS.
COUNTY OF BROWARD    )

I, MAUREEN A. VISCUSO, RPR, a Registered Professional Reporter, do hereby certify that pursuant to Notice of Taking Deposition in the above-styled cause, that I was authorized to and did stenographically report the foregoing deposition as hereinabove shown, and the testimony of said witness was reduced to computer transcription under my personal supervision.

I further certify that the said deposition was taken at the time and place specified hereinabove, and that I am neither of counsel nor solicitor to either of the parties in said suit nor interested in the event of the cause.

I further certify that I have delivered the original copy of said deposition to JUAN C. ENJAMIO, ESQ., to be retained by him pending further order of the court.

WITNESS my hand and official seal in the City of Fort Lauderdale, County of Broward, State of Florida, this 21st day of November, 2000.

_____
MAUREEN A. VISCUSO, RPR, Registered
Professional Reporter

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF FLORIDA
2                 FORT LAUDERDALE DIVISION

3
                  CASE NO. 00-6126-CIV-DIMITROULEAS
4

5    BETTY ORTEGA,

6              Plaintiff,          **ORIGINAL**

7         v.

8    UNISOURCE WORLDWIDE, INC., a
     foreign corporation,
9

10             Defendant.

11   - - - - - - - - - - - - - - - - - - x

12

13                      Two South Biscayne Boulevard
                        Suite 2500
14                      Miami, Florida
                        Tuesday, July 25, 2000
15                      10:05 a.m.- 12:05 p.m.
                        1:20 p.m.- 4:15 p.m.
16

17

18

19             DEPOSITION OF BETTY ORTEGA

20

21        Taken before Edward Varkonyi, Registered

22   Professional Reporter and Notary Public for the State

23   of Florida at Large, pursuant to Notice of Taking

24   Deposition filed in the above cause.



H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

```
 1                         APPEARANCES

 2

 3              JENNIFER DALEY, ESQ., of the firm of
                Amlong & Amlong, P.A.,
 4              on behalf of the Plaintiff.

 5              ROBERT H. BUCKLER, ESQ., and
                ROBERT C. STEVENS, ESQ., of the firm of
 6              Troutman Sanders, LLP,
                and
 7              JUAN C. ENJAMIO, ESQ., of the firm of
                Hunton & Williams,
 8              on behalf of the Defendant.

 9              ALSO PRESENT:   John Glaze
                                Amy George
10                              Thomas E. O'Connor, Jr.,
                Senior Counsel, Georgia Pacific Corporation

11

12                          I N D E X
           Witness       Direct    Cross    Red.    Rec.
13    BETTY ORTEGA          3        176     184     --

14                        E X H I B I T S
      Deposition                               For Ident.
15    1....................................................  15
      2....................................................  17
16    3....................................................  22
      4....................................................  36
17    5....................................................  41
      6....................................................  41
18    7....................................................  98
      8....................................................  99
19    9.................................................... 100
      10................................................... 102
20    11................................................... 107
      12................................................... 107
21    13................................................... 108
      14................................................... 108
22    15................................................... 115
      16................................................... 124
23    17................................................... 126

24
```

3

```
 1   Thereupon--
 2                         BETTY ORTEGA
 3   was called as a witness by the Defendant and, having
 4   been first duly sworn, testified as follows:
 5              MR. BUCKLER:  I don't know what the
 6         practice is down here.  My usual practice is we
 7         reserve all objections, except to the form of
 8         the question until there is an attempt to use
 9         the deposition at trial.
10              MS. DALEY:  I usually make the objections
11         that are required by the local rule, so we don't
12         waive it.
13              MR. BUCKLER:  Okay.
14              MS. DALEY:  Some judges don't go with
15         reserving everything until that time.
16              MR. BUCKLER:  Fine.  I just wanted to
17         know what rules we're playing under.
18                     DIRECT EXAMINATION
19   BY MR. BUCKLER:
20         Q.   Ms. Ortega, my name is Bob Buckler and I
21   am one of the counsel for Georgia-Pacific and I will
22   be taking your deposition today in a case that's
23   styled Betty Ortega versus Unisource Worldwide,
24   Incorporated.
```

4

1              Are you the Betty Ortega that is the

2  plaintiff in that case?

3      A.   Yes, I am.

4      Q.   I will be asking you some questions that

5  hopefully will require some simple answers, not

6  anything too complex and you will have to respond.

7              When I ask you the question, a shake of

8  the head or an uh-uh or no uh-huh, which works fine

9  if you and I are just talking doesn't quite work when

10  we got a court reporter here trying to transcribe

11  what we're saying, so you will have to give me

12  complete answers, okay?

13      A.   Okay.

14      Q.   If you have any questions or if I ask you

15  a question you don't understand, you have the right

16  to say I don't understand what you are asking, and

17  tell me that you don't understand it.

18      A.   Okay.

19      Q.   Let me get some preliminaries out of the

20  way before we get into the specifics of the

21  complaint.  Your education.  What's the extent of

22  your education?

23      A.   I have an associate's in arts and I have

24  an associate's in business administration.

1          Q.    From where?

2          A.    Miami-Dade Community College, and one

3    year of FIU.

4          Q.    One year of FIU?

5          A.    Florida International.

6          Q.    And what I would like for you to do is

7    start with the first job that you took after -- let

8    me back up.

9                When did you complete your associate's

10   degrees?

11         A.    '79.

12         Q.    '79.   What I would like for you to do is

13   since completing your associate's degrees bring me

14   forward with your employment history.

15               Tell me who you first worked for and the

16   position that you held after completing your

17   associate degree.

18         A.    I started working for M&M Printing.

19   After the first year I bought half of the business.

20   After my divorce I sold part of my business to my

21   associate and went to work for 12th Avenue Copy

22   Service.

23         Q.    Let back up.   I want to take each one of

24   these seriatim.   You got out and you went to work for

```
 1   M&M Printing?
 2        A.   Correct.
 3        Q.   What is the position that you held when
 4   you initially went there?
 5        A.   I was -- I did quoting.  I prepared all
 6   the jobs for the following day.  I made sure that
 7   everything was ready to go to production.
 8        Q.   When you say you quoted, you quoted
 9   prices?
10        A.   Correct.
11        Q.   And where was M&M Printing located?
12        A.   To the best -- 1005 Southwest 27th
13   Avenue, Miami.
14        Q.   Miami, okay.  And you said that shortly
15   after or a period of time after starting there you
16   bought part of the business?
17        A.   Correct.
18        Q.   And became one of the owners?
19        A.   Correct.
20        Q.   Who was your partner who owned the other
21   part?
22        A.   Manuel Montalvo.
23        Q.   And how long did you remain as a partner
24   in M&M Printing?
```

```
 1           A.   To the best of my recollection, about a
 2   year and a half.
 3           Q.   So that would bring you up to roughly
 4   what year?
 5           A.   Mid '81.
 6           Q.   And you said there was a combination of a
 7   divorce and leaving M&M Printing in there, is what I
 8   thought I heard you say.
 9           A.   Yes.   The reason I sold was I was going
10   through my divorce.
11           Q.   So you got divorced sometime in '80, '81
12   and at that point in time sold?
13           A.   Well, I got legally divorced in '87.   I
14   was separated the end of '81.
15           Q.   When you sold your part of M&M Printing,
16   who did you sell it to?
17           A.   Manuel Montalvo.
18           Q.   And at the time you sold your interest in
19   M&M Printing did you leave them as an employee also?
20           A.   No, I stayed.
21           Q.   You stayed?
22           A.   (Nods head in the affirmative.)
23           Q.   And what job did you hold after you sold
24   out your equity interest?
```

```
 1          A.    The same job I had before.

 2          Q.    Doing the same thing?

 3          A.    Doing the same thing.

 4          Q.    Doing quotes?

 5          A.    Doing quotes and visiting customers.

 6          Q.    Setting up production?

 7          A.    Yes, sir.

 8          Q.    Did you have any sales responsibilities?

 9          A.    Yes, sir.

10          Q.    All right.  Did you make outside calls

11   and do selling?

12          A.    Yes, sir.

13          Q.    What kind of printing operation was

14   this?  What did you do?

15          A.    We had -- it was a small house.  We had

16   about three AB Decks, we had a lot of presses and a

17   Challenger in there.

18                We did business with Felix Gonzalez doing

19   all the weddings and Baptism invitations.  We did

20   some business with Sun Bank.

21                I was in charge of quoting and preparing

22   the bids with Maria Palacio, one part of that bid.

23   And we had Lacsa Airlines and I did part of that,

24   too.
```

1          Q.    Now, how long did you stay with M&M

2     Printing?  When did you leave their employment?

3          A.    M&M was bought by 12th Avenue Copy

4     Service and I was there with them for about another

5     two years and left to Madison Paper in mid '85, I

6     believe.

7          Q.    When it was M&M Printing who did you

8     report to?  Who would have been your boss?

9          A.    Manuel Montalvo.

10         Q.    And when it became 12th Avenue Copy

11    Service?

12         A.    Lazaro Valdes.

13         Q.    There was a new man in charge then?

14         A.    Yes.

15         Q.    And his name was?

16         A.    Lazaro Valdes.

17         Q.    And did your duties change when 12th

18    Avenue Copy Service bought it?

19         A.    No.

20         Q.    You were still doing the same thing you

21    described earlier?

22         A.    Yes, I did.

23         Q.    When you left in mid '85 you went where,

24    you told me?

1          A.    Madison Paper.

2          Q.    Now, when you left 12th Avenue Copy

3    Service to go with Madison Paper was your leaving

4    there voluntary on your part or were you terminated?

5          A.    No, voluntary departed.

6          Q.    You went to work for Madison Paper in

7    what capacity?

8          A.    Customer service, order desk.

9          Q.    Customer service, order desk?

10         A.    Yes, sir.

11         Q.    Tell me what you did on the customer

12   service, order desk?

13         A.    Madison Paper was a small paper house.  I

14   took orders over the phone.  I had customers walking

15   in placing will-call orders.

16              I will take the orders, take it to the

17   guys in the warehouse.  They will pull the order.

18   Once they were ready to sign the ticket, I will be

19   there making sure that whatever was in my ticket was

20   given to the customer.

21              I had to collect.  If there was any COD,

22   I will handle that part too and I did do that for

23   about a year.

24         Q.    For about a year?

```
 1          A.    Correct.
 2          Q.    And who was your supervisor at Madison
 3   Paper?
 4          A.    Jerry Middleberg is the owner.
 5          Q.    And is Madison Paper also located in
 6   Miami?
 7          A.    Yes, sir.
 8          Q.    And how long were you there?
 9          A.    Approximately four years, until we had
10   the fire and the company was no longer in business.
11          Q.    So there was a fire at the plant?
12          A.    Yes.
13          Q.    The company went out of business at that
14   point in time?
15          A.    Yes, sir.
16          Q.    That would have been roughly what year?
17          A.    '89.
18          Q.    Okay.  And where did you go then?
19          A.    Jim Walter Papers.
20          Q.    Which, as I understand, is a predecessor
21   company to Unisource, your current employer; is that
22   correct?
23          A.    It was Jim Walter Butler then.
24          Q.    Several acquisitions, but you have been
```

1  working at the same place since 1989?

2    A. Yes, sir.

3    Q. When you left Madison Paper was your

4  leaving there voluntary or involuntary?

5    A. Voluntary.  The company was terminated.

6    Q. And you went to Jim Walter Papers in what

7  capacity?

8    A. Sales rep.

9    Q. And you said Jim Walters was purchased by

10  Butler Paper?

11    A. By Georgia-Pacific, which was Butler

12  Paper at the time.

13    Q. Then it was purchased by Unisource,

14  correct?

15    A. Correct.

16    Q. And Unisource was purchased back by

17  Georgia-Pacific, correct?

18    A. Yes, sir.

19    Q. But it still operates under the Unisource

20  name?

21    A. Correct.

22    Q. Have you been a sales rep the entire time

23  since you went to work at Jim Walter Papers in 1989?

24    A. Yes, sir.

```
 1            Q.   So you held the same position at the same
 2      company, just as the company has gone through several
 3      acquisitions; is that correct?
 4            A.   Yes, sir, that's correct.
 5            Q.   All right.  Now, you have filed a lawsuit
 6      styled Betty Ortega versus Unisource Worldwide,
 7      Incorporated.
 8                 My question is, have you ever been in any
 9      other lawsuits against anybody?  Have you ever been a
10      plaintiff in any other lawsuits?
11            A.   Would you clarify that question for me?
12            Q.   Have you ever brought a lawsuit against
13      anybody else?  Have you ever sued anybody, other than
14      the current lawsuit you are involved in here?
15            A.   Would that include a divorce?
16            Q.   All right.  Yes.
17            A.   Because my understanding --
18            Q.   Other than the divorce, any other
19      lawsuits?
20            A.   Car accidents?
21            Q.   Yes, car accidents.  Have you ever been
22      involved in a car accident?
23            A.   Yes, I have.
24            Q.   How many lawsuits have you been involved
```

1   in involving car accidents?

2        A.    One.

3        Q.    And when would that have been, roughly?

4        A.    I was at Butler, so it must have been

5   '89, '90.

6        Q.    And it was here in Dade County?

7        A.    Yes, sir.

8        Q.    Other than your divorce and the lawsuit

9   involving the car wreck any other lawsuits?

10       A.    No, sir.

11       Q.    Now, as part of your lawsuit against

12  Unisource, you filed a charge with -- I believe you

13  filed first with the Florida Civil Rights Commission,

14  a discrimination charge against Unisource?

15       A.    Yes.

16       Q.    We have a copy of that. Other than the

17  charge you filed that led to this lawsuit, any other

18  charge of discrimination ever, against anybody else?

19       A.    No, sir.

20       Q.    Now, we asked about lawsuits in which you

21  have been a plaintiff. You said your divorce, car

22  accident.

23             Any other lawsuits where you have been a

24  defendant, where somebody sued you?

```
 1              A.   No, sir.
 2              Q.   Military service?
 3              A.   None.
 4              Q.   Have you ever been convicted of a crime?
 5              A.   No.
 6              Q.   I am going to ask you some questions now
 7    about your lawsuit.
 8              A.   Okay.
 9              Q.   And I am going to use the complaint, the
10    amended complaint that you filed in this case.  I
11    will give you a copy of it.
12                   MR. BUCKLER:  Let's just make that as
13         Ortega 1, okay.
14                   (The document referred to was thereupon
15    marked Ortega Exhibit No. 1 for Identification, a
16    copy of which is attached hereto.)
17    BY MR. BUCKLER:
18              Q.   Now, I handed you a copy and your lawyer
19    is going through it.
20                   MS. DALEY:  Yes, unless you have an extra
21         copy.
22                   MR. BUCKLER:  I do have one, if you want
23         it, if you want to follow along.
24                   MS. DALEY:  Okay.
```

```
 1   BY MR. BUCKLER:
 2        Q.   Now, before the lawsuit was filed did you
 3   read a copy of this complaint Ms. Ortega?  Did you
 4   read this over before your lawyer filed the lawsuit
 5   on your behalf?
 6             MS. DALEY:  Go ahead and take a look at
 7        it.
 8   BY MR. BUCKLER:
 9        Q.   Yes, you can take a look.  Anything I
10   hand you, you can take a look at.
11             My question right now is simply did you
12   look over the lawsuit before it was filed, the actual
13   papers that were filed?
14             MS. DALEY:  I am just noting for the
15        record there is some attachments.  I am not sure
16        if you want to make that a part of the exhibit.
17             MR. BUCKLER:  We don't need to do that,
18        we can take out the back three pages.
19             THE WITNESS:  I saw it.  I didn't read it
20        all.  Yes, I saw it.
21   BY MR. BUCKLER:
22        Q.   Let me go through this, and I am going to
23   use it as the guide to go through here, so I can
24   understand what your lawsuit was about.
```

```
 1              To begin with, my understanding based on
 2   the charge of discrimination that you filed -- and we
 3   will go ahead and mark that 2.
 4              (The document referred to was thereupon
 5   marked Ortega Exhibit No. 2 for Identification, a
 6   copy of which is attached hereto.)
 7   BY MR. BUCKLER:
 8        Q.   Just look that over.  I hand you a
 9   document marked Ortega 2 that's styled Charge of
10   Discrimination and it's filed with the Florida
11   Commission on Human Relations.
12              Is the first page of Ortega 2 the charge
13   that you filed of discrimination against Unisource?
14        A.   Yes.
15        Q.   Now, based on having read your charge and
16   having read your amended complaint, my understanding
17   is that you are charging the company with violation
18   of several statutes, but there are four basic
19   components to your claim and I want to make sure
20   before I get into this that you and I are thinking
21   the same way, because if I am wrong I want to know it
22   now.
23              You are charging with having
24   discriminated against you on the basis of your race,
```

1   which is Hispanic, correct?

2           A.    Correct.

3           Q.    And you brought that charge under both

4   the Florida Civil Rights Act and Title VII, which is

5   a Florida statute, that prohibits discrimination on

6   the basis of race.

7           The second aspect of your complaint, as I

8   understand is, is you are claiming you were

9   discriminated against because of national origin,

10  which is also prohibited by the Florida Civil Rights

11  Act and Title VII; is that correct?

12          A.    (Nods head in the affirmative.)

13          Q.    Your national origin is Cuban?

14          A.    Correct.

15          Q.    The third aspect, as I understand, of

16  your complaint and your charge is that you are

17  claiming the company also discriminated against you

18  because of your sex or your gender and you have

19  brought that claim under both the Florida Civil

20  Rights Act and Title VII and you are a female,

21  correct?

22          A.    Yes.

23          Q.    So you claim you were discriminated

24  against because you are a female?

```
 1         A.   Yes, sir.

 2         Q.   Okay.  You are also claiming, as part of

 3   your sex claim, my understanding is, there is a

 4   separate statute that you are bringing your claim

 5   under called the Equal Pay Act, which is a provision

 6   that within the Fair Labor Standards Act that

 7   requires employers not to discriminate with regard to

 8   pay between men and women, correct?

 9         A.   Correct.

10         Q.   All right.  Then the last aspect of your

11   claim is, my understanding is you are claiming that

12   after you had engaged in what is known as protected

13   conduct, the filing of the charge or even just

14   bringing a complaint to the company about

15   discrimination that you were retaliated against by

16   the company in how they treated you for having

17   brought a complaint forward to the company; is that

18   correct?

19         A.   Could you repeat that again?

20         Q.   Yes, ma'am.  If you will look at -- and I

21   will direct you to the specific provisions in the

22   complaint.

23              If you will look on page 13 of your

24   complaint and then again on page 20 of your
```

1  complaint, in particular, the paragraphs of the

2  complaint are paragraphs 39 through 47, paragraphs 67

3  through 75.

4         Let me give you a chance to read those.

5         A.    Could you repeat your question again,

6  please?

7         Q.    Yes, ma'am.  The last part of your

8  complaint and your charge is -- my understanding is

9  you are claiming that as a result of the complaints

10  that you brought forward to the company about pay

11  disparity, that because of bringing those complaints

12  forward that the company retaliated against you for

13  having brought those complaints forward?

14         MS. DALEY:  Objection to form.

15  BY MR. BUCKLER:

16         Q.    Is that correct?  Let me direct you to

17  the operative paragraphs that I have my questions

18  about.

19         If you look at paragraph 41 and paragraph

20  69, they are the same.  Count VI and Count X

21  factually are the same allegations, it's just that

22  one of them is brought under the Florida Civil Rights

23  Act statute and the other one is brought under Title

24  VII, so they are brought under different statutes but

```
 1   the allegations in the complaint are the same.  If
 2   you look at them they reflect the same exact
 3   allegations.
 4              MS. DALEY:  Objection to the form.
 5              MR. BUCKLER:  I haven't asked a question
 6         yet.  I am just directing the witness.
 7              MS. DALEY:  Are you asking her a question
 8         or are you making a comment?
 9              MR. BUCKLER:  I haven't asked her a
10         question.  I am directing her to the paragraphs.
11              MS. DALEY:  You want her now to read the
12         paragraphs?
13              MR. BUCKLER:  Yes.
14              MS. DALEY:  Go ahead.  41, and I think he
15         said 69.
16              THE WITNESS:  Okay.
17   BY MR. BUCKLER:
18         Q.   My question to you is are you claiming
19   that the company, after you brought complaints about
20   pay disparity forward to the company, made complaints
21   to the company about what you believed was pay
22   disparity, are you claiming that in some way the
23   company retaliated against you for having brought
24   these complaints forward?
```

1          A.    Yes.

2          Q.    All right.  Thank you.  I am going to go

3    back.

4               What I want to do is on each of these

5    separate claims that you got I want to ask you some

6    specific questions.

7               We will just go straight through the

8    complaint.  If you will look on page 4, Count I is an

9    equal pay claim, in which you are alleging, at least

10   in paragraphs 10 and 11, that you were paid

11   differently from your male counterparts, correct?

12         A.    Correct.

13         Q.    I want to get some basic information from

14   you about how you were paid.

15              My understanding is that you were paid on

16   a straight commission basis; is that correct?

17         A.    That's correct.

18         Q.    A hundred percent of what you get is a

19   commission based on your sales?

20         A.    Correct.

21              (The document referred to was thereupon

22   marked Ortega Exhibit No. 3 for Identification, a

23   copy of which is attached hereto.)

24   BY MR. BUCKLER:

1        Q.   I am going to show you what I marked as

2   Ortega Exhibit 3 and it's a collective exhibit, the

3   top five pages of which are excerpts from the

4   Unisource Policies and Procedures manual that is

5   styled Unisource Commission Policy.

6             Then below that are eight pages, each

7   page of which contains a matrix showing certain

8   percentages, and what I want you to do first is look

9   at the top five pages, the Unisource Commission

10  Policy and my first question is, have you seen this

11  document before?

12        A.   Yes, sir.

13        Q.   All right.  This one, the date of issue

14  is 5/95, which is the last one I could find.

15             Is this the commission policy under which

16  you were paid, Ms. Ortega?  Take your time and look

17  it over.  Just the first five pages.  I am not asking

18  about the matrixes yet.

19             MS. DALEY:  Let me put my objection to

20        speculation.

21             THE WITNESS:  To the best of my

22        knowledge, yes.

23  BY MR. BUCKLER:

24        Q.   Okay.  Now, which Unisource office do you

```
 1   currently work out of?
 2         A.    Branch 45 Miramar.
 3         Q.    And how long have you worked out of that
 4   office?
 5         A.    Approximately five, five and a half
 6   years, six.  I believe March of '94.
 7         Q.    Are there are people who do what you do,
 8   other sales reps who work out of that office also?
 9         A.    Yes, sir.
10         Q.    You said March of what year, '95?  Is
11   that what you said?
12         A.    The merge was at the end of '94.
13         Q.    Somewhere in that time frame though?
14         A.    Correct.
15         Q.    Now, in claiming that you are paid
16   discriminatory because of your sex under the Equal
17   Pay Act, as you have alleged.  My first question to
18   you is, do all of the sales reps work under the same
19   Unisource commission policy out of that office?
20               MS. DALEY:  Objection, speculation.
21               THE WITNESS:  I wouldn't be able to tell
22       you.
23   BY MR. BUCKLER:
24         Q.    Do you know?  If you don't know, that's
```

1  an acceptable answer.

2          A.   Again, I wouldn't be able to tell you.

3          Q.   So you don't know whether they do or they

4  don't?

5          A.   Correct.

6          Q.   Let me rephrase the question a little

7  differently.

8              Are you aware of any male employees who

9  work out of the same office that you work out of who

10  were paid under a different commission policy?

11         A.   Yes, sir.

12         Q.   All right.   Which ones?

13         A.   John Huempfner.   He's no longer with the

14  company but he had a different commission deal cut at

15  the end of I believe it was '96, '97.

16         Q.   So he worked under a different commission

17  policy than you did?

18         A.   Yes, sir.

19         Q.   Any other males that you are aware of

20  that you say worked under a different commission

21  policy than you did?

22         A.   I have no idea, sir.

23         Q.   So he's the only one that you believe

24  worked under a different commission policy, that you

```
 1   know of?
 2        A.   That I know of, yes, sir.
 3        Q.   How did you become aware of John --
 4        A.   Huempfner.
 5        Q.   -- Huempfner working under a different
 6   commission policy?
 7        A.   It was common knowledge.
 8        Q.   Somebody told you, apparently, or maybe
 9   they didn't?
10             Let me ask you first, did you ever see it
11   in writing, any written statement that John Huempfner
12   worked under a different commission policy?
13        A.   No, I don't have that privilege.
14        Q.   All right.  So the way you acquired the
15   knowledge was through some verbal communication,
16   somebody told you that?
17        A.   Correct.
18        Q.   Do you know who told you that John
19   Huempfner worked under a different commission policy?
20        A.   No, sir.
21        Q.   Can you say for certainty it was anybody
22   in a management position at Georgia-Pacific?
23        A.   Well, it was not Georgia-Pacific at that
24   time, it was Unisource.
```

```
 1            Q.    Let's back up and let me use the right
 2  phrase.
 3            Was it anybody at Unisource, anybody in
 4  management at Unisource that told you this, or do you
 5  not recall?
 6            A.    I don't recall.
 7            Q.    So the way you found out about it was you
 8  heard it from somebody but you can't tell me who that
 9  person was at this point in time?
10            A.    No, sir.
11            Q.    All right.  Other than hearing through
12  the grapevine, to use a phrase, that John Huempfner
13  was paid under a different commission policy than you
14  were, was there any other way in which you acquired
15  this knowledge, other than just hearing it?
16            A.    No, sir.
17            Q.    As we sit here today, do you know for a
18  certainty that he was paid under a different
19  commission policy, or do you just believe that
20  because of what you heard?
21            A.    I know, sir.
22            Q.    How do you know that?
23            A.    It was common knowledge, like I said
24  before.
```

1         Q.   So, again, it was based on what you heard

2 through the grapevine?

3         A.   Yes.

4         Q.   Did you ever see any of the calculations

5 for how he received his commissions?

6         A.   There was something posted.  There was a

7 contest and you had to have a percentage of sales and

8 John Huempfner and Dennis Laux had two different

9 percentages of sale, one for whatever price

10 specifically than the other, and that was based on

11 how they were paid their commissions.

12         Q.   Dennis?

13         A.   Dennis Laux.

14         Q.   Is Dennis Laux a male?

15         A.   Yes.

16         Q.   And was Dennis Laux's commission the same

17 way yours was and his was different from John?

18         A.   I have no idea.

19         Q.   So you don't know how Dennis Laux was

20 paid?

21         A.   No, sir.

22         Q.   You don't know what his commission

23 agreement was?

24         A.   No, sir.

```
 1            Q.    Can you tell me what John Huempfner's
 2     commission arrangement was and how it differed from
 3     yours?
 4            A.    No, sir.
 5            Q.    Now, John Huempfner no longer works for
 6     Georgia-Pacific; is that correct?
 7            A.    No, sir.
 8            Q.    Or for Unisource?
 9            A.    Correct.
10            Q.    Do you know approximately when he left?
11            A.    I believe it's going to be two years.
12            Q.    And I may have already asked this, but
13     let me -- before I move on let me ask it again.
14                  Other than John Huempfner, are you aware
15     of anyone else that you believe had a commission
16     policy that they worked under that was different from
17     yours?
18            A.    No, sir.
19            Q.    Can you tell me how John Huempfner's
20     policy differed, the policy he worked under differed
21     from you?  Can you tell me what the differences were?
22            A.    I am not very aware how it was worked
23     out.  I know it was worked out between Bob McKee and
24     Brian Kelly, and it was worked out when John
```

 1  Huempfner decided to quit and went to or was going to

 2  Mac Paper.

 3       Q.   And when would this have been?

 4       A.   This was two years prior to the time he

 5  left.

 6       Q.   So you believe that John Huempfner had

 7  announced he was leaving?

 8       A.   No, he quit.  He left.

 9       Q.   For how long?

10       A.   He came in one morning and picked up

11  everything, and he was gone.

12       Q.   And how long was he gone?

13       A.   For less than six hours, because Brian

14  Kelly and the whole gang was down here in Miami

15  trying to resolve the situation.

16       Q.   And they were Unisource executives from

17  another location.  Who are Brian Kelly and what is

18  the other name?

19       A.   Bob McKee was our -- Bob McKee at that

20  time was the branch manager VP of sales and Brian

21  Kelly was out of Jacksonville.

22       Q.   Okay.  Your understanding is that when

23  Huempfner resigned they came down here and rearranged

24  his commission arrangement in order to get him to

31

```
 1  stay?
 2        A.    Correct.
 3        Q.    This would have been roughly four years
 4  or so ago?
 5        A.    Correct.
 6        Q.    If you will look at paragraph 10 of the
 7  complaint.
 8              It says, during her employment, that
 9  being your employment, by Unisource, Unisource paid
10  Ortega at rates less than it paid employees of the
11  males sex, although the jobs performed by Ortega
12  required equal skill, effort, responsibility and were
13  performed under similar working conditions.
14              Other than John Huempfner, who else do
15  you say were paid at rates different from you?
16        A.    Dennis Laux, Larry Press, John Price.  I
17  forgot Mike's last name.
18        Q.    Dennis Laux?
19        A.    Dennis Laux, John Huempfner, Larry Press,
20  John Price and I believe Mike's last name was Mike
21  Alto.
22        Q.    Can you spell it?
23        A.    I think it's A-L-T-O.  I am not sure.
24        Q.    These are other sales reps that worked
```

```
 1    out of the same office that you did?
 2         A.   Yes, sir.
 3         Q.   Do you know if these people worked on a
 4    commission basis first?
 5         A.   Yes, sir.
 6         Q.   So to the best of your knowledge all of
 7    the sales reps were working on a hundred percent
 8    commission basis?
 9         A.   That's right.
10         Q.   Are you saying that Dennis Laux worked on
11    a different commission basis than you?
12         A.   No.  What I am saying is that he worked
13    on the same commission basis as I was, given all the
14    accounts that I wasn't given, or any other female.
15         Q.   That's what I want to understand.  Are
16    you saying that Larry Press worked on a different
17    commission basis than you?
18         A.   No, sir.
19         Q.   Are you saying that John Price worked on
20    a different commission basis than you?
21         A.   No, sir.
22         Q.   Are you saying that Mike Alto worked on a
23    different commission basis?
24         A.   No, sir.
```

33

```
 1          Q.   So your allegation then is that these
 2    four individuals worked on the same commission basis
 3    but were given accounts that under the commission
 4    schedule that you all worked under would have
 5    produced more income?
 6          A.   Correct, same as John Huempfner.
 7          Q.   All right.  Let me ask you this:  Are you
 8    saying that John Huempfner then worked on a different
 9    commission basis than you, or are you just saying he
10    got more favorable accounts?
11          A.   Both.
12          Q.   Both with him.  So he is different from
13    Dennis Laux, Larry Press, John Price and Mike Alto,
14    in that sense?
15          A.   (Nods head in the affirmative.)
16          Q.   Yes?
17          A.   Yes, sir.
18          Q.   Anybody else, any other males that you
19    are saying at Unisource who worked in similar jobs,
20    jobs that required equal skill, effort and
21    responsibility, but who were paid more than you,
22    other than the people you are talking about?
23               What I am looking for, to be honest, is
24    your comparators.  You are saying you were paid less
```

1    than comparable males, so I am looking for the

2    people.

3         A.    The whole sales force, besides take away

4    the new ones, the ones that were hired two years

5    ago.

6              You are talking about Bill Bresnehan, Bob

7    Peterson, Steve Sullivan.  The whole male force.

8         Q.    Do you know what Dennis Laux made in the

9    calender year 1996?

10        A.    I have no idea.

11        Q.    Do you know what Larry Press made in the

12   calender year 1996?

13        A.    I have no idea.

14        Q.    Do you know what John Price made in the

15   calender year 1996?

16        A.    I have no idea.  I don't think he was

17   with us in 1996.

18             I think he came after that.

19        Q.    Do you know what Mike Alto made in the

20   calender year 1996?

21        A.    Well, he left because he had a better

22   offer.  So he said he had a better offer a hundred,

23   and he never put an end to the hundred.  That's the

24   reason he left.

```
 1            Q.    But do you know what he made in that year
 2    from Georgia-Pacific?
 3            A.    No, sir.
 4            Q.    Do you know what Mr. Huempfner made in
 5    1996?
 6            A.    Conversations, he claims a hundred and
 7    change, but I never saw.
 8            Q.    All right.  Do you know for a fact that
 9    you made less money than Dennis Laux in 1996 from
10    Unisource?
11            A.    Yes.
12            Q.    Do you know for a fact that you made less
13    money than Larry Press?
14            A.    No.
15            Q.    Do you know for a fact that you made less
16    money than John Price?
17            A.    John wasn't there in '96, I believe.
18            Q.    Mike Alto, do you know for a fact that
19    you made less money than him?
20            A.    I would say yes.
21            Q.    Well, either you know or you don't know
22    and unless you know for a fact --
23            A.    Then I don't know.
24            Q.    Okay.  I am not asking you to speculate.
```

```
 1          A.    Okay.

 2          Q.    Counsel has objected on speculation.    She

 3   hasn't instructed anything.    She voiced an objection

 4   earlier on speculation.

 5          A.    Okay.

 6          Q.    I am not asking you to speculate.

 7          A.    Okay.

 8          Q.    I am just asking what you know.

 9          A.    Okay.

10          Q.    Do you know for a fact that Dennis Laux

11   made more than you in 1996?

12          A.    Yes, I do.

13          Q.    How do you know that?

14          A.    He will walk into the office and claim

15   and show his paycheck, on a monthly basis.

16                (The document referred to was thereupon

17   marked Ortega Exhibit No. 4 for Identification, a

18   copy of which is attached hereto.)

19   BY MR. BUCKLER:

20          Q.    Ms. Ortega, I hand you a summary of what

21   Georgia-Pacific has prepared on commissions paid in

22   1996 for people out of the office in which you

23   worked.

24                First of all, I am going to ask you, do
```

1  you know -- other than yourself, do you know for a

2  fact what any of the people on this particular

3  document made in 1996?

4      A.   No.

5      Q.   So you have no basis for either agreeing

6  or disagreeing with this document, correct?

7      A.   No, sir.

8      Q.   I want to go down this list and I want to

9  determine which ones of these people are males and

10  which ones are females from your perspective.  It's

11  already on there, if I just open my eyes.

12     A.   It is?

13     Q.   It's already on the fourth column.  Now,

14  in 1996 it's got that you made $71,192.18 in

15  commissions.

16          Is that an accurate number?

17     A.   I am assuming.  I don't have my taxes

18  with me.

19     Q.   Okay.  Is that roughly what you recall

20  making that year?

21     A.   I don't recall.  In 1996?

22     Q.   1996.

23     A.   Okay.

24     Q.   Now, on this list I don't see a Larry

1    Press.   Do you know when he came with the company or
2    when he left?
3         A.    Maybe he left at the end of '95 because
4    his father left the beginning of '95, so I am
5    assuming, and Mike Alto is not here either.
6         Q.    Mike Alto, has he been gone for a while?
7         A.    Must have been '95, also.
8         Q.    Now, I do see a J. Price, which is John
9    Price on here?
10        A.    Yes.
11        Q.    Now, at least in 1996, according to this
12   document you made significantly more than John Price,
13   correct?
14        A.    Correct.   But I don't believe that John
15   Price was in Miami in 1996.   I believe he came from
16   another division.
17             That's what I am not certain of.
18        Q.    You have told me that you believed that
19   Mr. Huempfner worked on a different commission
20   arrangement than you did?
21        A.    Correct.
22        Q.    But you told me that you did not believe
23   that Dennis Laux did?
24        A.    Correct.

1          Q.   There is a gentleman R. Peterson on this

2  list?

3          A.   Yes, sir.

4          Q.   Do you know whether or not he worked

5  under a different commission arrangement?

6          A.   I have no idea, sir. I don't think so.

7          Q.   There is a gentleman by the name of

8  Bresnehan. Do you know him?

9          A.   Yes, sir.

10         Q.   Do you have any information that he

11  worked under a different commission arrangement than

12  you?

13         A.   No, sir.

14         Q.   And there is a gentleman by the name of

15  Gispert.

16             Do you have any information that he

17  worked under a different commission arrangement than

18  you?

19         A.   No, sir.

20         Q.   Now, you listed a minute ago, when I

21  asked you for the people that you thought had been

22  paid, who worked in similar jobs that you did but had

23  been paid more than you, you listed Dennis Laux,

24  Larry Press, John Price, Mike Alto and Huempfner?

```
 1          A.    Correct.

 2          Q.    Five people's names.  Looking at this

 3   list, are there any people on here who you feel were

 4   paid, in addition to the people you already listed,

 5   who were paid different or more than you because of

 6   their sex?  Anybody else on this list that I have

 7   handed you, on Ortega 4?

 8          A.    Because of the account structure I will

 9   still say John Price and I will say Rich Crane, which

10   I don't think is here.  Oh, he's here.  At this

11   point, in the past two years, two and a half, three

12   years --

13          Q.    But in '96?

14          A.    No.

15          Q.    You are not alleging in '96 --

16          A.    No, sir.

17          Q.    So in 1996, that year, the people who you

18   would be claiming, at least that were paid more than

19   you because of sex would have been Dennis Laux?

20          A.    John Huempfner.

21          Q.    John Huempfner?

22          A.    Larry Press, Mike Alto.

23          Q.    But if they weren't there in '96?

24          A.    Well, it was the year that I came in from
```

```
 1   '95, to whatever the time the two of them have

 2   gone.

 3              (The document referred to was thereupon

 4   marked Ortega Exhibit No. 5 for Identification, a

 5   copy of which is attached hereto.)

 6   BY MR. BUCKLER:

 7        Q.   I hand you Ortega 5, '97.  Mr. Press and

 8   Mr. Alto do not appear on this.  Were they gone by

 9   this point in time?

10        A.   Yes, sir.

11        Q.   Now, again, Dennis Laux and Mr. Huempfner

12   are on this list, and according to this list made

13   more than you did?

14        A.   Yes, sir.

15        Q.   Are there any other males on this list

16   who you believe were paid more than you because of

17   their sex, other than Huempfner and Laux?

18        A.   Peterson and Bresnehan made more than I

19   did.

20        Q.   It indicates they made more than you

21   did.  Are you alleging that is because of their sex?

22        A.   Yes.

23              (The document referred to was thereupon

24   marked Ortega Exhibit No. 6 for Identification, a
```

1   copy of which is attached hereto.)

2   BY MR. BUCKLER:

3        Q.   I have handed you Ortega Exhibit 6, which

4   is commissions paid for the year 1998.

5             MS. DALEY:  Do you have an extra copy?

6             MR. BUCKLER:  Yes.

7   BY MR. BUCKLER:

8        Q.   On this list the same four gentleman that

9   made more than you in '97 made more than you in '98.

10  Are you alleging, again, that was because of their

11  sex?

12       A.   Yes, sir.

13       Q.   Anybody else on this list that you claim

14  that you were treated disparately from on the basis s

15  of their sex from the '98 list?

16       A.   No.

17       Q.   Now, on the '97 there were men who made

18  less than you who worked out of that office, weren't

19  there?

20       A.   Yes, sir.

21            MS. DALEY:  Objection, speculation.

22            MR. BUCKLER:  I am asking were there or

23       were there not.

24            MS. DALEY:  Same objection.

```
 1  BY MR. BUCKLER:
 2         Q.    Fine.  You can answer.
 3         A.    Looking at this list, yes, sir.
 4         Q.    All right.  And in '97, if you look at
 5  the '97 list there were also men who made less than
 6  you, correct?
 7               MS. DALEY:  Objection, speculation.
 8               THE WITNESS:  Looking at this list, yes.
 9  BY MR. BUCKLER:
10         Q.    And the same is true for '96?
11               MS. DALEY:  Same objection.
12               THE WITNESS:  Same thing.  Looking at the
13      list, yes.
14  BY MR. BUCKLER:
15         Q.    Now, Mr. Huempfner, who we have talked
16  about previously, came to work for Unisource after
17  you were already there, correct?
18         A.    No.
19         Q.    He was already there when you came there?
20         A.    Yes.
21         Q.    So this hire date of 1992 is not
22  accurate?
23         A.    No.  Remember, I come from Butler.  I
24  came in to Unisource from a merge.
```

1        Q.    Okay.   All right.   And that merger

2    occurred after 1992?

3        A.    Correct.   I believe it occurred at the

4    end of '94.

5        Q.    Now I understand what you are saying.

6    Now I got that straight.

7        A.    Yes.

8        Q.    Like I said, this deposition is for me to

9    learn stuff and I will learn every time you answer

10   something.

11           My understanding was Mr. Huempfner had

12   one particular account that produced the great bulk

13   of his income; is that correct?

14           MS. DALEY:   Objection, speculation.

15           THE WITNESS:   I don't know.

16   BY MR. BUCKLER:

17       Q.    Avanti Press.   Do you know of his account

18   Avanti Press?

19       A.    Yes.   He's uncle-in-law is the owner of

20   Avanti.

21       Q.    He owned that account and he brought it

22   with him, as I understand, when he came to Unisource,

23   correct?

24       A.    Correct.

```
 1              Q.    And my understanding is that that
 2   particular account is what was the largest source of
 3   his income, by far?
 4              MS. DALEY:  Objection, speculation,
 5   BY MR. BUCKLER:
 6              Q.    Do you know one way or the other?
 7              A.    No.
 8              Q.    Do you know whether the difference
 9   between what Mr. Huempfner made and what you made was
10   because of that account?
11              A.    No, it was because of the accounts given
12   to John Huempfner.
13              Q.    What I want to know is you said that you
14   told me that you felt like Huempfner, among other
15   people, was given accounts that you weren't given,
16   they were given to him because of his sex.
17              I want you to name me the accounts that
18   you feel John Huempfner was given, that you were not
19   given, because of his sex?
20              A.    I won't be able to do that.
21              Q.    Can you name one?
22              A.    I won't be able to do that.
23              Q.    All right.  What is the basis for your
24   statement that he was given accounts that you weren't
```

1    given because of his sex?

2         A.    Because there were only three people that

3    were given accounts constantly at all times, John

4    Huempfner, Dennis Laux and it was a give in.

5         Q.    You said three.  Who was the third?

6         A.    Larry Press, before he left.

7         Q.    Can you tell me what accounts Larry Press

8    was given, that you weren't given, because of your

9    sex?

10         A.    When Mike Alto left all Mike's accounts

11    were given to Larry Press.  They were split between

12    Larry Press, John Huempfner and Dennis Laux.

13         Q.    All right.  That is one situation.  Any

14    others like that?

15         A.    I won't be able to tell you.

16         Q.    So the only specific situation that you

17    can identify to me today, as we sit here, wherein you

18    feel that any males were given specific accounts

19    because of their sex is when Mike Alto left and his

20    accounts were divided amongst Larry Press, John

21    Huempfner and Dennis Laux?

22         A.    We had other people that left too and

23    every time somebody did the accounts were

24    specifically guided to them.

```
 1              If we sit here and I have their list of
 2   accounts and Larry's and everybody else's, I would be
 3   able to tell you.  Without looking at it, I won't be
 4   able to.
 5        Q.    Do you know whether or not any of Mike
 6   Alto's accounts went to other women in the
 7   department?
 8        A.    I didn't get any.
 9        Q.    Do you know whether any other women did?
10        A.    I wouldn't be able to tell you.
11        Q.    During 1996, during that calender year
12   were you given any new accounts?
13        A.    Probably.
14        Q.    Some?
15        A.    I don't recall.  I will have to look on
16   my reports and see.
17        Q.    During 1997 were you given any new
18   accounts?
19        A.    Yes.
20        Q.    By whom?
21        A.    Bill Ready.
22        Q.    During 1998 were you given any new
23   accounts?
24        A.    Yes.
```

```
 1        Q.   By whom?
 2        A.   Bill Ready and John Glaze.
 3        Q.   During 1998 were you given any new
 4   accounts?
 5        A.   Yes.
 6        Q.   By whom?
 7        A.   By John Glaze.
 8        Q.   During 1999 were you given any new
 9   accounts?
10        A.   Yes.
11        Q.   By whom?
12        A.   John Glaze.
13        Q.   During 1999 were you given any new
14   accounts?
15        A.   Yes.  You just asked me that.
16        Q.   I just asked '99?  Okay.  I stopped
17   writing.  I was trying to keep up with you.
18             You said when Mike Alto left you felt
19   like his accounts were distributed discriminatorily
20   given to men?
21        A.   Yes, sir.
22        Q.   Who made the assignment of those
23   accounts?
24             MS. DALEY:  Objection, speculation.
```

```
 1              THE WITNESS:  Bill Ready.
 2   BY MR. BUCKLER:
 3        Q.   So as we sit here today you believe that
 4   Bill Ready assigned accounts discriminatorily?
 5        A.   Yes, sir.
 6        Q.   Now, in 1996 who would it have been that
 7   would have been assigning the accounts?
 8              MS. DALEY:  Objection, speculation.
 9              THE WITNESS:  I am assuming it would be
10        Bill Ready.  He was the sales manager.
11   BY MR. BUCKLER:
12        Q.   He was the sales manager over that
13   office, and who did what work in that office?
14        A.   He managed the sales force.
15        Q.   Okay.  In 1997 who would it have been
16   that made the decisions on the accounts?
17              MS. DALEY:  Objection, speculation.
18              THE WITNESS:  I am assuming Bill Ready.
19   BY MR. BUCKLER:
20        Q.   In 1998 who would it have been?
21              MS. DALEY:  Same objection.
22              THE WITNESS:  Bill Ready.
23   BY MR. BUCKLER:
24        Q.   When did John Glaze come?
```

1           A.    He came in '97 or end of '96, but he was
2    the branch VP.

3           Q.    Okay.   Now, you told me you believe that
4    Bill Ready assigned accounts on a discriminatory
5    basis?

6           A.    Yes.

7           Q.    Do you have any evidence or any belief
8    that John Glaze assigned accounts on a discriminatory
9    basis?

10          A.    If you assign accounts that have no
11   volume or commission to one person and assign an
12   account that has $4,000 commission at the end of the
13   month to another, I will say yes.

14          Q.    But --

15          A.    But the accounts that have been assigned
16   by John Glaze had zero commission value.

17          Q.    My question to you is this:   Do you
18   believe that John Glaze, in deciding who would get
19   what accounts has made his decisions on who would get
20   what accounts on the basis of the people's sex in
21   that office?

22          A.    Yes.

23          Q.    Other than the fact that certain accounts
24   that you believe were more lucrative were assigned to

1    men and weren't assigned to you as a woman, what

2    other evidence do you have that the basis for the

3    assignment of the accounts in that office during the

4    period between 1996 and the current time was done on

5    the basis of sex?

6         A.    I don't understand the question.

7         Q.    Well, you told me that you believed that

8    the accounts were assigned to men, more lucrative

9    accounts were assigned to men because they got the

10   accounts.

11             Other than the fact that the accounts

12   were given to the men and not to you, what other

13   evidence do you have that the decision was based on

14   sex?

15        A.    I wouldn't be able to answer that

16   question.

17        Q.    At any point in time, in '96, '97, '98,

18   '99 to the present, any of that five year period,

19   were you involved in any way in the decision making

20   over how accounts would be assigned?

21        A.    No.

22        Q.    Have either Bill Ready or John Glaze ever

23   told you how they arrived at the decision on the

24   reassignment of accounts?

```
 1          A.    No.
 2          Q.    Let me move on to page 6 of your
 3    complaint, Count II, and it's retaliation.
 4                What it says basically in paragraph 18 is
 5    that you complained about what you believed was
 6    discrimination in regard to how accounts were
 7    assigned.
 8                If you go onto page 19, next page, I mean
 9    paragraph 19, it says that as a result of your having
10    made these complaints you were retaliated against and
11    it lists four ways in which you were retaliated
12    against.
13                The first one, it says that you were not
14    given the export accounts that you had been promised
15    which instead were given to less qualified male
16    employee.   First question, who is the less qualified
17    male employee you are talking about?
18          A.    Bill Ready.
19          Q.    Who was the man you had previously
20    identified as your sales manager?
21          A.    Yes, sir.
22          Q.    Well, let me back up.   Which export
23    accounts are you talking about, when you say that you
24    were not given export accounts that had been promised
```

1   to you?

2          A.    Tony Gispert's territory.

3          Q.    And who had promised you Tony Gispert's

4   accounts?

5          A.    Bill Ready and John Glaze.

6          Q.    And when was this promise made?

7          A.    In my last two reviews with Bill Ready

8   everybody knew Tony was going to retire by the end of

9   '98 and Bill says don't worry, you are sitting okay,

10  because most of my accounts are export, I don't have

11  domestic big accounts.

12               Just wait, take your time and by the time

13  Tony retires the accounts will come to you because

14  nobody else does this in the branch.

15         Q.    So this would have been made at some

16  point in time in '98?

17         A.    No, this was made in '97 and '98, my last

18  two reviews with Bill.

19         Q.    Your last what review?

20         A.    Review.  He did my reviews and John Glaze

21  started doing the reviews.

22         Q.    Was anybody else in this review, other

23  than Mr. Ready?

24         A.    No.

54

```
 1            Q.   Now, you said that John Glaze also
 2    promised you these accounts?
 3            A.   Yes, sir.
 4            Q.   When did he do this?
 5            A.   Since the men started working together on
 6    our export ventures.  I don't recall.  '97 could be.
 7            Q.   Now, Mr. Ready had been your manager for
 8    a period of time prior to receiving these accounts,
 9    correct?
10            A.   Mr. Ready was my general manager and then
11    my sales rep manager since 1988.  Remember, I was
12    hired at Butler.
13            Q.   So when you came to work there --
14            A.   He came with us.
15            Q.   Was he already in place when you went to
16    work for Butler?
17            A.   He was the branch manager VP.
18            Q.   All right.  So he was the person that
19    would have basically been the person that hired you?
20            A.   Yes, sir.
21            Q.   So from the time that you went to work
22    there until Mr. Ready stepped down as the division
23    manager and went back into sales, he was your
24    immediate supervisor, correct?
```

```
 1            A.    Yes, sir.

 2            Q.    As well as supervising Mr. Gispert?

 3            A.    Yes, the whole sales force.

 4            Q.    Now, my understanding is these accounts

 5    of Tony Gispert, when he left were given to Bill

 6    Ready; is that correct?

 7            A.    That's correct.

 8            Q.    And my understanding is when these

 9    accounts were given to Mr. Ready his managerial

10    responsibilities ceased and he went back basically

11    into sales?

12            A.    Yes, sir.

13            Q.    And at that point in time you started

14    reporting to who directly, John Glaze?

15            A.    John Glaze.

16            Q.    So at least initially that position as

17    the division manager was just eliminated?

18            A.    I guess.

19            Q.    Now, do you know whether or not at the

20    time that Tony Gispert retired, whether or not

21    Mr. Glaze was under directions from the corporation

22    to cut cost and to eliminate positions?

23            A.    I have no knowledge of that, sir.

24            Q.    So if he was it's just you don't know
```

| | |
|---|---|
| 1 | about that? |
| 2 | MS. DALEY: Objection, foundation. |
| 3 | MR. BUCKLER: Correct? |
| 4 | MS. DALEY: Same objection. |
| 5 | THE WITNESS: I don't know that. I don't |
| 6 | know about that. |
| 7 | BY MR. BUCKLER: |
| 8 | Q. All right. Who made the decision to give |
| 9 | Tony Gispert's export accounts to Bill Ready? |
| 10 | MS. DALEY: Objection, speculation. |
| 11 | THE WITNESS: I don't know. |
| 12 | BY MR. BUCKLER: |
| 13 | Q. So you don't know who made that decision? |
| 14 | MS. DALEY: Same objection. I'm sorry, |
| 15 | asked and answered. |
| 16 | THE WITNESS: No, sir. |
| 17 | BY MR. BUCKLER: |
| 18 | Q. Do you know who made the decision to |
| 19 | eliminate Mr. Ready's manager position and put him |
| 20 | back into sales? |
| 21 | A. No, sir. I am not working corporate. |
| 22 | Q. Do you know how long Mr. Ready has been |
| 23 | involved in sales in the paper industry? |
| 24 | A. According to Ready, all his life. |

1          Q.   And how old is he?

2          A.   I have no idea.

3          Q.   Okay.  Now, you say Mr. Ready is less

4    qualified than you.

5          A.   In the export end, yes, he is.

6          Q.   You said he supervised your sales though

7    the whole time you were there?

8          A.   He had no idea what I was doing.

9          Q.   Was he your supervisor responsible for

10   supervising your sales?

11         A.   He was my sales supervisor.  He didn't

12   supervise what I did.

13         Q.   He supervised Mr. Gispert?

14         A.   I don't know, sir.

15         Q.   So you don't know what kind of

16   relationship he had with Mr. Gispert's accounts or

17   what relationship he had with Mr. Gispert, do you?

18         A.   If you asked me what relationship he had

19   with his accounts, no, sir, I wasn't involved.

20         Q.   Let's go to paragraph b.  It says you

21   were passed over for assignments to lucrative and/or

22   new accounts.

23              I want you to identify for me the

24   lucrative and/or new accounts that you say you were

1    passed over for.

2         A.    When Gene Press left Gene Press was the

3    general manager of Saxon, Unisource and in 1995 he

4    left, I don't know, 30, 40 accounts for export and

5    they were all active.

6              I went into Bill Ready's office and asked

7    him that I wanted to work that area and that I wanted

8    to work the accounts that were left by Gene Press and

9    he told me I was not qualified to work export.

10        Q.    And this was '95?

11        A.    Yes.    This is within a month after Gene

12   Press left and I wouldn't be able to tell you an

13   exact date, but I believe it was '95.

14        Q.    All right.    What other lucrative or new

15   accounts were you passed over for?

16        A.    I lost my biggest account in the industry

17   division and I came to Bill Ready and I said I need

18   help, I lost $600,000 in sales for export and he told

19   me that he had no accounts to give me or to help me

20   in any way.

21        Q.    And when was this?

22        A.    I believe mid '97.

23        Q.    In other words, again, the allegation is

24   you were passed over for assignment to lucrative

59

1    and/or new accounts.  I don't want to know now what

2    accounts you lost, but the name of the accounts that

3    you believe should have been assigned to you that you

4    were passed over for because of --

5              A.    Account names?

6              Q.    Names of the accounts.

7              A.    I don't have all the list of Gene Press'

8    accounts.

9              Q.    But we're leaving Gene Press.

10             A.    Okay.

11             Q.    Now we're going to mid '97.  You said at

12   that point in time you lost a big account?

13             A.    Right.

14             Q.    To a competitor, I assume?

15             A.    No, just because the export business is

16   that way, you have it today, gone tomorrow.

17             Q.    Well, they got their paper elsewhere?

18             A.    Or just stopped buying.

19             Q.    Okay.

20             A.    Or credit problem.

21             Q.    I am not interested in what accounts you

22   lost.

23                   Your allegation here is you were passed

24   over for assignment to new and/or lucrative

```
 1 │ accounts.  I want to know the names of the accounts.
 2 │       A.   I won't be able to give you that.
 3 │       Q.   So as we sit here today you can't give me
 4 │ the specific names of any accounts --
 5 │       A.   No, sir, but if you --
 6 │            MS. DALEY:  Let him finish the question.
 7 │ BY MR. BUCKLER:
 8 │       Q.   You feel you were passed over and they
 9 │ were not given to you because of your sex?
10 │       A.   Yes, sir.
11 │       Q.   All right.  Paragraph C, one account that
12 │ generated income was taken away from you and replaced
13 │ with an account that generated virtually no income.
14 │            What was the name of the account that was
15 │ taken away from you?
16 │       A.   AIB.
17 │       Q.   And when was that?
18 │       A.   About a month ago.
19 │       Q.   A month ago?
20 │       A.   Five months ago.
21 │       Q.   Five months ago.  Let's back up because
22 │ this complaint was filed originally on December 3rd,
23 │ 1999.
24 │       A.   Correct.  My evaluation -- yes.
```

1            Q.   All right.  And when was AIB taken away

2    from you?

3            A.   My last evaluation, which is every six

4    months, so must have been right in December.

5            Q.   And who made the decision to take it away

6    from you?

7                 MS. DALEY:  Objection, speculation.

8                 THE WITNESS:  John Glaze.

9    BY MR. BUCKLER:

10           Q.   And what's the account that he replaced

11   it with that generated no income?

12           A.   Enterprise Printing.

13           Q.   And what evidence do you have that the

14   reason that he made this change in accounts was

15   because that you had complained previously about

16   discrimination?

17           A.   None.

18           Q.   That's the account you are talking about

19   in C though?

20           A.   Yes.

21           Q.   Okay.  D says you were given new accounts

22   to service that generated virtually no income.

23           A.   Correct.

24           Q.   What were the new accounts that you were

1 given that generated no income?

2       A.   You want in the past five years?

3       Q.   Yes.  .

4       A.   I won't be able to tell you without

5 looking at all my records.

6       Q.   What evidence do you have that you were

7 given these new accounts that have generated no

8 income because you had previously complained about

9 being discriminated against?

10      A.   Would you repeat that again?

11      Q.   What evidence do you have to establish

12 that the reason you were given these accounts that

13 have generated no income was because you had

14 previously complained about being discriminated

15 against?

16      A.   None.

17      Q.   And when new accounts come in you didn't

18 get all of the new accounts, they went to various

19 people, they are spread around, correct, new accounts

20 are?

21           MS. DALEY:  Objection, speculation.

22           THE WITNESS:  I don't know.

23 BY MR. BUCKLER:

24      Q.   Well, do other people that are on the

63

1    sales staff get assigned new accounts that don't

2    generate any income?

3            A.    I don't know.

4            Q.    What evidence do you have that the reason

5    that Bill Ready was assigned Tony Gispert's export

6    accounts rather than you was because you had

7    previously complained about being discriminated

8    against?

9            A.    No.    The only reason I have is what John

10   Glaze told me.    I called him in.    I said I heard that

11   Tony is finally retiring, and I said I am ready and

12   he said, I am sorry, I won't be able to give you the

13   territory, because if you get hit by a bus and get

14   killed, I won't have an export department, and that

15   was the end of our conversation.

16           Q.    And my question again is what evidence do

17   you have that his decision to give those accounts to

18   Bill Ready was because you had previously complained

19   about being discriminated against?

20           A.    I have no evidence, sir.

21           Q.    What evidence do you have that the more

22   lucrative accounts that you claim were given to

23   Dennis Laux were given to him because he was a male?

24           A.    I have no evidence, sir.

1    Q.    What evidence do you have that the new
2    accounts, the more lucrative accounts that you
3    believe were given to Mr. Huempfner were given to him
4    because he's a male?

5    A.    I have no evidence.

6    Q.    What evidence do you have that any
7    accounts that you believe were more lucrative were
8    given to a gentleman by the name of Peterson were
9    given to him because he's a male?

10    A.    I have no evidence.

11    Q.    And what evidence do you have that any of
12    the accounts that you believe were more lucrative
13    were given to Mr. Bresnehan because he was a male?

14    A.    I have no evidence.

15    Q.    Let's go to page 8.  Now, this is Count
16    III, and it's your claim of sex discrimination, and
17    if you will look at Count III, and if you also look
18    at Count VII on page 15 I would like for you to read
19    through both of them and satisfy yourself that they
20    are the same allegations, just one is under Title VII
21    and one is under what is identified here as the FCRA,
22    which is the Florida Civil Rights Act, because I am
23    going to ask you some questions about your claim of
24    sex discrimination, but my questions are going to be

1   the same for Title VII and the Florida Civil Rights

2   Act, since your allegations are the same under both

3   statutes, but I want you to be comfortable and

4   understand why I am doing it this way so I don't go

5   through the same questions twice.

6           A.   Okay.

7           Q.   Okay.  Now, we will just use paragraph

8   21, which is the same as paragraph 49.

9                It says you were treated differently and

10  worse than male sales representatives.

11               And in particular it says first that they

12  failed or passed over you for promotions.

13               My first question to you is when were you

14  passed over for a promotion?

15          A.   For assignments of accounts.

16          Q.   So you are not talking about being

17  promoted to a different position within the

18  company --

19          A.   No, sir.

20          Q.   -- from sales rep?

21          A.   No, sir.

22          Q.   You are not alleging that the company

23  didn't promote you to manager or sales manager?

24          A.   I am not looking for that, sir.

66

```
 1          Q.   So this again relates to --
 2          A.   Accounts.
 3          Q.   -- the assignment of accounts?
 4          A.   Yes.
 5          Q.   And it goes on to say, and assignments,
 6    so that's talking again about accounts?
 7          A.   Yes, sir.
 8          Q.   So the discrimination that you feel
 9    occurred at Unisource was basically the
10    discrimination in the assignment of accounts?
11               MS. DALEY:   Objection to form.
12    BY MR. BUCKLER:
13          Q.   Correct?
14          A.   Would you repeat that again?
15          Q.   The discrimination on the basis of sex
16    that you are complaining about here was
17    discrimination in the assignment of accounts to sales
18    representatives?
19          A.   Yes.
20          Q.   Is there any other sex discrimination
21    that you are talking about in paragraph 21, other
22    than the assignment of accounts?
23          A.   No.
24               MS. DALEY:   Go ahead and read the
```

1        complaint.

2                THE WITNESS:  Would you read me the

3        question back, please?

4    BY MR. BUCKLER:

5        Q.    The question is, other than the

6    assignment of accounts, which you are alleging here

7    were accounts that were assigned on a discriminatory

8    basis to the men rather than you, is there any other

9    gender discrimination that you are talking about here

10   in this particular paragraph?

11       A.    No.

12       Q.    All right.  Now, we have already plowed

13   this turf a little bit with regard to the equal pay

14   claim, but in answering my previous questions you had

15   identified three situations where people left the

16   company and their accounts were assigned to people

17   other than you, that you said you believed those were

18   examples of discrimination.

19               Those three people were when Tony Gispert

20   left, when Mike Alto left and when Gene Press left.

21   We have been through those.

22               Any other instances where when somebody

23   left the company you felt like the reassignment of

24   accounts was done on the basis of sex?

```
 1          A.    Yes, when Dennis and Huempfner left.
 2          Q.    Dennis?
 3          A.    Laux, and John Huempfner.
 4          Q.    And John Huempfner.  Do you know who got
 5   Dennis Laux's accounts?
 6          A.    I got one.
 7          Q.    Do know who got the rest of them?
 8          A.    No, sir.
 9          Q.    Do you know who got John Huempfner's
10   accounts?
11          A.    No, but I got one.
12          Q.    Okay.  And you don't know who got the
13   others?
14          A.    No, sir.
15          Q.    What evidence do you have that the
16   reassignment of John Huempfner's accounts to other
17   people in the sales force, when he left, was done on
18   the basis of sex?
19          A.    None.
20          Q.    What evidence do you have that the
21   reassignment of Dennis Laux's accounts when he left
22   was done on the basis of sex?
23          A.    None.
24          Q.    What evidence do you have that the
```

1    reassignment of Mike Alto's accounts when he left was

2    on the basis of sex?

3         A.    None.

4         Q.    And what evidence do you have that the

5    reassignment of the Gene Press' accounts when he left

6    was done on the basis of sex?

7         A.    Gene Press' accounts were not

8    reassigned.  They sat there for two years.

9         Q.    I'm sorry?

10        A.    Gene Press' accounts were not

11   reassigned.  They just sat on the books for two

12   years.

13        Q.    What evidence do you have that the

14   failure to reassign Gene Press' accounts was done on

15   the basis of sex?

16        A.    Well, when I requested them to Bill Ready

17   he said that I was not qualified to work the

18   accounts.

19        Q.    But to the best of your knowledge he

20   didn't give those accounts to a male counterpart at

21   that point?

22        A.    No.

23        Q.    When did Dennis Laux leave; do you know?

24        A.    I believe it was the end of '98.  I

70

```
 1   believe it was December, but best of my knowledge.
 2        Q.   And what about John Huempfner?
 3        A.   Same.  Left the same day.
 4        Q.   Let's go to page 10, Count IV.
 5             Again, this is -- if you will look, this
 6   is basically the same allegation under Count IV.
 7   It's under Florida Civil Rights Act and under Count
 8   VIII on page 7 -- yes, Count VIII on page 17, it's
 9   under Title VII, but if you will look you will see
10   the paragraphs are basically the same.
11             This is your claim that you were
12   discriminated against because you are Hispanic, okay?
13        A.   Yes, sir.
14        Q.   If you look at paragraph 29 it says that
15   you were passed over or they failed to consider you
16   for assignments when lesser qualified non-Hispanic
17   people were given the assignments.
18             Are we talking, again, about the
19   assignment of accounts?
20        A.   Yes, sir.
21        Q.   So it's the same accounts that we talked
22   about on sex, you are saying not only was the
23   discrimination in assignment of those accounts based
24   on your sex, it was also based on the fact you are
```

```
 1  Hispanic?
 2        A.    Correct.
 3        Q.    What evidence do you have that any
 4  accounts were assigned to non-Hispanic sales
 5  representatives in the work force because of their
 6  race?
 7        A.    None.
 8        Q.    Is John Huempfner Hispanic, to the best
 9  of your knowledge?
10        A.    No.
11        Q.    What evidence do you have that any
12  accounts that were given to John Huempfner were given
13  to him because he was non-Hispanic?
14        A.    None.
15        Q.    What evidence do you have that when John
16  Huempfner left his accounts were given to other
17  people because they were not Hispanic?
18        A.    None.
19        Q.    Is Dennis Laux Hispanic?
20        A.    Not that I know.
21        Q.    What evidence do you have that Dennis
22  Laux was given accounts that you weren't given
23  because he was not Hispanic?
24        A.    None.
```

```
 1         Q.   When he left, what evidence do you have
 2   that the accounts that he was servicing were given to
 3   non-Hispanics because of their race?
 4         A.   None.
 5         Q.   Gene Press, is he Hispanic?
 6         A.   No.
 7         Q.   What evidence do you have that Gene Press
 8   was given accounts that you weren't given that were
 9   given to him because he's not Hispanic?
10         A.   I don't understand your question.
11         Q.   What evidence do you have that the reason
12   Mr. Press was given accounts that you weren't given
13   was because he was not Hispanic?
14         A.   Mr. Press was the general manager.
15         Q.   So Mr. Press is not one of the people
16   that you are complaining about and saying he was
17   given accounts?
18         A.   No, sir.  I asked for his accounts when
19   he left, when he was fired, or when he was
20   terminated.
21         Q.   Okay.  But during the time he was there
22   you are not alleging he was assigned accounts because
23   he was not Hispanic that you were passed over for?
24   We're not communicating here.
```

73

```
 1           A.   Yes, somewhere we left each other.

 2           Q.   My understanding is you are saying Gene

 3    Press had some sales accounts --

 4           A.   Correct.

 5           Q.   -- that you should have gotten when he

 6    left?

 7           A.   Correct.  I asked for those accounts.

 8           Q.   And my question first is during the time

 9    he was there, before he left, he was apparently

10    assigned some accounts.  He was assigned accounts?

11           A.   No, those are accounts he had for years

12    and years from Saxon Paper.  That's something that

13    came from way, way, way before.

14           Q.   So you are not alleging that Gene Press

15    was assigned accounts on a discriminatory basis?

16           A.   No, sir.

17           Q.   That's what I wanted to get clear.  Now,

18    when he left though you are saying there were some

19    accounts from his that did not get reassigned?

20           A.   Correct.

21           Q.   And you went and asked for those accounts

22    and you weren't given those accounts?

23           A.   Correct.

24           Q.   What evidence do you have that the reason
```

1    for not giving you those accounts was because you are
2    Hispanic?

3           A.    None.

4           Q.    Mike Alto, what evidence do you have that
5    during the time Mike Alto was employed at Unisource
6    that he was assigned accounts that you were not
7    assigned to because he is not Hispanic?

8           A.    None.

9           Q.    He is not Hispanic, to the best of your
10   knowledge?

11          A.    No.

12          Q.    And when he left there were some accounts
13   of his that were reassigned.  What evidence do you
14   have that the accounts that were reassigned from Mike
15   Alto were assigned to other people because of their
16   race?

17          A.    None.

18          Q.    Tony Gispert.  When Gispert left his
19   accounts were given to Bill Ready.  Mr. Ready is not
20   Hispanic, as I understand, correct?

21          A.    Correct.

22          Q.    What evidence do you have that the
23   decision to give Mr. Ready these accounts was because
24   of his race?

```
 1         A.   None.
 2         Q.   Skipping back to your gender claim that
 3   we went over a minute ago, sex.
 4              In regard to the assignment of accounts,
 5   whenever accounts were reassigned or whenever new
 6   accounts came in to be assigned to salespeople, what
 7   evidence do you have that the assignment of these
 8   accounts was made on the basis of an individual's
 9   sex?
10         A.   The lucrative accounts always were given
11   to men.
12         Q.   When you started there did you bring any
13   accounts with you?
14         A.   Of course.
15         Q.   When you came there at the start?
16         A.   To which one, Butler?
17         Q.   To Butler.
18         A.   To Butler, yes, I did.
19         Q.   All right.  How many of the accounts that
20   you are servicing now are accounts you brought with
21   you from Butler?
22         A.   None.
23         Q.   Or brought with you to Butler?
24         A.   None.  When we merged whoever had the
```

1   highest volume of sales, the accounts were split up.

2          Q.    When you merged with?

3          A.    Unisource.

4          Q.    Unisource.  That merger occurred when?

5          A.    End of '94, to the best of my knowledge.

6          Q.    So at that point in time you were

7   assigned to some accounts when the merger with

8   Unisource occurred, correct?

9          A.    I was assigned accounts, yes.

10          Q.    And some of those were pretty lucrative

11   accounts?

12          A.    No.

13          Q.    No?

14          A.    No.

15          Q.    Have you never been assigned an account

16   that has been lucrative?

17          A.    No.

18          Q.    So how have you gotten these accounts?

19          A.    My lucrative accounts are my export

20   accounts, the ones I go and knock on doors and make

21   phone calls, and got myself.

22          Q.    Okay.  And basically you and Gispert, as

23   I understand it, were the two people who were in the

24   export sales business?

```
 1          A.    Correct.
 2          Q.    Is there anybody else there over the last
 3   five years who was involved in export sales?
 4          A.    I believe that Kathy Healy has one
 5   account or two that she brought from Butler and they
 6   come in once -- once every six months or so.
 7          Q.    But 99 percent of the export sales were
 8   either yours or Gispert's?
 9          A.    Correct.
10          Q.    Is Gispert Hispanic?
11          A.    I think so.
12          Q.    Okay.  How long has your focus been in
13   export sales?
14          A.    Since 1989.
15          Q.    Since '89?
16          A.    (Nods head in the affirmative.)
17          Q.    And what percentage of your sales volume
18   is export sales?
19          A.    In a good year, about 80 percent.
20          Q.    And in a bad year?
21          A.    Forty percent.  It goes with the market.
22          Q.    Now, the non-export sales, how did you
23   get those accounts?  Were they assigned to you?
24          A.    Some were coming in from Butler that I
```

1   was able to keep and some the customers call in

2   because we had a previous relationship and they have

3   requested that I continue being the sales rep.

4        Q.   But when you came to work for Butler Bill

5   Ready was your manager?

6        A.   Yes, sir.

7        Q.   And he was the person at that point in

8   time when a new account would either come in or come

9   open, because somebody was leaving, Bill Ready would

10  have been the basic person that reassigned the

11  account?

12       A.   Correct.

13       Q.   And over the years that you worked for

14  Bill Ready, roughly ten years, Bill Ready assigned

15  you new accounts when they came in, didn't he?

16       A.   A few times.

17       Q.   And some of those accounts have generated

18  income?

19       A.   A few times.

20       Q.   Now, there is another sales

21  representative whose name appears on these three

22  commission sheets that I have given you Ortega 4, 5

23  and 6 by the name of Baquero-Vega, another female?

24       A.   Correct.

```
 1          Q.   Who I assume by her name is Hispanic?

 2          A.   No, she was born here.  She's American.

 3          Q.   But that is a Hispanic surname, correct?

 4          A.   Correct, her parents are Cuban.

 5          Q.   So she's Cuban?

 6          A.   No, she's not.  She's American.  She's

 7   born in United States.

 8          Q.   I understand.

 9          A.   She's from Cuban descendant.

10          Q.   That's what I was trying to determine.

11          A.   Okay.

12          Q.   All right.  Was she at Butler Paper with

13   you or did she come through Unisource?

14          A.   She comes from Saxon.

15          Q.   Which came through -- what is that?

16          A.   Saxon was -- we merged between Saxon and

17   Butler and we became Unisource Miami.  Saxon was the

18   company that was acquired before we were acquired.

19          Q.   So you began to work with her at the time

20   of that merger?

21          A.   Correct.

22          Q.   Which would have been in --

23          A.   The end of '94.

24          Q.   Now, does she work in domestic or export
```

1    sales?

2              A.    Domestic.

3              Q.    Do you know how Baquero-Vega got her

4    accounts?

5              A.    She inherited them from her father.  She

6    took the territory from her father when he got very

7    ill and she started working and covering for him and

8    finally she was kept as a full-time employee of

9    Saxon.

10             Q.    And this goes back to the Saxon days?

11             A.    Correct.

12             Q.    So the accounts she has now are accounts

13   that she took over from her father years ago, when he

14   was --

15             A.    And some new accounts she has opened up

16   and so forth and so on.

17             Q.    Do you know how she's gotten those new

18   accounts?  Do you know who has assigned them to her?

19             A.    No, sir.

20             Q.    Can you give me any new accounts that

21   came in?

22                   I am not talking about accounts where

23   somebody leaves and they have to be reassigned.  I am

24   talking about new accounts, that you know of, that

1    were assigned to a male employee because of his sex?

2         A.    I have no knowledge of that.

3         Q.    Can you identify any particular new

4    accounts, not accounts that are being reassigned when

5    somebody leaves, but new accounts that were given to

6    any non-Hispanic employees because of their race?

7         A.    I have no knowledge of that.

8         Q.    Let me get down to some specific names.

9              During the period of between 1996,

10   January 1st of '96 and the current date, or up until

11   the point in time when he left the company, can you

12   identify any new accounts that came to

13   Georgia-Pacific that were given to Dennis Laux that

14   you believe were given to him because of his sex,

15   that you have evidence were given to him because of

16   his sex?

17        A.    No, and Dennis was not employed by

18   Georgia-Pacific.  He left when we were still

19   Unisource.

20        Q.    Let me rephrase it.  Can you identify

21   between the period between January 1st of '96 and the

22   current time, any new accounts that came in that five

23   year period, that were assigned to Dennis Laux

24   because of his sex?

1          A.    No.

2          Q.    During the same time period, January 1st

3     of '96 to the current time, or to the time that he

4     left, can you identify any new accounts that came in

5     during that time period that you have evidence were

6     assigned to John Huempfner because of his sex?

7          A.    No.

8          Q.    Same time frame, January 1st of '96 to

9     the current time, in the current time, during that

10    time frame, any evidence of any new accounts that

11    were assigned to Mr. Peterson because of his sex?

12         A.    No.

13         Q.    Same time frame, January 1st, '96 to the

14    current time, any new accounts that you have evidence

15    that were assigned to Mr. Bresnehan because of his

16    sex?

17         A.    No.

18         Q.    During the same time frame, do you have

19    any evidence of any new accounts being assigned to

20    any of these four individuals, Laux, Huempfner,

21    Peterson, or Bresnehan because of their race?

22         A.    No.

23         Q.    How about because of their national

24    origin?

    1        A.    No.

    2        Q.    During the same time frame, January 1st

    3   of '96 to the current time, can you identify any new

    4   accounts that were assigned to either Laux,

    5   Huempfner, Peterson or Bresnehan that you believe

    6   should have been assigned to you?

    7        A.    No.

    8              MR. BUCKLER:    Why don't we break for

    9        lunch.

   10              MS. DALEY:    For how long?

   11              MR. BUCKLER:    How about an hour, be back

   12        at 1.    Is that okay?

   13              MS. DALEY:    That's fine.

   14              (Thereupon a lunch recess was taken,

   15   after which the following proceedings were had.)

   16   BY MR. BUCKLER:

   17        Q.    Ms. Ortega, earlier this morning one of

   18   the situations that you raised where you felt like

   19   you should have been assigned some accounts that you

   20   were not were some accounts that you said were

   21   accounts that had been serviced by Gene Press.

   22        A.    Yes.

   23        Q.    You said you went and asked for some of

   24   these accounts to Mr. Ready and he declined to give

_____

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

1    them to you.

2          A.    Yes, sir.

3          Q.    But you said you weren't aware what he

4    did with the accounts, whether he reassigned them to

5    anybody else.

6          A.    No, sir, they were not reassigned.

7          Q.    All right.  Now, isn't it a fact that one

8    of those accounts that Gene Press serviced at one

9    point in time was an account called Lenatal?

10         A.    Yes, sir.

11         Q.    And now you have Lenatal as an account?

12         A.    Yes, sir.

13         Q.    So at some point in time some of the

14   accounts that Gene Press serviced were ultimately

15   given to you, correct?

16         A.    Two years later.

17         Q.    Is another account Lithographics?

18         A.    Two years later were reassigned by John

19   Glaze, when he came on board.

20         Q.    And when would that have been?

21         A.    I believe John came aboard '96, '97 and

22   both accounts were at zero commission, zero buy from

23   us at all whatsoever, so I started from zero.

24         Q.    Okay.  But they were accounts that were

1    previously handled by Gene Press?

2        A.    Yes, sir.

3        Q.    Now, you mentioned a situation that

4    occurred, I think you said approximately four years

5    ago, when Mr. Huempfner had announced he was leaving?

6        A.    Yes, sir.

7        Q.    And you said they came down here and met

8    with him and changed his commission basis, you

9    believed?

10       A.    Yes, sir.

11       Q.    But you don't know how or in what way

12   they changed?

13       A.    No, sir.  I wasn't involved in that.

14       Q.    Do you know whether or not what they did

15   was that they changed the commission basis for web

16   sales?

17       A.    I am not involved.  All I know is John

18   Huempfner carried two different sales numbers.

19       Q.    Do you know whether or not the difference

20   was between his web sales and his sheet sales?

21       A.    I wasn't involved in that, sir.  I don't

22   know.

23       Q.    And do you know whether or not whatever

24   changes were made to Mr. Huempfner's commission was

```
 1   also made with other people doing web sales?
 2        A.   I wasn't involved.  I don't know.
 3        Q.   Have you ever done web sales?
 4        A.   No, sir.
 5        Q.   Have you ever asked for web sales
 6   accounts?
 7        A.   I was given one when John Huempfner
 8   left.
 9        Q.   So one of Huempfner's accounts you were
10   given when he left?
11        A.   Right, it was $14.
12        Q.   Was it web sales?
13        A.   It was web sales and then I turned it in
14   the minute I walked into the place.
15        Q.   You did what?
16        A.   I turned it back into the company.
17        Q.   It was assigned to you and you gave it
18   back to the company?
19        A.   Yes, sir.
20        Q.   And what is the name of it?
21        A.   It was Continental, Continental Printing
22   in Hialeah.
23        Q.   And other than that one instance when
24   they gave you Continental Printing as an account,
```

1    have you ever done any web sales since?

2         A.    No, sir.

3         Q.    Are there any web sales accounts that you

4    believe should have been assigned to you, but were

5    assigned to someone else?

6         A.    No, sir.  I don't get involved in web

7    sales at all.

8         Q.    So your complaint here in regard to

9    assignment of accounts does not deal with web sales?

10        A.    No, sir.

11        Q.    Now, you also mentioned an account that

12   you said you felt was taken away from you, AIB?

13        A.    Yes, sir.

14        Q.    Now, ultimately that account was given

15   back to you, correct?

16        A.    Yes, sir.  The customer called John

17   Glaze.

18        Q.    And how long were you without the AIB

19   account?

20        A.    About six months.

21        Q.    And prior to the AIB account being taken

22   away from you, did John Glaze counsel with you about

23   the declining volume of sales with AIB?

24        A.    Yes, he did.

 1          Q.    And at the time that he took it away from
 2     did, he say that he was reassigning it because there
 3     had been a decline in volume?
 4          A.    Yes, he did.
 5          Q.    Had there been a declining volume at that
 6     point?
 7          A.    Yes, it has been, and it wasn't because
 8     of Betty Ortega.
 9                It was because of my warehouse manager
10     and they couldn't take -- they had to take straight
11     trucks and my warehouse manager kept sending a
12     tractor trailer, so he got very upset.   He left
13     several messages for him.
14          Q.    He, being the account?
15          A.    The account, yes, and my warehouse
16     manager would not return calls and he transferred all
17     the business to Mac Paper.
18                John and I went and visited the account,
19     trying to solve the situation.
20          Q.    So John went with you -- before removing
21     it he went with you to the account to try to solve
22     the situation?
23          A.    Right.   After we went in to try to
24     resolve the situation my warehouse manager again sent

1   a tractor trailer inside the account.

2        Q.    So you don't deny that the volume was off

3   on the AIB account, you are just saying it wasn't

4   because of anything you had done or failed to do?

5        A.    Correct.

6        Q.    Now, one of the things you told me when I

7   got confused about Gene Press, was that you weren't

8   talking about any accounts that were assigned to Gene

9   Press, you were just complaining about not being

10  assigned some of his accounts when he left.

11             You explained to me because you said Gene

12  Press was a manager and wasn't in sales, correct?

13       A.    Correct.  Gene Press is a general manager

14  so I have no knowledge of anybody assigning accounts

15  to Gene Press.

16       Q.    Wasn't Mike Alto a manager for a period

17  of time, too?

18       A.    After I went in, before he was a sales

19  rep.

20       Q.    He was a manager before he was a sales

21  rep?

22       A.    Correct.

23       Q.    Okay.  Now, going back to your complaint

24  again, if you look at paragraph 18, it says that you

1  complained --

2        A.   What page?  I'm sorry.

3        Q.   It's on page 6.  It says you complained

4  on repeated occasions to your supervisors, including

5  managers, and vice presidents, that you believed you

6  were being paid less than your male counterparts.

7        A.   Yes, sir.

8        Q.   I want to know who you complained to and

9  when these occurrences happened?

10       A.   I complained to Bob McKee.  Bob McKee was

11  our general manager regional vice president, and he

12  carried all the titles from Unisource, which I can't

13  remember.

14             The minute he walked into our office I

15  went in and sat with him.  I said, this is happening,

16  Bill Ready is assigning accounts to Huempfner, Dennis

17  Laux, Larry Press, we're not given equal

18  opportunities.

19             I requested the accounts from Gene Press,

20  I wasn't given.  Nothing happened.

21       Q.   When would this complaint to McKee have

22  occurred?

23       A.   Mid '95, beginning of '96.

24       Q.   Any other conversations with McKee, other

1   than this one you are talking about here?

2           A.    No.   There were several, but I stopped

3   talking to him about it because he didn't do

4   anything.

5           Q.    When was your last complaint to McKee?

6           A.    When was my last complaint?  Sometime in

7   '96.

8           Q.    All right.  Other than McKee, anybody

9   else at management at Georgia-Pacific that you voiced

10  complaints to about?

11          A.    First Unisource.

12          Q.    Unisource, I'm sorry.  I will try to keep

13  that straight.  Anybody else in Unisource?

14          A.    John Glaze.

15          Q.    John Glaze.  And when did you complain to

16  John Glaze?

17          A.    I think the first or the second week he

18  was into the job.

19          Q.    Which would have been when?

20          A.    I don't know.

21          Q.    Roughly?

22          A.    John has been there four years, so

23  sometime in '96.

24          Q.    All right.  What did you tell John Glaze?

```
 1              A.     Same thing I told Bob McKee, that Bill
 2    Ready was playing favoritism with John Huempfner and
 3    Dennis Laux and certain individuals in our office and
 4    that I wasn't given the accounts and I gave him the
 5    story about Gene Press and I told him my export
 6    experience and we had many, many conversations about
 7    this.
 8              Q.     When was the last time you complained to
 9    John Glaze about it?
10              A.     End of '98.
11              Q.     Anybody else?
12              A.     No.  I had the same conversation with
13    Billy Thomas in the industrial end.
14              Q.     With who?
15              A.     Billy Thomas.
16              Q.     When would that have been?
17              A.     '95, and Jose Encinosa the same year.
18              Q.     Okay.  And when was your complaint to
19    Jose Encinosa?
20              A.     Same thing.  So Jose was --
21              Q.     When?
22              A.     '95, '96.  Then Jose, I believe, became
23    manager end of '96 or something like that, for the
24    industrial end.
```

| | | |
|---|---|---|
| 1 | Q. | Anybody else? |
| 2 | A. | No, sir. |
| 3 | Q. | Now, if you look at paragraphs 40 and |

4  68 --

5          A.    Which page?

6          Q.    It's on page 13.

7          A.    Okay.

8          Q.    Are these the same conversations you just

9   discussed with me, or are they different ones?

10          A.    No, those are the ones.

11          Q.    So in these conversations you raised not

12   only sex discrimination, but you also raised what you

13   believe was discrimination on the basis of your being

14   Hispanic?

15          A.    Correct.

16          Q.    And on page 20, paragraph 68, you are

17   still talking about the same complaint we just

18   discussed here, correct?

19          A.    (Nods head in the affirmative.)

20          Q.    You have to say yes or no.

21          A.    Yes.  I'm sorry.

22          Q.    That's okay.  Now, since 1996 when

23   Mr. Glaze arrived the fact of the matter is is that

24   you have been assigned a number of new accounts,

1   haven't you?

2       A.   Yes.

3       Q.   And some of them have proved to be fairly

4   lucrative?

5       A.   Yes, they have.

6       Q.   Lenatal being one?

7       A.   Yes, they have.

8       Q.   Now, I am going to go down a list of

9   accounts and ask you if these are accounts that have

10  been assigned to you in the last five years.

11      A.   Okay.

12      Q.   A.B. Graphic?

13      A.   Yes.

14      Q.   All American Paper & Supplies?

15      A.   Yes.

16      Q.   Associated Insurance Brokers?

17      A.   That was my account before and it was

18  reassigned again.

19      Q.   Color Express?

20      A.   Yes, sir.

21      Q.   Continental Printing Company?

22      A.   Yes, sir.   That's the one I was referring

23  that I gave back.

24      Q.   Okay.   Desber Import Export?

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Editorial Televisa? |
| 3 | A. | Yes, sir. |
| 4 | Q. | Executek Printing & Duplication? |
| 5 | A. | Yes, sir. |
| 6 | Q. | Florida Power & Light? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Gould Paper? |
| 9 | A. | Yes, sir. |
| 10 | Q. | Graphic Works, Incorporated? |
| 11 | A. | I don't recall that one. |
| 12 | Q. | Hispanic Mail Advertising? |
| 13 | A. | Yes, sir. |
| 14 | Q. | Litho Nova International Corporation? |
| 15 | A. | That's one of my new accounts.  It wasn't |
| 16 | assigned. | |
| 17 | Q. | It's one of the new accounts you |
| 18 | developed? | |
| 19 | A. | I developed. |
| 20 | Q. | Okay.  Maison Henri Deschamp? |
| 21 | A. | I believe that's Ready's account. |
| 22 | Q. | Multi Graphics & Paper? |
| 23 | A. | That's mine. |
| 24 | Q. | Nassau Hotel & Restaurant? |

```
 1          A.    That's mine.
 2          Q.    Is that a Bahamian account?
 3          A.    Yes, sir.
 4          Q.    Do you cover the Bahamas?
 5          A.    I cover the industrial end in the
 6    Bahamas.  I don't travel to the Bahamas.
 7          Q.    You cover the industrial end of the
 8    Bahamas?
 9          A.    Right, over the phone.
10          Q.    Who covers the other part of the Bahamas?
11          A.    Bill Ready.
12          Q.    Okay.  Paper Corporation of U.S.?
13          A.    That is Unisource International.  That's
14    our sister company and because sometimes they wanted
15    to buy a case of emblems and they want to have their
16    own account so it was put in.  They don't buy
17    anything from us.
18          Q.    But it's a new account that you were
19    assigned?
20          A.    Yes.
21          Q.    Since '96?
22          A.    Yes.
23          Q.    Pedro Ramirez Paper?
24          A.    That was my account.  It wasn't assigned
```

1  to me.

2          Q.    Pitney-Bowes Management?

3          A.    I brought that account from Butler.

4          Q.    Precision Art Printing?

5          A.    Precision was my account from Butler and

6  the customer called in and requested that I was the

7  sales rep again and I turned it in.

8          Q.    But they gave it to you again, it was

9  reassigned to you since '96?

10         A.    And I turned it in again.

11         Q.    You gave it back?

12         A.    Right.

13         Q.    Okay.  I am assuming you give them back

14 because you don't feel like you are going to be able

15 to make any inroads there?

16         A.    No, there are continue accounts in Miami

17 that I will not go into because of things that are

18 happening that I don't feel comfortable walking into

19 it and I'm very open about it, so I told management

20 and they sent somebody else.

21         Q.    But they gave you that account and you

22 gave it back?

23         A.    Correct.

24         Q.    Saral Publications?

1          A.    Yes.

2          Q.    Sep's and Neg's, Incorporated?

3          A.    Yes, no longer in business.

4          Q.    But that one was assigned to you?

5          A.    Yes, sir.

6          Q.    SunSwipe?  You don't recall that one?

7          A.    Doesn't ring a well.  It could be from

8    the industrial end.

9          Q.    Are there some other new accounts you

10   have been assigned since '96, other than the ones I

11   have given you here, that you can recall today?

12         A.    No, sir.

13         Q.    But Lenatal should be on that list, too?

14         A.    It should be and Lithographic Printer

15   should be on there, also.

16               (The document referred to was thereupon

17   marked Ortega Exhibit No. 7 for Identification, a

18   copy of which is attached hereto.)

19   BY MR. BUCKLER:

20         Q.    I hand you what we marked as 7; is that

21   correct?

22         A.    Yes.

23         Q.    It's the employee handbook for

24   Unisource.  Do you recall receiving this handbook?

```
1              A.    Yes, sir.
2              Q.    When you got it did you look through it
3    and read it over?
4              A.    Yes, sometimes.
5                    (The document referred to was thereupon
6    marked Ortega Exhibit No. 8 for Identification, a
7    copy of which is attached hereto.)
8    BY MR. BUCKLER:
9              Q.    This is Exhibit 8 and it's a two page
10   exhibit and these are two different receipts.
11                   Is that your signature on each one of
12   these?
13             A.    Yes.
14             Q.    Where you signed as receiving the
15   handbook and when it changed and they gave you a
16   second one.  Do you recall doing that?
17             A.    Yes.
18             Q.    Now, the handbook contains a procedure
19   for complaining if you feel you have been
20   discriminated against?
21             A.    Yes, sir.
22             Q.    Are you familiar with that?
23             A.    Some of it.
24             Q.    My question is did you ever follow the
```

1    procedure set forth in the handbook in bringing forth

2    any of the complaints that you have talked about

3    about discrimination?  Did you ever follow the

4    handbook procedure in doing that?

5        A.    Not in writing.  I did it verbally with

6    my management.

7        Q.    The way you talked about earlier?

8        A.    Yes, sir.

9              (The document referred to was thereupon

10   marked Ortega Exhibit No. 9 for Identification, a

11   copy of which is attached hereto.) 9

12   BY MR. BUCKLER:

13       Q.    I hand you what I marked as Exhibit 9,

14   which is a Unisource policy called the Help Policy,

15   that I understand is posted at the office in

16   Miramar.

17       A.    Yes, sir.

18       Q.    And it provided a toll free number where

19   you can call if you feel you have been treated

20   discriminatorily?

21       A.    Yes, sir.

22       Q.    Have you ever exercised the option of

23   calling from --

24       A.    I didn't call.  I believe it was in 1995,

1    end of '96 I was a part of all the sales rep signing

2    a letter for Billy Thomas, to have him removed from

3    his position.

4           Q.   And he was?

5           A.   And he was and he was very well kept in

6    another position and he's back in town again.

7                So after that I was very afraid.  And, as

8    a matter of fact, we were at a Circle of Excellence

9    and I was sitting at a table and I was retaliated by

10   one of our corporate people and at that particular

11   point I complained to Bob McKee.

12          Q.   Let's back up, because you are running

13   some stuff together for me.

14               You are running a few things together and

15   I want to go through it slowly, so I understand what

16   you are talking about.

17               My first question to you was did you ever

18   exercise any --

19          A.   No.

20               MS. DALEY:  Let him finish the question.

21   BY MR. BUCKLER:

22          Q.   Did you ever exercise your rights under

23   the Help Policy and contact anybody pursuant to the

24   Help Policy?

```
 1                    MS. DALEY:  Ms. Ortega, read the policy.
 2                    MR. BUCKLER:  She said she did.
 3                    MS. DALEY:  Just read the whole thing.
 4                    THE WITNESS:  I did.
 5   BY MR. BUCKLER:
 6        Q.   The answer was?
 7        A.   No.
 8        Q.   Now, then you said that you signed a
 9   letter along with a number of other employees?
10        A.   Yes, sir.
11        Q.   Out of the Miramar facility complaining?
12        A.   No, out of the Miami facility.
13        Q.   Out of the Miami facility, complaining
14   about an individual by the name of Billy Thomas?
15        A.   Yes, sir.
16        Q.   And this would have been back when, in
17   '94?
18        A.   Should have been '94, '95.
19        Q.   Okay.  And as a result of your complaint,
20   you and other peoples, not just yours, a number of
21   people complained, correct?
22        A.   (Nods head in the affirmative.).
23                    (The document referred to was thereupon
24   marked Ortega Exhibit No. 10 for Identification, a
```

1  copy of which is attached hereto.)

2  BY MR. BUCKLER:

3       Q.   I have handed you what's been marked as

4  Exhibit 10 and ask you if this is the letter that you

5  were referring to about where your complaint was

6  registered about Billy Thomas.

7            And on the next page there are 20

8  signatures, as I count them, roughly 20 signatures of

9  employees out of the Miami facility, one of which is

10 yours, correct?

11      A.   Correct.

12      Q.   And this is the letter you were talking

13 about, as a result of your having submitted this

14 letter Billy Thomas was removed from the Miami

15 facility, correct?

16      A.   Yes, sir.

17      Q.   Now, he was transferred to where; do you

18 know?

19      A.   Atlanta.

20      Q.   Do you know what position he was given in

21 Atlanta?

22      A.   I think sales rep.

23      Q.   So he was removed from any management

24 position and put in a sales position where he was not

1   supervising any employees?

2          A.   Yes.

3          Q.   Now, you said since then he is now back

4   in Miami, in the Miami area?

5          A.   He's in charge of the national accounts.

6   He has been in our branch several times.

7          Q.   So he's still in sales, to the best of

8   your knowledge?

9          A.   He's in charge of national accounts, so I

10  don't know if that's a management position or if

11  that's a sales position.

12         Q.   You don't know?

13         A.   I have no knowledge of that, no, sir.

14         Q.   Now, this letter in regards to Billy

15  Thomas is a complaint about a number of different

16  areas of inappropriate conduct on his part, but when

17  it comes to discrimination, the letter focuses on

18  racial discrimination.

19              It doesn't focus on sex, as I read the

20  letter.  You tell me, but I don't see anything in

21  this letter that complains about any discrimination,

22  other than racial discrimination.

23         A.   We were all interviewed and they did an

24  overall letter.  I wasn't a part of whoever wrote the

1    letter.  I was part of the interview with Cecil

2    McClary and Bob McKee at that particular time.

3        Q.    Who came down and investigated as a

4    result of the letter?

5        A.    Right.  They talked to me about what

6    these problems were with Billy Thomas.

7        Q.    And in that --

8        A.    And in that was the sexual and I made a

9    point of what he had said and the things that he was

10   saying about my accounts and myself, and that was

11   it.

12              I was not a part of the committee.  When

13   I signed the letter I was just given the letter that

14   particular day.

15       Q.    But when they came down and interviewed

16   you, you raised not only the racial aspect of things

17   but also the sex?

18       A.    (Nods head in the affirmative.)

19       Q.    Now, that was your conversation with

20   Cecil McClary and McKee?

21       A.    Correct.

22       Q.    Now, what about your conversations with

23   John Glaze, when you complained about

24   discrimination?  Did you raise national origin in

```
 1    those conversations?

 2         A.   Of course.

 3         Q.   Did you say you were discriminated

 4    against because you were Cuban?

 5         A.   Yes, sir.

 6         Q.   Did you complain you felt you were

 7    discriminated against because you were Hispanic?

 8         A.   Yes, sir.

 9         Q.   And also you complained about sex?

10         A.   Because I was female, yes.

11         Q.   So you raised all three of those in your

12    conversations with Glaze?

13         A.   Yes, sir, referring to Bill Ready.

14         Q.   Referring to Bill Ready?

15         A.   Correct.

16         Q.   Now, earlier today you told me that you

17    thought Bill Ready had discriminated against you on

18    the basis of your sex and your race and your national

19    origin?

20         A.   Yes, sir.

21         Q.   But also you told me you thought John

22    Glaze had, correct?

23         A.   Yes, sir.

24         Q.   Have you raised any complaint to anyone
```

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

```
 1   about John Glaze discriminating against you?
 2        A.   No, sir.
 3        Q.   Okay.
 4             (The document referred to was thereupon
 5   marked Ortega Exhibit No. 11 for Identification, a
 6   copy of which is attached hereto.)
 7   BY MR. BUCKLER:
 8        Q.   I am going to hand you a Unisource
 9   document that's identified as a Unisource policy and
10   procedure regarding harassment of employees.
11             Are you familiar with this particular
12   policy?  You have seen this before?
13        A.   I have seen it.  I didn't see it in 1994.
14        Q.   But you have seen it since then?
15        A.   Yes, I saw it since then.
16             (The document referred to was thereupon
17   marked Ortega Exhibit No. 12 for Identification, a
18   copy of which is attached hereto.)
19   BY MR. BUCKLER:
20        Q.   I hand you a document we marked as Ortega
21   12, which is another Unisource policy and procedure,
22   Subject:  Equal Employment Opportunity.
23             You have seen that document before,
24   ma'am?
```

```
 1            A.    I don't recall, but I should have.
 2            Q.    Okay.
 3                  (The document referred to was thereupon
 4     marked Ortega Exhibit No. 13 for Identification, a
 5     copy of which is attached hereto.)
 6     BY MR. BUCKLER:
 7            Q.    I hand you a letter from the EEOC that is
 8     addressed to you, and care of Karen Coolman Amlong at
 9     Amlong & Amlong.
10                  I am going to ask you if you recall
11     receiving a copy of that letter?
12            A.    Yes.
13            Q.    Okay.
14                  (The document referred to was thereupon
15     marked Ortega Exhibit No. 14 for Identification, a
16     copy of which is attached hereto.)
17     BY MR. BUCKLER:
18            Q.    I am handing you a copy of a document
19     that is a two page document, but the first page is
20     styled, Equal Employment Opportunity Commission,
21     Dismissal and Notice of Rights, which is a letter
22     from the EEOC addressed to you informing you about
23     the handling of your claim and your right to suit.
24                  Do you recall receiving this document?
```

109

```
 1   You have to speak up, ma'am?
 2        A.   Yes.  I'm sorry.
 3        Q.   Referring you back to your complaint,
 4   amended complaint, page 3.
 5             Let's go on over to page 4, where it
 6   really is.  At the top of page 4 is a part of
 7   paragraph 6, where there is an allegation in there,
 8   "I have been told that customers don't like Hispanic
 9   women because they are too aggressive."
10             This is an allegation in your complaint
11   that was taken from your charge of discrimination?
12        A.   Yes, sir.
13        Q.   Who told you that?
14        A.   Bill Ready.
15        Q.   Bill Ready told you that?
16        A.   Right.
17        Q.   When did Bill Ready tell you that?
18        A.   I can't recall.  It was in one of our
19   reviews.  We were talking about accounts and progress
20   we get and all that.
21        Q.   Bill Ready was your supervisor for ten
22   years, roughly?
23        A.   Yes, sir.
24        Q.   At what point in this ten years did Bill
```

1    Ready say this?

2        A.    Approximately in '97, when we got into

3    the issue of accounts and back and forth and my sales

4    were not going and I asked --

5        Q.    So this statement would have been made to

6    you sometime around '97?

7        A.    To my best recollection.

8        Q.    To the best of your knowledge?

9        A.    Yes.

10       Q.    Anybody else told you this, other than

11   Bill Ready?

12       A.    Similar to Billy Thomas, but it had to do

13   with my body and the way I was dressing.

14       Q.    This would have been when?

15       A.    Billy was '95, '96.

16       Q.    And what did Billy Thomas say?

17       A.    Billy Thomas said the reason I have so

18   many good sales was because the way I dressed,

19   because of my body language and because the way I

20   conducted business with my customers and that was one

21   of my things with Cecil.

22       Q.    That's one of the things you raised with

23   Cecil?

24       A.    And Bob McKee, when they came in.

1      Q.    When they were investigating the broad
2    complaint against Billy Thomas?

3      A.    Yes, sir.

4      Q.    Anybody else make any comment like this,
5    of Mr. Ready and Mr. Thomas?

6      A.    No, sir.

7      Q.    The one area of your complaint, turn to
8    page 12, that I don't believe I went into in the
9    detail I did with the gender and national origin -- I
10   mean gender and race discrimination, was the national
11   origin discrimination.

12           You got two allegations in here of
13   national origin discrimination, one on page 12 in
14   Count V and the other one is on page 19, Count IX.

15           And there are the same allegations found
16   under the Florida Civil Rights Statute and one is
17   under the Federal Title VII, okay.

18           If you look at paragraph 37 and then
19   again at paragraph 65, it's the same language in both
20   paragraphs, but the allegation is that Unisource
21   failed to consider you and passed over you for
22   assignments and gave them to non-Cuban people.

23     A.    Correct.

24     Q.    Are these the same assignments that you

112

1    talked about earlier that you felt you were passed
2    over because of your race being Hispanic and your
3    sex, because you were a woman?
4        A.    Yes, sir.
5        Q.    No different ones?
6        A.    No different ones.
7        Q.    And the assignments are the assignments
8    of the accounts, correct?
9        A.    Correct.
10       Q.    Can you give me any specific accounts by
11   name, that you feel were assigned to non-Cubans and
12   not you?
13       A.    I won't be able to do that.
14       Q.    What evidence do you have, as we sit here
15   today, that over the last five years any accounts
16   that have been assigned to sales reps out of the
17   office that you work out of, other than yourself,
18   were assigned to them because the people they were
19   assigned to were not Cuban?
20       A.    None.
21       Q.    Do you have any evidence that the
22   company's failure to assign you initially to any of
23   the accounts that were Gene Press' is because you
24   were Cuban?

```
 1              A.    Would you repeat that again.

 2              Q.    Do you have any evidence that the

 3   company's initial failure to assign you the accounts

 4   you requested of Gene Press', that their failure to

 5   do so was because you were Cuban?

 6              A.    No.

 7              Q.    Do you have any evidence that the

 8   company's failure to assign you any of Dennis Laux's

 9   accounts were because you were Cuban?

10              A.    No.

11              Q.    John Huempfner?

12              A.    No.

13              Q.    Mike Alto?

14              A.    No.

15              Q.    To the best of your knowledge was the

16   bulk of John Huempfner's accounts web sales?

17              A.    I have no information on that.

18              Q.    What about Dennis Laux?

19              A.    I have no information on that.

20              Q.    So as we sit here today do you know what

21   kind of accounts John Huempfner had?

22              A.    No, sir.  I don't have a list of his

23   accounts.

24              Q.    You don't know whether they were web or
```

```
 1   sheet?
 2         A.   No, sir.
 3         Q.   You don't know whether they were domestic
 4   or export?
 5         A.   No, but I know one about Dennis.
 6         Q.   I was going to ask you about Dennis
 7   Laux.
 8              What were you going to say about Dennis?
 9         A.   Sep's and Neg's out of Puerto Rico,
10   Dennis was working an export account.
11         Q.   Dennis was?
12         A.   Yes.
13         Q.   When he left that particular account was
14   given to you?
15         A.   Yes, sir.
16         Q.   Do you know of any export accounts that
17   John Huempfner was working that were given to someone
18   other than you, when he left?
19         A.   I have no idea.
20         Q.   Do you know any export accounts that
21   Dennis Laux was working that were given to someone
22   other than you?
23         A.   I have no idea.
24         Q.   Other than the accounts of Tony Gispert
```

1   that were given to Bill Ready, do you know of any

2   other export accounts that someone else was handling

3   and when they left they weren't given to you, they

4   were given to another salesperson?

5           A.   I have no idea.

6               (The document referred to was thereupon

7   marked Ortega Exhibit No. 15 for Identification, a

8   copy of which is attached hereto.)

9   BY MR. BUCKLER:

10          Q.   In this case we, Unisource, filed with

11  your counsel certain questions that are known as

12  interrogatories and you, through your counsel,

13  provided responses.

14              In paragraph 7 or in interrogatory number

15  7 -- if you will just turn to number 7 -- you are

16  asked to identify the equally or lesser qualified

17  males to receive promotions and assignments that you

18  were referring to in paragraph 21 of your complaint.

19              And we have talked about Bill Ready.   We

20  talked about John Huempfner.  We talked about Dennis

21  Laux.

22              There is a fourth person there, Larry

23  Press, who we have not talked about so far today.   We

24  talked about Gene Press, according to my notes, and

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

116

```
 1    this says Larry Press.  These are two different
 2    people?
 3         A.   We talked about Larry Press also at the
 4    beginning.
 5         Q.   But Gene and Larry Press are not the same
 6    person?
 7         A.   No.  Gene is the father, Larry is the
 8    son.
 9         Q.   Okay.  Now, you are asserting that Larry
10    Press got assignments that should have been given to
11    you but were given to him because he was a male,
12    correct?
13         A.   I am saying that he got accounts that
14    should have been assigned to female sales reps and
15    they were assigned to him.
16         Q.   Because he was male?
17         A.   Because he was male.  Because he was Gene
18    Press' son, too.
19         Q.   Well, I am less concerned about him
20    getting them as Gene Press' son than I am about him
21    being a male.
22         A.   Yes, sir.
23         Q.   What I want to know, what is the names of
24    the accounts that Larry Press got because he was a
```

1    male?

2        A.    I have no information on that, sir.

3        Q.    All right.  When would these accounts

4    have been assigned to Larry Press?

5        A.    He went to Pebble Beach in '95 so should

6    have been right into the day he left.  I believe he

7    left mid '95, a few months after his father left.

8        Q.    So any discriminatory assignment via

9    Larry Press occurred before '96?

10        A.    Yes.  He came in at the end of '94.

11        Q.    Okay.  Now, if you look at number 9, you

12   are asked to identify the non-Hispanic/Cuban

13   representatives who were allegedly paid more and

14   received assignments that you were more qualified for

15   and we have talked about Bill Ready, John Huempfner,

16   Dennis Laux, John Price.

17            Do you still, as we sit here today,

18   contend that John Price was paid more than you were?

19        A.    John Price makes more than I do at this

20   point.  When I asked my counselor about this question

21   it was talking year to date.

22        Q.    All right.  Let's back up then.  Are you

23   saying that John Price made more than you in '96?

24        A.    No.

118

```
 1        Q.    '97?
 2        A.    No.
 3        Q.    '98?
 4        A.    No.
 5        Q.    '99?
 6        A.    '99.
 7        Q.    You are saying he made more than you in
 8   '99?
 9        A.    I am saying '99/2000, he made more than
10   what I am making right now.
11        Q.    Let's talk about each tax year or each
12   calender year.  So you are claiming that in '99 John
13   Price made more than you?
14        A.    '99?
15        Q.    January 1st, '99 to December 31, '99.
16        A.    No, this fiscal year.
17        Q.    You are saying he's making more in the
18   year 2000?
19        A.    Correct.
20        Q.    The calender year 2000?
21        A.    Correct, the same as Rich Crane.
22        Q.    Give me the names of any accounts that
23   you feel were assigned to John Price because he was a
24   male, that were not assigned to you?
```

```
 1          A.    I can't.
 2          Q.    If John Price made less than you in '98
 3   and '99, what new accounts was he given in 2000 --
 4          A.    I don't know.
 5                MS. DALEY:   Let him finish the question.
 6                THE WITNESS:   Sorry.
 7   BY MR. BUCKLER:
 8          Q.    -- that resulted in him making more money
 9   than you?
10          A.    I don't know.
11          Q.    Do you know whether he was given any new
12   accounts in 2000?
13          A.    No.
14          Q.    Rich Crane.  Are you saying Rich Crane
15   made more than you in '96?
16          A.    No.
17          Q.    '97?
18          A.    No.
19          Q.    '98?
20          A.    No.
21          Q.    '99?
22          A.    No.
23          Q.    2000?
24          A.    Yes, sir.
```

1        Q.   How do you know that Rich Crane is making

2  more than you in 2000?

3        A.   The reassignment of accounts, the

4  accounts that he is handling.

5        Q.   All right.  What accounts are you saying

6  that Rich Crane was given that should have been given

7  to you but were given to him because he is a

8  non-Hispanic, non-Cuban male?

9        A.   I have no knowledge of that.  But his

10  accounts are very lucrative accounts and if you

11  compare the 23 accounts you read to me and how much

12  profit there are in those accounts compared to what

13  Rich Crane has, big difference.

14        Q.   I guess my question to you is, how do you

15  know that the amount of money that he is generating

16  in commissions, which is based on the amount of sales

17  to that account, is not based just on Rich Crane's

18  hard work and effort?

19        A.   Put me at H&D Graphics or any other

20  account and I will do as well as he does.

21        Q.   How long has he had H&D Graphics?

22        A.   I don't know.  What I am saying, give me

23  lucrative accounts and I will make it happen.

24        Q.   But are you saying -- let me understand

1   this correctly.

2            Are you saying you think some of the

3   accounts that some of these males that you have

4   identified have now should be taken away from them

5   and given to you?

6        A.   No.   I am saying when the distribution,

7   what is out there, it should have been divided

8   equally.

9            Don't tell me that one of those accounts

10  that you read that has zero value is the same as

11  having an H&D or any other account with a tremendous

12  profit in it.

13       Q.   Here is where I am lost a little bit.

14  What if Rich Crane came to me today and he said, I

15  think it's wrong.   I think what you all are trying to

16  do is you are trying to help the women more than you

17  are trying to help the men and I think I should have

18  been given the Lenatal account, and the only reason

19  you gave that to Betty was because she's been

20  complaining and you are trying to help her out, so

21  you gave it to her because she was a woman in

22  response to her complaints.

23            Would Rich Crane, as far as you are

24  concerned, have a case for sex discrimination because

1  the Lenatal account had been given to you?

2          MS. DALEY:  Objection to form.

3          THE WITNESS:  I won't be able to answer

4      that question.

5  BY MR. BUCKLER:

6      Q.   But in the last four years, since John

7  Glaze got there, you have been given some accounts

8  that were given to you, not to males, which have

9  resulted in some nice income to you, correct?

10         MS. DALEY:  Objection to form.

11         THE WITNESS:  I wouldn't be able to

12     answer that question.

13 BY MR. BUCKLER:

14     Q.   Have you been given accounts by John

15 Glaze in the last four years that have generated nice

16 accounts for you?

17         MS. DALEY:  Objection to form.

18         THE WITNESS:  I wouldn't be able to

19     answer that.

20 BY MR. BUCKLER:

21     Q.   Has the Lenatal account generated

22 lucrative income to you?

23     A.   It has, but I work export in Dade only.

24     Q.   Well, do you feel you should have been

123

1    given any of the domestic accounts that were given to
2    any of these men?
3         A.    Yes.  I worked domestic too very well,
4    also.
5         Q.    Well, if you should be assigned domestic
6    accounts as well as export accounts, do you feel that
7    some of the export accounts should be given to some
8    of these domestic salespeople?
9         A.    If they have the experience, why not, and
10   they are willing to do it, why not.  Nobody is
11   willing to do it in that division.
12        Q.    All right.  What was the name of the
13   account that you felt Rich Crane had been assigned in
14   the last five years that you feel like -- you named
15   it a minute ago -- you felt he was making a big
16   commission on?
17        A.    I just threw a name.
18        Q.    What is the name again?
19        A.    I don't know if it belongs to Rich Crane
20   or not, H&D.
21        Q.    H&D.  You don't know whether Rich Crane
22   is doing that one or not?
23        A.    No.
24        Q.    So you don't know who has the H&D

124

1    account?

2         A.    No, I don't.

3         Q.    Well, do you know of any accounts that

4    have been assigned to Rich Crane in the last five

5    years that are producing significant income to him?

6         A.    According to Rich Crane, yes.

7         Q.    Name them, please.

8         A.    I can't.

9         Q.    Do you know what those accounts were

10   generating before Rich Crane was assigned to them?

11        A.    No, sir.

12        Q.    Can you look at the interrogatories again

13   and look at number 11.  It asks you to identify any

14   and all documents that support or relate to your

15   contention that you were discriminated against

16   because of your gender or your sex.

17             And two of the documents, if you go on

18   over to the next page, page 11, you will see there is

19   a series of documents that are listed here as being

20   responsive to that question.

21             We don't have copies of this one, so if

22   you want to look, I will let you, take your time and

23   look it over.

24             (The document referred to was thereupon

1   marked Ortega Exhibit No. 16 for Identification, a

2   copy of which is attached hereto.)

3   BY MR. BUCKLER:

4       Q.   What I have marked is a two page exhibit,

5   marked 16, that basically makes up the first two

6   documents that you have identified in response to

7   this interrogatory, Bates numbers A&A001 and A&A002.

8           My question to you is, because I have

9   looked at them and I can't figure it out, what I want

10  for you to tell me is tell me how you believe those

11  two documents tend to support your allegation that

12  you were discriminated against on the basis of your

13  sex?

14      A.   I won't be able to answer that question.

15      Q.   Let me rephrase it then.  Is there

16  anything on either one of those documents, on the

17  face of either one of those documents, that you

18  believe shows that you were discriminated against on

19  the basis of your sex?

20      A.   No.

21      Q.   Is there anything on either one of those

22  documents that you believe tends to show you were

23  discriminated against because of your race or your

24  national origin?

```
 1              A.    No, just a bottom line, the salary.
 2              Q.    Is there anything on either one of those
 3    documents that you believe shows you were retaliated
 4    against in any way for having complained about
 5    discrimination?
 6              A.    No.
 7                    (The document referred to was thereupon
 8    marked Ortega Exhibit No. 17 for Identification, a
 9    copy of which is attached hereto.)
10    BY MR. BUCKLER:
11              Q.    I am going to hand you a memo dated April
12    23rd that is address to all Miami area sales reps and
13    office staff from John Glaze.
14                    Have you seen it before?
15              A.    Yes, sir.
16              Q.    Is this the memo that informed you that
17    Bill Ready was going to be doing the sales now and
18    not be a manager and be reporting directly to Glaze?
19              A.    No, I don't think this was the one.
20              Q.    The reason I am asking you that is if you
21    look at the top that memo is dated April the 23rd,
22    correct?
23              A.    Right.
24              Q.    And your charge is dated April the 23rd
```

1   of '99.  Is there any relation to the publication of
2   this memo and your filing of the charge here?

3       A.   No.  As a matter of fact, I became aware
4   after I left the office, because I am never in there
5   so it had nothing to do, one thing with the other.

6       Q.   All right.  That's fine.

7       A.   And this is not the memo that announced
8   that Bill Ready -- there is a memo that says Bill
9   Ready will be --

10      Q.   My purpose in asking the question about
11  this was asking if there was any relationship to this
12  memo and your filing of the charge, since it was the
13  same day?

14      A.   No, it was there long before that.

15      Q.   Look at page 13 of your answers to
16  interrogatories.

17      A.   Okay.

18      Q.   It's got the chart identifying the
19  documents that you have disclosed and again, these
20  are documents that you referenced in response to a
21  question asking you for documents that you think
22  support or relate to your contention that you were
23  discriminated against on the basis of your sex or
24  your gender.

```
 1              If you look down there you have listed on
 2   numbers 29 through 67, Amlong & Amlong numbers 0029
 3   through 0067, commission statements for Betty Ortega
 4   for 2/4/99 through 4/8/99.
 5              Is there anything in those particular
 6   commission statements, any information therein that
 7   you believe establishes that you were discriminated
 8   against on the basis of your sex?
 9        A.   No, just if you compare to the other
10   salaries.
11        Q.   Okay.  Anything in there that you think
12   establishes you were discriminated against on the
13   basis of your race or your national origin?
14        A.   No, same thing.
15        Q.   All right.  Go to the next documents and
16   it says customer sales report for Betty Ortega for
17   4/4/99.
18              What is the significance of that
19   particular customer sales report?  You generate
20   customer sales reports, I assume, and have for the
21   last 12 years you have been there, correct?
22        A.   (Nods head in the affirmative.)
23        Q.   Is that correct?  You have to say yes?
24        A.   Yes.
```

1        Q.   And my question to you is what is the

2    particular significance of the 4/4/99 sales report?

3        A.   It was the sales report that I had on

4    hand at that particular moment.  Those are my

5    accounts that I had on hand.

6        Q.   Okay.  So it was just to show what

7    accounts you were servicing as of that particular

8    date?

9        A.   Correct.

10        Q.   If you look at the next series of

11    documents they are bill order register by O/S for

12    Betty Ortega.  Do you know what O/S is?

13        A.   No.  I am assuming it's some type of

14    report by sales on a daily basis or weekly.  I don't

15    know.

16        Q.   Again, my question to you is other than

17    showing your sales for those two days, 4/1/99 and

18    4/2/99, any significance to this bill order register,

19    from your perspective?

20        A.   No.

21        Q.   Let's go back to your complaint.  Let's

22    go to page 5.  Let's go to paragraph 14.

23             In this paragraph you say that amongst

24    the injuries that you have suffered are lost wages

1    and benefits.

2             I understand the lost wage aspect of it.

3    What benefits are you talking about?  Any benefits

4    other than the difference in wages?

5         A.    Just the salary.

6         Q.    Okay.  Emotional pain.  First let me ask

7    you this:  Have you been treated by any physician?

8         A.    Yes, sir.

9         Q.    Or psychologist?

10        A.    I am on medication.  I have been treated

11   by Dr. Ragolta.  I was treated since November of last

12   year.  I was off the medication and I am back on the

13   medications again since the end of June.

14        Q.    That's doctor --

15        A.    Ragolta.

16        Q.    Now, you have also been treated over the

17   last several years by other physicians for various

18   things?

19        A.    Well, they asked me in my interrogatory a

20   list of all my physicians.

21        Q.    And you have given us that list?

22        A.    Yes, sir.

23             MR. BUCKLER:  Now, my understanding is,

24        this is not asked of you, this is asked of your

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

1     counsel, is we have asked for a release so we

2     can contact these physicians and get their

3     reports on their treatment of her to various

4     things and we have not received that yet,

5     Jennifer.

6          MS. DALEY:  Don't ask me any questions on

7     the record.  If you want to discuss this

8     afterward.

9          MR. BUCKLER:  I am going to put it on the

10    record.

11         MS. DALEY:  I am not going to answer

12    questions on the record.

13         MR. BUCKLER:  Then I will make a

14    statement on the record.

15         MS. DALEY:  You can do whatever you want.

16         MR. BUCKLER:  We have repeatedly asked

17    for a release from you for your medical records,

18    from your counsel, and counsel has not, at this

19    point in time, provided us with such a release

20    so we can get the records.

21         For that reason I am going to have to

22    hold this deposition open to examine you on some

23    of your claims in here for damages as a result

24    of emotional pain, suffering, inconvenience,

1          mental anguish, loss of enjoyment of life and

2          other pecuniary losses.  Do you understand?

3                    THE WITNESS:  That's fine.

4                    MS. DALEY:  Objection to form.  Don't

5          agree to anything.  I am going to object to the

6          form of that because that wasn't a question.

7    BY MR. BUCKLER:

8          Q.   All right.  What kind of emotional pain

9    and suffering are you claiming you have suffered as a

10   result of what you claim the discriminatory acts are?

11         A.   I have been treated for depression, loss

12   of self, loss of the ability to do the things I used

13   to do in my work.

14         Q.   In?

15         A.   In my work.  To be able to concentrate

16   and aggressively pursue all the areas that I was

17   doing.

18         Q.   Anything else?

19         A.   No, sir.

20         Q.   In regard to your loss of work, my

21   numbers, at least that I have been provided, indicate

22   that between '97, '98 and '99 your income rose each

23   year; is that correct?

24         A.   That's correct, sir.

```
 1            Q.   So during this period of time when you
 2    said you were unable to pursue your work as
 3    aggressively or as -- I don't know what the term is
 4    you would use, I don't want to misstate the words,
 5    but as diligently as you would have, your income has
 6    increased, hasn't it?
 7            A.   I was referring to 1999, sir.  I was not
 8    referring to '96, '97, '98.  I was not treated for
 9    any depression or any of those things prior to 1999.
10            Q.   But you are claiming you have been
11    discriminated against prior to '99?
12            A.   I have been discriminated since 1988.
13            Q.   Well, now, since 1999 have you had any
14    discussions with representatives of other competing
15    distributors of paper products about going to work
16    for them?
17            A.   No, sir.
18            Q.   Have you had any discussions with anybody
19    with Gould?
20            A.   No, sir.
21            Q.   You have not had any discussions with
22    anyone about moving from Unisource to another
23    company?
24            A.   No, sir.  I called Alex Gomez to come and
```

1    work for us.

2        Q.    But my question to you was if you had any

3    discussions with anyone about leaving and going to

4    work for them?

5        A.    No, sir.

6            MS. DALEY:    Objection, asked and

7        answered.

8    BY MR. BUCKLER:

9        Q.    In addition to emotional pain and

10   suffering you are also seeking damages for what is

11   described here as inconvenience.    Do you know what is

12   meant here by the word inconvenience?

13       A.    No, sir.

14       Q.    All right.    Mental anguish.    Anything

15   different from the emotional pain and suffering you

16   have described for me earlier with regard to your

17   damages for mental anguish?

18       A.    No, sir.

19       Q.    Loss of enjoyment of life.    Now, tell me

20   how you have lost enjoyment of life as a result of

21   this?

22       A.    The difference in salary.

23       Q.    Okay.    Then it says other nonpecuniary

24   loss.    What are the nonpecuniary losses you are

```
 1   talking about?

 2        A.   I don't know.

 3        Q.   You don't know at this time.  Thank you.

 4   You say this depression and these emotional issues

 5   arose in November of last year?

 6        A.   Yes, sir.

 7        Q.   In the last year, since this time last

 8   year, have you suffered any family losses?

 9        A.   No.

10        Q.   Have you suffered any other emotional

11   issues, outside of work?

12        A.   No.

13        Q.   Any other problems?

14        A.   No.

15        Q.   So you believe that this depression is

16   solely related to issues at work?

17        A.   Yes, sir.

18        Q.   And with regard to the issues at work,

19   what changed in November of '99 that made these

20   issues become more than you could emotionally bear?

21        A.   November of '99 was when I went back --

22   when I went to see the doctor.  It actually started

23   like mid September and I thought I was going to be

24   able to overcome the idea of going into work,
```

1   relating to John and dealing with my everyday work as

2   usual, the rumors in the company, the comments here

3   and there that I am not used to that and I don't want

4   to be a part of.

5           I was very afraid and very concerned

6   because eight months prior to that I filed for suit

7   and I was called into John Glaze's office because

8   Holly Hernandez had made a comment to somebody in the

9   office and it got to John, that the female sales

10   force was going to file suit.

11          And I was called in to his office and I

12   told him that at that point I had no idea what he was

13   talking about.  A week later he called me again and

14   he says I heard the same rumor and I said -- I

15   figured it was from Holly, and I denied it.

16          I was not the only one involved in

17   proceeding with this suit, the four of us were

18   together.  Because of that situation they were afraid

19   and I had to step out and wait about six or eight

20   months and proceeded with my intentions of the

21   lawsuit because I couldn't continue working in the

22   condition that I was.

23      Q.   This would have been sometime when, in

24   1999 you said, September?

137

1      A.    My first symptoms started in September,
2  yes.
3      Q.    Now, when did you have these
4  conversations with John Glaze?
5      A.    Eight months before that.  Eight, nine
6  months.  I can't recall.
7      Q.    You said initially they were four women
8  that were going to bring the lawsuit?
9      A.    Yes.
10      Q.    And who are those four you mentioned?
11      A.    Holly Hernandez, Bobbie Baquero-Vega,
12  Kathy Healy and of course myself.
13      Q.    Kathy?
14      A.    Healy.
15      Q.    Is Holly Hernandez Hispanic?
16      A.    No.  She was married to a Cuban and she
17  kept his last name.
18      Q.    But she's not Hispanic?
19      A.    No.
20      Q.    Has no Hispanic parents.  To the best of
21  your knowledge?
22      A.    No.
23      Q.    Bobbie Vega is his Hispanic and has Cuban
24  parents.  That's the lady we talked about earlier

138

1   today, correct?

2        A.   To me she's American.

3        Q.   I understand, and you explained to me

4   earlier --

5        A.   Yes.

6        Q.   -- that's because she was born here?

7        A.   Right.

8        Q.   But her parents are Cuban?

9        A.   Correct.

10       Q.   Then Kathy Healy, is she Hispanic?

11       A.   No.

12       Q.   So these three women plus you were going

13  to pursue a sex discrimination case?

14       A.   Sex discrimination and based on accounts

15  and so forth and so on, the same thing I am having

16  now.

17       Q.   But it was going to be based on sex,

18  because Holly Hernandez and Kathy Healy you told me

19  are not Hispanic?

20       A.   Correct.

21       Q.   So they would not be alleging they were

22  discriminated against because of their race or

23  because of their national origin?

24       A.   Correct.   We didn't get to go to the

1    lawyers.  Once I was pulled in, and the only one

2    pulled into the office by John Glaze, according to my

3    knowledge, they became very afraid.

4         Q.    These women never filed any charges

5    either, did they, to the best of your knowledge?

6         A.    No.

7         Q.    But the initial thought was to pursue

8    just a sex discrimination suit?

9         A.    Right.

10        Q.    Then when you decided to pursue it on

11   your own and went and sought counsel, you added the

12   race and national origin claims?

13        A.    Correct.

14        Q.    My question, to go back to my initial

15   question, what happened in September of '99 then that

16   caused this mental anguish and this depression for

17   you?

18             What occurred at that point in time that

19   had not been occurring beforehand?  Because you

20   apparently had been dealing with this, according to

21   what you told me now for almost ten years.

22        A.    For a very long time.  It was just the

23   anxiety.

24        Q.    Anxiety?

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

140

1          A.   The anxiety of -- I believe my first
2     review with John Glaze was at the end of April and it
3     was the first time that him and I sat together after
4     I filed for the suit.  It was very difficult for me.
5              From that point on it was a turning point
6     in my fears of am I going to be fired; am I going to
7     be looked upon differently; am I going to have more
8     problems than I already had; are my accounts in
9     export going to be supported the same way; am I going
10    to be able to continue working and have the support
11    that I had before.
12             All of those things came to play and one
13    thing led to another to another to another and
14    finally in September I decided that something was
15    going wrong and decided to go to the doctor.
16             And my first appointment was, I believe,
17    at the end of mid October and medication started in
18    November.
19        Q.   All right.  But all of this occurred
20    after you filed your charge in this case?
21        A.   Yes, sir.
22        Q.   Now, after you filed your charge, did
23    John Glaze treat you any differently?
24        A.   The first time we sat face-to-face.

1  Q. My question is just in a general sense,
2  just in the office?
3      A. No, not after that.
4      Q. So since the filing of your charge John
5  Glaze has not treated you any differently?
6      A. No.
7      Q. Are you agreeing with me, that he has
8  not?
9      A. I am telling you the first time we sat
10 face-to-face, yes and after that, no. After my first
11 review we had not seen each other for 30 days after I
12 filed for the suit. I don't have to go to the office
13 unless there is a meeting, so we had not had a one to
14 one contact.
15     Q. After filing your charge?
16     A. Correct.
17     Q. Then you had a meeting about 30 days
18 after you filed your charge?
19     A. Correct.
20     Q. Did John Glaze do anything different in
21 that meeting with you?
22     A. His attitude, his body language. He
23 didn't say anything. He was just very, very upset
24 and I know John very well.

1          Q.    But he didn't say anything?

2          A.    No.  He was just -- again, his body

3    language.

4          Q.    Didn't criticize you for filing the

5    charge?

6          A.    No, he will not do that.

7          Q.    He didn't take any accounts away from you

8    because you filed the charge?

9          A.    No, sir.  As a matter of fact, he gave me

10   lots of accounts after I filed my charge.

11         Q.    All right.  And after the filing of your

12   charge is when he went with you to see AIB, correct?

13         A.    No, it was before.

14         Q.    His visit with you to see AIB and try to

15   work with that account was before the filing of the

16   charge?

17         A.    Yes.

18         Q.    Was removal of the AIB account from you

19   before the filing of the charge?

20         A.    Yes.

21         Q.    Did you get the AIB account back before

22   the filing of the charge?

23         A.    No, after filing.  It was taken the day

24   that I filed, I believe, and it was given back

1 | afterwards, six months later.

2 | Q. It was taken the day what?

3 | A. It was taken on, I believe, on my review

4 | in October. I don't have my reviews with me.

5 | Q. So it was taken before you filed the

6 | charge?

7 | A. No, after I filed the charge.

8 | Q. When was the account taken away?

9 | A. Sometime in October.

10 | Q. Of '99?

11 | A. Correct.

12 | Q. Then it was given back to you sometime in

13 | 2000?

14 | A. Correct.

15 | Q. Other than this one meeting you had 30

16 | days after you filed your charge, where you said you

17 | detected a difference in body language on John's

18 | part, any other different treatment that you feel

19 | John has manifested towards you because of this

20 | lawsuit or the charge or anything else?

21 | A. No, sir.

22 | Q. When Tony Gispert announced he was going

23 | to be retiring prior to deciding what he was going to

24 | do with Gispert's accounts, John Glaze came to you

144

1   and asked you for recommendations on who he might
2   ought to go out and try to hire to come in and help
3   deal with export sales, didn't he?
4          A.   No, that's not true.
5          Q.   He did not?
6          A.   No.
7          Q.   Did you have any discussions about
8   possibly hiring anybody from the outside?
9          A.   After I came and I asked him for the
10  account and I was denied, I called him back because I
11  heard through the grapevine he was going to hire
12  Barbara Vega for the position.
13              I said, if you want to hire somebody else
14  that is good you call Alex at Cole Paper.
15         Q.   So you are saying after you were told
16  that you were not going to get Gispert's accounts --
17         A.   Yes, sir.
18         Q.   -- that you heard that he was thinking
19  about hiring a lady by the name of?
20         A.   Barbara Vega.
21         Q.   Is she working for a competitor?
22         A.   Yes.  She works for Mac Paper.  She was
23  working with us at Butler Paper prior to.
24         Q.   You knew her?

145

```
 1          A.    Very well.
 2          Q.    You did not think we should hire her, I
 3   take it?
 4          A.    No.
 5          Q.    And you told John that?
 6          A.    I did.
 7          Q.    And instead you recommended somebody
 8   else?
 9          A.    I recommended Alex Gomez.  Alex Gomez
10   from Gould Paper.
11          Q.    Give me the name of the person from Gould
12   again.
13          A.    Alex Gomez.
14          Q.    Is that a male or a female?
15          A.    Male.
16          Q.    How about a lady by the name of Maggy
17   Martinez.  Did you have discussions with Mr. Glaze
18   about Maggy Martinez?
19          A.    A long time before Tony announced his
20   retirement.  A very long time before Tony announced
21   his retirement.
22          Q.    After Tony announced his retirement, any
23   discussion with him about bringing in Maggy Martinez?
24          A.    No.
```

1          Q.   So the only two people you recall

2     discussing with him about possibly filling Tony

3     Gispert's position would have been Alex Gomez and

4     Barbara Vega?

5          A.   No.   I didn't discuss with him filling in

6     with Barbara Vega.   I said, do not hire Barbara

7     Vega.

8          Q.   I understand, but the only two people you

9     recall having discussions with him about whether they

10    would fill -- I am not saying you recommended Barbara

11    Vega.   Any other people you talked to him about,

12    other than Gomez and Vega, as you recall?

13         A.   No, Gomez.

14         Q.   And these discussions would have been

15    after you said John Glaze told you he didn't want to

16    give you that territory because he didn't want to put

17    all of the export sales with one person?

18         A.   Correct.

19              MR. BUCKLER:   Let me take a break here.

20         I need a rest room break.   I don't know if you

21         all do, but I do, so let's take a break.

22              (Thereupon a brief recess was taken,

23    after which the following proceedings were had.)

24    BY MR. BUCKLER:

1          Q.    Do you have any idea about the sales
2    experience of John Huempfner?  Do you know how long
3    he has been in this industry in sales?
4          A.    I believe he started in 1992, when he
5    married into the Avanti family.
6          Q.    Do you know that for a fact?
7          A.    No.
8          Q.    So you don't know for a fact how long he
9    has been --
10         A.    No, I don't know for a fact.
11         Q.    Do you know for a fact how long Dennis
12   Laux has been involved, what his experience is, how
13   many years?
14         A.    I believe it was 20 years he was with
15   Butler and he started in customer service and moved
16   on.
17              He worked the warehouse and every other
18   position, but I will not be able to tell you.
19   Certainly 20 years.
20         Q.    Do you know for a fact how many years
21   he's got in experience?
22         A.    No.
23         Q.    Okay.  Do you know for a fact how many
24   years of experience Mr. Bresnehan has?

```
 1          A.   No.
 2          Q.   Do you know how many years of experience
 3   Peterson has?
 4          A.   I believe 30.  He turned 30 the other
 5   day.  Not 30, they gave him an award 30 years.
 6          Q.   But isn't it a fact Dennis Laux has more
 7   experience than you do in this industry, years of
 8   experience?
 9               MS. DALEY:  Objection, speculation.
10               THE WITNESS:  I won't be able to tell
11      you.
12   BY MR. BUCKLER:
13          Q.   Isn't it a fact Mr. Huempfner has more
14   experience than you?
15               MS. DALEY:  Same objection.
16               THE WITNESS:  I wouldn't be able to tell
17      you.
18   BY MR. BUCKLER:
19          Q.   Isn't it a fact Mr. Bresnehan has more
20   years of experience than you?
21               MS. DALEY:  Objection, speculation.
22               THE WITNESS:  I wouldn't be able to tell
23      you.
24   BY MR. BUCKLER:
```

1         Q.    Isn't it a fact Mr. Peterson has more

2    years of experience than you?

3              MS. DALEY:   Same objection.

4              THE WITNESS:   I wouldn't be able to tell

5      you.

6    BY MR. BUCKLER:

7         Q.    Isn't it a fact Mr. Price has more

8    experience than you in this industry?

9              MS. DALEY:   Same objection.

10              THE WITNESS:   I wouldn't be able to tell

11      you.

12    BY MR. BUCKLER:

13         Q.    Isn't it a fact Mr. Crane has more years

14    of experience than you do in this industry?

15              MS. DALEY:   Objection, speculation.

16    BY MR. BUCKLER:

17         Q.    You have to answer one way or the other.

18         A.    I wouldn't be able to tell you.

19         Q.    Do you have any knowledge, any firsthand

20    knowledge about the sales skills of Mr. Laux?

21         A.    No.

22         Q.    Do you have any firsthand knowledge about

23    the sales skills of Mr. Peterson?

24         A.    No.

1        Q.    Mr. Huempfner?

2        A.    No.

3        Q.    Mr. Bresnehan?

4        A.    No.

5        Q.    Mr. Price?

6        A.    No.

7        Q.    Mr. Crane?

8        A.    No.

9        Q.    Do you have any idea about either the

10   experience or the sales skills of either Gene or

11   Larry Press?

12        A.    No, sir.

13        Q.    In your response to the interrogatories

14   you listed 18 people that you at least at that point

15   in time identified as having knowledge of facts that

16   you believe would support your claims that you were

17   discriminated against on the basis of race, your sex,

18   your national origin and that you were retaliated

19   against.

20            I am going to go down each one of these

21   people.  What facts do you believe Mr. Bresnehan

22   knows of that would support your claims that you were

23   discriminated against?

24        A.    Just on conversations with accounts that

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

1  were given.

2       Q.   Has Mr. Bresnehan ever told you that he

3  believed that accounts were assigned to people on the

4  basis of either sex or race or national origin?

5       A.   No.

6       Q.   Okay.  Has Mr. Bresnehan ever told you

7  that he believed you had been retaliated against by

8  the company in any way because of having complained?

9       A.   Not in those words.

10      Q.   All right.  Ofelia Colunga, who is

11 identified on here as your roommate.

12      A.   Correct.  She's my life partner.

13      Q.   She's what?

14      A.   Life partner.

15      Q.   Life partner.  Does Ms. Colunga have any

16 knowledge of any facts that would support your claim

17 that you were discriminated against in any way?

18      A.   She knows that I asked Bill Ready for the

19 accounts from Gene Press.  She knows about my

20 conversations with John Glaze.

21      Q.   But does she know about these because she

22 was there or only because you told her?

23      A.   No, I told her.

24      Q.   Any knowledge that she has is based on

```
 1   what you told her?
 2        A.   Correct.
 3        Q.   She doesn't have any independent
 4   knowledge?
 5        A.   No, sir.
 6        Q.   Independent of what you told her?
 7        A.   No.
 8        Q.   So let me rephrase my question again.
 9   Does Ms. Colunga have any independent knowledge,
10   independent of anything you told her, any facts that
11   support your claim that you were discriminated
12   against on the basis of your race, your sex or
13   national origin?
14        A.   No, sir.
15        Q.   Does she have any independent knowledge
16   of facts that would support your claim that you were
17   retaliated against in any way?
18        A.   No, sir.
19        Q.   Tony Gispert.  Is Mr. Gispert Hispanic?
20        A.   I am assuming.  I really don't know.
21        Q.   Is he Cuban?
22        A.   I really don't know if he's Cuban or
23   Spaniard.  I really don't know.
24        Q.   How long did Mr. Gispert work there
```

1    before his retirement?

2         A.    I have no idea.

3         Q.    Was he --

4         A.    He was there because he came in the

5    Unijack part of it.

6         Q.    In '94, when you became part of

7    Unisource, was Mr. Gispert there already then?

8         A.    Yes.

9         Q.    And from '94 until his retirement were

10   you and he the principal people responsible for

11   export sales?

12        A.    As far as I know, yes.

13        Q.    Is there anybody else that had a

14   significant amount of responsibility in export sales,

15   other than you and Mr. Gispert?

16        A.    To my knowledge Kathy had one account and

17   after Dennis left I learned that he had one account.

18   So if anybody else, I really don't know.

19        Q.    Kathy being?

20        A.    Kathy Healy.

21        Q.    When Dennis left that one account was

22   assigned to you?

23        A.    Yes.

24        Q.    Did Kathy Healy leave?

1    A.   No, she's there.

2    Q.   She's still there?

3    A.   Yes.

4    Q.   Does she still have an export account?

5    A.   Yes.

6    Q.   Just one account?

7    A.   Yes.  It's been with Kathy for years.

8    Q.   So that's not an account of which you had

9  a dispute over the assignment of?

10   A.   Not at all.

11   Q.   What facts do you believe Mr. Gispert has

12 knowledge of that would support your claim that you

13 were discriminated against on the basis of race, sex

14 or national origin?

15   A.   What I said to him, that I was declined

16 getting Mr. Press' accounts, that Bill Ready would

17 not assign them.

18   Q.   So you told Gispert that you asked for

19 Press' accounts?

20   A.   Right.

21   Q.   All right.  Anything else that you think

22 Gispert has knowledge of that would support your

23 claim here?

24   A.   As a matter of fact, we were not in very

1    good terms.

2        Q.   Okay.  John Glaze.  What facts do you

3    believe Mr. Glaze could testify to that would support

4    your claim that you were discriminated against on the

5    basis of race, sex or national origin?

6        A.   Because I sat with him and I explained

7    everything that had happened to me since the day I

8    started working with Bill Ready in 1988, to the day

9    that he got there.

10       Q.   So when John came on in '96 --

11       A.   Correct.

12       Q.   -- you had a conversation with him where

13   you explained what you believed were historical

14   instances of discrimination by Bill Ready?

15       A.   Yes, sir.  Correct.

16       Q.   Other than that conversation, where you

17   gave John the history, what other facts do you

18   believe that he has knowledge of, that he could give

19   testimony to, that would support your claim?

20       A.   I went in with how the account

21   distribution was, how Bill Ready never gave accounts

22   to none of the females when they were available.

23           How the accounts of export were kept on

24   the house number, which is 8801, and we are never a

1   distributor and that I was told I was not able to

2   handle work with export, which is the only thing that

3   has kept me all these years in Unisource, or Butler

4   for that sense.

5        Q.   Isn't it a fact that since John Glaze

6   took over in '96 he has done a number of things to

7   support you that weren't being done before he took

8   over?

9        A.   About a year and a half later, yes.

10        Q.   So beginning sometime in '97?

11        A.   Correct.

12        Q.   He began to do things to help you and

13   support you?

14        A.   Correct.

15        Q.   And since that point in time he's

16   continued to do that?

17        A.   Correct.

18        Q.   An example of these things, there is a

19   show called the Graphics of America Show, correct?

20        A.   Correct.

21        Q.   Which is a show where potential customers

22   come in to the show and are shown products and stuff

23   like that?

24        A.   Yes, sir.

1          Q.    And all of the leads that come out of

2     that show are given to you, correct?

3          A.    Correct, and to Tony.  And primarily they

4     are given to me because I am willing to work them.

5          Q.    Principally John gave those leads to you?

6          A.    Correct.

7          Q.    He has flown customers of yours up here

8     for open houses?

9          A.    Yes.

10         Q.    And that had not been done before?

11         A.    No, sir, not by Bill Ready.  Gene Press

12    used to do it all the time.

13         Q.    Gene Press?

14         A.    Yes, sir.

15         Q.    How long ago was that?

16         A.    When he was the manager of Saxon Paper,

17    until the end of '95.

18         Q.    I am talking about for you.  You didn't

19    work for Saxon Paper, did you?

20         A.    No.  I worked for Gene Press for about

21    six months only, for that portion.

22         Q.    But the first person with Unisource to

23    fly customers up here for you is John Glaze?

24         A.    Yes, sir.  That was last year.

```
 1              Q.   He's also made trips with you to the
 2   Dominican Republic?
 3              A.   Yes, sir.
 4              Q.   He tried to open up new territories there
 5   to help you out and open up new accounts?
 6              A.   We went to investigate that country.  We
 7   had some issues with our sister company Unisource
 8   International.
 9              Q.   And he's gone to Costa Rica with you?
10              A.   As a matter of fact, he went first by
11   himself to solve a situation we had with Unisource
12   International that were trying to get our accounts
13   from us.
14              Q.   There is some tension between your office
15   and its handling of export accounts and Unisource has
16   an international group that does international sales?
17              A.   Yes, sir.
18              Q.   And there has always been this tension,
19   where they felt you were intruding on their
20   territory?
21              A.   Correct.
22              Q.   And John Glaze has been a stalwart in
23   defending your territory for you, hasn't he?
24                   MS. DALEY:   Objection to the form and
```

1        speculation.

2               THE WITNESS:  I wouldn't be able to

3        answer that question.

4    BY MR. BUCKLER:

5          Q.   Ma'am, what did you say?

6          A.   I won't be able to answer that question.

7          Q.   Well, John Glaze has gone to bat for you

8    in disputes with the international group of Unisource

9    on a number of occasions, hasn't he?

10         A.   Yes, he has.

11         Q.   And has been very supportive of you in

12   those battles with Unisource International?

13         A.   Yes, he has.

14         Q.   When they were trying to take back and

15   away from you accounts that you had had for a number

16   of years?

17         A.   Yes, he has.

18         Q.   And that has occurred since the middle of

19   '97?

20         A.   Yes.

21         Q.   Let me ask you some questions that deal

22   with impaneling juries down here about the family and

23   stuff.

24         A.   Okay.

1      Q.   You are divorced.  How long have you been

2   divorced?

3      A.   Legally since '87.  He left the house in

4   '84.

5      Q.   His name?

6      A.   Carlos Dimuont.

7      Q.   Is that your only marriage?

8      A.   Yes, sir.

9      Q.   Any children by that marriage?

10     A.   Yes, sir.

11     Q.   How many?

12     A.   Two.

13     Q.   And how old are they?

14     A.   Paul is 17, Janet is 15 and a half.

15     Q.   And they live?

16     A.   With me.

17     Q.   With you.  Any other relatives, other

18   than your former husband, and your children here in

19   the South Florida area?

20     A.   My mother and father.

21     Q.   Their names?

22     A.   Roger Ortega and Bertha Ortega.

23     Q.   And they live where?

24     A.   Miami.

```
 1         Q.   Okay.
 2         A.   And a bunch of Cuban relatives, please.
 3         Q.   So if I started going into cousins and
 4    that kind of stuff, we would be here a long time?
 5         A.   Yes.
 6         Q.   And your life partners's name is?
 7         A.   Ofelia Colunga.
 8         Q.   Has she been married before?
 9         A.   No.
10         Q.   All right.  Does she have any children?
11         A.   No.
12         Q.   Does she have any relatives in the South
13    Florida area?
14         A.   Yes.
15         Q.   Parents?
16         A.   No, they are deceased.
17         Q.   All right.  What is the nature of her
18    relatives that are in South Florida?
19         A.   Two brothers, and cousins and aunts and
20    uncles.
21         Q.   What are the two brother's names?
22         A.   Francisco Colunga and Joaquin Colunga.
23         Q.   How old are they?
24         A.   Francisco is 47, I believe and Joaquin, I
```

```
 1   am guessing, 53, 54.
 2        Q.   They have children?
 3        A.   Yes, both.
 4        Q.   How old are their children?
 5        A.   Joaquin, on the first marriage, Susie is
 6   25.
 7        Q.   And her name is Susie?
 8        A.   Susana Colunga and Cristina Colunga.
 9   Cristy should be 23.
10        Q.   Okay.
11        A.   Francisco from a previous marriage has
12   Heather.  I believe Heather is 28.  I am not sure.
13   And from his second marriage he has a boy named David
14   and a girl named Amanda.
15        Q.   Under 18 years of age?
16        A.   Yes.
17        Q.   Okay.  How long have you been in the
18   relationship you have been in with Ms. Colunga?
19        A.   Eleven years.
20        Q.   All right.  Let's go back to the witness
21   list.  Next witness on the list is Kathy Healy, a
22   sales rep here in Miami.
23             What facts do you believe Ms. Healy has
24   knowledge of that would establish that you were
```

1    discriminated against on the basis of your race?

2        A.    Kathy and I were going through the same

3    situation.  Every time we asked for accounts they

4    were not available.

5              Every time accounts were assigned they

6    were assigned to specific males.

7        Q.    My question to you is race, not sex.

8    Kathy Healy, as I understand --

9        A.    Is American.

10       Q.    -- is American.

11       A.    So I misunderstood your question.

12       Q.    My question first was what facts do you

13   believe Kathy Healy has knowledge of that would

14   support your claim that you were discriminated

15   against on the basis of your race?

16       A.    Because I said it to her.

17       Q.    Any independent knowledge of any facts,

18   other than what you told her?

19       A.    I don't think so.  I don't know.

20       Q.    All right.  National origin, same

21   question.  What facts do you believe Kathy Healy has

22   knowledge of, independent facts, other than what you

23   may have told her?

24       A.    I don't know.

H. Allen Benowitz & Associates, a Veritext Company
(305)373-9997

1      Q.   All right.  Now, here is my sex

2   question.  We will get to the question you were ready

3   to answer first.

4           What knowledge do you believe Kathy Healy

5   has, facts that would support your claim you were

6   discriminated against on the basis of sex?

7      A.   Same thing that happened to me happened

8   to her.  Every time we asked for accounts, every time

9   accounts were reassigned the accounts of more

10   lucrative were given to the males instead of the

11   females, to specific males.

12      Q.   Again, you can't identify any of these

13   particular accounts?

14      A.   No.

15      Q.   Now, since John Glaze came in '96 has

16   this practice of continuing to assign accounts, more

17   lucrative accounts to males rather than females, do

18   you believe that's continued?

19      A.   Yes.  I believe it stopped like the end

20   of or mid '98.

21      Q.   Okay.  So since the middle of '98 you

22   don't believe that the practice of assigning accounts

23   to some people on the basis of either their race,

24   their sex or their national origin, you don't believe

1    that that has continued since the middle of '98?

2         A.   No, I don't think that's correct because

3    I have not been assigned any lucrative accounts since

4    John Glaze has been here.

5         Q.   That was my question.  You told me he

6    gave you Lenatal?

7         A.   Yes, he gave me Lenatal with zero.

8         Q.   But it's a lucrative account now?

9         A.   Well, because I made it happen, not

10   because it had --

11        Q.   When you say lucrative account, you are

12   talking about accounts, when they are given to you,

13   are in place and have a volume?

14        A.   Correct.

15        Q.   Can you give me an example of an account

16   with a significant volume of sales already in place

17   that John Glaze gave to somebody else since he has

18   been here?

19        A.   I have no knowledge of that.

20        Q.   Okay.  Does Kathy Healy have any

21   knowledge of facts that would support your claim that

22   you have been retaliated against because of having

23   complained about discrimination?

24        A.   I --

166

```
 1          Q.    Don't know?
 2          A.    I don't know.
 3          Q.    Okay.  Eleanor Jablonski that is listed
 4   on here, is she a former sales rep?
 5          A.    Yes.
 6          Q.    How long has she been gone?
 7          A.    Could be three years.
 8          Q.    What facts do you believe Eleanor
 9   Jablonski has knowledge of that would support your
10   claim that you were discriminated against on the
11   basis of race?
12          A.    I don't know.
13          Q.    What facts do you believe Eleanor
14   Jablonski has that support your claim that you were
15   discriminated against on the basis of your national
16   origin?
17          A.    I don't know.
18          Q.    What facts do you believe Eleanor
19   Jablonski has that support your claims that you were
20   discriminated against on the basis of sex?
21          A.    As a matter of fact, yesterday I was told
22   the same thing Eleanor was told, that she was put on
23   probation, and even though she improved she was let
24   go at the end of the 90 days.
```

```
 1            Q.    And who told you this?
 2            A.    Yesterday I had a review and apparently
 3    there is a new policy with Unisource and
 4    Georgia-Pacific if you don't do $348,000 by the end
 5    of December 31st you will be dismissed and I was told
 6    that I am short about $13,000.
 7            Q.    Counseled with yesterday?
 8            A.    Yes, sir.
 9            Q.    Eleanor Jablonski, what facts do you
10    believe that she has that would support your claim
11    that you were retaliated against?
12            A.    Same as me, she was not given accounts.
13    She came with me from Butler Paper.
14                  She was a printing sales rep and when he
15    did her review Bill Ready forgot about Ellie and left
16    her behind and all of a sudden she was put in from
17    being a printing sales rep to being put as an
18    industry sales rep, and from then on was downhill for
19    Ellie.
20            Q.    Did Eleanor Jablonski ever tell you she
21    was discriminated against?
22            A.    Yes.
23            Q.    On what basis?
24            A.    She was a female.
```

1          Q.    Not because of race or sex?

2          A.    No.

3          Q.    Race or national origin?

4          A.    No, sir, female.

5          Q.    Dennis Laux?

6          A.    Uh-huh.

7          Q.    What facts do you believe Dennis Laux has

8    knowledge of that would support your claim you were

9    discriminated against on the basis of either your

10   race, your sex or your national origin?

11         A.    On the sex part of it the accounts that

12   were given to him.  Dennis and I came together from

13   Butler.

14               I knew what he brought in and I knew what

15   he was given.  So account basis.

16         Q.    Do you know of any account that Dennis

17   Laux was given in 1998?

18         A.    No.

19         Q.    1997?

20         A.    No.

21         Q.    So other than Dennis Laux being able to

22   testify to what accounts he may have been given since

23   he came over, anything else you think he could

24   testify to that would support your claim?

1        A.   No.  My comment to Dennis is the same

2  thing I comment to Tony Gispert, about not giving the

3  export accounts when I asked for them.

4        Q.   Not?

5        A.   Given the export accounts from Gene

6  Press.

7        Q.   Okay.  Anything else?

8        A.   No.

9        Q.   And the way Dennis would know about the

10  Gene Press accounts was because you had told him?

11        A.   Yes.

12        Q.   Bob McKee.  What knowledge or facts does

13  Bob McKee have that would support your claim that you

14  were discriminated against on the basis of race or

15  sex or national origin?

16        A.   I sat with Bob McKee the same way I sat

17  with John Glaze, and explained what is happening with

18  Bill Ready and the way he was distributing the

19  accounts and what had happened, that I didn't get the

20  export accounts.

21        But Bob McKee was a people person, a PR

22  person, and he was really not concerned over what is

23  going on in the branch.

24        Q.   How long ago would this have been?

1        A.   God, a year and a half.  He came from

2  '95, to the time that John came.  I think he was

3  there for a year, year and a half or so.

4        Q.   He came until John came in '96?

5        A.   Right.  So he was there from -- he was at

6  Pebble Beach.  So it was '95, to the time when John

7  came, in '96.

8        Q.   These conversations then with McKee would

9  have occurred before John got there?

10       A.   Yes, sir.

11       Q.   What facts do you believe Bob Peterson

12  has knowledge of to support your claim you were

13  discriminated against?

14       A.   None whatsoever.

15       Q.   Any facts you believe he has that would

16  support your claim that you were retaliated against?

17       A.   Just talk in the office.

18       Q.   Gene Press.  What facts would Gene Press

19  have knowledge of that support your claim that you

20  would be discriminated against?

21       A.   None, but what he will have is what he

22  had as export accounts and they were his, and that's

23  about it.

24       Q.   But some of his export accounts have been

171

1    given to you since he left?

2         A.    Yes, two years later, when they had zero

3    value.

4         Q.    By John Glaze though?

5         A.    Yes, sir.  John Glaze instructed Bill

6    Ready.

7         Q.    Larry Press.  What facts do you believe

8    Larry Press has knowledge of that support your claim

9    that you have been discriminated against?

10        A.    None.  We sat and talked about his

11   father's account, and that was it.

12        Q.    John Price.  What facts do you believe

13   John Price could testify to --

14        A.    None.

15        Q.    -- that would support your claim you have

16   been discriminated against?

17        A.    Just talk in the office.

18        Q.    You say talk in the office.  What do you

19   mean when you say, just talk in the office?

20        A.    I am not in the office, because everybody

21   has their own group and they sit and talk and comment

22   and I am not a part of that politics, but you usually

23   hear everything that is going on.

24        Q.    Has either John Price or Bob Peterson

1   ever told you that they believed you have been

2   discriminated against in any way?

3       A.   No.  I don't talk much to them.

4       Q.   Have they ever talked to you about any

5   facts that you think would support your argument that

6   you have been discriminated against?

7       A.   No, sir.

8       Q.   Bill Ready.  What facts do you believe

9   Bill Ready could testify to that would support your

10  claim that you had been discriminated against on the

11  basis of race, sex or national origin?

12      A.   Whatever he wants to testify to.  I don't

13  know what he wants to say and what he will not.

14      Q.   So you don't have any specific knowledge

15  of anything that he would say, that would support

16  your claim?

17      A.   No, sir.

18      Q.   He's never told you he thought you were

19  discriminated against?

20      A.   Even when John asked about the accounts

21  he said, you never came and asked about Gene Press.

22  Here is a book, it's been sitting here for two years

23  and he pulled out a 1995, '96 account.

24      Q.   All right.  Randy Rominger?

1          A.    Uh-huh.

2          Q.    Randy Rominger?

3          A.    Yes.

4          Q.    What facts do you believe that Randy

5    Rominger could testify to that would support your

6    claim that you had been discriminated against on the

7    basis of, first, race?

8          A.    I sat many times -- when both offices

9    merged to Miramar I sat with Randy many, many times

10   and cried my heart out of the things that were going

11   on and the problems I was having with Bill Ready and

12   I talked to him about it and it's what I have said to

13   him.

14         Q.    To your knowledge does Randy Rominger

15   have any independent knowledge of any facts, other

16   than what you had told him?

17         A.    I don't know because he was in a

18   management position, and I don't know what was

19   discussed.

20         Q.    Okay.  Any knowledge that Randy Rominger

21   would have about you having been discriminated

22   against because of national origin or race?

23         A.    I don't know what conversations he had

24   with Bill Ready or the other managers.

1    Q.    He's never told you that anybody told him
2    anything?

3    A.    I have never asked him straightforward.

4    Q.    Okay.  Steve Sullivan.  What facts do you
5    believe Steve Sullivan has that would support your
6    claim that you have been discriminated against on the
7    basis of race, sex or national origin?

8    A.    He was the one that came to me and said I
9    don't understand why you are not getting Gene Press'
10   accounts, it makes no sense to me.

11   Q.    Other than a conversation that he had
12   with you about Gene Press' accounts, anything else
13   from Steve Sullivan?

14   A.    No, sir.

15   Q.    Billy Thomas.  What facts do you have
16   that Billy Thomas would testify to that you think
17   would support your claim that you have been
18   discriminated against on the basis of race, sex or
19   national origin?

20   A.    Whatever he wants to testify to.  I don't
21   know.

22   Q.    Billy Thomas, to your knowledge did he
23   ever admit he discriminated against people on the
24   basis of race, sex or national origin?

1          A.    Yes.

2          Q.    He admitted that he did?

3          A.    Yes, all the time.  He did it all the

4     time.

5          Q.    I understand he did, but did he ever

6     acknowledge after the accusations were brought

7     against him that he was discriminating against you?

8          A.    We were not allowed to talk to him.  He

9     was removed from the office.  We never sat and

10    talked.

11         Q.    Did you have any conversation with Billy

12    Thomas since he left in '94?

13         A.    No.  As a matter of fact, he was in our

14    office two or three months ago and I was sitting at

15    my desk and he just went by, didn't say anything.

16         Q.    The answer is no to my question?

17         A.    No.

18         Q.    Bobbie Vega.  What facts do you believe

19    Bobby Vega would testify to that would support your

20    claim that you have been discriminated against on the

21    basis of race, sex or national origin?

22         A.    The same, as far as having the same

23    problem, we not getting accounts.

24         Q.    Was she giving you any evidence,

```
 1  independent of anything you knew, of discrimination?
 2          A.    No.
 3                MR. BUCKLER:  Other than reserving my
 4          time to come back down here and ask some
 5          questions on some documents that have not been
 6          produced at this point in time, specifically
 7          with regard to some medical records, plus some
 8          tax returns, at this point in time I am
 9          through.
10                At this point with the questions we had,
11          we had about four hours of deposition based on
12          my count.
13                MS. DALEY:  And I have a few follow-up.
14                MR. BUCKLER:  Jennifer, don't let me
15          forget, when we get through I want to talk about
16          some of these things off the record, about
17          scheduling and stuff.
18                MS. DALEY:  Sure.
19                        CROSS EXAMINATION
20  BY MS. DALEY:
21          Q.    Ms. Ortega, I am showing you what has
22  been marked as Exhibit No. 4.
23                Prior to the deposition today have you
24  seen that document entitled 1996 commission paid?
```

1          A.    No.

2          Q.    Do you have any idea who compiled that

3    information on that exhibit?

4          A.    No.

5          Q.    Do you have any idea as to the source of

6    the information contained in that exhibit?

7          A.    No.

8          Q.    Do you know if the information is even

9    accurate?

10         A.    I don't know.  I could only tell you

11   about mine and I don't have my income tax return for

12   that year.

13         Q.    Okay.  Can we turn now to Exhibit No. 5,

14   please.  Exhibit No. 5 is entitled 1997 commissions

15   paid.

16               Prior to the deposition today have you

17   ever seen that document?

18         A.    No.

19         Q.    Do you know who prepared the document?

20         A.    No.

21         Q.    Do you have any idea as to the source of

22   the information used to prepare the information on

23   this document?

24         A.    No.

```
 1          Q.    And do you know whether or not the
 2   information on this document is even accurate?
 3          A.    I don't have any information on that.
 4          Q.    Okay.  I am going to refer you now to
 5   Exhibit No. 6.  It's entitled 1998 commissions paid,
 6   and I am going to ask you the same set of questions.
 7                Prior to the deposition today have you
 8   ever seen that document?
 9          A.    No.
10          Q.    Do you know who prepared the document?
11          A.    No.
12          Q.    Do you have any information, any idea as
13   to the source of information used to compile the
14   information listed on this document?
15          A.    No.
16          Q.    And do you know if the information listed
17   on this document, especially with respect to the
18   commissions paid, is accurate?
19          A.    No.
20          Q.    Let me refer you to Exhibit No. 7 now.
21   And, in particular, I want you to turn to page 4.
22          A.    Okay.
23          Q.    There is a portion on page 4, I am
24   looking at the left-hand side of the page entitled
```

1  Equal Employment Opportunity.

2         You were asked whether or not you

3  complied with the company's procedure with respect to

4  reporting discrimination. Review those two

5  paragraphs and tell me if you see anything in those

6  two paragraphs related to reporting complaints of

7  discrimination?

8         A.    Yes.

9         Q.    And do those two paragraphs tell you who

10 you need to report complaints of discrimination to?

11        A.    No.  I first reported it to my immediate

12 management.

13        Q.    I am asking you to look at these two

14 paragraphs.

15        A.    No, it doesn't.

16        Q.    Let me finish the question.  Is there any

17 provision in the two paragraphs under the word Equal

18 Employment Opportunity, that tells you who you need

19 to report complaints of discrimination to?

20        A.    No.

21        Q.    Now, looking further down the page there

22 is a section entitled harassment, and there are four

23 paragraphs that continues over on page 58.

24        Can you review those and tell me if there

1    is a procedure listed in there for reporting

2    complaints of harassment.  I am going to direct your

3    attention to the last paragraph of that section.

4             A.    It says here to contact your supervisor.

5             Q.    And is there anyone else listed?

6             A.    Or your immediate management.

7             Q.    Now, assuming that discrimination also

8    falls under this harassment policy, with respect to

9    your complaint of discrimination did you discuss it

10   with anyone who you considered to be your supervisor?

11            A.    Yes, ma'am.

12            Q.    And who did you discuss issues of

13   discrimination with?

14            A.    Bob McKee, John Glaze and Bill Ready.

15            Q.    Now, with respect to members of

16   management, did you discuss issues of discrimination

17   with anyone who you considered to be a member of

18   management?

19            A.    Yes, ma'am.

20            Q.    And who did you discuss it with?

21            A.    Bob McKee and John Glaze.

22            Q.    I am going to direct your attention now

23   to Exhibit No. 9.  I believe you were asked some

24   questions whether or not this Help Policy was posted

1 | at your work area. Do you recall if it was?

2 |     A.   I don't. I think it should be. I don't

3 | know. I don't recall.

4 |     Q.   Okay. While you worked for either

5 | Unisource, or any of its predecessors, did anyone

6 | either in human resources or any one of your

7 | supervisors or anyone in management sat down and

8 | explained to you what this Help Policy means?

9 |     A.   No.

10 |     Q.   Did anybody ever tell you what type of

11 | complaint or what type of issues needs to be

12 | addressed under this Help Policy?

13 |     A.   No. Unless you read it, no.

14 |     Q.   Okay. Now, while you worked for

15 | Unisource or any of its predecessors, did any of your

16 | supervisors or anyone in human resources ever discuss

17 | with you the procedure that you needed to utilize to

18 | report complaints of discrimination?

19 |     A.   No.

20 |     Q.   I am going to direct your attention now

21 | to Exhibit No. 11, and this is a policy and procedure

22 | addressing harassment of employees.

23 |     I am directing your attention now to the

24 | second page of the policy and there is a paragraph

1    entitled A.  Can you review that paragraph and tell

2    me if there is anything discussed in that paragraph

3    with respect to who you need to report complaints of

4    harassment?

5        A.    My immediate supervisor.

6        Q.    Is there anyone else who is listed under

7    that paragraph?

8        A.    And the area management.

9        Q.    And you have testified previously about

10   the supervisors who you reported complaints of

11   discrimination to?

12       A.    Yes.

13       Q.    I am going to direct your attention now

14   to Exhibit No. 12 and it's entitled Equal Employment

15   Opportunity.

16           Can you review that policy and tell me if

17   there is anything in there that tells you who you

18   need to report complaints of discrimination to?

19       A.    No.

20       Q.    Okay.  On direct examination you were

21   asked questions about the symptoms that you have

22   experienced, that you eventually saw a psychiatrist

23   about.  Did you experience any of those symptoms

24   before September of 1999?

183

1    A.    No.

2    Q.    Can you tell us when you first began to

3  notice that you were experiencing the symptoms that

4  led you to see a psychiatrist?

5    A.    I would lose track of the things that I

6  was doing.  I will have crying spells.  I had fears

7  of not being able to provide and do the work that I

8  had to do on a daily basis.

9         I was afraid of coming into the office

10  and that created anxiety.  And the symptoms were

11  growing and growing, and I have not been able to

12  concentrate most of the time and because of stress

13  that my job has on a daily basis, I decided to go and

14  find out what was going on.

15         And what they have told me, that it's a

16  loss of self because of the process that I am going

17  through and losing my identity as being the sales

18  rep, the provider, and so forth and so on.

19    Q.    When did you first begin to notice those

20  type of symptoms, if you recall?

21    A.    September.

22    Q.    Okay.  Now, I am going to direct your

23  attention to Exhibit No. 15.

24    A.    Okay.

1          Q.   Which are the answers to the first set of

2    interrogatories, and direct your attention

3    particularly to page 5.

4          A.   Uh-huh.

5          Q.   You were asked questions about the

6    witnesses who are listed on page 5 through page 8.

7               Now, do pages 5 through page 8 contain

8    areas of knowledge with respect to each one of the

9    witnesses listed on those pages?

10         A.   Yes.

11              MS. DALEY:  I have no further questions.

12                   REDIRECT EXAMINATION

13   BY MR. BUCKLER:

14         Q.   I have one.  You started going to the

15   psychologist in November?

16         A.   I made -- my appointment was given the

17   last week of October with the psychiatrist.

18         Q.   Have you ever seen this particular doctor

19   before?

20         A.   My son, two and a half years before, was

21   in treatment with him.

22         Q.   Okay.  So who referred you to this

23   doctor?

24         A.   I did.  I called.

1        Q.    Okay.

2        A.    I called him in.

3              MR. BUCKLER:  All right.  That's it.

4              MS. DALEY:  We're going to read.

5              (Thereupon the taking of the deposition

6    was concluded.)

7

8

                          Deponent
9

10         Sworn to and subscribed before me this

11      day of              2000.

12

13

14

15

16

17

18

19

20

21

22

23

24

186

```
 1          CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER
 2    STATE OF  FLORIDA:
                     SS:
 3    COUNTY     DADE:

 4          I, the undersigned authority, certify that
      BETTY ORTEGA personally appeared before me and was
 5    duly sworn.
               WITNESS my hand and official seal this 31st
 6    day of July 2000.
 7
      STATE OF FLORIDA:
 8                   SS:
      COUNTY  OF  DADE:
 9
               I, EDWARD VARKONYI, and Registered
10    Professional Reporter and a Notary Public for the
      State of Florida at Large, do hereby certify that I
11    reported the deposition of BETTY ORTEGA; that the
      foregoing pages, numbered from 1 to 185, inclusive,
12    constitute a true and correct transcription of my
      shorthand report of the deposition by said witness on
13    this date.
               I further certify that I am not an
14    attorney or counsel of any of the parties, nor a
      relative or employee of any attorney or counsel
15    connected with the action, nor financially interested
      in the action.
16          WITNESS my hand and official seal in the
      City of Miami, County of Dade, State of Florida, this
17    31st day of July 2000.
18
                    Notary Public, State of Florida at
19                  Large; my commission expires
                    February 26, 2003.  Bonded through
20                  General Insurance Underwriters.
21
22
23
24
```