UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 00-CV-6126

JUDGE WILLIAM P. DIMITROULEAS

MAGISTRATE JUDGE JOHNSON

BETTY ORTEGA,

Plaintiff,

v.

UNISOURCE WORLDWIDE, INC., a foreign corporation,

Defendant.

NIGHT BOX
FILED
JAN 2
CLARENCE MADDOX
CLERK, USDC / SDFL / FTL

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7.5 of the United States District Court for the Southern District of Florida, Defendant Unisource Worldwide, Inc. ("Unisource") submits the following responses to Plaintiff's Statement of Disputed Material Facts. Although Unisource denies several of Plaintiff's Statement of Disputed Material Facts, as described below, the facts that Unisource denies are not material to the instant action. Unisource responds to each numbered Paragraph of Plaintiff's Statement of Disputed Material Facts as follows:

**STATEMENT NO. 1:**

Plaintiff, Betty Ortega ("Ortega") is an Hispanic female of Cuban descent. (Deposition of Betty Ortega, at 18.) Defendant Unisource's predecessor hired Ortega in 1988 as a sales representative. (Deposition of William Ready, at 37-38.) Before she was hired, Ortega had sales



responsibilities, including making outside calls, for printing companies where she worked from 1979 through 1988. (Ortega, at 8-9; Ortega Declaration, at ¶ 2,5.)

**RESPONSE NO. 1:**

Unisource admits that Ortega is a Hispanic female of Cuban descent and that Unisource's predecessor hired Ortega in 1988 as a sales representative. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations which therefore stand denied.

**STATEMENT NO. 2:**

The accounts handled by the sales representatives in the printing segment of the Miami Division at Unisource in which Ortega worked include export accounts, sheet fed accounts and web accounts. (Deposition of John Glaze taken October 25, 2000, at 46.) Representatives who service export accounts sell products to customers located outside the continental United States. (Ortega Declaration, at ¶ 5.) Representative who service sheet fed accounts sell papers in cut sheets and folios. (Deposition of Laurence Press, at 16, 17.) Representatives who service web accounts sell paper on rolls. (Press, at 16) Web accounts include heat set web accounts, which involve paper made using dryers, and cold set web accounts, which involve a different process. (Deposition of Richard Crane, at 12; Deposition of Glaze taken on September 28, 2000, at 15.) Web account paper goes from the mill in full truckloads directly to the customer, as opposed to being housed first in a warehouse and then delivered from the warehouse by Unisource's trucks. (Deposition of Robert Peterson, at 8.)

**RESPONSE NO. 2:**

Unisource admits Statement No. 2.

**STATEMENT NO. 3:**

Bill Ready supervised Ortega during 1988, and from 1996 through 1997. (Ready, at 28-29.) As manager, he assigned accounts to Ortega and other representatives in her division during 1996, 1997 and 1998. (Ready, at 45; Ortega, at 49; Defendant's Answers to Ortega's Seventh Interrogatories, at Nos. 2(c), 3(c) and 4(c).)

**RESPONSE NO. 3:**

Unisource admits Statement No. 3.

**STATEMENT NO. 4:**

John Glaze joined the Miami Division in October 1996 as a General Manager. (John Glaze's Witness Statement, at 1.) He, along with others, assigned accounts to the sales representatives during 1998, 1999 and 2000. (Ortega, at 48-49; Deposition of John Glaze taken October 30, 2000, at 33; Seventh Interrogatory Answers, at No. 5(c).) He also supervised Ortega from August 1998 until Lou Kaminow was hired in 2000. (Defendant's Facts, at ¶ 8; Glaze, at 28.)

**RESPONSE NO. 4:**

Unisource admits Statement No. 4.

**STATEMENT NO. 5:**

Ortega and other sales representatives are paid on a straight commission based on the volume of sales generated on the accounts that they handle. (Ortega, at 22; Glaze, at 5.)

**RESPONSE NO. 5:**

Unisource admits Statement No. 5.

**STATEMENT NO. 6:**

Neither Ready nor Glaze, both of whom assigned accounts to sales representatives, were aware of any written policies or guidelines that specified any particular skills needed to sell the various accounts serviced by the sales representatives in Ortega's division. (Ready, at 22, 23,24, 25; Glaze, at 45-46; 30(b)6 II Depo, at 81-82.)

**RESPONSE NO. 6:**

Unisource admits Statement No. 6.

**STATEMENT NO. 7:**

No particular skills are required to sell from export accounts, except an understanding of the particular county's language. (Ready, at 24-25.) Likewise, no special skills are needed to sell sheet fed accounts. (Ready at 25-26.) Testimony conflicts concerning whether special skills are required for selling web accounts.

a. According to Peterson, a representative who handles web accounts, nothing is done differently in servicing web accounts than with other accounts and Unisource did not provide any training to Peterson for handling web accounts. (Peterson at 9, 10.) Richard Crane who also handles web accounts, attested that no difference exists in the sales approach for heat set web accounts and cold web accounts. (Crane, at 12.) John Huempfner, another

representative who handled large web accounts, also testified that "if you sell the sheet fed, you should be able to sell web," even though the web accounts may involved larger orders. (Deposition of John Huempfner, at 15.) No special skill or selling approach is required for selling from the larger accounts, as opposed to the mid size accounts or smaller accounts and even Ready testified that, other than trainees, all of the representatives were for the most part qualified to handle accounts of all sizes. (Crane, at 14-15; Ready, at 80.)

b. According to other testimony by Ready, however, different skills are required to sell web accounts, namely keeping up with the type of paper involved and the technology, and "just building relationships." (Ready, at 21-22.) Glaze also disputes the facts attested to by Crane, Peterson and Huempfner, claiming that a representative had to have past experience handling heat set web accounts to be assigned those accounts. (Glaze, at 48.)

**RESPONSE NO. 7:**

Plaintiff mischaracterizes the evidence. The evidence reflects and Unisource admits that no particular or specific skill are required to sell export accounts except an understanding of the particular country's language and that no particular or specific skills are required to sell sheet fed accounts. However, all sales representatives must possess the core qualifications to be a sales representative regardless of what type of account they service: product knowledge, sales skills, verbal and written communications skills, basic math skills, and industry knowledge. (Glaze Dep. of Oct. 25, 2000 at 51-52.) Unisource denies the remaining allegations in the introductory paragraph of Statement No. 7. Unisource denies that the introductory paragraph to Statement No. 7 is material to this instant action.

a. Unisource admits that Peterson is a sales representative who handles web accounts. Unisource admits that Peterson testified that he could not think that he did anything differently with respect to servicing web accounts and that Unisource did not provide Peterson with formal training for web accounts. The remaining allegations in Statement No. 7, subpart a, sentence 1, are denied. Unisource admits that Crane testified that he did not know of any difference in the sales approach for selling heat set web accounts and cold set web accounts. The

remaining allegations in Statement No. 7, subpart a, sentence 2, are denied. Unisource admits that Huempfner testified that he thought if you are able to sell sheet fed you should be able to sell web. The remaining allegations in Statement No. 7, subpart a, sentence 3, are denied. Unisource admits that Crane testified that he was never told that there was a special or different selling approach for large accounts. Unsource also admits that Ready testified that the sales representatives at Unisource are very qualified. The remaining allegations in Statement No. 7, subpart a, sentence 4, are denied.

b. Unisource admits that Ready and Glaze testified that different skills are required to sell web accounts, namely keeping up with the type of paper involved, keeping up to date with technology, building relationships, and having past experience handling large commercial accounts. Unisource denies the remaining allegations in Statement No. 7, subpart b. Moreover, Unisource denies that Statement No. 7, subpart b, is material to the instant action.

**STATEMENT NO. 8:**

Ortega is most qualified to handle export accounts, which she handled at Madison before Unisource's predecessor hired her. (Ready, at 29; 30(b)6 Depo II, at 8; Ortega Declaration, at ¶5.)

**RESPONSE NO. 8:**

Unisource admits that Ortega is qualified to handle export accounts. (Ready Dep. at 29.) Unisource is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Statement No. 8 which therefore stand denied. Furthermore, Plaintiff's belief that she was more qualified does not constitute competent summary judgment evidence. See e.g., Sanchez v. Henderson, 188 F.3d 740, 747 (7th Cir. 1999) (speculation does not create a genuine issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment) (citations omitted).

**STATEMENT NO. 9:**

Ready and Glaze gave conflicting testimony concerning Ortega's qualifications to handle web accounts. According to Glaze, Ortega has handled cold set web accounts and is qualified to handle them. (Glaze, at 107-8.) He also admitted that she "might meet the minimum qualifications" for handling heat set web accounts, but then said he was not sure. (Glaze, at 108-9.) As 30(b)6 designee, Glaze testified that Ortega was not qualified to handle large heat set web accounts because she lacked the necessary product and industry knowledge. (30(b)6 Depo I, at 63-64.) Ready, who was not aware of any web account that Ortega had serviced, testified that she was not qualified and showed no interest in them, although with training she could have handled them. (Ready, at 29,31.)

**RESPONSE NO. 9:**

Unisource admits that Ready, who was not aware of any web accounts that Ortega had serviced, testified that she was not qualified and showed no interest in them, although with training she could have handled them. (Ready Dep. at 29, 31.) Unisource denies the remaining allegations in Statement No. 9. Unisource also denies that Statement No. 9 is material to the instant action. Futhermore, web accounts are not at issue in this action. (Pl. Dep. at 86-87.)

**STATEMENT NO. 10:**

Unisource has no written or unwritten criteria outlining how accounts should be assigned or transferred to sales representatives and did not provide the managers who assigned the accounts with any guidelines or criteria. (Glaze, at 45; 30(b)6 Depo II, at 81-82; Ready, at 46-47.) Ready and Glaze gave conflicting testimony concerning what, if any, criteria they personally applied in assigning accounts to Ortega and other sales representatives. For example;

a. Ready first testified that "[t]here was (sic) no criteria," but that "[o]nce in a while he] would look at geographical operational area." (Ready, at 46.) Otherwise, he did not look at any other factors in deciding which sales representatives should get what accounts, (Ready, at 47.) Later, however, Ready testified that he looked at (a) geography, (b) the size of the account (in terms of sales), (c) what is "around" the account in terms of geography, and (d) experience, but did not consider all four factors every time that he assigned an account. (Ready, at 75, 77-78, 80.)

b. Glaze, who likewise never was told what criteria to use in assigning accounts, testified that he did so based on (a) experience level, (b) previous product expertise, (c) potential personality fits, (d) territory geographies, (e) time available, and (f) work habits of the sales representatives, but, like Ready, did not always consider each factor when assigning

accounts, and he could not say which, if any, he always applied when assigning accounts. (Glaze, at 44-45, 54.)

**RESPONSE NO. 10:**

Unisource admits that it has no written or unwritten criteria outlining how accounts should be assigned or transferred to sales representatives and did not provide the managers who assigned the accounts with any guidelines or criteria. Unisource denies the remaining allegations in Statement No. 10. (Ready Dep. at 74-82; Glaze Dep. of Sept. 28, 2000 at 44-54.). Furthermore, Unisource denies that Statement No. 10 is material to the instant action.

**STATEMENT NO. 11:**

Prior to 1999, the Miami Division's export accounts were handled primarily by Ortega and Tony Gispert. (Ortega, at 53, 77.)

**RESPONSE NO. 11:**

Unisource admits Statement No. 11.

**STATEMENT NO. 12:**

Ortega had been one of the top sales representatives in the Miami Division every year since 1996. (Defendant's Facts, at ¶ 21.)

**RESPONSE NO. 12:**

Unisource admits Statement No. 12.

**STATEMENT NO. 13:**

When sales representatives leave the company, it is necessary to reassign existing accounts among sales representatives. (Defendant's Facts, at ¶ 12.)

**RESPONSE NO. 13:**

Unisource admits Statement No. 13. However, before assigning existing accounts among sales representatives, Unisource must first determine that the existing sales force can handle the accounts as opposed to hiring a new sales representative. (Defendant's Facts at ¶ 13.)

**STATEMENT NO. 14:**

During Ortega's performance reviews in 1997 and 1998, Ready promised Ortega that she would get Gispert's accounts when he retired. (Ortega, at 53.) In 1997, Glaze also promised Ortega that she would be given Gispert's accounts. (Ortega, at 54; Ortega Declaration, at ¶ 14.) When Ortega heard that Gispert was retiring, she told Glaze that she was ready to handle the accounts. (Ortega, at 63.) Glaze responded that he would not give them to her because if she got hit by a bus and was killed, he would not have an export department. (Ortega, at 63.)

**RESPONSE NO. 14:**

Unisource admits that Glaze told Ortega that he would not give Gispert's accounts to her because if she got hit by a bus and was killed, he would not have an export department. (Ortega Dep. at 63.) Unisource, however, denies that Ready or Glaze ever promised Ortega that she would be given Gispert's accounts. (Glaze Dep. of Sept. 28, 2000, at 96; Ready Dep. at 66.) Furthermore, Unisource denies that Ortega expressed an interest in handling Gispert's accounts. (Glaze Dep. of Sept. 28, 2000, at 112.) Although Unisource denies portions of Statement No. 14 are material to this instant action, it is immaterial because Plaintiff admits that when Gispert retired she was not promised the accounts and that she does not know why the accounts were assigned to Ready. (Pl. Dep. at 55-57.)

**STATEMENT NO. 15:**

Ready, however, who assisted Glaze in filling Gispert's position when he retired in March 1999 and participated in deciding which of Gispert's accounts would be assigned to Ortega and other sales representatives, (Ready, at 5-6; Glaze, at 96; Defendant's Facts, at ¶ 24), provides another explanation: during a 1997 performance review, while discussing the accounts handled by Ortega, Ready told Ortega that "customers don't like Hispanic women because they

are too aggressive." (Ortega. at 109-110.) Subsequently, when Gispert retired, Ortega was not even discussed for his position. (Ready, at 6, 8, 9 and 10.)

**RESPONSE NO. 15:**

Unisource admits that Ortega was not discussed for Gispert's accounts. (Glaze Dep. of Sept. 28, 2000 at 65.) Unisource admits that Ready, Ortega, and Gispert all assisted Glaze in filling Gispert's position when he retired in March 1999 by offering recommendations for Gispert's position. (Defendant's Facts ¶ 26.) Plaintiff mischaracterizes Ready's role in deciding which of Gispert's accounts would be assigned to Ortega. Glaze made the ultimate decision with respect to Gispert's accounts. (Glaze Dep. of Sept. 28, 2000 at 96; Defendant's Response to Plaintiff's Fourth Set of Interrogatories at 2A.) Unisource denies the remaining allegations in Statement No. 15. Furthermore, Unisource denies Statement No. 15 is material to this instant action. Moreover, the allegation attributed to Ready is mischaracterized and time-barred. See 29 U.S.C. § 255; 42 U.S.C. 2000e-5(e); FCRA § 760.11.

**STATEMENT NO. 16:**

Ultimately, despite the promises made to Ortega, almost all of Gispert's accounts - totaling over $375,291.59 in 1999 YTD sales and $85,665.00 in 1998 Fiscal Year Commissions - were assigned to Ready. (30(b)6 Depo II, at 46 and Exhibit 41; Defendant's 1998 Commission Chart.) The accounts were primarily export accounts. (Ready, at 14-15.) Ortega was assigned only one of Gispert's accounts, Editorial America. (30(b)6 Depo II, at 46-47), which had generated only $1,043.35 in 1999 YTD sales. (30(b)6 Depo II, Exhibit 41; 30(b)6 Depo II, at 49-50.) The income generated from Gispert' s accounts placed Ready among the top commission earners for fiscal years 1994 through 1998, and projected for 1999. (Defendant's Commission Charts for 1994 through 1999.)

**RESPONSE NO. 16:**

Unisource admits that almost all of Gispert's accounts were assigned to Ready and that these accounts were primarily export accounts. Further, Unisource admits that Ortega was also assigned one of Gispert's accounts, Editorial America. This account had generated $1,043.35 in

1999 YTD sales. Unisource denies the remaining allegations in Statement No. 16. Furthermore, Unisource denies that Statement No. 16 is material to this instant action because Plaintiff admits that when Gispert retired she was not promised the accounts and that she does not know why the accounts were assigned to Ready. (Pl. Dep. at 55-57.)

**STATEMENT NO. 17:**

When Ready received Gispert's accounts, both he and Ortega had over 10 years of experience handling export accounts. (Ready, at 15; Glaze, at 105.) Ready, however, did not service export accounts as a sales representatives and his export experience was gained as general and sales manager. (Ready, at 15-18.) Glaze claimed he was unaware of how many years (if any) Ready had personally serviced export accounts (Glaze, at 106), but knew that he had been a manager for 30 years prior to returning to sales. (30(b)6 Depo II, at 85.)

**RESPONSE NO. 17:**

Unisource admits Statement No. 17.

**STATEMENT NO. 18:**

Despite the corporate directive to reduce payroll expenses by $150,000 (Defendant's Facts, at ¶ 22), when Ready received Gispert's accounts, Unisource gave him a salary guarantee for two years based on his previous base salary of over $7,000 per month. (Ready, at 12.) Thus, even though Gispert's accounts were projected to provide Ready with only $79,685.55 in commissions (Ready, at Exhibit 10, Projected Commission Chart), Unisource guaranteed him a base salary of over $84,000 per year and Ready actually made more as a sales representative than he did as a manager. (30(b)6 Depo II, at 6l; Ready, at 12,13.)

**RESPONSE NO. 18:**

Unisource admits that it gave Ready a salary guarantee for two years based on his previous base salary when Ready's position was elimiated and he received some of Gispert's accounts. Furthermore, Unisource admits that Ready has earned more as a sales representative than he did as a manager. Unisource admits that Gispert was projected to earn $79,658.55, not $79,685.55, in commissions for 1999. (Projected Commission Chart.) Furthermore, Unisource

denies the remaining allegations in Statement No. 18 and denies that Statement No. 18 is material to this instant action.

**STATEMENT NO. 19:**

Dennis Laux and John Huempfner left Unisource effective December 31, 1998. (Defendant's Facts, at ¶ 14) Laux's accounts generated total commissions of $138,903.56 in fiscal year 1998; Huempfner's accounts generated total commissions of $182,536.86 for that same year, (Defendant's 1998 Commission Chart.)

**RESPONSE NO. 19:**

Unisource admits Statement No. 19.

**STATEMENT NO. 20:**

Laux's larger accounts included Florida Sportsman and Universal Litho, both web accounts, and Health Communications, a sheet fed account. (Press, at 15-16.) Accounts handled by Huempfner also included large web accounts and sheet feed accounts. (Huempfner, at 8-9.)

**RESPONSE NO. 20:**

Unisource admits that Larry Press testified that Dennis Laux's larger accounts in 1996 included Florida Sportsman and Universal Litho, both web accounts, and Health Communications, a sheet fed account. Unisource admits the remaining allegations in Statement No. 20.

**STATEMENT NO. 21:**

After Laux and Huempfner left Unisource Glaze and Ready assigned their accounts. (30(b)6 Depo II, at 77; Seventh Interrogatory Answers, Nos. 10 and 20.) The majority of Laux's accounts, along with the majority of Huempfner's accounts, were assigned to James Ware. (Glaze, at 11; 30(b)6 II Depo, at 75-76, 79-80.) Others were assigned to Ready and Crane. (Crane, at 19) Ortega received only one of Laux' accounts, Sep's & Neg's, Inc., an export account which had generated only $23,429 in gross sales in fiscal year 1998 and $1,078 in annual commissions. (30(b)6 11 Depo, at 75, 79-80.) She likewise received only one of Huempfner's accounts, Continental Printing, which had generated only $20,519 in sales in fiscal year 1998 and $681 in commissions. (Ortega, at 68.) Because the Continental Printing account generated so little in sales, Ortega gave it back to the "house" as was customary among the sales representatives when an account generated little income. (Ortega, at 68; Deposition of William Breshnehan, at 11; Huempfner, at 23; Peterson, at 24.)

**RESPONSE NO. 21:**

Unisource admits that after Laux and Huempfner left Unisource Glaze and Ready assigned their accounts and that the majority of Laux's accounts, along with the majority of Huempfner's accounts, were assigned to James Ware. Unisource admits that other accounts were also assigned to Ready and eventually Crane. Further, Unisource admits that Ortega received one of Laux's accounts, Sep's & Neg's, Inc., and she received one of Huempfner's accounts, Continental Printing. Unisource denies that the reason Ortega gave the Continental Printing account back to the "house" was because the Continental Printing account generated so little in sales. Rather, Ortega asserted in her deposition that the reason she returned Continental Printing was because it was a web account. (Pl. Dep. at 86.) Unisource denies the remaining allegations in Statement No. 21 and denies that Statement No. 21 is material to this instant action.

**STATEMENT NO. 22:**

Glaze was unaware of how many years of experience Ware had handling larger accounts. (30(b)6 Depo II, at 81.)

**RESPONSE NO. 22:**

Unisource admits that Glaze did not know specifically how many years Jim Ware had handling larger accounts. However, Glaze knew that he had experience handling larger accounts for Unisource in South Carolina.

**STATEMENT NO. 23:**

After Mike Altholz left in 1994, Ready split up his accounts between Larry Press, Huempfner and Laux. (Ortega Depo, at 46,49; John Glaze's December 8, 2000 Affidavit at 14.)

**RESPONSE NO. 23:**

Unisource is without knowledge or information sufficient to form a belief as to the truth of the allegations in Statement No. 23 which therefore stand denied. Unisource denies that

Statement No. 23 is material. Moreover, Statement No. 23 is time-barred. See Mitchell v. Jefferson Co. Bd. of Educ., 936 F.2d 539, 548 (11th Cir. 1991); Lieberman v. Miami-Dade Co., No. 99-1714-CIV-King, 2000 WL 1717649, at *1 n.2 (S.D. Fla. Aug. 16, 2000).

**STATEMENT NO. 24:**

Similarly, when Gene Press left in 1995, Ortega asked Ready to assign some of his accounts to her, but Ready said that she was not qualified to handle the accounts. (Ortega, at 69.) Two years later, Glaze gave Ortega two of Press's account's, Le Natal and Lithographics, but only after they had been held by the house so long that they had zero sales and were paying zero commissions. (Ortega, at; 61, 84; 30(b)6 Depo I, at 68, 66.) The others were assigned to male sales representatives, including Gispert and Bill Ready. (Press Depo, at 47.)

**RESPONSE NO. 24:**

Unisource admits that Ready assigned Gene Press' accounts to inside salespeople, who managed the accounts as house accounts to save on sales commissions. (Glaze Dep. of Oct. 25, 2000 at 66-68.) Furthermore, Unisource admits that Glaze assigned Ortega several of Gene Press' accounts, including, Le Natal and Lithographics. Unisource denies the remaining allegations in Statement No. 24. Moreover, Unisource denies that Statement No. 24 is material to this instant action because it is time-barred. See Mitchell v. Jefferson Co. Bd. of Educ., 936 F.2d 539, 548 (11th Cir. 1991); Lieberman v. Miami-Dade Co., No. 99-1714-CIV-King, 2000 WL 1717649, at *1 n.2 (S.D. Fla. Aug. 16, 2000).

**STATEMENT NO. 25:**

After Larry Press left Unisource in June 1996, although Ortega requested that Ready assign some of his accounts to her, but she did not receive any. (Press, at 5; Ortega Declaration, at ¶ 28.) Ready redistributed them to males sales representatives, including Huempfner and Dennis Laux who got the lucrative accounts. (Ortega Declaration, at ¶28.)

**RESPONSE NO. 25:**

Unisource admits that Larry Press left Unisource in June 1996. Unisource denies the remaining allegations contained in Statement No. 25. Furthermore, Unisource denies that

Statement No. 25 is material to this instant action because it is time-barred. See Mitchell v. Jefferson Co. Bd. of Educ., 936 F.2d 539, 548 (11th Cir. 1991); Lieberman v. Miami-Dade Co., No. 99-1714-CIV-King, 2000 WL 1717649, at *1 n.2 (S.D. Fla. Aug. 16, 2000).

**STATEMENT NO. 26:**

During mid 1997, Ortega approached Ready about getting some more accounts because she had lost her biggest export account, which generated $600,000 in sales in the industry division, but Ready he told her that he had no accounts or help to give to her. (Ortega, at 59.)

**RESPONSE NO. 26:**

Unisource denies Statement No. 26. Furthermore, Unisource denies that Statement No. 26 is material to this instant action because it is time-barred. See Mitchell v. Jefferson Co. Bd. of Educ., 936 F.2d 539, 548 (11th Cir. 1991); Lieberman v. Miami-Dade Co., No. 99-1714-CIV-King, 2000 WL 1717649, at *1 n.2 (S.D. Fla. Aug. 16, 2000).

**STATEMENT NO. 27:**

For sales of stock delivered from Unisource's warehouse and delivered from its trucks, all female and some male representatives are paid commissions using commission schedules or matrices computed according to the level of gross profit generated on the account. (Glaze, at 5.)

**RESPONSE NO. 27:**

Unisource denies Statement No. 27. Plaintiff incorrectly cites Glaze's deposition testimony that says for sales of stock delivered from Unisource's warehouse and delivered from its trucks, all female and all male representatives are paid commissions using commission schedules or matrices computed according to the level of gross profits generated on the account. (Defendant's Facts at ¶ 3; Glaze Dep. of Sept. 28, 2000 at 5.)

**STATEMENT NO. 28:**

Certain male sales representatives, however, were and still are paid a straight thirty (30%) percent of the gross profit generated on sales from heat set web accounts. (Glaze, at 8; Peterson, at 13, 15; Huempfner, at 16.)

**RESPONSE NO. 28:**

Unisource admits that certain web accounts are paid pursuant to a thirty percent of the gross profit generated on sales. However, Unisource denies that Statement No. 28 is material to this instant action. (Pl. Dep. at 86-87.)

**STATEMENT NO. 29:**

Web accounts are direct sales. (Huempfner, at 17.) Direct sales involve selling a truckload of paper product which is delivered from the manufacturer to the customer without any involvement by the warehouse. (30(b)6 Depo II, at 30.) In contrast, indirect sales involve selling a stocked product that the manufacturer ships to a merchant or distributor, and which Unisource in turn redistributes out of its warehouse. (30(b)6 Depo II, at 30, 31.)

**RESPONSE NO. 29:**

Unisource admits Statement No. 29.

**STATEMENT NO. 30:**

Ortega handles web accounts and also makes direct sales to customers by truckloads, similar to the way in which web sales are made, but is paid according to the written commission schedule or matrix. (30(b)6 Depo II, at 30-31.) Those schedules pay commissions at varying rates from 9% through 37.6% of the company's gross profit for direct sales, and from 10% to 35.1% for indirect sales. (Commission Schedules; 30(b)6 Depo II, at 30.)

**RESPONSE NO. 30:**

Unisource admits that Ortega handles cold set web accounts and also makes direct sales to customers by truckloads. Unisource admits that Ortega is paid according to the written commission schedule or matrix which pays commissions at varying rates from 9% through 37.6% of the company's gross profit for direct sales, and from 10% to 35.1% for indirect sales. Plaintiff's statement that Ortega makes direct sales to customers by truckload similar to the way in which web sales are made is a legal conclusion that cannot be considered by the Court pursuant to Local Rule 7.5.

**STATEMENT NO. 31:**

As a result of the different commission structures, Ortega earned less commissions for making direct sales which required equal. skill. effort and responsibilities. and which were performed under similar working condition as Peterson, Huempfner and Laux for web sales under the different commission structure. (Report of Michael Piette. at Tables 6, 7 and 8; Ortega Declaration, at ¶ 10.)

**RESPONSE NO. 31:**

Unisource denies Statement No. 31. This denial is not material because Ortega testified that she did not want web sales and that they are not part of this case. (Pl. Dep. at 86-87.) Furthermore, Statement No. 31 is in the form of an issue or a legal conclusion that cannot be considered by the Court pursuant to Local Rule 7.5.

**STATEMENT NO. 32:**

Although commission statements show that certain male representatives received the special commission rate on web accounts. Glaze. both individually and as defendant's corporate representative, could not testify why these men were paid under a different commission structure (Glaze, at 9. 22; 30(b)6 Depo I, at 44) and could not point to any written documents that address the special commission structure applied to them. (30(b)6 Depo II. at 18.) Likewise, Ready. who supervised those representatives. testified that he did not know why male representatives were paid differently on web accounts. (Ready, at 55; Glaze at 9, 22.)

**RESPONSE NO. 32:**

Unisource admits that Glaze and Ready testified that they did not know why there was an additional commission structure for certain web accounts. Further. Unisource denies Statement No. 32 is material to this instant action. (Pl. Dep. at 86-87.)

**STATEMENT NO. 33:**

Since 1990, Ortega has complained repeatedly to Unisource that she has been treated differently. and worse, because she is a female, Hispanic and spoke out against discrimination, including:

a. in a July 22, 1994 letter to Cecil McClary, Unisource's Human Resources Manager, signed by Ortega and several others, complaining of racial slurs and discriminatory

remarks by the General Manager for the Miami Division, Billy Thomas, and requesting an investigation.

b. in mid-1995 or early 1996 to General Manager and Vice President Bob McKee, about the manner in which Ready was assigning accounts to Huempfner, Laux and Press and that "we're not given equal opportunities." (Ortega, at 90.)

c. during 1995 and 1996 to Billy Thomas, Industrial Division General Manager, and Jose Encinosa, another industrial manager in the Miami Division, about the gender discriminatory assignment of accounts. (Ortega, at 92.)

d. in October 1996, to Glaze that Ready favored men over women and about specific historical instances of discrimination by Ready. (Ortega, at 91-92, 155, 180; Glaze Statement, at ¶ 1; Amy George's October 10, 2000 Deposition as corporate representative, at 41 42, Glaze, at 69.) She had many similar conversations with Glaze, with the last occurring in the end of 1998. (Ortega, at 92-93.) She did not refuse to offer him specifics about her complaints. (Ortega's Declaration, at ¶ 12), and Glaze told McClary that Ortega had complained to him about discriminatory assignment of accounts, including Gispert's former accounts. (Deposition of Cecil McClary, at 32.)

e. in another conversation with Glaze, during which Ortega reported that she felt uncomfortable around Dennis Laux and that he was dangerous, and which she also reported to Cecil McClary. (Ortega Declaration, at ¶ 13; Glaze Statement, at ¶ 1; McClary, at 8-9.)

f. about sexual discrimination to Glaze, Ready and McKee. (Ortega, at 180.)

g. to McClary that another sales representative, Billy Thomas, commented about her body, and that the reason her sales were good was because of the way she dressed and conducted herself with customers. (Ortega, at 105, 110; McClary, at 8; Ortega Declaration, at ¶ 13.)

h. to the Equal Employment Opportunity Commission and the Florida Commission on Human Relations, when on or about April 23, 1999, Ortega filed her Charges of Discrimination alleging race, sex and national origin discrimination.

i. in the summer of 1999, when Ortega complained about harassment by a Georgia Pacific vendor who has touched her in an unfriendly or sexual way. (George 30(b)6 Depo, at 40; McClary, at 17-18.)

**RESPONSE NO. 33:**

Unisource denies the introductory allegations in Statement No. 33.

a. Unisource admits Statement No. 33, subpart a.

b. Unisource is without knowledge or information sufficient to form a belief as to the truth of the allegations in Statement No. 33, subpart b which therefore stand denied.

c. Unisource is without knowledge or information sufficient to form a belief as to the truth of the allegations in Statement No. 33, subpart c which therefore stand denied.

d. Unisource admits that in October 1996 Ortega complained to Glaze that Ready favored men over women. In addition, Unisource admits that Ortega complained about the assignment Gispert's former accounts. Unisource denies the remaining allegations contained in Statement No. 33, subpart d.

e. Unisource admits Statement No. 33, subpart e.

f. Unisource admits that Ortega complained to Glaze that Ready favored male sales representatives. (Glaze Dep. of Sept. 28, 2000 at 69.) With respect to Ortega's complaint to McKee, Unisource is without knowledge or information sufficient to form a belief as to the truth of that allegation in Statement No. 33, subpart f which therefore stands denied. Unisource denies the remaining allegations in Statement No. 33, subpart f. (Ready Dep. at 53.) Unisource denies that Statement No. 33, subpart f, is material to this instant action.

g. Unisource admits that Ortega complained to McClary, along with several others, in a July 22, 1994, about racial slurs and discriminatory remarks by the General Manager for the Miami Division, Billy Thomas, and requested an investigation. Unisource denies the remaining allegations in Statement No. 33, subpart g. Furthermore, Unisource denies that Statement No. 33, subpart g, is material to this instant action.

h. Unisource admits Statement No. 33, subpart h.

i. Unisource admits Statement No. 33, subpart i.

**STATEMENT NO 34:**

Unisource has not taken any action to remedy or correct any of the matters about which Ortega complained. (George 30(b)6 Depo. at 45.)

**RESPONSE NO. 34:**

Unisource denies Statement No. 34. Unisource denies Statement No. 34 is material to this instant action.

**STATEMENT NO. 35:**

During 1999, Ortega was assigned five new accounts, which were generating the following income by the end of the 1999 fiscal year.

| Accounts | FY 1999 Sales | FY 1999 Commission | Assigned by Date | Old Representative |
|---|---|---|---|---|
| Seps & Negs | $36,323.00 | $2,392.00 | Glaze(1/5/99) | Dennis Laux (DEF02832,1183) |
| Executek Printer | $50.890.00 | $1,016 00 | Glaze(3/12/99) | Cece Romaine (DEF02823) |
| Editorial Television | $2,122.00 | $199.00 | Ready(4/19/99) | Direct Marketing (DEF02820, 1183) |
| American Disc., Inc. | $174.00 | $0.00 | Glaze(7/22/99) | Barbara Vega (DEF03623, 1183) |
| Intergraph | $0.00 | $0.00 | Glaze(7/22/99) | Bill Heard (DEF03623,8290) |

**RESPONSE NO. 35:**

Unisource admits that it assigned these five accounts, among others, to Ortega in 1999 and that these sales representatives previously handled the accounts in fiscal year 1999. Unisource denies the remaining allegations in Statement No. 35. In particular, Unisource denies that the FY 1999 sales and commission figures accurately reflect the sales and commission figures for FY 1999. Plaintiff mischaracterizes the sales and commission figures for the five accounts by only listing the sales and commission figures for Ortega during the periods in which she was assigned the accounts during fiscal year 1999 and not the sales and commission figures for these accounts for the entire fiscal year. Furthermore, Unisource denies that Statement No. 35 is material to this instant action.

**STATEMENT NO. 36:**

On November 22. 1999. Glaze took several accounts away from Ortega. including Associated Insurance Brokers ("AIB"), which generated approximately $56,921 in gross sales for fiscal year 1998 and $1,924 in commissions (DEF08192), and 3 other accounts. In return, Glaze gave Ortega one account. Enterprise Printing. which generated only $774 in gross sales during fiscal year 1998 and $40 in commissions (DEIO8 193) and the income of which was declining because of a dispute with the warehouse manager and the manner in which the paper was being delivered. (Ortega, at 60-61. 89; Glaze at Exhibit 18). Glaze gave the AIB account back to Ortega six months later, but only after the customer called and requested Ortega. (Ortega, at 87.)

**RESPONSE NO. 36:**

Unisource admits that on November 22. 1999, Glaze reassigned numerous accounts to and from sales representatives. including reassigning four accounts previously handled by Plaintiff, and assigning Plaintiff Enterprise Printing. Unisource admits that Glaze returned the AIB account to Ortega in February of 2000 after the customer called and requested Ortega. (Ortega. at 87.) Unisource denies that the income of Enterprise was declining because of a dispute with the warehouse manager and the manner in which the paper was being delivered. Rather. the income of AIB was declining because of a dispute with the warehouse manager and the matter in which the paper was being delivered. (Ortega, at 88-89.) Unisource denies the remaining allegations in Statement No. 36. Furthermore, Unisource denies that Statement No. 36 is material to this instant action.

**STATEMENT NO. 37:**

On July 24, 2000, the day before her deposition. Ortega was placed on probation under the company's Minimum GTM Program. (Ortega, at 167; 30(b)(6) Depo II 26; Glaze, at 85.) She was told that if she failed to meet a gross profit goal of $350,000 by year end, she would be terminated. (Ortega, at 167; 30(b)(6) Depo II, at 24-26.) Although the probation was never "termed" as a disciplinary action. Glaze testified, "whenever you're working with an employee to bring up their performance, and there's the possibility of disciplinary action, then I would say, yes, that's disciplinary action." (Glaze, at 92-93.)

**RESPONSE NO. 37:**

Unisource admits it counseled Plaintiff in July 2000 pursuant to its Minimum GTM Program. Furthermore, Unisource admits that Glaze testified, "whenever you're working with an employee to bring up their performance, and there's the possibility of disciplinary action, then I would say, yes, that's disciplinary action." Unisource denies the remaining allegations in Statement No. 37 Unisource denies that Statement No. 37 is material to this instant action.

**STATEMENT NO. 38:**

In previous years, other representatives who had not opposed discriminatory conduct but who had failed to meet sales goals-were not placed on probation or otherwise disciplined. These included Huempfner, who failed to meet his goal by about 10% in 1996 or 1997 because he had lost his largest account, Avanti (Huempfner, at 28, 34); Peterson, who sometimes failed to meet his goals by about 5% (Peterson, at 23-24); and Bresnehan, who failed to meet his goals 4 or 5 times, including in 1997. (Bresnehan, at 13-14.)

**RESPONSE NO. 38:**

Unisource denies Statement No. 38. Further, Unisource denies that Statement No. 38 is material to this instant action.

HUNTON & WILLIAMS
Attorneys for Unisource Worldwide, Inc.
One Biscayne Tower, Suite 2500
2 South Biscayne Boulevard
Miami, Florida 33131-1802

By: ______________________
Juan C. Enjamio
Florida Bar No. 571910

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS** was

mailed to Karen C. Amlong, Esq., Jennifer Daley, Esq., Amlong & Amlong, P.A., 500 Northeast Fourth Street, Second Floor, Fort Lauderdale, Florida 33301-1154 on this 26th day of January, 2001.

By: ______________________
Juan C. Enjamio

OF COUNSEL:
TROUTMAN SANDERS, LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Robert H. Buckler
Georgia Bar No. 092650
Robert C. Stevens
Georgia Bar No. 680142