cv-06126-WPD    Document 74    Entered on FLSD Docket 01/25/2001    P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 00-CV-6126

JUDGE WILLIAM P. DIMITROULEAS

MAGISTRATE JUDGE JOHNSON

BETTY ORTEGA,

    Plaintiff,

v.

UNISOURCE WORLDWIDE, INC., a
foreign corporation,

    Defendant.
_____/

**NIGHT BOX FILED**

JAN 2 ... 20

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## DEFENDANT UNISOURCE WORLDWIDE, INC.'S MOTION TO STRIKE PARAGRAPH 27 OF BETTY ORTEGA'S UNSWORN DECLARATION, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

COMES NOW Unisource Worldwide, Inc. ("Unisource"), and hereby files this Motion to Strike Paragraph 27 of Betty Ortega's Unsworn Declaration, Under Penalty of Perjury, Pursuant to 28 U.S.C. § 1746 in Support of Plaintiff's Response to Motion for Summary Judgment and Brief in Support.

### INTRODUCTION

Plaintiff filed this action on December 3, 1999, claiming that Unisource discriminated against her in the assignment of accounts and pay on the basis of her sex, race and national origin and retaliated against her for complaining about the assignment of accounts. Unisource deposed



Plaintiff in this case on July 25, 2000. After the close of discovery, Unisource timely moved for summary judgment on all of Plaintiff's claims on December 8, 2000. Plaintiff responded to Unisource's motion for summary judgment on January 16, 2001. In her Response, Plaintiff relies heavily on her own twenty-nine paragraph declaration filed contemporaneously therewith. Plaintiff's declaration is nothing more than a last ditch effort to recast her prior deposition testimony in a more favorable light in order to manufacture an issue of material fact and survive summary judgment. Ostensibly recognizing that Unisource is entitled to summary judgment based on the competent record evidence in this matter, paragraph 27 of Plaintiff's declaration seeks to add claims to this lawsuit which Plaintiff unequivocally testified in her deposition was not part of this action. Specifically, paragraph 27 of Plaintiff's declaration seeks to add a claim of disparate pay for and disparate assignment of web accounts. This paragraph directly contradicts and is inherently inconsistent with Plaintiff's prior deposition testimony. For these reasons, and as described in more detail below, the Court should grant Unisource's Motion to Strike paragraph 27 of Plaintiff's declaration from the record and award Unisource its costs and fees incurred in bringing this Motion.

## ARGUMENT AND CITATION OF AUTHORITY

The law is clear in the Eleventh Circuit that a party cannot give "clear answers to unambiguous questions" in a deposition and thereafter attempt to raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction. Rollins v. TechSOUTH, Inc., 833 F.2d 1525, 1530 (11th Cir. 1987). When a party does, the trial court may disregard the affidavit as a sham. Id. Thus, an affidavit is properly considered a sham whenever the affiant (1) makes a conclusory, unexplained assertion regarding a material fact which (2) directly contradicts that person's unequivocal deposition testimony. Tippens v. Celotex Corp., 815 F.2d 66, 68 (11th Cir.

1987); <u>Van T. Junkins and Assoc. v. U.S. Industries</u>, 736 F.2d 656 (11th Cir. 1984). In the instant action, Plaintiff submitted to this Court her own declaration which contains testimony that contradicts, and is inherently inconsistent with, her prior deposition testimony. Accordingly, this Court should disregard that testimony in Plaintiff's declaration as a sham.

A simple comparison of Plaintiff's testimony at deposition and the newly minted testimony in paragraph 27 of her declaration plainly demonstrates the contradictions:

Plaintiff's July 25, 2000 deposition testimony regarding web sales is as follows:

Q: Are there any web sales accounts that you believe should have been assigned to you, but were assigned to someone else?

A: No, sir. I don't get involved in web sales at all.

Q: So your complaint here in regard to assignment of accounts does not deal with web sales?

A: No, sir.

(Ortega Dep. at 87, relevant pages attached hereto as exhibit A.) Comparatively, paragraph of 27 of Plaintiff's January 16, 2001 declaration directly contradicts her deposition testimony.

Paragraph 27 of Plaintiff's January 16, 2001 Declaration:

However, after reviewing the documents produced by Unisource during discovery in this case, I realized that John Huempfner, Dennis Laux and Bob Peterson handled web accounts for which they were paid according to a different commission structure. I am claiming that Unisource discriminated against me in the assignment of Huempfner's and Laux's accounts, including their web accounts.

(Pl. Decl. at 27, attached hereto as exhibit B.) Paragraph 27 of Plaintiff's declaration seeks to add new claims to this case that Plaintiff unequivocally and under oath stated were not part of this case. As is apparent, Plaintiff's declaration directly contradicts her July 25, 2000 deposition testimony. Simply put, after the close of discovery and after Unisource filed its motion for

3

summary judgment, Plaintiff is seeking to manufacture an issue of fact by offering a sham declaration to this Court. Such actions are the very actions that the rule against sham affidavits seek to prohibit. See Van T. Junkins, 736 F.2d at 657; see also Margo v. Weiss, 213 F.3d 55, 65 (2d Cir. 2000) (affirming striking of sham affidavit and errata sheet and award of sanctions against party attempting use sham affidavit and belated errata sheet); Jones v. General Motors Corp., 939 F.2d 380, 385 (6th Cir. 1991) ("[I]t is well settled that a plaintiff may not create a factual issue for the purpose of defeating a motion for summary judgment by filing an affidavit contradicting a statement the plaintiff made in a prior deposition"); Simmons v. Neumann, 1999 WL 1893667, at *14, No. 97CV8653 (S.D. Fla. 1999) (not crediting sham affidavit); St. Hilaire v. The Pep Boys, 73 F. Supp. 1350, 1362 (S.D. Fla. 1999) (not crediting sham affidavit). Given Plaintiff's blatant attempt to manufacture a material issue of fact where one does not exist, Unisource's Motion should be granted and Unisource should be awarded its costs and fees incurred in filing this motion.

## CONCLUSION

Plaintiff has played fast and loose with her previous deposition testimony in an attempt to manufacture a sham issue of material fact in a last ditch effort to survive summary judgment. Plaintiff has taken liberties with her declaration that directly contradict her prior deposition testimony. Such actions are at best irresponsible and at worst untruthful. Plaintiff's declaration therefore meets the definition of a "sham affidavit" in this Circuit and is an impermissible attempt to circumvent summary judgment. Accordingly, paragraph 27 of Plaintiff's declaration

should be stricken by the Court from the record, and Plaintiff should be made to rely on the relevant testimony already on record in this case.

> HUNTON & WILLIAMS
> Attorneys for Unisource Worldwide, Inc.
> One Biscayne Tower, Suite 2500
> 2 South Biscayne Boulevard
> Miami, Florida 33131-1802
>
> By: _____
> Juan C. Enjamio
> Florida Bar No. 571910

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **DEFENDANT UNISOURCE WORLDWIDE, INC.'S MOTION TO STRIKE PARAGRAPH 27 OF BETTY ORTEGA'S UNSWORN DECLARATION, UNDER PENALTY OF PERJURY, PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT** was mailed to Karen C. Amlong, Esq., Jennifer Daley, Esq., Amlong & Amlong, P.A., 500 Northeast Fourth Street, Second Floor, Fort Lauderdale, Florida 33301-1154 on this _____ day of January, 2001.

> By: _____
> Juan C. Enjamio

OF COUNSEL:

TROUTMAN SANDERS, LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
Robert H. Buckler
Georgia Bar No. 092650
Robert C. Stevens
Georgia Bar No. 680142

5

```
 1  have you ever done any web sales since?
 2       A.  No, sir.
 3       Q.  Are there any web sales accounts that you
 4  believe should have been assigned to you, but were
 5  assigned to someone else?
 6       A.  No, sir.  I don't get involved in web
 7  sales at all.
 8       Q.  So your complaint here in regard to
 9  assignment of accounts does not deal with web sales?
10       A.  No, sir.
11       Q.  Now, you also mentioned an account that
12  you said you felt was taken away from you, AIB?
13       A.  Yes, sir.
14       Q.  Now, ultimately that account was given
15  back to you, correct?
16       A.  Yes, sir.  The customer called John
17  Glaze.
18       Q.  And how long were you without the AIB
19  account?
20       A.  About six months.
21       Q.  And prior to the AIB account being taken
22  away from you, did John Glaze counsel with you about
23  the declining volume of sales with AIB?
24       A.  Yes, he did.
```

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number:00-6126-CIV-DIMITROULEAS/JOHNSON

BETTY ORTEGA,

　Plaintiff,

vs.

UNISOURCE WORLDWIDE, INC., a
foreign corporation,

　Defendant.
_____/

**Plaintiff's Notice of Filing Betty Ortega's Unsworn Declaration, Under Penalty of Perjury, Pursuant to 28 U.S.C. § 1746 in Support of Plaintiff's Response to Motion for Summary Judgment and Statement of Disputed Material Facts Under Seal**

　　　Plaintiff, Betty Ortega, gives notice of filing Betty Ortega's Unsworn Declaration, Under

Penalty of Perjury, Pursuant to 28 U.S.C. § 1746, in support of Plaintiff's Response to Defendant's

Motion for Summary Judgment and Plaintiff's Statement of Disputed Material Facts, under seal,

which is attached hereto.

Respectfully Submitted,

_signature_

KAREN COOLMAN AMLONG
Florida Bar No: 206565
JENNIFER DALEY
Florida Bar No: 0856436
Amlong & Amlong, P.A.
Attorneys for Plaintiff
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, FL 33301-1154
(954)462-1983
(954)523-3192

Page 1 of 2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by __U.S. Mail__ this __16th__ day of January, 2001 to Juan C. Enjamio, Esquire, Hunton & Williams, One Biscayne Tower, Suite 2500, 2 S. Biscayne Blvd., Miami, FL 33131; Robert Stevens, Esq., Troutman Sanders, LLP, 5200 Bank of America Plaza, 600 Peachtree Street, N.E., Atlanta, GA 30308.

I:\CPWin\HISTORY\001222A\6EC.13i

Jennifer Daley

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 00-6126-Civ-Dimitrouleas/Johnson

BETTY ORTEGA,

    Plaintiff,

vs.

UNISOURCE WORLDWIDE, INC., a foreign
corporation,

    Defendant.
_____/

### Betty Ortega Unsworn Declaration, Under
### Penalty of Perjury, Pursuant to 28 U.S.C. § 1746

State of Florida

County of Broward

Betty Ortega deposes and says:

1. My name is Betty Ortega. I am the plaintiff in the above-styled case.

2. Between 1987 and 1988, I worked as assistant to the President for Madison Paper. As indicated on the job application that I completed for Jim Walter Papers (attached as Exhibit A, DEF01105), my job duties at Madison Paper included purchasing and sales.

3. In 1988, when I was hired by Jim Walter Papers, Bill Ready told me that I was hired as a sales representative. After I was hired, Ready did not provide me with any on-the-job sales training before I handled the accounts assigned to me.

4. When I interviewed with Bill Ready, I brought a list of accounts that I handled at Madison Paper, some of which Jim Walters had previously assigned to other representatives. I also told Ready about my previous sales experience working at Madison Paper and M&M Printing. After I was hired, I continued to service the accounts on the list that were not assigned to a representative.

5. When I discovered that Gene Press was leaving the company in 1995, I asked Bill Ready to assign some of Gene Press's accounts to me. Ready told me that he would not because I had no export experience. However, prior to that time, I had handled export accounts (from which I sold

Page 1 of 6

products to customers outside the continental United States) for about seven years, including the following accounts:

    a. Las Casa de Papeles de Argentina, in approximately 1985 at Madison Paper;

    b. Martinez y Martinez (a Mexican account) in approximately 1985 at Madison Paper;

    c. Papeles Seleccionados (a Costa Rican account) in approximately from 1991 and ongoing with Butler Paper, Unisource's predecessor; and

    d. Multigrafica de Puerto Rico, from 1991 through 1994 or 1995 with Butler Paper, Unisource's predecessor.

6. Based on my review of my Commission Analysis Reports, attached as Composite Exhibit B, I did not primarily handle export accounts during:

    a. Fiscal year 1996 – Only 2 of the 35 accounts listed on my Commission Analysis Detail Report for fiscal year 1996 (DEF07921) are export accounts: Papeles Seleccionados; and Expo Trade.

    b. Fiscal year 1997 – Only 5 of the 36 accounts listed on my Commission Analysis Detail Report for fiscal year 1997 (DEF08115) are export accounts: Papeles Seleccionados; Donadios Paper Ink; Le Natal SA; Litographic Printers; and Phoenix Printery Ltd.

    c. Fiscal year 1998 – Only 10 of the 42 accounts listed on my Commission Analysis Detail Report for fiscal year 1998 (DEF08192) are export accounts: Le Natal SA; Donadios Paper Ink; Papeles Seleccionados; Burromatic; Phoenix Printery Ltd.; Litographic Printers; Desber Import Export; Multi Graphics & PA; Interprint; Imprenta Comercial PA; and D'Vision Grafica.

    d. Fiscal year 1999 – Only 9 of the 46 accounts listed on my Commission Analysis Detail Report for fiscal year 1999 (DEF08261) are export accounts: Papeles Seleccionados; Donadios Paper Ink; Le Natal SA; Sep's & Neg's, Inc.; Litographic Printers; Phoenix Printery Ltd.; Desber Import Export; Alpha Graphics; and Media Sales Ltd.

    e. October to December 1999 – Only 7 of the 30 accounts listed on my Commission Analysis Detail Report for October - December 1999 (DEF08315) are export accounts: Donadios Paper Ink; Papeles Seleccionados; Sep's & Neg's, Inc.; Sir Speedy; The Buccaneer Hotel; Litographic Printers; and Polaris Ent. Inc.

    f. 2000 – Only 8 of the 34 accounts listed on my Commission Analysis Detail Report for YTD 2000 (DEF08326) are export accounts: Papeles Seleccionados; Donadios Paper Ink;

Le Natal SA; Litographic Printers; Interprint; Media Sales LTD, Kenneth Gomez; and Blades & Williams.

7. After Tony Gispert left in 1999, Bill Ready and I were and still are two sales representatives who handle most of the export accounts in the Miami Division.

8. Prior to my deposition on July 25, 2000, I had been assigned one account from which the customer bought only web paper, i.e., paper on rolls, Continental Printing.

9. Prior to my deposition on July 25, 2000, I have not handled any domestic account from which the customer bought only web paper, i.e., paper on rolls. However, on one occasion, I sold rolls of paper to Le Natal and Papeles Seleccionados, export accounts. I also have sold NCR rolls of paper to Tiger Business forms since 1995. I also quoted rolls of paper to my export customers.

10. I did not refuse to handle John Huempfner's web accounts. The skills, efforts responsibilities, and working conditions that I use for direct sales are equal to the skill, effort and responsibilities, working conditions used by Bob Peterson, John Huempfner and Dennis Laux for servicing accounts under the different commission structure for web accounts.

11. After John Huempfner left on December 31, 1998, John Glaze assigned to me one of Huempfner's former web accounts, Continental Printing, which was not in the top 20% of Huempfner's account in terms of sales generated. I was unable to effectively service that account because I discovered that Huempfner had continued to service that account after he left, about which Glaze failed to inform me. Also, the customer told me that it would not do business with Unisource because its prices were too high, about which Glaze also failed to inform me. While I had the account, I sold only 2 cases of stretch film, on which I received no commission. Because of those reasons, I returned the account to Unisource.

12. When I complained to John Glaze after he came to the Miami Division in October 1996 about Bill Ready favoring male sales representatives over female sales representatives, I did not refuse to offer him specifics about my complaint. I told him that Billy Thomas, had made comments about my body, including that the reason that my sales were good was because of the way I dressed and conducted myself with customers.

13. When I complained to John Glaze about Dennis Laux, I told Glaze that I felt uncomfortable being in the office around Dennis Laux and that he was dangerous, based on his conduct which included following me around the office, staring at me while I at sat at my desk, and putting his personal belongings on my desk. I later reported my concerns to Cecil McClary as well.

Page 3 of 6

14. In response to my request to John Glaze for Gispert's territory, Glaze told me that Gispert would retire soon and that his territory would be mine.

15. John Glaze did not assign the following accounts to me:
   a. Litho Nova International Corporation – I developed this account on my own.
   b. Pedro Ramirez – I brought this account with me from Butler Paper, before Glaze came to the Miami Division.
   c. Pitney Bowes Management – I brought this account with me from Butler Paper, before Glaze came to the Miami Division.
   d. Precision Art Printing – I brought this account with me from Butler Paper, before Glaze came to the Miami Division.
   e. SunSwipe – This is an industrial account that I had before Glaze came to the Miami Division.

16. I had the Associated Insurance Brokers account before Glaze came to the Miami Division. After I filed my Charge of Discrimination in April 1999, Glaze took that account away from me in November 1999. The account was given back to me after the customer called and requested that the account be reassigned to me.

17. I had the Florida Power & Light account before John Glaze came to the Miami Division as a single account from which I sold both printing and industrial products. After Glaze came to the division, I was given a separate number for selling industrial products under the industrial division.

18. John Glaze assigned the Executek Printing & Duplication account to me after the customer requested my assignment to that account.

19. I no longer handle the Maison Henri Deschamp account.

20. Sep's and Neg's is no longer in business.

21. Glaze has used Unisource's resources to do the following for me and other sales representatives of which I am aware:
   a. travel and fund trips for them, including Tony Gispert and Bill Ready, to develop accounts; and
   b. pay telephone and postage expenses.

22. I am not aware of any lead that may have been forwarded to me by Jeanne Holmes that resulted in me getting an account.

23. I am not aware of any export lead from a trade show that may have been forwarded to me by John Glaze that resulted in me getting an account.

24. On one occasion in April 2000, after I filed the above-styled lawsuit, Glaze used Unisource's funds to fly a customer, Papeles Seleccionados, to the United States to attend an open house.

25. During my performance reviews in 1997 and 1998, Bill Ready told me that I would get Tony Gispert's accounts when he retired.

26. Before my July 25, 2000 deposition in this case, I was told that all male and female representatives in the Miami Division were paid according to same Commission Schedules for direct and indirect sales. When I asked if male sales representatives were paid according to a different schedule and received a different commission rate, my supervisors, John Glaze and Bill Ready, told me that they were not.

27. However, after reviewing the documents produced by Unisource during discovery in this case, I realized that John Huempfner, Dennis Laux and Bob Pearson handled web accounts for which they were paid according to a different commission structure. I am claiming that Unisource discriminated against me in the assignment of the Huempfner's and Laux's accounts, including their web accounts.

28. After Larry Press left in 1996, I requested that Ready assign some of his accounts to me, but I did not receive any. Instead, Ready assigned two of Press's lucrative accounts to John Huempfner and Dennis Laux.

29. Since I filed my Charge of Discrimination in April 1999, I have been unable to meet the sales goals set for me under my sales plan. The truckload portion of one of my most lucrative accounts, Papeles Seleccionados, which generated over $300,000 in sales for fiscal year 1999, was taken away and given to Unisource International. John Glaze told me that in return, Unisource International would give me the non-truck load business that it had. To date, I have not received the non-truckload business. As a result of losing that portion of Papeles Seleccionados, I lost approximately $200,000 in annual sales on that account.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Ft. Lauderdale, Florida, this __16__ day of January, 2001.

BETTY ORTEGA