UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 00-CV-6126

JUDGE WILLIAM P. DIMITROULEAS

MAGISTRATE JUDGE JOHNSON

NIGHT BOX
FILED

JAN 31 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / FTL.

BETTY ORTEGA,

        Plaintiff,

v.

UNISOURCE WORLDWIDE, INC., a
foreign corporation,

        Defendant.

_____/

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE THE ERRATA SHEET OF PLAINTIFF BETTY ORTEGA, MOTION TO STRIKE PARAGRAPH 27 OF THE UNSWORN DECLARATION OF BETTY ORTEGA, AND MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant Unisource Worldwide, Inc. ("Unisource") and hereby submits this Supplemental Memorandum in Support of Defendant's Motion to Strike the Errata Sheet of Betty Ortega, Motion to Strike Paragraph 27 of the Unsworn Declaration of Betty Ortega, and Motion for Summary Judgment.

On December 3, 1999, Plaintiff Betty Ortega ("Ortega") filed the above-styled action against Unisource alleging discriminatory assignment of accounts and pay based on her sex, race, and national origin and in retaliation for complaining about the assignment of accounts. On July 25, 2000, Unisource deposed Plaintiff under oath before a certified court reporter. Discovery



closed on December 1, 2000, and Unisource filed its Motion for Summary Judgment on December 8, 2000.

After two extensions of time, Plaintiff filed her response to Unisource's Motion for Summary Judgment on January 16, 2000. In support, Plaintiff submitted, for the first time, an errata sheet to her deposition of July 25, 2000, and an Unsworn Declaration under Penalty of Perjury, seeking to substantially change her prior sworn deposition testimony in an obvious attempt to manufacture an issue of fact where one does not exist. In response to Plaintiff's disingenuous attempt to change her deposition testimony in the face of Unisource's Motion for Summary Judgment, Unisource filed a Motion to Strike the Errata Sheet of Plaintiff Betty Ortega and a Motion to Strike Paragraph 27 of Betty Ortega's Unsworn Declaration, under Penalty of Perjury, pursuant to 28 U.S.C. § 1746 ("Defendant's Motions to Strike").

Defendant submits this Supplemental Memorandum in order to bring to the Court's attention to a March 21, 2000, Order of this Court, which Defendant just obtained. This Order sanctions the law firm of Amlong & Amlong, P.A. (the attorneys in this action) for errata sheet violations in another action. See Order Sustaining Objections to Magistrate's Report and Recommendation and Granting Defendant's Motions for Fees, Costs and Expenses in Floride Norelus v. Denny's Inc., et al., Case No. 94-2680-CIV-Lenard/Bandstra, U.S.D.C. So. Dist. of Fla., attached hereto as Exhibit A.[1] Specifically, the Court's Order states that "Plaintiff's counsel undertook efforts to 'repair the damage' plaintiff's deposition caused, and filed the Errata Sheet in an effort to bolster testimony." (Order at 32.) The Court went on to hold that "the number

---

[1]    Due to the voluminous nature of the exhibits attached to this Order, Unisource does not file those exhibits herewith. If the Court believes that those exhibits should be submitted, Unisource will file them at the Court's direction.

and nature of the Errata Sheet 'corrections,' amount to unreasonable, vexatious behavior that unnecessarily multiplied these proceedings." (Order at 33.)

Due to the similarities in the actions by the same law firm in both cases, in attempting to bolster its client's deposition testimony with substantial errata sheet changes, Unisource brings this March 21, 2000, Order to the Court's attention. Although the errata sheet changes were substantially more in *number* in the prior action, the *substance and nature* of the changes in this action is equally if not more egregious, given that Plaintiff's errata sheet and declaration directly contradict and are inherently inconsistent with Plaintiff's prior deposition testimony. In fact, the timing of the submission of Plaintiff's errata sheet and sham declaration – after the close of discovery and after Defendant has already filed its Motion for Summary Judgment, unequivocally demonstrate that these filings are nothing more than a last-ditch effort to recast Plaintiff's deposition testimony in a more favorable light in order to fabricate an issue of material fact and survive summary judgment.

The fact that the same law firm continues to engage in efforts to "repair the damage" its client's deposition caused through the submission of sanctionable errata sheets and sham declarations, despite the March 21, 2000 sanctions Order, demonstrates that the conduct remains undeterred. As is apparent from the actions in Norelus, Plaintiff's counsel's practice is to attempt to create issues of fact through sanctionable errata sheets and sham declarations. Such conduct should not be permitted or condoned, especially in light of the fact that this Court has already sanctioned the same law firm within the past year for similar actions. For these reasons, and as described in more detail in Defendant's Motions to Strike filed on January 24, 2001, Defendant's Motions to Strike should be granted and Defendant should be awarded its costs and

3

fees incurred in filing these motions.

Respectfully submitted,

HUNTON & WILLIAMS
Attorneys for Unisource Worldwide, Inc.
One Biscayne Tower, Suite 2500
2 South Biscayne Boulevard
Miami, Florida 33131-1802
Telephone: (305) 810-2511
Telefax: (305) 273-8684

By: _____
Juan C. Enjamio
Florida Bar No. 571910

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE THE ERRATA SHEET OF PLAINTIFF BETTY ORTEGA, MOTION TO STRIKE PARAGRAPH 27 OF THE UNSWORN DECLARATION OF BETTY ORTEGA, AND MOTION FOR SUMMARY JUDGMENT** was mailed to Karen C. Amlong, Esq., Jennifer Daley, Esq., Amlong & Amlong, P.A., 500 Northeast Fourth Street, Second Floor, Fort Lauderdale, Florida 33301-1154 on this $3/5$ day of January, 2001.

By: _____
Juan C. Enjamio

OF COUNSEL:
TROUTMAN SANDERS, LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308-2216
PH: (404) 885-3000
FAX: (404) 962-6693
Robert H. Buckler
Georgia Bar No. 092650
Robert C. Stevens
Georgia Bar No. 680142

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No. 94-2680-CIV-LENARD/BANDSTRA

**FLORIDE NORELUS** a/k/a,
**LAVICTORE REMY,**

       Plaintiff,

vs.

**DENNY'S INCORPORATED** and
**T.W. SERVICES INCORPORATED,**
foreign corporations,
**MEOS CORPORATION, INC.,**
a Florida corporation,
**ASIF JAWAID,** individually,
and **RAHEEL HAMEED,**
individually



FILED by _____ D.
MAR 2 1 2000
CLARENCE ·······
CLERK U.S. ·······
S.D. OF FLA. ·······

       Defendants.
_____/

## ORDER SUSTAINING OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION AND GRANTING DEFENDANTS' MOTIONS FOR FEES, COSTS AND EXPENSES

       **THIS CAUSE** is before the Court on three Motions for Sanctions by: (1) Defendants

Denny's Inc. and T.W. Services, Inc., filed January 10, 1997; (2) Defendant Meos

Corporation, filed January 10, 1997; and (3) Defendant Asif Jawaid, filed January 10, 1997.

The Motions were referred to United States Magistrate Judge Ted E. Bandstra for a report

and recommendation. A Report was filed February 5, 1998.

       Defendants each filed timely Objections to the Report. After careful review of the

entire record in this case, the Court finds that the Objections shall be sustained, and that, as

discussed below, each of the three Motions for attorneys fees, costs, and expenses shall be granted.

Having reviewed the Motions, the Report, the Objections to the Report, and based on de novo review of the entire record in this case, the Court finds as follows:

## I. Introduction

On December 19, 1994, Plaintiff Floride Norelus ("Norelus"), a/k/a Lavictore Remy, filed this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. (1994 & Supp. II), the Equal Pay Act, 29 U.S.C. § 206(d) (1994), and the Florida Civil Rights Act of 1992, Fla. Stat. ch. 760.10 et seq. (1998) ("FCRA"). Plaintiff alleged that she was sexually harassed, assaulted, battered, and raped by Defendants Asif Jawaid, ("Asif") and Raheel Hameed ("Hameed"), managers of two Denny's restaurants in Miami, Florida. At the time of the alleged incident, Plaintiff was employed as a bus-person at two Denny's restaurants. She also named as Defendants Denny's Inc. and T.W. Services, Inc., a/k/a Flagstar Corporation ("Denny's"), and Meos Corp., Inc. ("Meos"), the corporate owners and franchisee of the restaurants, respectively.

The allegations in the Complaints and described in Plaintiff's deposition were extraordinarily lewd, lascivious, and sexually graphic. Plaintiff maintained these allegations although: (1) no corroborating evidence could be produced; (2) conflicting evidence from Plaintiff's own witnesses demonstrated the clear frivolity of the claims; and (3) most importantly, Plaintiff's own deposition was so replete with falsities, misrepresentations, and

2

contradictions that no reasonable person could have believed the allegations. This Court

dismissed Plaintiff's action for failure to comply with court orders. The Court addresses the

remaining issues of fee imposition and sanctions in this Order.

### A.    Factual Background

Plaintiff's original Complaint was replaced by an Amended Complaint on July 27,

1995, and a Second Amended Complaint on February 12, 1996. The Second Amended

Complaint states:

> "This is a claim brought by a female restaurant worker
> from Haiti who was the target of sexual harassment, battery,
> rape, unequal pay and negligent and intentional infliction of
> emotional distress by managers of two Denny's restaurants over
> a period of several months. She claims that both of the men
> used their authority as Denny's managers to extort her into
> having unwilling sex with them and to otherwise sexually
> demean and discriminate her, and that when she complained to
> her supervisors, her supervisors did nothing to protect her or to
> prevent the conduct from continuing."

(2d Am. Compl. at 1.) In addition to Title VII, Equal Pay Act and FCRA claims, Plaintiff

sought damages for common law battery, invasion of privacy, false imprisonment, intentional

and negligent infliction of emotional distress, and for negligent training, retention, and

supervision. (See id. at 1-2.) Plaintiff sought declaratory and other relief, compensatory

damages, punitive damages, and costs, including attorney's fees. (See id. at 2.)

### 1.    Discovery and Deposition Call Plaintiff's Credibility Into Question

Plaintiff, a citizen of Haiti, illegally entered the United States in 1993 and shortly

3

Scanned Image - 1 94CV02040 Document 475 page 3 Mon Apr 10 05:25:34 2000

thereafter applied to work at Denny's restaurant as a bus-person.[1]  Plaintiff alleged that the

sexual abuse, assaults and harassment began in June 1993 and continued until May 1994.

(See 2d Am. Compl. ¶ 11.) After Plaintiff filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") and the Florida Commission on Human

Relations, the EEOC issued a Right to Sue Letter on September 19, 1994, finding the

allegations could not be substantiated.  Plaintiff timely filed this action on December 19,

1994.

Plaintiff was first deposed in this matter in August 1995 and was again deposed over

the course of several days in January and February 1996.  From the outset, Plaintiff's

testimony and conduct called into question the validity of her claims.  Plaintiff not only

forgot key details set forth in the Complaints but provided several inconsistent versions of

the events or outright falsehoods.[2]

---

[1]Plaintiff admitted to completing a false Immigration and Naturalization Service I-9 Employment Eligibility Form using the name of a cousin, "Lavictore Remy." (See Norelus Dep. (May 1996) at 390-92.)  Similarly, Plaintiff admitted to filing false 1993 and 1994 income tax returns under the same name.  (See id.)

[2]One example is illustrative: during the January 1996 deposition Plaintiff was questioned about the name, "Lavictore Remy," the name she first used when she became a Denny's employee.  Plaintiff first stated, in August 1995, that she made up that name and didn't know anyone by that name.  (See Norelus Dep. (Aug. 1995) at 31.)  Plaintiff then repeated this statement at the continuation of her deposition in January 1996.  (See Norelus Dep. (Jan. 1996) at 27.)  Plaintiff specifically denied having any relative or cousin by the name of Lavictore Remy.  (See id. at 17-23.)  Shortly after this exchange, she became belligerent and agitated, and Plaintiff's counsel requested a break so that Plaintiff could "calm down." (See id. at 28.)  Upon returning from the break, Plaintiff's counsel admitted, contrary to Plaintiff's repeated assertions, that Plaintiff did have a cousin named Lavictore

4

Several unsubstantiated allegations in the Complaints that never had any evidentiary support in the record, where a complete lack of evidence was clear throughout discovery, and where Plaintiff's deposition directly contradicted the allegations, include: (1) allegations of oral, vaginal and anal intercourse in a walk-in freezer area or cooler as alleged in the Amended Complaint at paragraph 11 and Second Amended Complaint at paragraph 11 (compare Norelus Dep. (Feb. 1996) at 1005 (stating that no sex occurred in walk-in cooler or freezer)); (2) allegations of sexual intercourse inside the Meos restaurant as alleged in the Complaint at paragraph 8, Amended Complaint at paragraph 11, and Second Amended Complaint at paragraph 11 (compare Norelus Dep. (Jan. 1996) at 303 (stating that no sexual intercourse occurred in restaurant)); (3) allegations of retaliation against Plaintiff by Meos managers after she complained to the owners about sexual harassment, as alleged in the Complaint at paragraph 17, Amended Complaint at paragraph 22, and Second Amended Complaint at paragraphs 22 and 35 (compare Norelus Dep. (Feb. 1996) at 969) (stating that no retaliation occurred because Plaintiff did not complain until after resignation)); and (4) allegations of required medical treatment for Plaintiff because, as alleged in the Complaint

---

Remy. (See id. at 29-30.) When the deposition resumed Plaintiff vigorously denied that she had just lied:

> "Q. You lied about knowing Lavictore Remy. You said you
> didn't know her.
> A. Of course, what's wrong with that?"

(Id. at 33.)

5

at paragraph 8, Amended Complaint at paragraph 11, and Second Amended Complaint at paragraph 11, Plaintiff claimed she was raped with a hairbrush and received medical attention as a result. Plaintiff's attorneys were unable to produce any evidence confirming these allegations in response to Defendants' repeated discovery requests. (See generally, Valladares Test., Evid. Hg. Tr. at 160-68.) In addition, Plaintiff was unable to provide the name of any health care provider or facility where such treatment occurred. (See id. at 204.)

On June 14, 1996, five months after the second deposition, Plaintiff served the aforementioned Errata Sheet on all defense counsel.

### 2.   The Errata Sheet

The Errata Sheet was sixty-three pages long and made 868 changes to Plaintiff's sworn deposition answers, and sought to explain material changes to Plaintiff's testimony through four broad categories: (1) "Did not understand what was being asked"; (2) "Refreshed recollection"; (3) "Poor translation by interpreter"; and (4) "Clarification of response." (See Errata Sheet at 1.) The following are examples of purported material changes in testimony:

| Page | Summary of Plaintiff's Initial Statement in Deposition | Change of Response in Errata Sheet's "Should Say" column |
|------|---------------------------------------------------------|-----------------------------------------------------------|
| 28 | Plaintiff did not know anybody by the name of "Lavictore Remy," she just randomly assumed the name. | "Lavictore Remy" was her cousin's name and she testified falsely when first asked about its origin. |
| 35 | Plaintiff declared that she did not lie about making up the social security number listed on her employment application. | The social security number she used was that of her cousin, Lavictore Remy. |

6

| Page | Summary of Plaintiff's Initial Statement in Deposition | Change of Response in Errata Sheet's "Should Say" column |
|------|--------------------------------------------------------|----------------------------------------------------------|
| 41 | Plaintiff stated she lived with "Tony", Plaintiff's brother Lucarne Norelus, and Lucarne's wife in a shared residence. | She stated that "Tony" did not live at the same residence |
| 58-60 | Plaintiff said she received two applications for employment and described Denny's application process in detail. | Plaintiff received only one application, and described application process differently, including who helped her get the job. |
| 74 | Plaintiff explained that the year she took an English class in Haiti was 1983, and that was the last time she went to school. | She had the English class in 1995 and she understood more English than she earlier admitted. |
| 105 | Plaintiff did not know if she had a niece living in Orlando, Florida. | She did have a niece living in Orlando, Florida. |
| 164 | When asked about Asif's car, Plaintiff could not remember any detail about the make, color, seats or other details. | She described the car in great detail and remembered that it was a light gray, automatic Toyota Camry with fabric seats. |
| 273 & 275 | Plaintiff stated that she did not tell Mr. Fernandez or the police that she got paid for ten hours the day after the first incident. | She told Mr. Fernandez and the police ten hours, but changed her story because she remembered it was 8 or 9 hours. |
| 317 | Plaintiff stated "No, I don't remember" when asked if she was dating "Mike" in January, 1994 and remembered nothing about the relationship. | She was dating "Mike" at this time and they had an intimate relationship. |
| 325 | When asked if Asif ever forced her to have sex "from the back", Plaintiff replied "No," and said that it was always from the front. | Asif did force her to have sex "from the back" and that the sex "was always vaginal, and sometimes anal sex, too". |
| 359 & 360 | Plaintiff did not remember what kind of car Hameed drove, or any details about it. This was a car in which Plaintiff was supposedly an unwilling passenger when, "six or seven times," she was forced to go to Hameed's home. | She stated that it was a cream colored Jaguar with four doors. |
| 364 | When asked at second deposition, "Do you remember the streets that you took between your house and Hameed's house?," Plaintiff answered "no". | She provided detailed directions, including the street-by-street route of this trip. Details included the ordinal directions the car turned on each street. Then, Plaintiff could not explain this changed answer, nor restate directions at all, *during her third deposition.* |
| 369 | Plaintiff said that Asif removed her skirt during one assault incident: "He pulled it down. I had zipper in the- the skirt had zipper in the back. He unzip it and then he pull it down." | She stated that "He did not take my skirt off me-he pulled it up." |

7

| Page | Summary of Plaintiff's Initial Statement in Deposition | Change of Response in Errata Sheet's "Should Say" column |
|------|--------------------------------------------------------|----------------------------------------------------------|
| 391 | She explained in detail that she informed her brother, Lucarne, about the beatings. | She stated that it was *not* Lucarne but "Wilson" she told about the beatings. |
| 398 | She described an incident that was supposedly the second time Asif sexually assaulted her. | She changed the entire story of this alleged incident and provided great factual detail not previously stated. For example, she changed the details of what she was doing immediately prior to the incident, and also about what specifically happened during the "attack." |
| 417 | She did not remember the color or material of the brush that Asif allegedly used to sodomize her. | She stated that it was a light to medium colored wooden brush. |
| 503 | Plaintiff said that she never worked the same hours as David Hill. | She stated that "Some of our hours did overlap sometimes". |
| 532 | When asked if David Hill recommended her attorney, Plaintiff answered, "No, I don't remember if it was David." | She changed this answer to "Yes" |
| 914 | Plaintiff stated that she did not remember if she lied about anything in this lawsuit. Then she stated, "No, I did not lie. Because those things, beside the paper of the social security and the income tax, I did not lie." | She stated that "the only things that I lied about were using my cousin's name and social security number on my application at Denny's and on the tax returns". |
| 1136 | Plaintiff did not remember anything that she told the police (this was also repeated earlier in the deposition). | She changed this testimony, stating that she remembered that she told the police that Asif and Hameed sexually assaulted her. |

(See generally, Errata Sheet, dated June 14, 1996 (hereinafter "Errata Sheet") (annexed

hereto as Appendix A.)[3]

Due to the obvious inconsistencies and highly unusual nature of the Errata Sheet, the

---

[3]The Errata Sheet is a spurious document. Unpaginated and non-conforming with Southern District of Florida Local Rules 5.1, 7.1 or Federal Rules of Civil Procedure 11 and 30(e)-(f), the Errata Sheet was served on all defense counsel containing only Plaintiff's signature, without signature of any Plaintiff's counsel. See infra, App. A. The Errata Sheet was therefore never properly served by Plaintiff's counsel. As discussed below, Plaintiff's counsel explained process of its preparation and service during the evidentiary hearing precipitating this Order.

8

deposition was reopened by Order of the Court on August 26, 1996. Upon reexamination

in September 1996 it became clear that numerous statements in the Errata Sheet were not

Plaintiff's, because she evinced no knowledge of the changes and could not in any

*meaningful way explain the new information or changed answers as provided in the* Errata

Sheet. (See Norelus Dep. (Sept. 1996) at 140-43.) Thus, the statements in the Errata Sheet

cannot be fairly attributed to Plaintiff herself.

Although the Errata Sheet attempts to reconcile the numerous inconsistencies between

Plaintiff's deposition and demonstrable record evidence, they were so numerous that not

even a sixty-three page Errata Sheet could address them all, as Defendants point out. Two

such examples include Plaintiff's testimony at deposition that Asif was not circumcised,

when in fact he is,[4] and Plaintiff's testimony that Asif had a waterbed at his house, when

evidence has shown that Asif never possessed or owned a waterbed. (See generally, Def.

Denny's Obj. Report at 2-16, & Exh. 1-38.)

### a)    Errata Sheet Used to Bolster Testimony

After examining the Errata Sheet and comparing it with Plaintiff's testimony, the

---

[4]Plaintiff claimed she was forced to have oral sex with Asif every day she worked at
the restaurant between June 1993 and May 1994. (See Norelus Dep. (Sept. 1996) at 460-68.)
Plaintiff later claimed to have slept with 1,000 men. (See id.) The Court does not casually
include these references, and notes this case is replete with lewd, lascivious and sexually
graphic allegations that find no evidentiary support whatsoever in the record. The Court
refers to certain examples only to demonstrate the baselessness of these claims, and has
omitted reference to numerous like-allegations.

9

Court finds that the Errata Sheet was used to bolster Plaintiff's case and recitation of facts as alleged in the Complaints, not simply to correct inaccuracies or mistakes. Although Plaintiff's counsel argued that cultural or language barriers prevented Plaintiff from understanding certain questions or otherwise caused confusion, in the Errata Sheet, Plaintiff used "Did not understand what was being asked" more than 500 times, often for simple, "yes or no" questions.[5] Moreover, at Plaintiff's insistence, Plaintiff's brother, Lucarne Norelus, served as the translator during the depositions, and Plaintiff or her counsel often stopped the questioning to confer with one another.

This asserted "communication breakdown" is further undermined by close examination of the deposition questioning. In one instance, Plaintiff was asked if David Hill ever came to her house before the time she left Denny's, to which she initially responded "yes," a response she later changed to "no" in the Errata Sheet. This example is illustrative, because her deposition answer was provided immediately after the question was asked, without hesitation or evidence of misunderstanding. The first indication this question was misunderstood appeared in the Errata Sheet.

---

[5]Plaintiff used her two brothers, Lucarne Norelus and Tony Garrison, as translators to assist her throughout the case, including when she "reviewed" her depositions. (See Norelus Dep. (Sept. 1996) at 106.) Throughout the depositions, the translators would interpret the "meaning" of questions as well as the actual question, and simultaneously confer with Plaintiff's counsel. (See id.) This lack of an objective translator was a problem throughout the case. Plaintiff's counsel argued that Plaintiff's failure to understand certain questions prevented Plaintiff from "accurately" answering questions, although Plaintiff did not make other arrangements for a translator.

10

Perhaps the most egregious example of fact creation by Plaintiff involves supposed visits to the homes of Asif or Hameed, where Plaintiff was supposedly forced into sexual encounters. Plaintiff was asked repeatedly during the deposition if she could remember anything about Asif's car, Hameed's car, or the route that Hameed took when driving from the restaurant to his house. (See Norelus Dep. at 164, 359 & 364.) In response to these questions Plaintiff repeatedly answered that she did not remember anything about either car or the route taken by Hameed. (See id.) In the Errata Sheet, however, Plaintiff's answers were changed and great detail was provided about both cars and the exact route that Hameed took to his house. This new information included multiple street names and precise ordinal directions for the route. After the deposition was reopened, however, Plaintiff again had no recollection of these facts.

### 3.    Attorneys Representing Plaintiff

The original Complaint, filed December 19, 1994, was signed by Joseph A. Chambrot, Esq. The Amended Complaint, filed July 27, 1995 was signed by Karen Amlong, Esq., Christopher C. Sharp, Esq., Amlong & Amlong, P.A., Joseph A Chambrot, Esq., and Debra A. Valladares, Esq. The Second Amended Complaint, filed December 27, 1995, was signed by Karen Amlong, Esq., Lisa B. Stern, Esq., Amlong & Amlong, P.A., Joseph A. Chambrot, Esq., and Debra A. Valladares, Esq. In addition to these attorneys, certain pleadings were signed by William R. Amlong, Esq., including Plaintiff's Response to Defendant Denny's Inc.'s Motion for Partial Summary Judgment, filed under seal December 29, 1995. (D.E. #

11

95; see also Evid. Hg. Tr. at 149-163.) Thus, the Court finds from the record in this case that the following attorneys represented Plaintiff in this matter: (1) Joseph A. Chambrot, Esq.; (2) Karen Amlong, Esq.; (3) Christopher C. Sharp, Esq.; (4) Debra A. Valladares, Esq.; (5) Lisa B. Stern, Esq.; (6) William R. Amlong, Esq., and (7) the law firm of Amlong & Amlong, P.A.[6]

### 4. Plaintiff's Counsel's Lack of Investigation and Support for Allegations

From review of the entire record in this case, the Court finds that Plaintiff's counsel rested on Plaintiff's allegations alone and did not adequately verify or interview the list of people Plaintiff claimed witnessed the incidents. (See id. 198-202.) Of the many examples demonstrating lack of investigation, most obvious are the numerous witnesses listed by Plaintiff in discovery materials as persons with knowledge of the sexual abuse or hostile working conditions. Rose Belida, Michelle Stuart, Evan Martin, Luis Hernandez, Julio Loriston, and Edmond Reed all were listed as material witnesses. Plaintiff's Counsel did not interview any of these "witnesses" prior to filing any of the Complaints or at any stage of discovery. When eventually deposed by Defendants, none of these witnesses knew anything about the allegations or could lend support to the claims.

At the evidentiary hearing, Karen Amlong, Esq. was asked whether or to what extent

---

[6]Southern District of Florida Local Rule 11.1(D) provides that "[t]he filing of any pleading shall, unless otherwise specified, constitute an appearance by the person who signs the pleading."

12

an investigation of Plaintiff's allegations had occurred:

> "Q. Before appearing in this case as lead counsel, though, you
> didn't interview a single fact witness, did you?
> A. I did not.
> Q. And that includes the plaintiff?
> A. That's correct
> Q. Neither did anybody else at your firm. Is that correct?
> A. That's correct."

(Id. at 463.)

Ms. Valladares testified that prior to filing the lawsuit she only talked with Plaintiff,

Plaintiff's two brothers, and David Hill, a person who stated he confronted Asif about the

allegations. (See id. at 156.) When asked whether she interviewed anyone else, including

fact witnesses alleged in the complaints to have witnessed the incidents, Ms. Valladares

replied:

> "No, I was given various other names of witnesses, some who
> were no longer employed by Denny's, and I was given some
> phone numbers. I tried to call as many as I could, but was
> unable to."

(Id. at 157-58.) Furthermore, Ms. Valladares testified that she did not talk to any of the

supposed eyewitnesses to the sexual abuse, even though the names of these witnesses were

purportedly provided by Plaintiff. (See id. at 198-202.)

As recounted above, Ms. Amlong testified that before she appeared in the case as lead

counsel she did not interview a single fact witness, including Plaintiff, nor did anybody at

13

her firm.[7] (See id. at 463-64.) Mr. Chambrot explained that his belief in the validity of the allegations was based solely on Plaintiff's look of "fear," because she "looked like a victim."[8] (Id. at 336-37.) No other attorney for Plaintiff testified to having conducted any fact investigation in this case.

As discovery progressed and depositions of "witnesses" were taken, it became evident that none of the supposed witnesses had seen any of the alleged acts by Asif or Hameed. Conversely, these witnesses testified that Plaintiff herself acted in an inappropriate sexual

_____

[7]Plaintiff's counsel had Plaintiff undergo two ex parte lie detector tests. Plaintiff's expert allegedly concluded she "passed" these tests. Defendants counter that these tests were highly dubious because they were conducted without prior notice to Defendants, no audio or video recording was made of either test, and no independent Creole language interpreter was used. Furthermore, Defendants argue the questions for both tests were designed by Plaintiff's counsel alone. Plaintiff did not submit to Defendants' requests for an independent polygraph examination.

Plaintiff's counsel claimed also to have hired a private investigator, yet no explanation of the investigator's duties, findings, or relevant investigative report was provided during the evidentiary hearing. (See Evid. Hg. Tr. at 165-66.)

[8] Mr. Chambrot expressed the basis for his belief in the following testimony:

> "Q. Did you believe what the plaintiff had told you about being sexually harassed by the individual defendants.
> A. Yes, sir.
> Q. What was the basis of that belief?
> A. Ms. Norelus' appearance. You can't fake fear and she had it in her voice in the way she talked. She looked like someone who had been raped. She looked like a victim, and I see them all the time . . . ."

(Evid. Hg. Tr. at 336 & 338.)

14

manner at work. One defense attorney testified at the evidentiary hearing that

> "[t]he witnesses; Rose Belida, Michelle Stuart, Evan Martin, Luis Hernandez, Julio Loriston, Edmond Reed . . . who had been listed by the plaintiff as having knowledge of the sexual harassment which the plaintiff allegedly was subjected to, testified unanimously--and their excerpts are broken down, your Honor--that she came to work happy, friendly, she would joke about sex at work [and engage in sexually graphic innuendo].
> None of these witnesses ever saw Asif touch the plaintiff in a sexual way, they never heard any sexual comments, they never saw him follow her into the men's room, where she claimed she was allegedly forced to perform oral sex, and, significantly, she never complained about Mr. Juad [sic] to any of these people."

(Freedman Test., Evid. Hg. Tr. at 60-61.)

Throughout the evidentiary hearing, Plaintiff's attorneys uniformly testified that they maintained a strong belief in Plaintiff's allegations in spite of the absence of corroborating evidence. As review of the evidence and testimony has shown, however, the "belief" of Plaintiff's counsel was premised neither on facts nor reasonable investigation. Counsel had literally no evidence beyond Plaintiff's incendiary and contradictory descriptions that Defendants committed any of the acts alleged in the Complaints.

When Plaintiff's deposition finally concluded, it became clear to Plaintiff's counsel that the claims lacked credibility. At that point, counsel undertook efforts to "repair the damage." Ms. Amlong was asked what she did when Plaintiff's deposition raised "credibility" problems:

> "Q. After you found out that she had answered that way,

15

what, if anything, did you do to insure that that would not be happening again?

A. Well, that's partly why we did the Errata Sheet, because those were not appropriate answers. This was our way of attempting to set the record straight. You know, we certainly weren't trying to hide anything from the defendants by giving them a sixty-page Errata Sheet."

(<u>Id.</u> at 440.) After admitting she asked Ms. Stern to prepare the Errata Sheet, Ms. Amlong

was asked why she thought the Errata Sheet appropriate:

"Because I felt that it was the appropriate thing to do. [Plaintiff's] answers had been nonresponsive or inaccurate, in some instances. Sometimes they were inaccurate because of a translation error, sometimes they were nonresponsive, sometimes she remembered new things. With this many questions and answers, Judge, there still may be some inconsistencies here. You know, we're still not perfect, but we were trying to do the best job we could to present as honestly as we could what the truth was."

(<u>Id.</u> at 440.) Ms. Amlong then characterized the errata changes as "immaterial changes or

elaborations. I think there are very few that are really significant." (<u>Id.</u> at 440-41.)

## B.    Procedural History

Defendants filed a Motion to Dismiss and for Sanctions on August 1, 1996 based on

Plaintiff's alleged falsities and misrepresentations during the deposition and the filing of the

sixty-three page Errata Sheet. On August 26, 1996, the Court denied Defendants' Motion

to Dismiss, but ordered Plaintiff's deposition reopened at her expense because of the

extraordinary number of proffered changes. The Order further directed Plaintiff to file an

appendix identifying the errata changes and explain in detail the reasons for those changes.

16

The August 26, 1996 Order cautioned Plaintiff that failure to comply with orders of the Court would result in sanctions.

On October 16, 1996, the Court clarified the August 26, 1996 Order and further determined that Defendants' costs and fees associated with the reopened deposition should be paid by either Plaintiff or her attorneys. The October 16, 1996 Order directed Plaintiff or her attorneys to pay these costs within ten days of the Order's entry and stated that failure to comply with this directive would result in dismissal of the case.

To date, Plaintiff and her attorneys have failed to comply with the Court's August 26, 1996 and October 16, 1996 Orders. No appendix was ever filed. On December 11, 1996, the Court entered an Order of Dismissal due to Plaintiff's lack of compliance, determining that Plaintiff was in "willful contempt for the judicial process." (Order dated Dec. 11, 1996 at 3.) Plaintiff or her counsel have yet to pay the reopened deposition costs pursuant to the October 16, 1996 Order.

On January 10, 1997 Defendants filed motions for attorneys' fees and costs incurred during the lawsuit. Defendants sought to recover fees and costs from Plaintiff's counsel pursuant to Title VII, 28 U.S.C. § 1927, Federal Rules of Civil Procedure 41(b) and 54(d), and the Local Civil Rules of the Southern District of Florida. Defendants contended that Plaintiff's counsel failed to conduct a fact investigation prior to filing any of the Complaints, and ignored record evidence demonstrating that her claims were baseless. On January 24, 1997 the Court referred these motions to Magistrate Judge Bandstra for purposes of

17

conducting an evidentiary hearing and submitting a report and recommendation. The Report

was filed February 5, 1998.

### 1.    Magistrate's Report and Recommendation

After conducting an extensive evidentiary hearing that examined the pre-filing

investigation conducted by Plaintiff's counsel, the evidence gathered through a lengthy

discovery period, and the facts surrounding the dismissal of the case with prejudice,

Magistrate Judge Bandstra made a number of findings regarding the frivolity of the case and

lack of investigation by Plaintiff's counsel. Based on these findings, Magistrate Judge

Bandstra determined that Plaintiff's claims against all Defendants were

> "unreasonable and without factual foundation thereby
> warranting attorney's fees under § 2000e-5(k) . . . . Plaintiff's
> counsel accepted and believed those allegations, based almost
> exclusively on Plaintiff's own recollections and initial
> corroboration from Plaintiff's brother and a third person, and
> proceeded to file this lawsuit on that basis . . . .
>
> Almost immediately thereafter, Plaintiff's allegations
> began to appear questionable, even to Plaintiff's attorneys . . . .
>
> More importantly, Plaintiff's listed witnesses, including
> her own family members, friends, and co-workers at Denny's,
> all testified contrary to Plaintiff's version of the facts . . . .
>
> Under these circumstances, the undersigned finds that the
> Defendants have established the frivolity of Plaintiff's claims .
> . . .
>
> While Plaintiff's counsel may have believed Plaintiff
> with respect to the core allegations of this case, and felt a
> continuing obligation to represent Plaintiff despite her inability
> to testify consistently, the undersigned finds that Plaintiff's case
> always lacked credible evidence, or any evidence other than
> Plaintiff's own unreliable recollections."

18

(Report at 8-10 (emphasis added).)

Having made these findings, Magistrate Judge Bandstra went on to distinguish
between the behavior of Plaintiff's counsel and the behavior of Plaintiff herself. Finding no
evidence of "willful abuse of the judicial process," the court determined that no "reckless
disregard of duty" could be discerned from this record that would justify the imposition of
sanctions pursuant to 28 U.S.C. § 1927:

> "Plaintiff's action lacked a sufficient factual basis beyond the
> uncorroborated and contradictory testimony of plaintiff herself.
> The evidence presented by the parties further leads the
> undersigned to conclude, however, that plaintiff's counsel did
> not unreasonably and vexatiously multiply this litigation so that
> they should not be subject to sanctions under 28 U.S.C. § 1927."

(Id. at 6; see also id. at 15.) Given the previous findings of frivolity, lack of investigation,
lack of corroborating evidence, and presence of contradictory evidence, Magistrate Judge
Bandstra recognized the difficulty of reconciling these findings with the conclusion that
Plaintiff's counsel should pay no portion of the Defendants' fees, but reasoned that Plaintiff's
counsel "believed in the core allegations and credibility of the lawsuit.'" (See id. at 13.)

_____

[9]Addressing the unusual sixty-three page Errata Sheet, the court noted:

> "First and foremost, the care and detail in which that document
> was prepared by plaintiff's attorneys reveal their grave concern
> to tell an accurate story in this case . . . . Also, the Errata Sheet
> demonstrates, at least in part, the difficulty plaintiff had in
> dealing with the discovery process including her deposition.
> While plaintiff can be faulted for her conduct and has been
> above, her attorneys should not. In the undersigned's view, they

19

Thus, the court recommended that Defendants, as prevailing parties, be awarded attorneys

fees from Plaintiff alone pursuant to 42 U.S.C. § 2000e-5(k), in amounts to be determined

at a later date, but recommended that Defendants' motions for fees from Plaintiff's attorneys

be denied.

All Defendants filed timely objections to the Report and Recommendation.[10]  The

Court must now address whether Plaintiff's counsel may be held responsible for the fees,

costs, and expenses incurred by the Defendants during this litigation.

## II. Discussion and Analysis

First analyzing the applicable attorney's fees provisions of Title VII, 28 U.S.C. §

1927, the discovery rules, and the Court's inherent powers, the Court delineates the standard

of review to be employed in this matter. The Court then analyzes the behavior of Plaintiff's

counsel in this case under the applicable standards, and determines this behavior to have been

---

> did the best they could with a most difficult client and did not
> try to prolong the case or multiply these proceedings to gain a
> tactical advantage over their adversaries."

(Report at 14.) The Court finds these conclusions to be based on an incorrect standard,
incorrect interpretation of law, and not based on the record.  While the Court declines to
adopt any of the Report's legal conclusions, the Court specifically finds this analysis to be
incorrect.

[10]Plaintiff and Plaintiff's attorneys did not file Objections to the Report and
Recommendation.  Failure to object to a magistrate's factual findings may bar a party from
attacking on appeal the factual findings contained in the report, to the extent adopted, if at
all, by the district court. See Reliance Trust Corp. v. Hallmark Builders, Inc., 996 F.2d 1144,
1149 (11th Cir. 1993).

20

vexatious and contrary to the applicable statutory provisions and the Federal Rules of Civil Procedure. Based on these findings, the Court determines this conduct requires an award of attorneys fees, costs, and expenses incurred by all Defendants and all defense counsel from June 20, 1996 until the close of this matter including the determination of this attorneys' fees and costs award.

### A.    Standard of Review

### 1.    Title VII Attorneys' Fees

Title VII allows for either party to obtain attorney's fees for suits brought under the statute: "In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee (including expert fees) as part of the costs." 42 U.S.C. § 2000e-5(k). The Supreme Court in Christiansberg Garment Co. v. E.E.O.C., 434 U.S. 412 (1978), explained that a "district court may award attorney's fees to a prevailing defendant in a Title VII case 'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" Turner v. Sungard Bus. Sys., Inc., 91 F.3d 1418, 1422 (11th Cir. 1996) (quoting Christiansberg, 434 U.S. at 420-22)). Thus, no finding of bad faith is necessary to award fees. Where there is a finding of bad faith on the part of a party or attorney, on the other hand, a fee award is also appropriate. See Turner, 91 F.3d at 1422 n.6.

Under Christiansberg, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the

21

plaintiff continued to litigate after it clearly became so." 434 U.S. at 422; see also Bruce v.
City of Gainesville, 177 F.3d 949, 950 (11th Cir. 1999) (discussing district court's discretion
to award attorneys fees under Christiansberg).

### 2.    28 U.S.C. § 1927

Title 28, U.S.C. section 1927 provides that "any attorney or other person admitted to
conduct cases in any court . . . who so multiplies the proceedings in any case unreasonably
and vexatiously may be required by the court to satisfy personally the excess costs, expenses,
and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The
Eleventh Circuit has determined that three elements underpin § 1927 sanctions:

> "First, the attorney must engage in 'unreasonable and vexatious'
> conduct. Second, that 'unreasonable and vexatious' conduct
> must be conduct that multiplies the proceedings. Finally, the
> dollar amount of the sanction must bear a financial nexus to the
> excess proceedings., i.e., the sanction may not exceed the 'costs,
> expenses, and attorney's fees reasonably incurred because of
> such conduct."

Peterson, 124 F.3d at 1396 (quoting 28 U.S.C. § 1927).

With the implementation of § 1927, Congress sought to protect Defendants from
burdensome litigation with insufficient legal or factual basis. See Bruce, 177 F.3d at 950.
In the words of one court of appeals, "[s]uits are easy to file and hard to defend. The best
way to control unjustified tactics in litigation is to ensure that those who create costs also
bear them. When an attorney recklessly creates needless costs the other side is entitled to
relief." In re TCI Ltd., 769 F.2d 441, 445 (7th Cir. 1985). Section 1927 allows district

22

courts to "assess attorneys fees against litigants, counsel and law firms who willfully abuse the judicial process by conduct tantamount to bad faith." Malautea v. Suzuki Motor Co., Ltd., 987 F.2d 1536, 1544 (11th Cir. 1993) (quotation omitted), cert. denied, 510 U.S. 863; see also Roadway Express, 447 U.S. at 765.

Section 1927 fees may be awarded in cases lacking in credibility from the outset, such as when an attorney fails to investigate adequately or properly the allegations contained in the complaint. See Sullivan v. School Bd. of Pinellas County, 773 F.2d 1182, 1189 (11th Cir. 1985). For example, in Beard v. Annis, 730 F.2d 741 (11th Cir. 1984), an employee brought a frivolous suit against his employer alleging race discrimination. See id. at 743. Awarding defendants fees and costs incurred for the duration of the suit, the district court observed that "the allegations were shown to be irresponsible, untruthful, outrageous, scandalous, and slanderous at times, evidencing a callous regard for the truth or the rights of the parties." Id. at 744. Upholding the fee award, the Eleventh Circuit found the lawsuit "groundless, baseless, and frivolous at the time it was filed." Id. at 745.

Attorneys are not only responsible for investigating the claims of a lawsuit prior to filing, but have a continuing obligation throughout the pendency of the action. See Avirgran v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991) (stating that "[w]hen it becomes apparent that discoverable evidence will not bear out the claim, the litigant and his attorney have a duty to discontinue their quest.") (quotation omitted). If evidence becomes known that is contrary to the asserted claim, or if it becomes clear that the claim is baseless, attorneys have an

23

obligation to seek voluntary dismissal. See Walden, 834 F.2d at 965. When an attorney is

on notice that a claim is without merit but continues to prosecute nonetheless, the attorney

acts in bad faith and risks sanctions.[11]

## 3.    Federal Rule of Civil Procedure 26(g)

Federal Rule of Civil Procedure 26(g) governs discovery disclosures and requires that

---

[11] See Stovall v. Price Waterhouse Co., 652 F.2d 537, 543 (5th Cir. Unit A 1981). A
majority of circuits that have addressed attorney's bad faith under § 1927 have adopted an
objective standard. See Holmes v. City of Massillon, 78 F.3d 1041, 1049 (6th Cir. 1996)
(holding § 1927 sanctions "warranted when an attorney has engaged in some sort of conduct
that, from an objective standpoint, falls short of the obligations owed by a member of the bar
to the court and which, as a result, causes additional expense to the opposing party."), cert.
denied, 519 U.S. 935; Pacific Dunlop Holdings Inc. v. Barosh, 22 F.3d 113, 119 (7th Cir.
1994) (noting § 1927 "bad faith standard has an objective component, and extremely
negligent conduct, like reckless and indifferent conduct, satisfies this standard."); Blue v.
United States Dept. of Army, 914 F.2d 525 (4th Cir. 1990) (holding counsel's failure to
reasonably investigate Plaintiff's claims warranted sanctions pursuant to § 1927 for bad faith
litigation), cert. denied, 499 U.S. 959 (1991); Cruz v. Savage, 896 F.2d 626, 631 (1st Cir.
1990) (holding § 1927 does "not require a finding of subjective bad faith as a predicate to the
imposition of sanctions . . . behavior is 'vexatious' when it is harassing or annoying,
regardless of whether it is intended to be so . . . in assessing whether an attorney acted
unreasonably and vexatiously in multiplying proceedings, the district courts in this circuit
should apply an objective standard."); Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir.
1987) (holding § 1927 fees "imposable against an attorney personally for conduct that,
viewed objectively, manifests either intentional or reckless disregard of the attorney's duties
to the court"); Reliance Ins. Co. v. Sweeney Corp., 792 F.2d 1137 (D.C. Cir. 1986) (finding
subjective bad faith unnecessary for § 1927 sanctions); see also O'Rear v. American Family
Life Assurance Co. of Columbus, Inc., 144 F.R.D. 410, 413 (M.D. Fla. 1992) (determining
no subjective bad faith necessary for § 1927 fee award); but see Stiglich v. Contra Costa Bd.
of Supers., 106 F.3d 409 (9th Cir. 1997) (employing subjective bad faith standard);
MacDraw, Inc. v. CIT Group Equip. Fin., 73 F.3d 1253, 1262 (2d Cir. 1996) (holding § 1927
sanctions require finding subjective bad faith of counsel).

24

an attorney must sign every disclosure and discovery request. See Fed. R. Civ. P. 26(g)(1).
The signature "constitutes a certification that to the best of the signer's knowledge,
information, and belief, formed after reasonable inquiry, the disclosure is complete and
correct as of the time it is made." Id. If the discovery matter or request is later found to be
"without substantial justification," the court, upon motion or its own initiative, "shall impose
upon the person who made the certification, [or] the party on whose behalf" the discovery
request or proffer is made, or both, "an appropriate sanction." Fed. R. Civ. P. 26(g)(3).

## 4.    Federal Rule of Civil Procedure 11, Local Civil Rules and Rules of Professional Conduct

Federal Rule of Civil Procedure 11 authorizes sanctions for the "filing of papers that
are frivolous, lacking in factual support, or 'presented for any improper purpose, such as to
harass.'" Crawford-El v. Britton, 118 S. Ct. 1584, 1598 (1998) (quoting Fed. R. Civ. P. 11).
Furthermore, the Local Rules for the Southern District of Florida provide that "[a]ttorneys
practicing before this Court shall be governed by this Court's Local Rules, by the Rules of
Professional Conduct, and . . . the American Bar Association Model Rules of Professional
Conduct." S.D. Fla. Local R. Governing Att'y Discipl. I(A).

Rule 11 sanctions are proper:

> "(1) when a party filed a pleading that has no reasonable factual
> basis; (2) when the party files a pleading that is based on a legal
> theory that has no reasonable chance of success and that cannot
> be advanced as a reasonable argument to change existing law;
> or (3) when the party files a pleading in bad faith for an
> improper purpose."

25

Worldwide Primates, Inc. v. McGreal, 87 F.3d 1252, 1254 (11th Cir. 1996) (quoting Jones v. International Riding Helmets, Inc., 49 F.3d 692, 694 (11th Cir. 1995)).

A court considering Rule 11 sanctions must determine whether "the party's claims are objectively frivolous -- in view of the facts or law -- and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is whether he would have been aware had he made a reasonable inquiry." Worldwide Primates, 87 F.3d at 1254 (citing Jones, 49 F.3d at 694)). As explained in Worldwide Primates, "If the attorney failed to make a reasonable inquiry, then the court must impose sanctions despite the attorney's good faith belief that the claims were sound. The reasonableness of the inquiry may depend on such factors as how much time for investigation was available to the signer." 87 F.3d at 1254 (citation and internal quotation omitted) (emphasis added). In that case, United States District Judge Kenneth L. Ryskamp found that no reasonable investigation occurred prior to filing the lawsuit and ordered a plaintiff and his attorney to pay $25,000 each in Rule 11 sanctions. See id. Affirming Judge Ryskamp's sanction order, the Eleventh Circuit specifically held that "under Rule 11, an attorney must make a reasonable inquiry into both the legal and factual basis of a claim prior to filing suit." Id. at 1254; see also Turner v. Sungard Bus. Sys., Inc., 91 F.3d 1418, 1420 (11th Cir. 1996) (holding Rule 11 sanctions proper where attorney failed to conduct proper factual investigation during discovery); Battles v. City of Ft. Myers, 127 F.3d 1298, 1300 (11th Cir. 1997) (holding "[r]easonableness under the circumstances" to be the test under Rule 11); see generally Cooter & Gell v.

Hartmarx Corp., 496 U.S. 384, 391-394 (1990) (discussing application of Rule 11).

The district court may impose sanctions upon a supervising attorney or law firm alone where an associate attorney prepared or signed a document under supervision of a partner or managing attorney. See Stuart I. Levin & Assocs., P.A. v. Rogers, 156 F.3d 1135, 1137 (11th Cir. 1998) (upholding approximately $330,000 fee and cost award imposed by United States District Judge James Lawrence King against law firm alone where associate prepared documents under direction of managing partner); see also Jerold S. Solovy et al., Sanctions Under Rule 11, 601 PLI/Lit 105, 217 (1999) (collecting cases). Rule 11 was amended in 1993 to "expressly provide for the sanctioning of law firms, permitting courts to hold firms 'jointly responsible for violations committed by its partners, associates, and employees.'" See Rogers, 156 F.3d at 1137 (quoting Fed. R. Civ. P. 11).

### 5.    Inherent Power

Pursuant to the Court's inherent power to supervise and control its proceedings, the Court may award reasonable attorneys' fees to the prevailing party when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" F.D. Rich Co., Inc., v. United States ex rel. Indus. Lumber Co., Inc., 417 U.S. 116, 129 (1974); see also Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986) (finding that "[a]n inherent power award may be imposed either for commencing or for continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons"). As the Supreme Court explained in Hall v. Cole, 412 U.S. 1, 15 (1973), "'bad faith' may be found, not only in the actions that led to the lawsuit,

27

but also in the conduct of the litigation."

Fees awarded pursuant to the Court's inherent power should not be made lightly, for "because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers v. Nasco, Inc., 501 U.S. 32, 44 (1991) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 764 (1980)). As the Chambers Court explained, however, "[a] primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." 501 U.S. at 44-45. Thus, "in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel[.]" Id. (quoting Roadway Express, 447 U.S. at 765)). When a party or an attorney acts "in bad faith, vexatiously, wantonly, or for oppressive reasons," Chambers, 501 U.S. at 45-46 (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975)) (internal quotation marks omitted), the court may assess attorney's fees.

The inherent power of courts to sanction such conduct exists separately from any statute or rule providing for similar fees. See Chambers, 501 U.S. at 47. The inherent power may be invoked by a court even where the conduct could also be sanctioned under a statute or the Rules. See id. at 50. A district court invoking its inherent powers to sanction conduct should "make plain that it is so doing and [explain] how its employment of those powers falls within the 'narrowly defined circumstances' that warrant their use." Peterson v. BMI Refractories, 124 F.3d 1386, 1395 n.5 (11th Cir. 1998).

28

**B.      Under Applicable Standards, The Conduct of Plaintiff and Her Counsel Amounts to Bad Faith.**

Based on an analysis of all of the evidence in this case, it is evident that Plaintiff's counsel should be held responsible for the fees, costs, and expenses that resulted from the submission of the Errata Sheet on June 20, 1996 pursuant to Title VII, 28 U.S.C. § 1927, the applicable discovery rules, and the Court's inherent power.

After a deposition is completed, Federal Rule of Civil Procedure 30(e) provides that the "deponent shall have 30 days . . . in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them." Apart from the duty to investigate prior to filing, when an Errata Sheet sixty-three pages long with 868 corrections is necessary to validate testimony, any reasonable attorney would be on notice that such testimony may be incredulous. Once on notice, the Rules make clear that attorneys relying on such testimony must reasonably investigate that testimony and supporting evidence before continuing to prosecute the lawsuit. The Court finds, therefore, that all counsel for Plaintiff were on notice of the baseless nature of the claims from the time the deposition first revealed Plaintiff's inconsistencies and falsehoods, and had an obligation to investigate their client's testimony and the supporting evidence.

**1.      Karen Amlong, William Amlong and the Law Firm of Amlong & Amlong, P.A. Were Responsible for All Aspects of This Case.**

During the evidentiary hearing, Ms. Amlong explained that from the very outset of

29

this case she and Amlong & Amlong, P.A. were responsible "for all aspects of the case." (Evid. Hg. Tr. 456.) The original Complaint signed by Mr. Chambrot and prepared by Ms. Valladares was a "form complaint" provided by Ms. Amlong, partner in a firm specializing in employment law. Ms. Amlong later explained that the only reason the initial Complaint was not signed by herself and Amlong & Amlong, P.A. was that the representation arrangement had not yet been memorialized, although it had already been agreed between the attorneys and the Plaintiff that Amlong & Amlong, P.A. would lead the case and Ms. Amlong would manage the case. (See Evid. Hg. Tr. at 456.) Ms. Amlong further acknowledged that she had "legal responsibility" for investigating the "factual aspects of the case." (Id.)

At least three of Plaintiff's other attorneys, Mr. Chambrot, Ms. Valladares, and Ms. Stern had never before prosecuted a workplace harassment case or had only limited experience. Along with Ms. Henkins and Mr. Sharp, these attorneys were either young associates at the Amlong & Amlong, P.A. law firm, were inexperienced with workplace harassment law, or were newly admitted to the bar. Based on the testimony at the evidentiary hearing and the record in this case, the Court finds that these attorneys worked under the direction and guidance of Karen Amlong, Esq. and William Amlong, Esq.

Conversely, Ms. Amlong expounded on her experience prosecuting Title VII cases as a litigator and administrative partner of a firm specializing in workplace discrimination law. (See id. at 456.) Ms. Amlong went on to explain that "Title VII litigation requires

30

specialized knowledge." (Id.) Ms. Amlong claimed to have such knowledge. (See id.) The Court finds the associate who completed the Errata Sheet, Ms. Stern (later Ms. Taylor) did so only at the direction and under the supervision of Ms. Amlong. (See id. at 488.) Ms. Stern even brought the highly unusual and problematic nature of the Errata Sheet to the attention of Ms. Amlong, but Ms. Amlong determined its filing to be "the right thing to do." (See id.)

### 2.    Specific Duty To Investigate Facts

The Court further finds that Plaintiff's counsel had a specific duty to conduct a reasonable investigation of the facts alleged in the Complaint, Amended Complaint, and Second Amended Complaint. Although Plaintiff's counsel claim the Errata Sheet was their way of "setting the record straight," (id. at 440), review of the entire record in this case *demonstrates that Plaintiff's counsel undertook no reasonable investigation prior to filing any* of the Complaints or at any point during the entire pendency of this litigation.

During discovery in this case, Plaintiffs counsel never read or reviewed a <u>single</u> deposition of a <u>single</u> fact witness: Ms. Amlong admitted at the evidentiary hearing that neither she nor her firm had ordered a copy of a single deposition transcript of any witness in this case from the court reporting services that prepared them, and, other than Plaintiff's deposition, which they copied from the court file, had not read a single transcript excerpt prior to the sanctions hearing. (See id. at 457.) Ms. Amlong explained it was her frequent practice not to interview fact witnesses, even witnesses testifying on behalf of her own

31

clients, prior to trial. (See id.)

Furthermore, as Ms. Amlong testified, the Court finds that Ms. Amlong and Amlong & Amlong, P.A. guided and directed Ms. Valladares and Mr. Chambrot in filing the original Complaint and had direct control over every stage of the litigation from that point until the time of dismissal. Ms. Amlong and Amlong & Amlong, P.A. "faxed a form complaint" to Ms. Valladares, and at Ms. Amlong's direction, an associate of Amlong & Amlong, P.A., Mr. Sharp, provided "technical assistance" and guidance to Ms. Valladares, for purposes of copying, "cutting and pasting," and preparing what became the original Complaint in this suit. (See id. at 461.)

### 3.    Errata Sheet Changes and Continued Litigation Amount to Bad Faith Efforts to "Repair the Damage" and Continue Frivolous Litigation.

Plaintiff's counsel undertook efforts to "repair the damage" Plaintiff's deposition caused, and filed the Errata Sheet in an effort to bolster testimony. At the evidentiary hearing Ms. Amlong attempted to explain the errata changes:

> "Q. How would you characterize the substantial bulk of the changes?
> A. As immaterial changes or as elaborations. I think that there are very few that are really significant in the course of this trial and if there are those inconsistencies, able counsel certainly can exploit them at trial."

(Evid. Hg. Tr. at 441.) In contrast to this testimony, however, the Court's close examination of the 868 errata changes indicates a concerted effort to provide factual support to an otherwise meritless case. The information included in the errata changes forms the factual

32

backbone of Plaintiff's case and is unsupported by Plaintiff's deposition, both before and

after the preparation of the errata changes. Coupled with the complete lack of supporting

evidence in this case, the nature and quantity of entries on the Errata Sheet -- which bolstered

inconsistencies or covered up falsities, and thereafter the Plaintiff's inability to factually

support the errata changes at the subsequent deposition -- demonstrate bad faith and willful

disregard for the judicial process by Karen Amlong, Esq., William Amlong, Esq., and

Amlong & Amlong P.A. As such, the Court finds the number and nature of the Errata Sheet

"corrections," amount to unreasonable, vexatious behavior that unnecessarily multiplied

these proceedings.

The record demonstrates that reasonable investigation, once counsel was aware of the

"inconsistencies" of the deposition, would have made any reasonable attorney aware of the

frivolity of this case. For example, had Plaintiff's counsel interviewed the fact witnesses

listed as supporting witnesses in discovery material, counsel reasonably would have been

aware that these claims were baseless.

In sum, the Court finds the preparation and filing of the Errata Sheet demonstrates

counsel's bad faith in this litigation, and further finds that the behavior here was vexatious,

oppressive, and served to multiply the proceedings. As such, the Court finds that fees, costs

and expenses shall be awarded pursuant to 28 U.S.C. § 1927, 42 U.S.C. § 2000e-5(k), Rule

26, and the Court's inherent power.[12]

Therefore, the Court finds that all Defendants' fees, costs, and expenses related to this lawsuit, from the date of submission of the Errata Sheet on June 20, 1996 to the date of this Order shall be awarded to each Defendant and all defense counsel. Fees, costs, and expenses, for each Defendant and all defense counsel shall be payable jointly and severally by Karen Amlong, Esq., William Amlong, Esq., and the Law Firm of Amlong & Amlong, P.A. This award specifically includes fees, costs and expenses associated with the sanctions motions, evidentiary hearing and objections.

The Court further finds Karen Amlong, Esq., William Amlong, Esq., and the Law Firm of Amlong & Amlong, P.A. to be in violation of the Court's October 16, 1996 Order for not having paid the costs and expenses associated with Plaintiff's reopened deposition. The "costs and attorneys' fees associated with the reopening of Plaintiff's deposition," (Order dated Oct. 16, 1996 at 2), shall be paid by Karen Amlong, Esq., William Amlong, Esq. and the Law Firm of Amlong & Amlong, P.A., jointly and severally, with back interest of 10% per annum from October 26, 1996 to the date of remittence.

### III. Conclusion

For the reasons discussed above, Defendants' Motions for attorneys fees shall be

---

[12] No motion for Rule 11 sanctions was filed by Defendants and the Court has not provided Plaintiff's counsel with notice of intention to issue such sanctions. Therefore, the Court issues no sanctions under Rule 11 in this Order.

34

granted. It is therefore **ORDERED AND ADJUDGED** as follows:

1.   The Defendants' Objections to the Report and Recommendation, filed by Denny's on February 20, 1998, Meos Corp. on February 20, 1998, and Asif Jawaid on February 23, 1998 are **SUSTAINED.**

2.   The three Motions for sanctions, filed by Defendants' Denny's, Meos Corp., and Asif Jawaid, January 10, 1997 are **GRANTED**. Pursuant to 42 U.S.C. §§ 2000e-5(k), 28 U.S.C. § 1927, Rule 26, and the inherent power of the Court, the law firm of Amlong & Amlong, P.A., Karen Amlong, Esq., and William R. Amlong, Esq. shall pay, jointly and severally, the reasonable fees, expenses, and costs incurred by all Defendants and all defense counsel from June 20, 1996 to the date of this Order. All fees, costs, and expenses incurred by each Defendant and defense counsel reasonably related to this litigation shall be payable.

3.   The law firm of Amlong & Amlong, P.A., Karen Amlong, Esq., and William R. Amlong, Esq. shall pay, jointly and severally, "the reasonable fees, expenses, and costs incurred by all Defendants and all defense counsel associated with the reopening of Plaintiff's deposition," (Order dated Oct. 16, 1996 at 2), with back interest of 10% per annum from October 26, 1996 to the date of remittence.

4.   Attorneys for all Defendants and any Defendant appearing pro se are

35

soon thereafter as may be completed: (a) affidavits of all fees, costs, and expenses incurred by all Defendants individually and all defense counsel reasonably related to this litigation, from June 20, 1996 until the date of this Order; and (b) two (2) affidavits from independent members of the Bar, admitted to practice in the United States District Court for the Southern District of Florida, not involved in this case, attesting to a reasonable fee amount.

Defendants are further **DIRECTED** to provide an accounting of the costs, fees, and expenses associated with Plaintiff's reopened deposition pertinent to the Court's October 16, 1996 Order.

5.     The law firm of Amlong & Amlong, P.A., Karen Amlong, Esq., and William R. Amlong, Esq. shall have twenty (20) days thereafter to provide: (a) opposing affidavits; and (b) two (2) affidavits from independent members of the Bar, admitted to practice in the United States District Court for the Southern District of Florida, not involved in this case, attesting to a reasonable fee amount.

Thereafter, the Court shall issue a final judgment awarding fees, costs, and expenses in sum certain.

6.     All motions not otherwise ruled upon are **DENIED AS MOOT**.

36

**DONE AND ORDERED** at Miami, Florida, this _2/_ day of March, 2000.

Joan A. Lenard
**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

Case No. 94-2680
cc:
U.S. Magistrate Judge Ted E. Bandstra
U.S. Magistrate Judge William C. Turnoff

Attorneys for Defendants:

Avril Marcus, Esq.
Manas & Marcus
1406 One Datran Center
9100 S. Dadeland Blvd.
Miami, FL 33156

Jon K. Stage, Esq.
Akerman Senterfitt
450 E. Las Olas Blvd., Ste. 950
Ft. Lauderdale, FL 33301

Mr. Rahmeel Hameed, Pro Se
11035 S.W. 147th Ct.
Miami, FL 33196

Dale L. Friedman, Esq.
Conroy Simberg Lewis & Ganon
3440 Hollywood Blvd., 2nd Fl.
Hollywood, FL 33021

Attorneys for Plaintiffs:

Joseph Chambrot, Esq.
950 N.W. 22nd Ave.
Miami, FL 33125-3343

William Amlong, Esq.
Karen Amlong, Esq.
Amlong & Amlong, P.A.
500 N.E. 4th St., 2nd Fl.
Ft. Lauderdale, FL 33137

Theodore Dempster, Esq.
2650 Biscayne Blvd.
Miami, FL 33137

Debra Valladares, Esq.
1855 Coral Way
Miami, FL 33145-2730

37