IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case Number: 00-6126-CIV-DIMITROULEAS/JOHNSON

BETTY ORTEGA,

Plaintiff,

vs.

UNISOURCE WORLDWIDE, INC., a
foreign corporation,

Defendant.
_____/



## Plaintiff's Notice of Filing Plaintiff's Revised Deposition Designations

Plaintiff, Betty Ortega, gives notice of filing the attached revised

deposition designations for use at trial in the above-styled cause.

Respectfully Submitted,

AMLONG & AMLONG, P.A.
500 Northeast Fourth Street
Second Floor
Fort Lauderdale, Florida 33301-1154
(954) 462-1983

KAREN COOLMAN AMLONG
Florida Bar No. 275365
WILLIAM R. AMLONG
Florida Bar No. 470228
JENNIFER DALEY
Florida Bar No: 0856436



Amlong &
Amlong, P.A.

Page 1 of 2



## Certificate of Service

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been furnished by_facsimile_ this 13th_ day of April, 2001 to Juan C. Enjamio,

Esq., Hunton & Williams, One Biscayne Tower, Suite 2500, 2 S. Biscayne Blvd.,

Miami, FL 33131; Robert Stevens, Esq., Troutman Sanders, LLP, 5200 Bank of

America Plaza, 600 Peachtree Street, N.E., Atlanta, GA 30308.

JENNIFER DALEY

I:\CPWin\HISTORY\010227A\6EC.1A7

Page 2 of 2

## Deposition Designation

**Deposition of Amy George as Rule 30(b)6 Representative, taken on October 10, 2000**

| Page | Line |
|------|------|
| 3 | 17-18 |
| 4 | 20-24 |
| 21 | 10-22 |
| 23 | 10-12 |
| 25 | 1-6, 11-17 |
| 26 | 8-13 |
| 27 | 11-16 |

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                 Case No. 00-6126-Civ-Dimitouleas/Johnson

 3

 4        BETTY ORTEGA,

                        Plaintiff,
 5

 6              vs.

 7

          UNISOURCE WORLDWIDE, INC., a
 8        foreign corporation,

 9                      Defendant.
          ----------------------------------
10

11              Deposition of AMY GEORGE, taken on behalf of

12        the Plaintiff, pursuant to Re-Notice of Telephonic

13        Deposition in the above-entitled action, on Tuesday,

14        October 10, 2000, at 1:29 p.m., at Unisource Worldwide,

15        Inc., 330 Stevens Street, Jacksonville, Florida, before

16        Richetta R. Brown, Court Reporter and Notary Public in

17        and for the State of Florida at Large.

18

19        APPEARANCES:

20              JENNIFER DALEY, Esquire, Attorney for Plaintiff,
                    (Via telephone.)
21
                ROBERT C. STEVENS, Esquire, Attorney for
22                  Defendant.

23

24

25
```

Hedquist & Associates Reporters, Inc.

```
 1              S T I P U L A T I O N
 2          It was stipulated and agreed by and between
 3     counsel for the respective parties, and the witness,
 4     that the reading and signing of the deposition by the
 5     witness not be waived.
 6          (Witness was duly sworn.)
 7          MR. STEVENS:  Do you want to run through the
 8       areas that she's speaking to or --
 9          MS. DALEY:  I was going to ask her.
10          MR. STEVEN:  Okay.  Perfect.  Go ahead.  I'm
11       sorry.
12                        AMY GEORGE,
13     having been produced and first duly sworn as a witness,
14     testified as follows:
15                   DIRECT EXAMINATION
16     BY MS. DALEY:
17       Q     Please state your full name.
18       A     Amy Jordan George.
19       Q     What is your date of birth?
20       A     1/19/69.
21       Q     What is your home address?
22       A     4315 Vicksburg Avenue.
23       Q     That's in Jacksonville?
24       A     Yes.
25       Q     Can you hear me?  Sound like something
```

```
 1   dropped?

 2            MR. STEVENS:  No, we're okay.

 3        Q    Okay.  What is your Social Security number?

 4        A    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.

 5        Q    Ms. George, have you been designated by

 6   Unisource Worldwide as its corporate representative

 7   with respect to the areas listed on the notice that I

 8   will refer to as exhibit number -- the notice that's a

 9   part of Exhibit Number 26?

10            MR. STEVENS:  It's in the book there.

11        A    Where?  I'm not certain where you're talking

12   about.

13        Q    Look under the tab number 26.  I think there

14   is two notices.  There's one notice of deposition.

15        A    Okay.

16        Q    And there's a second notice, plaintiff's

17   notice of taking deposition of corporate representative

18   and combined request to produce.

19        A    Okay.

20        Q    And were you one of the representatives chosen

21   with respect to plaintiff's notice of taking deposition

22   of corporate representative and combined request to

23   produce?

24        A    Yes.

25        Q    And for what areas were you designated?
```

Hedquist & Associates Reporters, Inc.

1    what else did you do?  Did you speak to anybody else?

2        A    No.

3            MS. DALEY:  Excuse me.  Can we go off the

4        record, please?

5            MR. STEVENS:  Sure.

6            (Off-the-record discussion.)

7    BY MS. DALEY:

8        Q    Ms. George is ready?

9        A    Yes.

10       Q    Now, can you tell me what type of benefits the

11   company provides to Ms. Ortega today?

12       A    Health insurance, dental insurance, vision,

13   life -- company paid life insurance, the opportunity to

14   purchase additional life insurance for herself, a

15   spouse or children, if applicable, long-term

16   disability, supplemental long-term disability, tuition

17   reimbursement, medical leave, company paid pension

18   plan, 401(k), vacations, holidays, and allowance for

19   her phone, workers' comp insurance, unemployment.

20       Q    Anything else?

21       A    Let me think for just a second.  Social

22   Security.  That's all I can think of.

23       Q    Do you definitely know whether or not there

24   are any other benefits that the company provides to Ms.

25   Ortega?

```
 1   costs to defendant of providing compensation and

 2   benefits to plaintiff from 1996 to present.

 3          Now, today are you prepared to answer that

 4   question completely?

 5      A    Yes.

 6      Q    Okay.  Well, tell me the rest of the benefits

 7   that were provided to Ms. Ortega today.

 8      A    I've given you the list of the benefits that I

 9   am aware of.

10      Q    And what's the total cost to the company today

11   of providing Ms. Ortega with all of those benefits?

12      A    It would be 23 percent of her salary.

13      Q    And how did you come up with that figure?

14      A    That's the figure we use for our fringe

15   benefits.

16      Q    When you say we, who is the we that you're

17   talking about?

18      A    The company.

19      Q    And where did you get that figure from?

20      A    Our previous payroll manager.

21      Q    Who is that?

22      A    Willie Beardsley.

23      Q    You spoke with him to get that figure from

24   him?

25      A    Yes, I did.
```

```
 1        A    Could you repeat the question?

 2        Q    Sure.  What was the cost to Unisource of

 3   providing Ms. Ortega with benefits in 1999?

 4        A    It would be that 23 percent of her salary.

 5        Q    So that 23 percent would apply for all years

 6   between 1996 and 2000?

 7        A    Yes.

 8        Q    And is this the information you also got from

 9   Mr. Beardsley?

10        A    Yes.

11        Q    And how much did Ms. Ortega get for a car

12   allowance -- I'm sorry, for phone allowance?

13        A    $20 per month.

14        Q    And how did the pension plan work?

15        A    The pension plan is based on a percentage.

16   1 percent of a salary.  It's a calculation and I'm not

17   certain what that calculation is.

18        Q    Who within the company would know that?

19        A    Probably Willie Beardsley might would know.

20        Q    And did he give you the 1 percent figure as

21   well?

22        A    No, I believe it's in our handbook.

23        Q    As soon as I get that I'll ask you to direct

24   me to where in the hand- -- do you have the handbook in

25   front of you to tell me where in the handbook you got
```

```
 1    the 1 percent from?

 2        A    I do not. I did not get it from the handbook

 3    but I do believe it's in the handbook.

 4        Q    But you -- okay. Let me ask it this way.

 5    Where did you get the 1 percent figure from?

 6        A    Just to my knowledge, since I'm an employee,

 7    it affects me as well.

 8        Q    Do you know if that 1 percent applied to each

 9    year from '96 to the present?

10        A    It's the same program for all years mentioned.

11        Q    And with respect to the 401(k) plan, did the

12    company make any contributions?

13        A    It's possible.

14        Q    Did you check anything to determine if the

15    company's making any contributions to the 401(k) plan

16    for Ms. Ortega between '96 and the present?

17        A    No.

18        Q    Who within the company would know?

19        A    I would assume our planned administrator would

20    know.

21        Q    Who is that?

22        A    Vanguard.

23        Q    I'm sorry?

24        A    Vanguard.

25        Q    Van- -- V-a-n-g-u-a-r-d?
```

Hedquist & Associates Reporters, Inc.

```
 1        A    Yes.

 2        Q    What's the first name?

 3        A    That's a company.  They administer our policy

 4   for us.

 5        Q    But is there anyone within Unisource who would

 6   know if Unisource is making any contributions to Ms.

 7   Ortega's pension plan?

 8        A    Not to my knowledge -- pension plan or 401(k).

 9        Q    To 401(k)?

10        A    Not to my knowledge. .

11        Q    And how does Ms. -- what type of compensation

12   does Mr. Ortega receive?

13        A    She's full commission.

14        Q    And are all of the commissions that she

15   receive reported on her W-2?

16        A    To my understanding

17        Q    And does the same apply with respect to the

18   other representatives in her division?

19        A    To my understanding.

20        Q    To your knowledge is there any type of bonus

21   plan or any type of incentive plan by which Ms. Ortega

22   and the other representatives may receive any salary or

23   salaried commission?

24        A    I'm not aware of any type of bonus program.

25   There may be some special programs by which if they
```

Hedquist & Associates Reporters, Inc.

1          CERTIFICATE OF REPORTER

2    STATE OF FLORIDA)

3    COUNTY OF DUVAL)

4          I, Richetta R. Brown, Court Reporter, certify

5    that I was authorized to and did stenographically

6    report the deposition of **AMY GEORGE**; that a review of

7    the transcript was requested; and that the transcript

8    is a true and complete record of my stenographic notes.

9

10         I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the parties,

12   nor am I a relative or employee of any of the parties'

13   attorney or counsel connected with the action, nor am I

14   financially interested in the action.

15

16         DATED this $9th$ day of January , 2001.

17

18

19                            Richetta R. Brown

20                            Richetta R. Brown

21

22

23

24

25

Hedquist & Associates Reporters, Inc.

**Deposition of William Ready taken on September 29, 2000**

| Page | Line |
|------|------|
| 3 | 23-24 |
| 4 | 5-9 |
| 5 | 14-21 |
| 8 | 18-25 |
| 9 | 1-5 (up to the word "position") |
| 9 | 18-22 |
| 11 | 1-5 |
| 12 | 6-18 |
| 14 | 9-25 |
| 15 | 1-10 |
| 24 | 24-25 |
| 25 | 1-6 |
| 28 | 3-11 |
| 29 | 2-8 |
| 45 | 4-7 |
| 46 | 13-25 |
| 47 | 1-12 |

1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA

2

3    BETTY ORTEGA,

4             Plaintiff,

5       vs.                      CASE NO.
                     00-6126-Civ-Dimitrouleas/Johnson

6

    UNISOURCE WORLDWIDE, INC.,
7    a foreign corporation,                COPY

8             Defendant.
    _____/

9

10

11                         Fort Lauderdale, Florida

12                         September 29th, 2000

13                         10:00 o'clock A.M.

14   APPEARANCES:

15
     AMLONG & AMLONG, P.A.
16   BY:  JENNIFER DALEY, ESQ.
     appearing on behalf of the Plaintiff.
17
     TROUTMAN, SANDERS, LLP
18   BY: ROBERT C. STEVENS, ESQ.
     appearing on behalf of the Defendant.
19

20              - - - - - - - - - - - -

21

22                      DEPOSITION

23                         OF

24                WILLIAM JOSEPH READY

25

                BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1    Deposition of WILLIAM JOSEPH READY, a witness of

2    lawful age, taken by the Plaintiff for the purpose of

3    discovery and for use as evidence in the above-entitled

4    cause, wherein BETTY ORTEGA is the Plaintiff and

5    UNISOURCE WORLDWIDE, INC., a foreign corporation, is

6    the Defendant, pending in the United States District

7    Court of the Southern District of Florida, in and for

8    Broward, Florida, pursuant to notice heretofore filed,

9    before ANDREA ROBINSON-WEST, Registered Professional

10   Reporter, and Notary Public in and for the State of

11   Florida at Large, at the Offices of Amlong & Amlong,

12   P.A., Fort Lauderdale, Florida, on the 21st day of

13   September, 2000, commencing at 10:00 o'clock A.M.

14                  - - - - - - - - - - - -

15   Thereupon:

16                  WILLIAM JOSEPH READY,

17     a witness named in the notice heretofore filed,

18     being of lawful age, and being first duly sworn

19     in the above cause, testified on his oath as

20     follows:

21                  DIRECT EXAMINATION

22   BY MS. DALEY:

23       Q.    Please state your full name.

24       A.    William Joseph Ready.

25       Q.    What is your date of birth?

```
 1              A.    11-28-1939.

 2         Q.    What is your home address?

 3         A.    1227 Southwest 87 Terrace, Plantation,

 4    Florida, 33324.

 5         Q.    You're working now as a sales

 6    representative for Unisource?

 7         A.    Yes, ma'am.

 8         Q.    And you were a manager before that?

 9         A.    Yes, ma'am.

10         Q.    And how did it come that you moved from

11    a manager position to a sales representative

12    position?

13         A.    It came quite suddenly when Tony Gispert

14    took an unexpected retirement.  I talked it over

15    with my wife and it didn't happen immediately.  It

16    was a couple weeks there involved, a week or so,

17    and I said back and forth with my wife over the

18    weekend, I said, "Do you mind me going back into

19    sales," and she said, "No, I don't," because I'm

20    in the twilight of my career.  I said, "I think I

21    might do that.  When I go in Monday, I'm going to

22    talk to John," and so that's what I did.  I talked

23    to John when I went in and said, "Would you mind

24    if I took that territory," and he said, "No, not

25    really."  You know, I sort of caught him by
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

1   surprise, I caught myself by surprise a little bit

2   too, but that's what I did.

3      Q.   Now just before you got the sales

4   representative position did any of your managers

5   raise any concern about your performance?

6      A.   No, ma'am.

7      Q.   During your entire career with Unisource

8   or any of it's predecessors have any of your

9   managers ever raised any concerns about your work

10  performance?

11     A.   No, ma'am.

12     Q.   And have you ever been disciplined?

13     A.   No, ma'am.

14     Q.   Now before you got the sales

15  representative position did anybody indicate to

16  you that your manager position would be

17  eliminated?

18     A.   No.

19     Q.   So the conversation that you had to

20  obtain the sales position was initiated by you?

21     A.   Yes, ma'am.

22     Q.   And when did you have that conversation

23  with Mr. Glaze?

24     A.   Tony came into my office, it was on

25  February the 17th, and said that the 26th would be

```
 1 |  whatever.
 2 |      Q.   Okay.  He said after - later in the day
 3 |  he came back to you and told you what?
 4 |      A.   He said he would definitely consider it.
 5 |      Q.   He said he will consider giving you the
 6 |  position?
 7 |      A.   Yes.
 8 |      Q.   And at that point did you have the
 9 |  position?
10 |      A.   I felt I had a good chance of getting it
11 |  as far as - I felt I had a good chance of getting
12 |  it, yes.
13 |      Q.   When were you informed that you actually
14 |  had the position?
15 |      A.   Within a day or so I knew it.
16 |      Q.   And who told you you had the position?
17 |      A.   Mr. Glaze.
18 |      Q.   Now before you were actually told that
19 |  you had the position did you have any other
20 |  conversations with Mr. Glaze about who would get
21 |  the position?
22 |      A.   We were looking for someone I know and I
23 |  had recommended two people to Mr. Glaze.  I
24 |  recommended a young lady named Sue Pullin, this
25 |  was the week prior I think it was or there abouts
```

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
 1   and I called her and asked her if she would have
 2   an interview with John for this territory.
 3            And I also talked to a young lady named
 4   Barbara Vega and asked if she would be interested
 5   in interviewing for the position and she told
 6   me -- I called her back the next day, she said she
 7   thought about it -- talking about Barbara -- and
 8   said that she really wouldn't be interested at
 9   this time.  She was doing very well for herself
10   and would rather not change and Ms. Pullin did
11   come over and interview with John.
12       Q.   Okay.  So you're saying that you had
13   this conversation with Mr. Glaze in which you
14   discussed Sue Pullin as a candidate and Ms. Vega
15   as a candidate?
16       A.   I did.  That was prior to me asking for
17   the job, naturally.
18       Q.   Okay.  So you're saying before you
19   actually told John Glaze you were interested in
20   the position you spoke to him about Ms. Pullin
21   getting the job and Ms. Vega getting the job?
22       A.   That's correct.
23       Q.   And did you speak with Mr. Glaze about
24   anybody else other than those two people getting
25   the job?
```

1         Q.    Now, when you were a manager just before

2    you got this sales position, what type of

3    compensation did you receive from Unisource?

4         A.    I was salaried with the possibilities of

5    a bonus if we made plan.

6         Q.    Now what was your salary before you got

7    the sales position?

8         A.    I don't know exactly.  It would be -- I

9    don't want to guess but it was a little over seven

10   thousand dollars a month.

11        Q.    And you mentioned the possibility of a

12   bonus.  What was the bonus based on?

13        A.    It was based on if the division made its

14   sales plan, my bonus was based on that sales and

15   profit.

16        Q.    Okay.

17        A.    As a division number.

18        Q.    What was the amount of the last bonus

19   that you received before you got the sales

20   position?

21        A.    I don't actually recall that.

22        Q.    And did you have any other benefits as a

23   manager before you got the sales position?

24        A.    I had expenses if I entertained a

25   customer or gas allowance.

```
 1        Q.   Anything else?
 2        A.   They paid for my telephone, cellular
 3   telephone.
 4        Q.   Anything else?
 5        A.   Not that I can recollect.
 6        Q.   And with respect to the sales position
 7   that you eventually accepted, what was your
 8   compensation for that position?
 9        A.   I was guaranteed my base salary.  That
10   was it.
11        Q.   And that was the base salary of seven
12   thousand dollars per month?
13        A.   Whatever.  That was seven thousand
14   something.
15        Q.   So you were guaranteed your base salary
16   regardless of what type of sales you generated
17   from the accounts you got from Tony Gispert?
18        A.   Yes.
19        Q.   And did the company honor that guarantee
20   that it gave to you with respect to your salary?
21        A.   Yes.
22        Q.   So you're being paid now a salary or a
23   percentage of the sales that you generate?
24        A.   If I fall short of my guarantee  they
25   would make that up.
```

```
 1   what we're all about, you know, and I don't look
 2   at it as a demotion by any stretch of the
 3   imagination.
 4         Q.   Do you supervise anybody today?
 5         A.   No, ma'am.
 6         Q.   Did you used to supervise people as a
 7   manager?
 8         A.   Yes, ma'am.
 9         Q.   What type of accounts did you get from
10   Tony Gispert?
11         A.   A couple stationers and the balance
12   would be printers, commercial type small printers,
13   a newspaper with a commercial shop, and a hotel
14   down in the Keys.
15         Q.   How many accounts did you get when you
16   became a salesperson that Tony Gispert used to
17   handle?
18         A.   I do not know the exact number.  A good
19   estimate would probably be between fifteen and
20   twenty.
21         Q.   And were they all export accounts?
22         A.   Are you saying of Tony's accounts?
23         Q.   Yes.
24         A.   With the exception of a couple small
25   accounts locally, and like I said, locally I'm
```

1    talking about there's a hotel in the Keys and an
2    outfit in Fort Lauderdale called Pompano --
3    actually, called Sultan and Son that buy
4    shipboards every - once a year, and that's a
5    telemarketing account now.  That was turned over
6    to telemarketing.  That's the only domestic
7    accounts that I got.
8         Q.   So with the exception of those, the rest
9    of them were export accounts?
10        A.   Yes, ma'am.
11        Q.   Before you accepted the position, the
12   sales position, how many years of experience did
13   you have personally handling export accounts?
14        A.   Handling export accounts?  Twelve to
15   fifteen years would be a good number.
16        Q.   And where did you gain those twelve to
17   fifteen years?
18        A.   When I worked for Jim Waldur which was
19   Butler Paper they immediately gave me the Bahamas
20   Paper Company which was a master distributor in
21   Nassau run by Mr. Harry Skates, and I handled that
22   for the duration of the time that I was at that
23   location.
24        Q.   And how many years was that?
25        A.   It was over ten years.

BRICKEL GOMBERG & ASSOCIATES    954-522-0057

1    account they're usually very large accounts.  They

2    use a lot of paper.  And for the most part, these

3    people, you know, they pretty much know exactly

4    what they're after.

5         I mean, they won't sit - for the most

6    part I don't think they'll sit, and just for lack

7    of a better term, shoot the bull with you.  You

8    must know what you're doing when you walk through

9    the door as any other professional.  You must know

10   what you're doing when you sit down with these

11   people because once they get on press it gets very

12   expensive to run those type presses.

13        Q.   So this is just something that you

14   gathered from your years of experience?

15        A.   It's been built a long time but I've

16   seen reps that take it upon themselves to study

17   it.  We don't have a written policy on it.

18   They'll get interested in it.  We've had a few

19   study it, watch it, redo the reading.  We have a

20   web book on supplies, where they're coming from,

21   different type papers.  We do publish that and you

22   know it's something that comes from within,

23   sometimes.

24        Q.   Now with respect to export accounts, to

25   your knowledge, does Unisource have any written

1    guidelines or policies requiring a sales

2    representative to have any special skills in order

3    to sell from that type of account?

4        A.    I don't know of any particular skill

5    that's required unless it would be in certain

6    countries, a language.

7        Q.    Now, the same with respect to the sheet

8    fed accounts, to your knowledge does Unisource

9    have any guidelines or any policies stating what

10    type of skills or knowledge a sales representative

11    needs to have in order to handle that type of

12    account?

13        A.    We have no written policy on what they

14    need for skills.  When we hire a salesman, they're

15    given tests, challenges, would they fit the

16    profile that we're looking for.  It doesn't

17    necessarily have to be in paper but are they

18    trainable.  This Chally test does yield a lot of

19    that in answers --

20        Q.    Now --

21        A.    -- as a guideline for hiring.

22        Q.    Are you saying that there are some

23    guidelines that the company follows with respect

24    to determining if a sales representative is

25    qualified to handle a sheet fed account?

1    the accounts that Unisource handles?

2        A.    I'm not aware of anything like that.

3        Q.    Have you ever supervised Betty Ortega?

4        A.    Yes, I have.

5        Q.    During what timeframe?

6        A.    I hired Betty in I think 1988, early

7    part of 1988, and then I was her supervisor until

8    we put the divisions together, late 1994 in that

9    area.  And then she was off and on under my

10   supervision and she is also supervised by John

11   Glaze.

12       Q.    So you started supervising her in 1988?

13       A.    That's correct.

14       Q.    And when did you stop?

15       A.    I supervised her up through the

16   divisions and then when we put the division

17   together, I supervised her probably for a year or

18   so after that, then we split the sales force up

19   and at that time she came under John Glazes'

20   wings.  John took on some sales responsibilities

21   so it would have been from '88 to -- I'm sorry,

22   '88, '96, '97, in that range.

23       Q.    And other than Ms. Ortega, did you also

24   supervise other sales representatives in the Miami

25   division between '88 and '97?

```
 1            A.    Yes, I did.

 2            Q.    During the timeframe that you supervised

 3      Ms. Ortega, was she qualified to handle sheet fed

 4      accounts?

 5            A.    Yes.

 6            Q.    Was she qualified to handle export

 7      accounts?

 8            A.    Yes.

 9            Q.    Was she qualified to handle all of the

10      web accounts that Unisource handled?

11            A.    No.   I don't think Ms. Ortega showed me

12      any interest at all that she wanted to work in the

13      web area.

14            Q.    My question was whether or not you felt

15      she was qualified to handle the web accounts that

16      the company has.

17                  MR. STEVENS:   I'm going to object as

18            asked and answered, but if you want to go

19            ahead, you can go ahead.

20                  MS. DALEY:   He needed to make his

21            objection.

22                  THE WITNESS:   Okay.

23      BY MS. DALEY:

24            Q.    Okay.   What I asked you is if you

25      believe that Ms. Ortega was qualified to handle
```

```
 1 │ need that.  And if it's accepted, then it's in
 2 │ black and white.  That's what you must do for next
 3 │ year.
 4 │     Q.    Now when you were a manager, did you
 5 │ make decisions concerning which accounts should be
 6 │ assigned to which representatives?
 7 │     A.    From time-to-time I did, yes.
 8 │     Q.    Now when you made the decision with
 9 │ respect to which accounts should be assigned to
10 │ which representatives, what criteria did you
11 │ follow in deciding how the accounts should be
12 │ assigned?
13 │     A.    Personally when I made the decision it
14 │ was very rare for me to switch an account only
15 │ because it takes a long time to build that
16 │ relationship and it was the last thing that I
17 │ wanted to do.
18 │         The account would almost have to be dead
19 │ on a salesman account list for me to switch it.
20 │ If they were doing business and the salesman said
21 │ I can get a break there and I could do better, I'd
22 │ let it go for another ninety days and we'd talk
23 │ about it but it was very rare that I would just
24 │ switch an account for whatever reason.  It's just
25 │ not my style.
```

center
BRICKEL GOMBERG & ASSOCIATES    954-522-006

```
 1          Q.    Okay.  But I want to know on the
 2    occasions when you did assign accounts to
 3    representatives whether or not it's actually an
 4    initial assignment versus a reassignment, did you
 5    follow any criteria or any guidelines?
 6          A.    The account would have to be dead in the
 7    water for me to do that.  In other words, if
 8    they're doing nothing with the account and it's
 9    just sitting on the salesman's account list and
10    we're not getting anything out of it.
11          Q.    Okay.  Let me try it this way.
12          A.    Okay.
13          Q.    On the occasions when you were assigning
14    accounts did you follow any criteria or were there
15    any factors that you took into consideration in
16    deciding who should get which accounts?
17          A.    There was no criteria.  Once in a while
18    I would look at geographical operational area.  If
19    it was way north, if it was way south, what other
20    accounts was it close to that another person might
21    be down the street from would call on an account.
22    I think I looked at some geographic things at
23    times.  If it was way far north, it would probably
24    go to one of the sales reps up there.  If it was
25    far south, it would go to someone in the south or
```

1    central, whatever.

2        Q.    So other than the geographic things that

3    you looked at, did you look at any other factors

4    or any other criteria in deciding which sales

5    representative should get which account that needs

6    to be assigned?

7        A.    No, no.

8        Q.    And as far as you know, did the company

9    have any written or unwritten guidelines for you

10   to follow in deciding which sales representatives

11   should get which account?

12       A.    Not that I know of.

13       Q.    When you were a manager, did you ever

14   place any of the sales representatives on any form

15   of probation or any form of corrective action?

16       A.    I might have done it once or twice but I

17   just don't remember when.

18       Q.    And do you remember the name of the

19   sales representatives?

20       A.    I don't even know if it was a sales

21   representative.  It might have been a sales

22   promotion representative that calls on ad agencies

23   or something.  I don't recall when or who I did it

24   to.  It is something very rare for me.

25       Q.    From the time that Ms. Ortega was hired

BRICKEL GOMBERG & ASSOCIATES    954-522-0067

```
1                              CERTIFICATE

2      STATE OF FLORIDA   )

3      COUNTY OF BROWARD )

4          I, ANDREA ROBINSON-WEST, R.P.R. and Notary

5      Public in and for the State of Florida at large

6      do hereby certify that WILLIAM JOSEPH READY

7      was by me first duly sworn to testify the whole

8      truth, and that the above deposition given by him was

9      recorded stenographically by me personally, and

10     reduced to typewriting under my direction.

11         I further certify that the said deposition was

12     commenced and completed at the time and place

13     herein set forth, and that the foregoing pages

14     numbered 1 through 99, inclusive, contain

15     a true and correct transcription of the testimony

16     of said witness.

17         I further certify that I am neither attorney

18     or party, nor am I related to or employed by any

19     attorney or party connected with the action, nor

20     am I financially interested in the action.

21         WITNESS MY HAND AND SEAL this 16th day of

22     November, 2000.

23                    _____
                      ANDREA ROBINSON-WEST, R.P.R.
24

25
```

**Deposition of William T. Bresnehan taken September 21, 2000**

| Page | Line |
|------|-------|
| 3 | 19-20 |
| 3 | 25 |
| 4 | 1 |
| 4 | 10-25 |
| 5 | 1-9 |
| 5 | 19-21 |
| 6 | 2-5 |
| 6 | 25 |
| 7 | 1-3 |
| 7 | 13-25 |
| 8 | 1-14 |

.

Bresnahan, John: Page 1 Line 1 to Page 1 Line 57

```
    1
    1
    2
    3               IN THE UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF FLORIDA
    4          Case No. 00-6126-Civ-Dimitrouleas/Johnson
    5     -----------------------------X
    BETTY ORTEGA,                   :
    6                               :
    Plaintiff,           :
    7                               :
    v.                              :
    8                               :
    UNISOURCE WORLDWIDE, INC.,      :
    9   a foreign corporation,      :
    :
    10              Defendant.       :
    -----------------------------X
    11
    12
    13
    14
    15
    16          TELEPHONIC DEPOSITION OF WILLIAM T. BRESNEHAN
    (Taken by the Plaintiff)
    17                 Charlotte, North Carolina
    September 21, 2000
    18
    19
    20
    21
    22
    23
    Reported by:   Dayna H. Lowe
    24                 Court Reporter
    Notary Public
    25
```

Bresnahan, John: Page 3 Line 19 to Page 3 Line 20

```
    19       Q.   Can you please state your full name.
    20       A.   William Thomas Bresnehan.
```

Bresnahan, John: Page 3 Line 25 to Page 4 Line 1

```
    25       Q.   And by whom are you presently employed?
    SPHERION DEPOSITION SERVICES
    (704) 333-9889
    4
    1       A.   Unisource Worldwide.
```

Bresnahan, John: Page 4 Line 10 to Page 5 Line 9

```
10        Q.   Can you tell me what your present position is
11   now with the company?
12        A.   Outside sales.
13        Q.   You're an outside sales representative?
14        A.   Correct.
15        Q.   What division are you working in now for the
16   company?
17        A.   The Charlotte division.
18        Q.   And is your territory in Charlotte as well?
19        A.   No, it is not.
20        Q.   What is your present territory?
21        A.   It encompasses Spartanburg, South Carolina,
22   Asheville, North Carolina, and eastern Tennessee, and in
23   addition some more western North Carolina, west of
24   Asheville.
25        Q.   Prior to working in the Charlotte division,
SPHERION DEPOSITION SERVICES
(704) 333-9889
5
1    what division did you work with?
2         A.   I worked with the Miami division.
3         Q.   And when did you start working in the Charlotte
4    division?
5         A.   October -- I think it was the 2nd or 3rd -- of
6    '99.  It was the first Monday in October.
7         Q.   What was the last territory that you had when
8    you worked in the Miami division?
9         A.   It was Broward and Palm Beach Counties.
```

Bresnahan, John: Page 5 Line 19 to Page 5 Line 21

```
19        Q.   Who was your last supervisor when you worked at
20   the Miami division?
21        A.   John Glaze.
```

Bresnahan, John: Page 6 Line 2 to Page 6 Line 5

```
2         Q.   Who was your supervisor, your direct
3    supervisor, before John Glaze?
4         A.   Well, actually my direct supervisor before John
5    Glaze was Bill Ready.
```

Bresnahan, John: Page 6 Line 25 to Page 7 Line 3

```
25        Q.   And have you ever handled any web accounts?
SPHERION DEPOSITION SERVICES
(704) 333-9889
7
1         A.   Yes.  I handled Avanti Press in Miami in 1979
2    through '82, and then Sirs for about -- since 1986, and
3    I'm presently selling two web accounts here in this area.
```

Bresnahan, John: Page 7 Line 13 to Page 8 Line 14

```
13        Q.    Any other web accounts that you handled while
14   you were employed by Unisource or one of its
15   predecessors?
16        A.    Yes.  Including where I am now?
17        Q.    Yes.
18        A.    Uh-huh.  Interstate Graphics -- and that's in
19   Johnson City, Tennessee -- and Altman Printing in
20   Spartanburg, South Carolina.
21        Q.    And you got Interstate Graphics and Altman
22   Printing since you moved to the Charlotte division?
23        A.    Yes, I did.
24        Q.    Now, how if at all do web accounts differ from
25   the other accounts that you handled in the Miami
SPHERION DEPOSITION SERVICES
(704) 333-9889
8
1    division?
2         A.    A web account runs rolls of paper.  A sheet-fed
3    accounts runs sheets of paper.
4         Q.    In your experience, do you have to do anything
5    different in selling web accounts than you do when you
6    were selling the other accounts that you handled in the
7    Miami division?
8         A.    Well, it's not really different.  It's all the
9    same principle.  You buy paper by the pound and you sell
10   it by the pound.  It's just whether you sell it in rolls
11   or sheets.  It's still sold by the pound.
12        Q.    Did the company provide you with any special
13   training for handling web accounts?
14        A.    No.
```

**Deposition of John Glaze taken on September 28, 2000**

| Page | Line |
|------|------|
| 3 | 7-8, 23-35 |
| 24 | 21-25 |
| 25 | 1-4 |
| 45 | 8-11 (beginning with the word "Did") |
| 58 | 15-16, 19-25 |
| 62 | 8-24 |
| 63 | 9-11 (beginning with the word "What") |

```
 1              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2

 3
                CASE NO. 00-6126-CIV-Dimitrouleas/Johnson
 4

 5
     BETTY ORTEGA,                        )
 6                                        )
                      PLAINTIFF,          )
 7                                        )
          v.                              )          ORIGINAL
 8                                        )
     UNISOURCE WORLDWIDE, INC., a         )
 9   foreign corporation,                 )
                                          )
10                   DEFENDANT.           )
                                          )
11   - - - - - - - - - - - - - - - - - - x

12
                          500 N.E. 4th Street
13                        Ft. Lauderdale, Florida
                          September 28, 2000
14                        2:30 p.m.

15

16                   DEPOSITION OF JOHN GLAZE

17

18

19           Taken before JACKIE JOHNSON, Professional

20   Reporter and Notary Public in and for the State of

21   Florida at Large, pursuant to Notice of Taking

22   Deposition filed in the above cause.

23                   - - - - - - -

24        BRICKELL, GOMBERG & ASSOCIATES (954) 522-0067

25  521 South Andrews Avenue, Suite One, Ft. Lauderdale  33330
```

1    Thereupon --

2                    JOHN GLAZE,

3    was called as a witness and, having been first duly

4    sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6  BY MS. DALEY:

7        Q.    Please state your full name.

8        A.    John Arthur Glaze.

9        Q.    What is your date of birth?

10       A.    9-9-63.

11       Q.    What is your home address?

12       A.    4122 Boston Court, Weston, Florida.

13       Q.    What is your --

14       A.    The zip?

15       Q.    -- zip?

16       A.    33331.

17       Q.    What is your Social Security number?

18       A.    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.

19       Q.    Have you ever been convicted of a crime?

20       A.    No, ma'am.

21       Q.    Ever arrested?

22       A.    No, ma'am.

23       Q.    I am going to hand you a book of exhibits

24   right now.  Can you turn to the one under Tab No. 11.

25   Under Tab Number 11 should be four pages tabbed EEOC

1      A.    Not that I can recall.

2      Q.    And do you directly supervise any sales

3   representatives?

4      A.    The only one that I directly supervise

5   today is Mario Pettineo, that I can recall, because

6   he does not have a sales manager at the moment.

7      Q.    Have you ever directly supervised any sales

8   representative?

9      A.    Yes, ma'am.

10     Q.    And which sales representatives have you

11  directly supervised from the Miami Division?

12     A.    Again, I will try to give you a list, but I

13  may omit some people because of inability to remember

14  them all.  John Huempfner, Betty Ortega.  We just

15  said Mario Pettineo.  Tony Gispert.  Actually, at one

16  point, I had all the sales reps on the printing side.

17  Bobby Vega, Bob Peterson, Bill Ready, Steve Sullivan,

18  Phil Hazan.

19     Q.    Anybody else that you can recall?

20     A.    There are more, but I am sorry.

21     Q.    What are your duties today, your job

22  duties?

23     A.    I have operational responsibility for the

24  division in South Florida, Miramar and Medley

25  distribution facilities.

```
 1      Q.    Any other job duties?

 2      A.    Yes, and I also have operational

 3   responsibilities, which includes sales and

 4   operations, for the state of Florida.

 5      Q.    Any other?

 6      A.    No, I think that just about covers it.

 7      Q.    Now, with respect to the sales

 8   representatives in the Miami Division, are sales

 9   goals set for the sales representatives?

10      A.    Yes, ma'am.

11      Q.    And who sets the sales goals?

12      A.    Their sales manager.

13      Q.    And do you have any input with respect to

14   the sales goals that are set for representatives?

15      A.    Yes, I have input.

16      Q.    And what type of input?

17      A.    Well, in some cases, guidelines are set

18   even above me, but my input is based on what I know

19   the sales reps' territory is capable of, and I share

20   my feelings with the sales manager.

21      Q.    Now, how often are the sales goals set for

22   the sales representatives?

23      A.    Annually.

24      Q.    And what type of input do you provide with

25   respect to the sales goal?
```

 1    mentioned ever documented in any type of written

 2    guidelines for you to follow?

 3        A.    Not that I'm aware of.

 4        Q.    Did anyone ever tell you what specific

 5    criteria you need to apply with respect to the

 6    assignment of accounts?

 7        A.    Could you repeat the question?

 8        Q.    Sure.    Did anyone at Unisource ever tell

 9    you that you had to follow any particular criteria in

10    assigning accounts to sales representatives?

11        A.    Not that I can recall.

12        Q.    So how did you come up with these criteria

13    that you just listed for assigning the accounts?

14        A.    General industry experience, my sales

15    manager, and me, basic common sense.

16        Q.    So these were basically subjective criteria

17    that you set?

18        A.    I am not going to respond to that.    I don't

19    think that's subjective.    I think they were

20    measurements of the person's capabilities versus the

21    opportunities.

22        Q.    But these were measurements that you

23    personally set, and no one at the company told you to

24    set?

25        A.    I suppose that you if you look at it that

```
 1      Q.    Do you recall how many such discussions you
 2   had with Miss Holmes about the leads that she had
 3   referred to Miss Ortega?
 4      A.    A specific number, no, ma'am.
 5      Q.    No, with respect to the telephone calls and
 6   the Fed-Ex costs that the company paid for Miss
 7   Ortega, was this a practice that the company did with
 8   respect to other sales representatives, as well?
 9      A.    Did we do it with other representatives,
10   yes, ma'am.
11      Q.    And have you traveled with any other
12   representative in order to develop his or her sales
13   on accounts?
14      A.    Yes, ma'am.
15      Q.    Did you ever have a conversation with Bill
16   Ready about an open sales representative position?
17      A.    About which?
18      Q.    An open sales representative position?
19      A.    Yes, ma'am.
20      Q.    And when did you have that conversation?
21      A.    I can't recall specifically.
22      Q.    Do you recall if it was within the last two
23   years?
24      A.    We had a discussion about Tony Gispert's
25   open territory sometime March of last year.
```

1    A.    No, ma'am, not that I can recall.

2    Q.    Did you discuss with Mr. McClary what type

3    of qualifications were needed for the position?

4    A.    I can't recall.

5    Q.    Did you discuss with your boss the type of

6    qualifications that were necessary for the position?

7    A.    I am sorry. I can't recall.

8    Q.    And what criteria, if any, did you consider

9    in selecting Mr. Ready for the position?

10    A.    We were under a pretty strict directive to

11    reduce costs. In fact, we had been given a head

12    count reduction number of $150,000 in head count. So

13    by Mr. Ready's interest in this position, I was able

14    to move him, because he had the background and the

15    experience, into this job, and have his salary count

16    towards my head count reduction goal and save another

17    employee, Faith Fray, who still works with us.

18    Q.    Any other criteria that you considered in

19    selecting Mr. Ready for the position?

20    A.    That he had paper knowledge and he had

21    knowledge of the accounts and he had knowledge of

22    export.

23    Q.    Anything else?

24    A.    Not that I can recall.

25    Q.    Now, what position did Mr. Ready hold

1    before he was selected for the position that you

2    selected him for?

3        A.    Can you be more specific? I just want to

4    make sure that we're --

5        Q.    Sure.  We're talking about the position

6    that you said you made the decision to select

7    Mr. Ready for?

8        A.    The sales position?

9        Q.    Correct.  What position did Mr. Ready hold

10   before the sales position?

11       A.    He was sales manager.

12       Q.    And what type of compensation did Mr. Ready

13   receive as a sales manager, before he was selected

14   for this sales representative position?

15       A.    Are you asking for his specific salary?

16       Q.    I am asking for your knowledge as to what

17   type of compensation Mr. Ready received as a manager,

18   before he was selected for a sales representative

19   position?

20       A.    He was salaried, plus bonus.

21       Q.    And do you know what his salary was?

22       A.    I can't recall.

23       Q.    Did he get any other benefits from the

24   company, as far as you know?

25       A.    His expenses, his business expenses were

```
 1                    CERTIFICATE

 2    STATE OF  FLORIDA:
                        : SS.
 3    COUNTY OF BROWARD:

 4

 5
                I, JACKIE JOHNSON, being a Professional
 6    Court Reporter and Notary Public for the State of
      Florida at Large, do hereby certify that I was
 7    authorized to and did stenographically report the
      foregoing deposition and that the transcript is a
 8    true record of the testimony given by the witness.
                I further certify that I am not a relative,
 9    employee, attorney or counsel of any of the parties,
      nor am I a relative or employee of any of the
10    parties' attorney or counsel connected with the
      action, nor am I financially interested in the
11    action.
                Under penalties of perjury, I declare that
12    I have read the foregoing document and that the facts
      stated in it are true.
13              The foregoing certification of this
      transcript does not apply to any reproduction of the
14    same by any means unless under the direct control
      and/or direction of the certifying reporter.
15              WITNESS my hand and official seal in the
      City of Ft. Lauderdale, County of Broward, State of
16    Florida, this 20th day of November, 2000.

17

18              _____
                JACKIE JOHNSON, NOTARY
19              PUBLIC AT LARGE.
                MY COMMISSION EXPIRES:
20              MAY 20, 2003

21

22                         Jackie Johnson
                           My Commission CC836278
23                         Expires May 18, 2003

24

25
```

**Deposition (continued) of John Glaze as Rule 30(b)6 Representative
taken on October 30, 2000**

| Page | Line |
|------|------|
| 46 | 1-3, 15-18 |
| 47 | 1-10 |
| 48 | 5-14 |
| 57 | 21-25 |
| 58 | 1, 23-25 |
| 59 | 5-21 |
| 60 | 25 |
| 61 | 1-6 |
| 79 | 24-25 (beginning with the word "what") |
| 80 | 1-25 |
| 81 | 1-23 |



IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No:00-6126-Civ-Dimitrouleas/Johnson

BETTY ORTEGA,                      )
                                   )
                Plaintiff,         )
                                   )
vs.                                )
                                   )
UNISOURCE WORLDWIDE, INC., a       )
foreign corporation,               )
                                   )
                Defendant.         )
_____  )

**ORIGINAL**

CONTINUATION

OF THE

DEPOSITION

OF

JOHN GLAZE

Amlong & Amlong, P.A.
500 Northeast 4th Street
Second Floor
Fort Lauderdale, Florida
October 30, 2000
1:48 p.m. - 5:08 p.m.

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1     who made the decision to reassign Tony Ginsberg's

2     accounts?

3         A.    It was my decision.

4         Q.    And did you make that decision in conjunction

5     with anyone?

6         A.    In conjunction? No, I ran that by my boss

7     and my human resource manager.

8         Q.    And who were those people?

9         A.    Chris Alecson (phonetic) and Cecil McClary.

10        Q.    And when was that decision made?

11        A.    Ma'am, I don't have the exact date with me

12     today. I know I testified to that in my personal

13     testimony, but I'm afraid I don't have the date with me

14     now.

15        Q.    And to whom were the accounts that

16     Mr. Gisbert used to handle transferred?

17        A.    The bulk of which -- the bulk of the accounts

18     were assigned to Bill Ready.

19        Q.    And who got the rest of them?

20        A.    Some went into a SOC, small order customer,

21     which are accounts that we, basically, designate as

22     unprofitable accounts, and they have minimal orders and

23     we don't put salespeople in them at all. And a couple

24     of accounts we gave to telemarketing inside sales. And

25     one account -- looks like one account at least we gave

```
 1    to Betty.
 2          Q.    What type of accounts did Mr. Gisbert
 3    handle?
 4          A.    Primarily English speaking Caribbean export
 5    accounts.  He had a few accounts in the Keys.  He had a
 6    few accounts -- couple of accounts in the Dutch Islands.
 7    That's the best of my -- the best of my knowledge.
 8          Q.    And which one was assigned to Ms. Ortega?
 9          A.    Editorial America SA, which I think was the
10    only Miami based account, but I'm not positive.
11          Q.    Where were the rest of them based?
12          A.    Really?  Acme Printers was in the Bahamas.
13    Freeport is Bahamas.  Nassau Guardians in Bahamas.
14    Executive Print is in Bahamas.  Wong's is in Bahamas.
15    John Bull Off is in Bahamas.  Island Images Advertising,
16    I'm not positive which island it was from.  Nassau
17    Guardian was in the Bahamas.  Caribbean Printing, I'm
18    not positive.  The Printshop and Vad NV were from a
19    Dutch island, but I'm not positive which one.  There are
20    some smaller accounts here that I don't know which
21    islands are from.
22          Q.    You're saying here are you referring to some
23    particular document?
24          A.    Yes.
25          Q.    What document are you referring to?
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1              A.    Customer list of sales and gross profit, the
 2        MI3050 we talked about from Tony Gisbert, the month
 3        before -- actually, was like the month before he gave
 4        notice, period four, January 31st of '99, so it's...
 5              Q.    Which of Mr. Gisbert's accounts were assigned
 6        to Mr. Ready?
 7              A.    Acme Printers, Freeport Advertising, Nassau
 8        Guardian, Executive Printer of Bahamas, Wong's, John
 9        Bull, Island Images, Nassau Guardian, Caribbean
10        Printing, the Printshop, Vad NV, Express Press, Printing
11        & Office Supply, the Draughting Shaft, Raul Fiorito,
12        F-I-O-R-I-T-O, the Mapco Business Printers, Sands of the
13        Keys, Elmendorf Colors, Office Stop, Bahamas Office
14        Supply.
15                    MS. DALEY:  Can you mark that question
16              for me please?
17                    (Thereupon, a recess was taken.)
18                    MR. ENJAMIO:  We're now producing to you
19              what will be or has been Bate stamped DEF03786
20              through DEF03812, and those are the sales
21              representative commitments for fiscal years
22              1997, 1998, 1999 and 2000.  Again, it's with
23              the W-2's that we produced last week as well as
24              with the documents that we produced in
25              connection with this 30(b)(6) depo, they're
```

1        Q.    Such as?

2        A.    We would require that he have good

3    organizational skills, that -- I don't have the list in

4    front of me, but good communication skills, you know,

5    those things that I stated in my earlier testimony.

6        Q.    Now, you say the person needed to know the

7    laws there.  Where are you talking about?

8        A.    In the -- in the markets that you trade, and

9    you can't know all the laws I understand, but around

10   export, if you -- if you go to the Bahamas and you give

11   someone -- you start selling a printer, a particular

12   product line and you indicate to them that they have an

13   exclusive, that you won't sell that product line to

14   anyone else, then you may have just verbally entered

15   yourself into a life long agreement that if you ever

16   decide to give anyone else distribution rights to you to

17   pay that first business all these fines and, you know,

18   royalties, so there's laws around doing business in

19   these countries that you have to have some basic

20   understanding of before you go and start making deals.

21       Q.    Did Ms. Ortega possess all of the

22   qualifications for handling the accounts that

23   Mr. Gisbert left when he left the company?

24       A.    I would say generally she did, yeah.  She

25   didn't have as much working knowledge of the Bahamas

1       specifically, but yes.

2           Q.    Why was only one of the accounts assigned to

3       Ms. Ortega?

4           A.    As I said in my earlier testimony, the

5       decision to assign the accounts for Mr. Gisbert to

6       Mr. Ready was based on the need to meet head count

7       reduction goals and the fact that he had come to me and

8       asked for an opportunity in outside sales, asked to

9       be -- to have this territory, so -- and he was

10      completely qualified as well.  Had more years of paper

11      knowledge than Ms. Ortega or CeCe or anyone else almost.

12      He had plenty of paper knowledge.

13                I was able to count his income towards our

14      headcount reduction goals, and so I assigned those

15      accounts to Mr. Ready.  Ms. Ortega got -- there were a

16      few accounts that didn't fit for whatever reason, a few

17      that were I thought too small to worry about that went

18      to CeCe or SOC, and an account that I thought was

19      Spanish speaking that might, you know -- Mr. Ready

20      didn't have -- doesn't speak Spanish, I thought might

21      fit Ms. Ortega.  Everything, though, I meant to give the

22      whole territory that made sense to Mr. Ready.

23          Q.    Now, was Mr. Ready an employee of the company

24      before he got Mr. Gisbert's account?

25          A.    Yes.

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1              Q.    What documents are you referring to?

 2              A.    It was a memo from human resources or Paul

 3       Stewart that, basically, spelled out the requirements.

 4       I sent a memo to Paul Stewart answering my original

 5       plan.

 6              Q.    When we take a break, I'll find that memo.

 7                    So you sent a memo to Paul Stewart about this

 8       headcount reduction goal?

 9              A.    Uh-huh.

10              Q.    And how is Mr. Stewart's last name spelled?

11              A.    S-T-E-W-A-R-T.

12              Q.    And when Mr. Ready got Mr. Gisbert's

13       accounts, how if any -- what, if any, dollars did the

14       company save by giving the accounts to Mr. Ready?

15              A.    We did not replace Mr. Ready's job.

16              Q.    I'm sorry, let me rephrase this.

17                    When the accounts were given from Mr. Gisbert

18       to Mr. Ready, what, if any, money did the company save

19       in expenses?

20              A.    Mr. Ready's salary as a sales manager.  We

21       continued to pay the commissions on the accounts.  In

22       the past we would have paid them to Mr. Gisbert.  In the

23       future we paid them to Mr. Ready, only now we didn't

24       continue to pay a sales manager also.

25              Q.    Now, did Mr. Ready keep the same salary after
```

BRICKELL, GOMBERG & ASSOCIATES, INC.   '954' 522-0067

```
 1      he received the accounts from Mr. Gisbert?

 2           A.    We paid him all commissions, straight

 3      commissions almost from day one.  I think it was from

 4      day one.  We gave him a two-year guarantee that we

 5      wouldn't allow him to make less money than he had made

 6      before.

 7           Q.    And was that guarantee ever reduced to

 8      writing?

 9           A.    There is an offer letter in his human

10      resources file in Jacksonville that would have that

11      offer.

12           Q.    And what was the two-year time frame?

13           A.    I don't -- from the date of this move

14      approximately March, April of 1999 until approximately

15      March, April of 2001.

16           Q.    Now, who made the decision to reassign Gene

17      Press's account when he left the company?

18           A.    Gene Press left prior to my arriving and Gene

19      Press was replaced by Bob Mckey, so Bob Mckey and Bill

20      Ready would have been responsible for reassigning those

21      accounts.  Ultimately, I got involved and assigned some

22      accounts to -- or asked Bill Ready to assign some

23      accounts to Betty Ortega, but it was much later.

24           Q.    To whom were Gene Press's accounts reassigned

25      after he left?
```

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

```
 1            Q.    On that list.

 2            A.    KER Printing, Colonial primarily.

 3            Q.    Any others?

 4            A.    There were a few other web ones here, but I

 5       think they were uncoded web.

 6            Q.    So KER and Colonial are heat set web

 7       accounts?

 8            A.    Yes, ma'am.

 9            Q.    Do you know if Colonial was an account that

10       Ms. Ortega handled when she was with Butler Paper?

11            A.    I wouldn't have that knowledge, no, ma'am.

12       If she had had it and done something with it and

13       exceeded -- or succeeded with Colonial Press, she

14       probably would still have it.

15            Q.    But I'm trying to determine if you know if

16       Colonial was an account that Ms. Ortega had at Butler

17       Paper?

18                  MR. ENJAMIO:   Asked and answered.

19                  THE WITNESS:   That's right, I answered

20            the question.

21       BY MS. DALEY:

22            Q.    And so you don't know?

23            A.    That's correct.

24            Q.    And what criteria was used for reassigning

25       the accounts that Mr. Laux handled just before he left
```

BRICKELL, GOMBERG & ASSOCIATES, INC.   (954) 522-0067

1    the company?

2       A.  A lot of the larger accounts were given to

3    Jim Ware.  I wanted someone that had experience working

4    with larger accounts, someone that could dedicate a lot

5    of their time.  I wanted -- I tried not to spread the

6    existing accounts around -- the bigger accounts around

7    to existing salespeople too much because I wanted the

8    territory to be really dedicated to.  It took me a

9    couple months to get someone hired, and I wanted someone

10   that could be focussed on those accounts, to bring those

11   accounts back.

12      As I say, the bigger accounts I gave to Jim

13   Ware who had big account experience and could dedicate

14   and focus his time and energy.  There was Sepson Eggs

15   was an export account that I gave to Betty Ortega.

16   Actually, it was in Puerto Rico, but for practical

17   purposes involves ocean shipping and so that was given

18   to Betty Ortega.  A lot of these went to house because

19   they were legal, you know, they were credit problems.

20   That was generally the criteria.

21      Q.  When you say larger accounts, does larger

22   refer to the income that's generated by the account?

23      A.  It refers to the -- I think I explained this

24   in my testimony the other day.  It generally refers to

25   accounts that are larger press format, can buy in full

BRICKELL, GOMBERG & ASSOCIATES, INC.  (954) 522-0067

1    truckload quantities and yes, would relate to a greater

2    sales opportunity.

3         Q.   Now, had Ms. Ortega handled any of those type

4    accounts before you assigned these accounts for Mr. Laux

5    to Mr. Ware?

6         A.   Large accounts?

7         Q.   The larger accounts that you're referring to.

8         A.   Specifically these accounts or larger

9    accounts in general as I've described them?

10        Q.   You just told me what larger accounts are.  I

11   want to know if prior to assigning the accounts -- the

12   larger accounts that Mr. Laux used to handle to

13   Mr. Ware, if Ms. Ortega had handled similar larger

14   accounts before that time frame?

15        A.   I don't -- wasn't aware of any web -- heat

16   set web -- large heat set web accounts that she had

17   managed, but she had managed some large commercial

18   printers before, yes.

19        Q.   And how many years of experience did Mr. Ware

20   have in handling the larger accounts that were assigned

21   to him?

22        A.   Him, I don't know specifically how many

23   years.

24        Q.   Does -- I'm moving now to area 16.

25             Between 1996 and the present, did Unisource

**Deposition of Robert Peterson Taken September 28, 2000**

| Page | Line |
|------|-------|
| 3 | 7-8 |
| 3 | 24-25 |
| 4 | 1-5 |
| 4 | 10-11 |
| 4 | 15-17 |
| 4 | 21-25 |
| 5 | 17-25 |
| 6 | 1-4 |
| 6 | 21-22 |
| 7 | 3-5 |
| 8 | 4-25 |
| 9 | 1-8 |

Peterson, Robert: Page 1 Line 1

```
    1                 IN THE UNIETD STATES DISTRICT COURT
    SOUTHERN DISTRICT OF FLORIDA
    2
    3
    CASE NO. 00-6126-Civ-Dimitrouleas/Johnson
    4
    5
    BETTY ORTEGA,                          )
    6                                              )
    PLAINTIFF,           )
    7                                              )
    v.                               )
    8                                              )
    UNISOURCE WORLDWIDE, INC., a       )
    9   foreign corporation,             )
    )
    10                      DEFENDANT.         )
    )
    11   - - - - - - - - - - - - - - - - - - x
    12
    500 N.E. 4th Street
    13                      Ft. Lauderdale, Florida
    September 28, 2000
    14                      1:15 p.m.
    15
    16              DEPOSITION OF ROBERT PETERSON
    17
    18
    19              Taken before JACKIE JOHNSON, Professional
    20    Reporter and Notary Public in and for the State of
    21    Florida at Large, pursuant to Notice of Taking
    22    Deposition filed in the above cause.
    23                      - - - - - - -
    24       BRICKELL, GOMBERG & ASSOCIATES (954) 522-0067
    25 521 South Andrews Avenue, Suite One, Ft. Lauderdale  33301
    Page 1
```

Peterson, Robert: Page 3 Line 7 to Page 3 Line 8

```
    7       Q.     Please state your full name.
    8       A.     Robert William Peterson.
```

Peterson, Robert: Page 3 Line 24 to Page 3 Line 25

```
    24       Q.     And who are you employed by today?
    25       A.     Unisource.
```

Peterson, Robert: Page 4 Line 1 to Page 4 Line 5

```
    1       Q.     And when did you start with Unisource?
    2       A.     Unisource, itself?
    3       Q.     Or any of its predecessors?
```

```
    4      A.    I think about 1968, '67, Jacksonville Paper
    5   Company.
```

Peterson, Robert: Page 4 Line 10 to Page 4 Line 11

```
   10      Q.    What is your present job?
   11      A.    Salesman.
```

Peterson, Robert: Page 4 Line 15 to Page 4 Line 17

```
   15      Q.    And out of what division do you work today?
   16      A.    Miami Printing, Hollywood Printing, I
   17   guess.
```

Peterson, Robert: Page 4 Line 21 to Page 4 Line 25

```
   21      Q.    Who is your current supervisor?
   22      A.    Lou Kaminow would be directly over me.  I
   23   guess. I don't know.
   24      Q.    Who was your supervisor before Mr. Kaminow?
   25      A.    John Glaze.
```

Peterson, Robert: Page 5 Line 17 to Page 6 Line 4

```
   17      Q.    What type of accounts do you handle for
   18   Unisource today?
   19      A.    Basically, printing.
   20      Q.    Have you ever handled what's called a web
   21   account?
   22      A.    Yes, I have.
   23      Q.    Do you handle any of them today?
   24      A.    Yes, I do.
   25      Q.    Now, are there any other types of accounts
   Page 5
    1   that you handle, other than web accounts?
    2      A.    Quick printers, implant print shops, School
    3   Board, new paper commercial, I guess what you call
    4   color sheet fed, color printers.
```

Peterson, Robert: Page 6 Line 21 to Page 6 Line 22

```
   21      Q.    Which web accounts do you handle today?
   22      A.    I have a customer called Tiger Tail.
```

Peterson, Robert: Page 7 Line 3 to Page 7 Line 5

```
    3      Q.    Any others?
    4      A.    Stuart News.  They use web paper, you know.
```

5    It's not a big thing.

Peterson, Robert: Page 8 Line 4 to Page 9 Line 8

4        Q.    Do you recall the year when you first
5    started to handle any type of web account?
6        A.    It would have to be over 25 years ago, Palm
7    Beach Newspaper, 20, 25 years ago.
8        Q.    Now, how, if at all, do web accounts differ
9    from other types of accounts that you handle?
10       A.    Mostly, direct business.  No, well, sales.
11       Q.    What does that mean?
12       A.    The paper comes from the paper mill,
13   generally, full truckloads of paper direct to the web
14   account, where other types of sales generally are
15   sales that we deliver from our warehouse and our
16   truck.
17       Q.    Any other way, that you're aware of, that
18   web accounts differ from the other types of accounts
19   that you handle?
20       A.    That's basically it, that I know of.
21       Q.    Now, with respect to the web accounts that
22   you handle, do you approach servicing those accounts
23   differently from the way you approach servicing the
24   other accounts that you handle?
25       A.    Certainly.
Page 8
1        Q.    How?
2        A.    They, generally, buy one item.  They don't
3    have a variety of products, the type of paper you
4    sell.
5        Q.    But do you do anything differently with
6    respect to servicing those accounts, as opposed to
7    the other types of accounts that you service?
8        A.    Not that I can think of.